UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JENNIFER VIRDEN, | § | |
| Plaintiff, | § | |
| | § | |
| | § | Civil Case No. 21-CV-271 |
| v. | § | |
| | § | DECLARATORY AND INJUNCTIVE |
| CITY OF AUSTIN, TEXAS, | § | RELIEF SOUGHT |
| Defendant. | § | |

## PLAINTIFF'S VERIFIED COMPLAINT[1]

Plaintiff JENNIFER VIRDEN complains as follows:

## Preliminary Statement

1.      This is a civil action for declaratory and injunctive relief arising under the First and Fourteenth Amendments to the Constitution of the United States. This suit concerns the constitutionality of the City of Austin's categorical ban on one fundamental aspect of political association—pooling resources for campaign speech—more than one year before election day.

2.      Unlike the Texas Legislature, the Austin City Council meets year-round. This means that, in general, there are no temporal limitations on the Council's ability to propose and adopt new initiatives and programs, regulate the activity of businesses and individuals, and appropriate (or mis-appropriate) taxpayer funds.  The incumbent mayor and councilmembers are free, year-round, to promote their agenda and propagate their messages by virtue of their official positions, aided by taxpayer-funded staff, and including by means of the free media coverage that comes with incumbency.

---

[1] The verification for Plaintiff is attached to this Complaint.

3.     While City officeholders act year-round, potential challengers and their supporters are prohibited from pooling resources to fund competing messages and campaigns regarding the City's future, except for the last year before an election.  The City's Code of Ordinances provides that a candidate may only raise funds for an election during an authorized campaign period, and the period for a general election begins "the 365th day before the date of the general election." Code §§ 2-2-7(B), (G).  This provision will be referred to herein as the "new blackout period."  It is "new" in that the City adopted it after the federal courts enjoined the City from enforcing the original blackout period in article III, section 8 of the Charter—which limited fundraising to the last six months before election day—because it violates the First Amendment. Extending the fundraising window from six months to a year does not avoid the constitutional infirmity in the City's arbitrary line-drawing.

4.     The effect of the new blackout period is that, for three out of four years of an incumbent mayor or councilmember's term of office, the competing speech of challengers is silenced.  Yet this law fails to advance the only legitimate governmental interest relevant in this area – the prevention of *quid pro quo* corruption or its appearance.  *See McCutcheon v. FEC*, 134 S. Ct. 1434, 1441-42 (2014).  Even if the blackout were aimed at a legitimate governmental interest, it is not appropriately tailored to avoid the unnecessary abridgment of associational freedom.  It is unconstitutional under the First and Fourteenth Amendments, and relief is required to correct these abridgements.

## **Jurisdiction and Venue**

5.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343.  This civil action arises under the First and Fourteenth Amendments of the United

States Constitution and 42 U.S.C. § 1983.  Plaintiff seeks a declaration of her rights pursuant to the Declaratory Judgments Act, 28 U.S.C. §§ 2201-02.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant City of Austin is located in this district, and the Defendant's official duties are performed in this district.  Additionally, a substantial part of the events giving rise to this claim occurred in this district.

## Parties

7.      Plaintiff Jennifer Virden resides in Austin City Council District 10, and she ran to represent the District on the Council in 2020.  In the November general election, she received more than 11,000 votes, finishing in the top two of seven candidates and forcing a runoff with the incumbent.  In the December 15, 2020 runoff, Virden narrowly lost by approximately 51%-49%.  Virden will run for City of Austin office in the general election to be held in November 2022.

8.      Defendant City of Austin, Texas ("the City") is a home-rule municipality in Travis County, Texas with the capacity to sue and be sued.  Its main address is 301 West Second Street, Austin, Texas 78701.  The City is a subdivision of the State of Texas.  The City and its officials are responsible for creating, adopting, and enforcing the rules, regulations, ordinances, laws, policies, practices, procedures, and/or customs for the City.

## Statement of Facts

### Virden will run for City office in 2022, but is barred from accepting campaign contributions until November 2021

9.      Plaintiff Virden will run for City office in the November 2022 general election.  She desires to raise funds immediately for two purposes: (a) to produce and distribute public communications that will simultaneously inform voters on city issues

Verified Complaint

and solicit support for Virden's campaign, and (b) to build her campaign account for use in the November 2022 elections.

10.    Virden will run for City office in the November 2022 elections.  She will either run for mayor or to represent her council district, if her district is on the 2022 ballot.  The particular council district in which Virden resides, and whether such district will appear on the November 2022 ballot, will not be known until the redistricting plan is finalized in November 2021, as discussed below.

11.    Regardless of whether Virden runs for mayor or for city council, she desires to solicit and accept campaign contributions now.

12.    The new blackout period prohibits her from soliciting or accepting campaign contributions now.

13.    The new blackout period provides that "[a] candidate may only raise funds for an election during an authorized campaign period," and defines "campaign period" separately with respect to general, runoff, and special elections.  Code §§ 2-2-7(B), (C), (D), (G).

14.    The elections for mayor and any council district on the ballot in November 2022 are "general elections," because they are elections that regularly recur at fixed dates but are not primary elections.  *See* Tex. Elec. Code § 1.005(6) (defining "general election").

15.    Therefore, the new blackout period means that neither Virden nor any other candidate for any Austin office on the November 8, 2022 ballot may "raise funds" for the election until 365 days before election day – November 8, 2021.  Code § 2-2-7(B).

16.    This new blackout period effectively silences organized campaign efforts to fund messages opposed to, or different than, the messages promoted by Austin incumbents and media outlets.

17.     But for the new blackout, Virden would have already been soliciting and accepting campaign contributions from persons who share her views on City policies and depositing them into her campaign account.

18.     Numerous individuals would have already contributed to her campaign but for the new blackout period.

19.     Virden would use such funds partly to prepare and distribute communications discussing political issues in a timely manner as they are impending, as they are happening, and/or as they are being discussed and contemplated by Austin City Council, Austin voters, and in Austin media.

20.     For example, Virden strongly opposes the continuing decisions of the Austin Mayor and incumbent Council majority to exacerbate the exploding vagrancy problem and to recklessly endanger public safety by undermining the Police Department.  Virden believes that these policies help no one.  In fact, they make Austin residents less safe and have devastating effects on economic activity in the City.  Virden desires to affect messaging to the voting public in response to what she believes to be the biased and partisan propaganda spread by the majority of the current Council and Mayor.

21.     Virden has similarly strong views on many city issues, including taxes, regulation, and spending.

22.     Additionally, Virden holds strong positions regarding several of the propositions up for public vote on the May 1, 2021 ballot.  She would like to campaign for some of these propositions, and against others, as a candidate.  She believes it is important—to her campaign and to the benefit of Austin voters—that she be able to communicate widely via paid media, mailers, etc., her views on issues as they happen in Austin.  It is not sufficient for her to sit and wait seven months to speak, and hope in seven

months to remind Austin voters of the destructive decisions that Austin officeholders are making right now and how issues happening right now should have been handled differently.

23.     But for the new blackout period, Virden would have already been raising funds from like-minded persons to pay for the preparation and distribution of advertisements by paid media, including by radio broadcast, direct mail, and other means, regarding these issues and any other issues that may arise.

24.     In soliciting contributions, Virden would explain her views regarding contemporaneous City actions, policies, or issues, and explain that contributions will help fund her messages on these issues and further her campaign for City office in 2022.

25.     Virden also hopes that her speaking out in such manner—and in a timely fashion, as things are happening—may also encourage other rational people in the Austin community to stand up against their irrational and dangerous incumbent officeholders.

26.     Virden wants to fund paid communications with Austin voters by radio, direct mail, text messaging, email, and any other effective means available.

27.     Virden believes that a robust and timely messaging campaign will not only better inform those already likely to vote in city elections, but will reach additional persons and encourage their participation in city elections, and perhaps broaden the electorate.  But targeted and timely communication is key.

28.     Virden does not have vast personal financial resources with which to self-fund her campaign.

29.     However, as her 2020 campaign reflects, she was able to strike a chord with many Austin residents and voters, who contributed to her campaign and voted for her.  In her 2020 campaign, Virden raised over $95,000 from individual contributors before the

general election, and over $124,000 for the December runoff election. She received more than 11,000 votes in her single-member district election – far more than the typical performance in a single-member district since Austin adopted the 10-1 system in 2014.

30.    As the election returns from 2020 reflect, Virden won the support of many Austinites, and she believes it is important to continue communicating with Austin voters as things happen in Austin politics to provide diversity of thought regarding City issues and build political support for her 2022 campaign.

31.    Limitations on her ability to fundraise necessarily prevent her from spending money to communicate with Austin voters, because she cannot spend money that she has not yet raised.

32.    As of the filing of this lawsuit, Virden has less than $3,800 remaining in her campaign account.

33.    Virden wants to spend much more than this amount on paid communications, beginning as soon as possible, to communicate her position on several propositions on the May 1 ballot speaking as a candidate for Austin office in 2022.

34.    Virden desires immediately to raise funds to pay for additional advertisements discussing her candidacy and her position on other issues as they arise.

35.    She also desires to retain some of the funds raised to build her campaign account as much as possible in advance of the 2022 elections. Building a campaign account early is important not just because of the things that Virden can do with the money in her campaign when she decides to spend it, but because demonstrating fundraising success early serves as a statement of the level of support a candidate has, and demonstrates viability.

36.     Virden is prohibited by the new blackout period from raising any funds for her desired purposes for another seven months.

37.     Regardless of whether Virden is successful in her campaign for City office in November 2022, she intends to be a candidate for City office again in future elections.

**Composition of Austin City Council and Potential Effects of Redistricting**

38.     The Austin charter provides that the city council is comprised of a mayor elected at-large and ten council members elected from single-member districts.  Art. II, § 1(A).

39.     The boundaries of each council district are adjusted after each decennial census.  Charter art. II, § 3(B).  Following a 2012 amendment to the charter, the "Independent Citizens Redistricting Commission" (the "Commission") is responsible for adjusting the boundary lines.

40.     In light of the 2020 census, the Commission must adopt a final plan with adjusted district lines by November 1, 2021.  Charter art. II, § 3(G).  This final plan shall be certified to the city council and will have the force of law.  *Id.*  In drawing district lines, the Commission is expressly prohibited from considering the place of residence of any incumbent or potential political candidate.  *Id.* § 3(F).

41.     Elections for the City Council are "staggered so that a general election is held every two years, and half, or as near to half as is practical, of the council is elected at each election."  *Id.*, art. III, § 2(A).  Elections for Districts 1, 3, 5, 8, and 9 were last held in November 2018, and Districts 2, 4, 6, 7, and 10 were on the ballot in November 2020.  Accordingly, Districts 1, 3, 5, 8, and 9 are on the ballot again in November 2022.  The mayor's office is also on the November 2022 ballot.

42.     Moreover, Austin voters will decide at the May 1, 2021 election whether to approve Proposition G, which would add an additional single-member council district, resulting in eleven council districts.  *See* Ord. 20210209-001 at 41-50 (proposed charter amendments to effectuate additional council district).

43.     If Proposition G is approved, the Commission's final plan, required to be released by November 1, 2021 pursuant to article II, section 3 of the charter, must divide the City into eleven districts rather than ten, and a representative from the new District 11 will be elected at the November 2022 election.  Ord. 20210209-001 at 41 (adding transitional provision at article I, section 8).

44.     Virden's residence is within District 10 as it is currently drawn.  After redistricting, even if Proposition G (adding District 11) is not approved—her residence could be within a district that is on the 2022 ballot.

45.     If Proposition G *is* approved, her residence could be within a district that is on the 2022 ballot.

46.     While it is not clear today which council district Virden's residence will fall within or whether that seat will be on the 2022 ballot, it is clear today that Virden will run for City office in 2022, and that she wants to solicit and accept campaign contributions immediately, some of which she will use for immediate speech and other campaign activities, and some of which she will keep to build her account for use closer to election day in 2022.

## Relevant Law

**Austin's Campaign Finance Regime**

47.     The City of Austin has enacted a comprehensive campaign finance regime, occupying article III, § 8 of the City Charter as well as an entire chapter of the Code of Ordinances entitled the "Austin Fair Campaign Chapter." Code § 2-2-1 *et seq*.

48.     Article III of the Charter and Chapter 2-2 of the Code impose several detailed restrictions on solicitations and contributions applicable to all City candidates and persons making contributions to candidates.

49.     <u>Base Limit</u>. The Charter strictly limits the amount that a city candidate may accept to $300 per person,[2] per election,[3] with an exception for the candidate and small-donor political committees that satisfy rigid requirements. Charter art. III, § 8(A)(1). This limit is adjusted periodically for inflation. *Id.* For the 2020 elections, the limit was $400 per person. This kind of a restriction—limiting the *amount* that a single contributor may give to a single candidate per election—is referred to in the caselaw, and herein, as a "base limit."

50.     Although this base limit severely restricts the *amount* that any person is eligible to contribute to a City candidate per election, the City of Austin imposes additional restrictions on contributions, and subjects certain categories of persons to a near-total ban on contributions. *See infra* ¶ 58, 59.

---

[2] "PERSON means an individual, corporation, partnership, labor union, or labor organization, or any unincorporated association, firm, committee, club, or other organization or group of persons, including a political committee organized under the Texas Election Code[.]" Code § 2-2-2(17).

[3] The base limit "appl[ies] separately to each general election, runoff election, and special election." Code § 2-2-7(A).

51.    <u>Art. III, § 8(A)(3) Aggregate Limit</u>.  The Charter also limits the total amount that a City candidate may accept *in the aggregate* from all sources that are not (i) "natural persons" (ii) eligible to vote in a zip code completely or partially within Austin city limits. Charter art. III, § 8(A)(3).  The most recent adjusted ceiling, as announced for the 2020 elections, was $38,000 per election, and $25,000 in the case of a runoff election.  This aggregate limit is not challenged in this lawsuit.[4]

52.    The provision challenged here—the new blackout period—provides that "[a] candidate may only raise funds for an election during an authorized campaign period." Code § 2-2-7(G).

53.    The new blackout period thus imposes a categorical ban on "rais[ing] funds for an election" except during the applicable "authorized campaign period" as defined by the City.

54.    "The campaign period for a runoff election begins the day after the date of an election at which no candidate receives the majority of the votes."  Code § 2-2-7(C). "The campaign period for a special election, including a recall election, begins the day after the date the council calls the special election."  *Id*. § 2-2-7(D).  As described above, the most immediately approaching elections, those in November 2022, are "general elections," and the campaign period begins on November 8, 2021.

---

[4] The restrictions in article III of the Charter (the base limit and the art. III, § 8(A)(3) Aggregate Limit) do not apply to "the solicitation, acceptance, or use of contributions for" a "Criminal or Civil Litigation Fund" for actions brought or defended in the person's capacity as a candidate or officeholder.  Charter art. III, § 8(H).  The original blackout period and the disgorgement provisions stated in the charter do not limit fundraising for a litigation fund either, but those provisions are not relevant as they have already been permanently enjoined.

55.    The new blackout period thus prohibits Virden—and all other candidates for City office—from raising funds for their City campaigns except during the very narrow window beginning November 8, 2021 and ending November 8, 2022.[5]

56.    A narrow exception to this temporal restriction allows an unsuccessful candidate who has debts remaining from a prior campaign to continue fundraising until the debts are paid off.  Charter art. III, § 8(F)(4); Code § 2-2-7(E) ("An unsuccessful candidate may only solicit or accept political contributions after an election to the extent authorized by City Charter [Art. III, § 8(F)(4)])."  But this does not permit fundraising for an upcoming campaign.

57.    The new blackout period is not related to Austin's business calendar.  The City Council does not have a set term in the same manner as the Texas Legislature.  The City Council instead is free to, and does, meet year-round in regular and special meetings.

**Additional restrictions and reporting requirements for candidates for City office**

58.    The Code generally prohibits contributions from being made, solicited or accepted at a City-owned building.  Code § 2-2-52.

59.    The Code restricts City lobbyists and their spouses from contributing more than $25 to a City candidate, officeholder or specific-purpose political committee.  Code § 2-2-53.

60.    Candidates for City office in Austin are subject to robust reporting requirements.

---

[5] A candidate in a runoff election would be permitted to raise funds during the ensuing runoff campaign period.

61.    Chapter 254, Texas Election Code, sets out the substantive requirements for reports and the filing schedule applicable to City of Austin candidates.  *See* Tex. Elec. Code. § 251.001(1) (defining "candidate" as used in title 15, Texas Election Code, to include all persons taking affirmative action to gain nomination or election to "public office"); *id*. § 252.005 (setting out the authority with whom a candidate's campaign treasurer appointment is to be filed, including for candidates for municipal office); *id*. § 254.066 (requiring that reports filed under this chapter be filed with the authority with whom the candidate's campaign treasurer appointment is filed); *see also* Code § 2-2-2(7) ("CAMPAIGN FINANCE REPORT means a periodic report of contributions, loans, credit, interest, gains, reimbursements, and expenditures of a candidate…required to be filed under the Texas Election Code, including any other matters and reports required to be disclosed under this chapter.").

62.    In all years, including non-election years, candidates must file two "semiannual" reports, due on January 15 and July 15.  Tex. Elec. Code § 254.063.

63.    Candidates must file additional reports in election years.  Specifically, any candidate who is running opposed for a City office must file reports due thirty days and eight days before Election Day.  *Id*. § 254.064(b), (c).  Additionally, if the candidate participates in a runoff election, the candidate must file a report no later than the eighth day before the runoff election date.  *Id*. § 254.064(e).

64.    Each report is required to contain voluminous information, as set out in § 254.031(a), Texas Election Code, including detailed information for each source contributing in excess of $50 in a reporting period, loans, political expenditures, payments not qualifying as political expenditures, any interest or other gains accruing from political contributions, etc.

65.    Knowingly failing to file complete and timely reports is a criminal offense punishable as a Class C misdemeanor.  Tex. Elec. Code § 254.041.

66.    Even if law enforcement does not pursue a candidate for reporting failures, the Texas Election Code vests any resident of Austin with standing to seek injunctive relief requiring a candidate or officeholder, or a specific purpose committee related to such candidate or officeholder, to file a report that was not timely filed.  *Id*. § 254.043.

67.    In addition to the information required under the Election Code, the City adds another level of information required, including "disclosure of the occupation of the contributor and the name of the contributor's employer" for any individual contributing in excess of $200 in a reporting period.  Code § 2- 2- 21(A).

68.    The City also requires special reports capturing last-minute contribution activity within the last nine days before an election (that is, the activity that otherwise falls outside of the reporting period for the state-required eight-day pre-election report). Specifically, "Special Pre-Election Reports" must be filed by any candidate who accepts contributions, or makes personal loans or expenditures from personal funds, that total more than $10,000 during the period beginning the 9th day before the date of the election and ending at 5 p.m. on the day before the date of an election.  Code § 2-2-29(A)(1).  The report(s) must be filed essentially within 24 hours of triggering contributions and must disclose information about the contributions and contributors.

69.    The City further requires candidates to make extensive disclosures regarding individuals who "bundle" contributions from other individuals in support of the campaign.  The City imposes an aggregate limit on bundling activity of individuals associated with a "business association" that is itself a registered lobbyist, owned in whole

or in part by a registered lobbyist, employs a registered lobbyist, or compensates another person to lobby on its behalf.  Code § 2-2-22.

## Public availability of campaign finance reports

70.    The City requires electronic filing of campaign finance reports (with a narrow exception that, naturally, only applies to certain *incumbents*, but not challengers). Code §§ 2-2-26, 2-2-26(G) (providing exception for certain candidates "running for re-election").

71.    The city clerk must post the report on the city clerk's campaign finance report website within one business day of receipt of the report.  Code § 2-2-26.

## Penalties

72.    Pursuant to Code § 2-2-5(A), violations of any provision of the campaign finance chapter of the code of ordinances, or Charter article III, § 8 are defined as Class C misdemeanors punishable "in accordance with [Code] section 1-1-99 by a fine not to exceed $500." "Each contribution, expenditure or other action in violation of chapter 2 constitutes a separate offense."  *Id.*

73.    This City-authorized punishment is cumulative of penalties under state and federal law.  *Id.* § 2-2-5(C).

## First Amendment Principles

74.    "Contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities," *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam), implicating freedom of political speech and association.  *Randall v. Sorrell*, 548 U.S. 230, 246 (2006) (plurality op.).

75.    Laws that burden political speech are subject to strict scrutiny.  *Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011); *see also McCutcheon v. FEC*, 134 S. Ct. 1434, 1445-46 (2014) (plurality op.).

76.    Even limits on contributions should be subject to strict scrutiny.[6]   Both *McCutcheon* and *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409 (5th Cir. 2014), declined to announce whether the limits at issue were still subject to the lesser "closely drawn" standard, finding that they failed scrutiny even under the "closely drawn" test.  *McCutcheon*, 134 S. Ct. at 1446; *Catholic Leadership*, 764 F.3d at 424.  Nonetheless, Virden recognizes that, in striking down Austin's original blackout period at Art. III, § 8(F)(2) of the charter, the Fifth Circuit held that that blackout period was subject to "closely drawn" scrutiny as a contribution limit.  Just like in *Catholic Leadership*, the court need not determine what level of scrutiny applies because the new blackout period fails even closely drawn scrutiny for the same reasons as the old blackout period.

77.    Under closely drawn scrutiny, contribution restrictions may only be sustained "if the [Government] demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms."  *McCutcheon*, 134 S. Ct. at 1441 (quoting *Buckley*, 424 U.S. at 25); *Catholic Leadership*, 764 F.3d at 424.

78.    Prevention of actual or apparent *quid pro quo* corruption is the only government interest sufficient to justify campaign finance restrictions, whether limits on contributions or expenditures.  *McCutcheon*, 134 S. Ct. at 1450.  The Supreme Court has

---

[6] Plaintiff acknowledges that the Court may conclude it is still bound to apply closely drawn scrutiny to a contribution limit.  Plaintiff preserves this request for potential review by the Supreme Court.

Verified Complaint                                16

recently clarified how narrowly this interest is defined. *Quid pro quo* corruption "captures the notion of a direct exchange of an official act for money." *Id*. at 1441.

79.     Even if a particular contribution limit is supported by the requisite governmental interest, and regardless of whether the Court applies strict or "closely drawn" review, the court "must assess the fit between the stated governmental objective and the means selected to achieve that objective. Or to put it another way, if a law that restricts political speech does not 'avoid unnecessary abridgment' of First Amendment rights, it cannot survive 'rigorous' review." *McCutcheon*, 134 S. Ct. at 1445 (internal citations omitted).

80.     The Government always bears the burden of justifying speech-restrictive laws, including in the campaign finance context. *Id*. at 1452; *Catholic Leadership*, 764 F.3d at 425.

## Preliminary and Permanent Injunctive Relief

81.     Plaintiff re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

82.     The new blackout period has deprived, and will continue to deprive, Plaintiff and her supporters of their fundamental rights protected by the First and Fourteenth Amendments. Money damages cannot adequately compensate these constitutional injuries and, absent injunctive relief, the injuries will be irreparable. Accordingly, injunctive relief and a declaration of the unconstitutionality of the statutes are necessary.

83.     Plaintiff faces a credible threat of legal sanction, including prosecution, if she solicits or accepts a political contribution before the narrow window for fundraising permitted under the new blackout period opens.

84.    Plaintiff is not willing to expose herself to criminal and civil penalties and, thus, she has been forced to refrain from engaging in core political activity pending vindication of her constitutional rights.

85.    Plaintiff intends to run for Austin elective office again in the future, regardless of the outcome of the November 2022 elections, and unless the unconstitutionality of the challenged restrictions is recognized, Plaintiff's First Amendment rights will be restricted in the future election or elections.

86.    The free speech and associational rights of others not before the Court will be similarly infringed as the challenged provisions are applied to other candidates in the November 2022 general election in the City of Austin, as well as against candidates in future elections, and enforced by these Defendants.  *See Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974); *Catholic Leadership*, 764 F.3d at 423-24.

### COUNT 1

**The new blackout period is facially unconstitutional because it is unsupported by any cognizable government interest and because it is not appropriately tailored.**

87.    Plaintiff re-alleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

88.    The new blackout period imposes a zero-dollar aggregate limit on the amount a city candidate may raise in funds for an upcoming election for three years out of every four-year mayoral or councilmember election cycle.

89.    The new blackout period is an additional restriction layered atop the City's severe base limit (currently $400), and the City must demonstrate that it is independently necessary to guard against the threat of *quid pro quo* corruption.

Verified Complaint

90.     Even if this Court views the new blackout period's unique and severe burden as a contribution limit, it should be subject to strict scrutiny.

91.     However, whether under strict or closely drawn scrutiny, the new blackout period cannot pass constitutional muster.

92.     The new blackout period does not further the government's interest in preventing the actuality or appearance of *quid pro quo* corruption.

93.     Because the new blackout period imposes an aggregate limit on contributions to Virden and similarly-situated City candidates, and because aggregate limits do not address corruption as a matter of law, it is facially unconstitutional for lack of any cognizable government purpose.

94.     In addition, Austin cannot demonstrate the requisite government purpose because it cannot demonstrate that a contribution within the base limit made more than 365 days ahead of an election is any more problematic than a contribution made eleven months, or six months, ahead.

95.     Neither is the new blackout period appropriately tailored for numerous reasons.  These reasons include, but are not limited to, the following: (A) the aggregate zero dollar limit necessarily also limits contributions from *any single contributor* to zero dollars, despite the fact that at other times of the year persons may contribute $400, an amount which the City judges to be non-corrupting; (B) the period subject to the fundraising blackout is exceedingly long and bears no relation to the City's business calendar; and (C) the City has already addressed its legitimate anticorruption interest with other measures, including stringent base limits, near-absolute bans on contributions from professional lobbyists, and robust reporting requirements making available detailed information about contributions to the public.  The absolute temporal ban on non-legal-

fee fundraising is an unnecessary abridgment of Plaintiff Virden's First Amendment rights resulting from the City's failure to tailor the provision to any threat of corruption.

96.    The new blackout period violates the First Amendment rights of speech and association of Plaintiff and of any and all persons who desire to or would contribute to Plaintiff's campaign.

97.    The new blackout period also violates the First Amendment rights of members of the public, as it prevents them from hearing the views of candidates for City office who cannot raise money with which to widely disseminate their views in a manner commensurate with the reach available for incumbents who spread their messages with taxpayer-funded resources.

98.    The new blackout period has deprived, and will continue to deprive, Plaintiff and others similarly situated of their fundamental rights protected by the First and Fourteenth Amendments.  Money damages cannot adequately compensate these constitutional injuries and, absent injunctive relief, the injuries will be irreparable.  There is no adequate remedy at law.

## PRAYER FOR RELIEF

Plaintiff prays for the following relief:

1.    A declaratory judgment that the new blackout period is facially unconstitutional under the First Amendment to the United States Constitution;

2.    In the alternative to a facial declaration, a declaratory judgment that the new blackout period is unconstitutional under the First Amendment to the United States Constitution as applied to Plaintiff;

Verified Complaint                                    20

3.    A preliminary and permanent injunction enjoining Defendant from enforcing the new blackout period against Plaintiff or against any other candidate for City of Austin office;

4.    That any declaration or injunction also apply against Charter art. III, § 8(F)(4), to the extent that provision would also or independently prohibit fundraising for an upcoming campaign outside of the authorized "campaign period" under Code § 2-2-7;

5.    An award of compensatory and nominal damages for the violation of Plaintiff's constitutional rights;

6.    Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 or any other applicable statute or authority; and

7.    Any other relief that the Court deems just and appropriate.


Respectfully submitted,

_____*/s/ Jerad Najvar*_____
Jerad Wayne Najvar
Texas Bar No. 24068079
jerad@navjarlaw.com
Austin M.B. Whatley
Texas Bar No. 24104681
austin@najvarlaw.com
NAJVAR LAW FIRM PLLC
2180 North Loop West, Suite 255
Houston, TX 77018
Phone:        (281) 404-4696
Facsimile:    (281) 582-4138
*Counsel for Plaintiff*

Verified Complaint                    21