UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JENNIFER VIRDEN, | § | |
| Plaintiff, | § | |
| | § | |
| | § | Civil Case No. 1:21-cv-00271-RP |
| v. | § | |
| | § | |
| CITY OF AUSTIN, TEXAS, | § | |
| Defendant. | § | |

## **PLAINTIFF'S OPPOSED MOTION FOR PRELIMINARY INJUNCTION**

Jerad Wayne Najvar
Texas Bar No. 24068079
jerad@najvarlaw.com
Austin M.B. Whatley
Texas Bar No. 24104681
austin@najvarlaw.com
NAJVAR LAW FIRM PLLC
2180 North Loop West, Ste. 255
Houston, TX 77018
Phone:      (281) 404-4696
Facsimile:   (281) 582-4138
*Counsel for Plaintiff*

### TABLE OF CONTENTS

Table of Authorities ............................................................................................. iv

Introduction ......................................................................................................... 1

Factual and Statutory Background ...................................................................... 1

Argument .............................................................................................................. 1

I.   Virden is Presently Injured by the New Blackout Period ............................ 1

II.  Preliminary Injunction Standard ................................................................. 3

III. Plaintiff is Likely to Succeed on the Merits ................................................ 5

    a.  The blackout burdens "the most fundamental" First Amendment rights and is subject to rigorous review ............................................................................... 5

    b.  The Blackout Period is facially unconstitutional ................................... 7

        i.   The Blackout Period is an especially pernicious burden on First Amendment rights ............................................................................ 7

        ii.  Fighting "quid pro quo" corruption is the only cognizable government interest in this area ......................................................... 8

        iii. Austin's blackout period is an aggregate limit and invalid for lack of a cognizable interest ...................................................................... 9

            1.  *McCutcheon*, *Catholic Leadership*, and *Zimmerman* dictate the result here ........................................................................... 10

            2.  The true purpose behind the fundraising blackout appears to be something other than addressing corruption ........................... 12

        iv.  The blackout period is facially unconstitutional because it is not appropriately tailored ..................................................................... 13

            1.  There is no nexus between the period of Austin's ban and any corrupting activity ................................................................... 13

            2.  Austin's 36-month ban is asymmetrical to any threat ............. 15

            3.  More narrowly-tailored base limits provide a less restrictive alternative .................................................................................. 15

            4.  Austin has already addressed the threat of quid pro quo corruption with narrow contribution bans and reporting requirements ............................................................................. 15

IV.   Plaintiff Will Suffer Irreparable Harm Without the Injunction ................................17

V.   Balancing of Harms ........................................................................................... 18

VI.   Effect on the Public Interest............................................................................. 18

VII.   The Court Should Waive the Bond Requirement of FRCP 65(c) ........................... 19

 Conclusion ................................................................................................................ 19

TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner,* 387 U.S. 136 (1967) ....................................................................1

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ................................................................ 5

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806 (2011).......5, 6, 12

*Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002 (9th Cir. 2003) .................................. 8

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ........................................................................ 4

*Buckley v. Valeo,* 424 U.S. 1 (1976) .........................................................................5, 13

*Califano v. Sanders,* 430 U.S. 99 (1977)....................................................................... 3

*Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409 (5th Cir. 2014) ..........passim

*Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347 (3d Cir. 2014)................... 3

*Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300 (5th Cir. 1978)......................... 19

*FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480 (1985)...................... 16

*FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449 (2007) .................................................. 6, 18

*Foster v. Dilger*, No. 3:10-CV-00041, 2010 WL 3620238 (E.D. Ky. Sept. 9, 2010)........ 18

*Free Market Found. v. Reisman*, 540 F. Supp.2d 751  (W.D. Tex. 2008) ............ 17, 18, 19

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006)........ 4

*Jones v. Jegley*, 947 F.3d 1100 (8th Cir. 2020)....................................................... 12, 15

*Justice v. Hosemann*, 771 F.3d 285 (5th Cir. 2014)........................................................ 3

*Laredo Rd. Co. v. Maverick County, Tex.*, 389 F. Supp.2d 729 (W.D. Tex. 2005) ......... 18

*McCutcheon v. FEC*, 572 U.S. 185 (2014) .................................................................... 4

*Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006) ................................................................ 3

*Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971)........................................................... 5

*New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495 (10th Cir. 1995) .............. 3

*N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999)......................................14

*Ogden v. Marendt,* 264 F. Supp.2d 785 (S.D. Ind. 2003)............................................... 19

*Planned Parenthood v. Sanchez*, 403 F.3d 324 (5th Cir. 2005) ........................................ 3

*Planned Parenthood of Hidalgo County v. Suehs*, 828 F. Supp.2d 872 (W.D. Tex. 2012)4

*Sanders County Republican Cent. Comm. v. Bullock*, 698 F.3d 741 (9th Cir. 2012) ........ 4

*Shrink Mo. Gov't PAC v. Maupin*, 922 F. Supp. 1413 (E.D. Mo. 1996) ...................... 11, 15

*Smith v. Bd. of Elec. Comm'rs,* 591 F. Supp. 70 (N.D. Ill. 1984) ..................................... 19

*Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020) ................................................ 3

*State v. Dodd*, 561 So.2d 263 (Fla. 1990) ........................................................................ 16

*Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013) .... 4, 7, 17, 18

*Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) .............................................. 4

*Williams v. Rhodes*, 393 U.S. 23 (1968) ........................................................................... 5

*Zeller v. Florida Bar*, 909 F. Supp. 1518 (N.D. Fla. 1995) ........................................passim

*Zimmerman v. City of Austin, Tex.*, 881 F.3d 378 (5th Cir. 2018) ...................... 7, 8, 9, 12

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

## INTRODUCTION

Plaintiff Virden desires to raise campaign funds immediately, and the City has no authority to tell her to wait until November.  In 2018, the Fifth Circuit affirmed a permanent injunction against Austin's original blackout period (in article III of the City charter), which limited campaign fundraising to the last six months before an election. *Zimmerman v. City of Austin, Tex.*, 881 F.3d 378 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 639.  The new blackout period—adopted after the district court injunction in *Zimmerman*—is unconstitutional for all the same reasons as the original blackout.  It should be enjoined immediately.

## FACTUAL AND STATUTORY BACKGROUND

Plaintiff incorporates her verified complaint in this motion, and, pursuant to Western District Local Rule CV-7.d.1, describes certain additional facts in a factual appendix filed with this motion, which includes her supplemental declaration.

## ARGUMENT

Plaintiff requests a preliminary injunction so she and her supporters can exercise their fundamental rights to speech and association without any further delay.

### I.      Virden is Presently Injured by the New Blackout Period.

The Supreme Court has held that "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts ... must be permitted[.]"  *Abbott Labs. v. Gardner,* 387 U.S. 136, 153 (1967), *abrogated on other grounds, Califano v. Sanders,* 430 U.S. 99, 105 (1977).  The blackout period prohibits Virden from undertaking her desired campaign plans right now.

Virden has alleged in detail her desire to solicit and accept contributions from supporters now, so that she can both fund timely advertisements on current issues, which advertisements will also request support at the ballot box in 2022, and retain some of the received funds for use closer to election day. Appx. 2, ¶¶ 3, 5, 6. In part, and critically for purposes of this injunction motion, she desires to collect funds with which to fund advertisements in advance of the May 1 City elections. *Id*. ¶ 7. Austin law directly prohibits her from raising funds for these purposes. Code § 2-2-7(G) states that "[a] candidate may only raise funds for an election during an authorized campaign period," and, for the November 2022 general elections, that period does not open until November 8, 2021. To the extent that Charter art. III, § 8(F)(4) is also read to prohibit fundraising by an "unsuccessful candidate" for a forthcoming election cycle, then it, and Code § 2-2-7(E), also infringe Virden's rights.

Therefore, Virden will forego her desired fundraising plans because of the challenged law(s)[1] unless and until she secures relief from the court. Seeking to advance her 2022 campaign, she has publicly announced her intent to run for office on the November 2022 ballot, and she has engaged counsel to prosecute this lawsuit in an effort to free the way to begin fundraising.

Because the statute has the present effect of deterring the exercise of Virden's First Amendment speech and associational rights, her rights are chilled and standing for this pre-enforcement challenge is clear. "In First Amendment pre-enforcement challenges, chilling a plaintiff's speech is a constitutional harm adequate to satisfy the

---

[1] To the extent Charter art. III, § 8(F)(4) and Code § 2-2-7(E) also act to prohibit a candidate from fundraising for a forthcoming election outside of the authorized campaign period, Virden challenges them as well and any reference herein to the "blackout period" shall be read to include these provisions.

injury-in-fact requirement...and it is not necessary that a plaintiff first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014) (internal quotations and citations omitted) (standing established where group of "like-minded friends and neighbors" "contend that they would have pooled their resources" for political advertisements, but did not do so "because of what they view as Mississippi's onerous and complicated disclosure requirements"). The Fifth Circuit recently reiterated that "[i]t is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 331 (5th Cir. 2020). *See also Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 364 (3d Cir. 2014); *Miller v. Brown*, 462 F.3d 312, 317-18 (4th Cir. 2006) (finding current injury because "the mere existence of the open primary law causes these decisions to be made differently than they would absent the law"); *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1500-02 (10th Cir. 1995) (challenge to statute preventing spending federal campaign funds for state office was ripe, even though candidate had not announced a run for state office, because it prevented him from making his campaign plans in advance).

## II.      Preliminary Injunction Standard

A plaintiff seeking a preliminary injunction must establish:

(a) a substantial likelihood of success on the merits;
(b) a substantial threat of irreparable harm if the injunction is not granted;
(c) that the threatened injury outweighs any damage that the injunction might cause the Defendants; and
(d) that the injunction will not disserve the public interest.

*Planned Parenthood v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005).

However, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions," *McCutcheon v. FEC*, 572 U.S. 185, 134 S. Ct. 1434, 1452 (2014), and "[t]he burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006); *see also Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Therefore, "[w]hen seeking a preliminary injunction in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Sanders County Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012).

Because the "purpose of a preliminary injunction is to prevent irreparable injury to the parties and 'preserve the court's ability to render a meaningful decision on the merits,'" *Planned Parenthood of Hidalgo County v. Suehs*, 828 F. Supp.2d 872, 880 (W.D. Tex. 2012), the "relative position" to preserve is Austin not enforcing the challenged provisions against Plaintiff. *See Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013) (affirming preliminary injunction against enforcement of a contribution limit under Texas Election Code).

**Facial challenges.**   In the First Amendment context, a statute is facially unconstitutional if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013).

**III.       Plaintiff is Likely to Succeed on the Merits**

### A. The blackout burdens "the most fundamental" First Amendment rights and is subject to rigorous review.

The new blackout severely burdens political speech and association. But "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley v. Valeo,* 424 U.S. 1, 14 (1976) (per curiam). "Indeed...the First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" *McCutcheon*, 134 S. Ct. at 1441 (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). Accordingly, "contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities." *Id*. at 14.

Additionally, the Supreme Court has recognized that candidates frequently represent not just themselves but a political cause, *see Anderson v. Celebrezze*, 460 U.S. 780, 790-94 (1983); *id*. at 792-93 ("[A]n election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens."), and burdens on candidacies burden voters' "choice[s] on the issues as well." *Williams v. Rhodes*, 393 U.S. 23, 33 (1968).

In light of the fundamental nature of the activity at issue, and the centrality of candidates to the "expression of views on the issues of the day," *Anderson*, *supra*, Austin bears a heavy burden in seeking to justify these restrictions. In fact, strict scrutiny should apply here. "Laws that burden political speech are subject to strict scrutiny, which requires the government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011). *Bennett* said this despite

the fact that the provision challenged there did not impose any direct restraint on the plaintiff at all.  The plaintiff candidate was merely chilled from spending funds because exceeding a certain threshold would have allowed his opponents to receive contributions in excess of the otherwise-applicable base limit.  *Bennett* held that putting candidates to that choice was an "*unprecedented penalty* on any candidate who robustly exercises his First Amendment rights" because it "leads to advantages for opponents in the competitive context of electoral politics."  564 U.S. at 737 (emphasis added).  Bennett is one of several cases in which the Supreme Court has applied strict scrutiny to laws that *indirectly* burdened campaign expenditures without imposing an outright ban or limit.  *See, e.g.*, *Ariz. Free Enter.*, 131 S. Ct. at 2818; *Davis*, 554 U.S. at 724; *FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 477 n.9 (2007).  The Supreme Court has never considered a categorical ban on all campaign contributions for a period of time, as under Austin's blackout period, but it is even more burdensome than the indirect burden in these cases because it flatly prohibits candidates from raising any funds whatsoever for a period of time.

Virden recognizes that *Zimmerman* said that "closely drawn" scrutiny applied to Austin's original blackout period, and intermediate scrutiny is sufficient because she wins anyway, as described below.  Nonetheless, she makes this argument here primarily to preserve it for potential review on appeal.  Temporal bans on all contributions regardless of amount (banning even miniscule dollar amounts) are a severe restriction of a type the Supreme Court has never considered, and the Supreme Court would likely apply strict scrutiny.

### B.  The Blackout Period is facially unconstitutional.

Considering Austin's old blackout provision, allowing fundraising only six months before election day, *Zimmerman* explained that "Austin must show (1) that the six-month limit serves the sufficiently important interest of preventing actual corruption or its appearance and (2) that it employs means that are closely drawn."  881 F.3d at 391.  The new blackout fails for all the same reasons as the prior blackout.  Virden first explains the unique burdens imposed by this type of temporal ban on contributions, and then why Austin cannot demonstrate that it serves its anti-corruption interest or is closely drawn to that interest.

### i.  The Blackout Period is an especially pernicious burden on First Amendment rights.

Any restriction on the right to make or receive political contributions—whether an amount limitation, a temporal ban, or a ban on solicitation—burdens a fundamental right and incurs First Amendment scrutiny.  The Blackout Period is especially damaging to the robust public discussion of candidates and issues that *Buckley* and its progeny so vigorously protect.

First, Austin's lackout period is exceedingly long, banning solicitations and contributions for 36 months of every four-year cycle.  Wealthy candidates can begin campaigning as early as they want with their own money.  However, for non-self-funding candidates, the blackout period acts simultaneously as a limit on campaign *expenditures*, as money that cannot be raised cannot be spent.  *See Texans for Free Enter.*, 732 F.3d at 539 ("[Plaintiff's] ability to speak is undoubtedly limited when it cannot raise money to pay for speech.").  Regardless of how small the prospective contributions from any single source, the blackout imposes an *aggregate* limit of zero

dollars in receipts by a candidate for a period of time.  This distinguishes the blackout period from base contribution limits because, even under base limits, the candidate's *aggregate* fundraising potential is unlimited.  For these reasons, the blackout period is materially different from base limits and instead functions as an expenditure limit on City campaigns.  *See, e.g.*, *Zeller v. Florida Bar*, 909 F. Supp. 1518, 1524 (N.D. Fla. 1995) (judicial canon prohibiting contributions to judicial candidates earlier than one year before the election "necessarily ha[s] an impact on the amount of the candidate's campaign expenditures"); *accord Opinion of the Justices to the House of Representatives*, 637 N.E.2d 213, 216 (Mass. 1994).

Second, temporal restrictions—much less temporal *bans*—on political activity are particularly suspect.  In politics, "timing is of the essence," *Catholic Leadership*, 764 F.3d at 431, and it is important to "get[] the message out in a timely[] or…even instantaneous fashion."  *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1009 (9th Cir. 2003).

### ii. Fighting "quid pro quo" corruption is the only cognizable government interest in this area.

Whether under strict or "closely drawn" scrutiny, the Supreme Court "has identified only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption."  *McCutcheon*, 134 S. Ct. at 1450.  The interest is defined narrowly to mean only "*quid pro quo* corruption"; that is, "the notion of a direct exchange of an official act for money"—"dollars for political favors."  *Id*. at 1441.  "Ingratiation and access…is not corruption," *Catholic Leadership*, 764 F.3d at 425 (quoting *Citizens United*, 558 U.S. 310, 360 (2010)), nor is "spending large sums of money in connection with elections, but not in connection with an effort to

control the exercise of an officeholder's official duties." *Id.* (quoting *McCutcheon*, *supra*, at 1450). Government may not seek to "'level the playing field'… 'equalize the financial resources of candidates,'…or 'restrict the speech of some elements of our society in order to enhance the relative voice of others.'" *McCutcheon*, *supra*, at 1450.

Moreover, the corruption threat must be supported by evidence of a real, not merely conjectural, danger. *Id.*

### iii. Austin's blackout period is an aggregate limit and invalid for lack of a cognizable interest.

In *Zimmerman*, with respect to government interest, the Fifth Circuit explained that

> Austin must justify the limit with some evidence of actual corruption or its appearance. … Furthermore, following *McCutcheon*, an additional limit on contributions beyond a base contribution limit that is already in place must be justified by evidence that the additional limit serves a distinct interest in preventing corruption that is not already served by the base limit. … That is to say, Austin needed to establish that even if a $350 contribution near the time of an election is not likely to lead to actual corruption or its appearance, the same contribution made at another time is. Furthermore, while the quantum of evidence needed is not clearly established, … what is needed to justify a temporal limit is additional to and distinct from what is needed to justify a dollar limit on contributions. … While *Buckley* and the long line of cases following it make clear that the dangers of large contributions "are neither novel nor implausible," *id.*, there is not the same well-trodden path regarding the dangers of contributions made far in time from an election.

881 F.3d at 391–92 (some internal citations omitted). *Zimmerman* held Austin's 42-month blackout period did not serve a legitimate government interest because Austin "failed to present evidence to show how a contribution made seven months before election day presents a different threat of *quid pro quo* corruption than a contribution made three months before election day." 881 F.3d at 391.

Austin responded by simply extending the fundraising window by six months. But this new, 36-month long blackout on political association similarly fails, as the City cannot present evidence that a contribution within the base limit made more than one year ahead of an election presents a different threat of corruption than one made closer to election day.

### 1. *McCutcheon*, *Catholic Leadership*, and *Zimmerman* dictate the result here.

*Zimmerman* affirmed judgment against the original blackout, citing Austin's failure to present evidence to support it, and the new blackout will fail for the same reason. However, this is not merely due to a failure of evidence. A temporal limit banning even small contributions does not address the *quid pro quo* corruption threat *as a matter of law*. In other words, Austin cannot possibly provide any evidence that would ever support a categorical ban on contributions—regardless of amount—for *any* period of time.

*McCutcheon* reiterates that the threat of *quid pro quo* corruption arises only in the context of *large* contributions from one person to one particular candidate, *McCutcheon*, 134 S. Ct. at 1442, 1452, 1460-61, and the aggregate limits failed to address this threat because "once they kick in, they ban all contributions of any amount." *Id.* at 1452. Following shortly after *McCutcheon*, the Fifth Circuit characterized a Texas statute, which required newly-registered "general purpose committees" to wait 60 days and collect contributions from ten different contributors before making more than $500 in contributions, as an aggregate contribution limit and explained that Texas could not justify the application of an aggregate, as opposed to a base, limit. 764 F.3d at 432-33 ("[I]f a single $500 contribution does not risk corruption, it is hard to see how three

$167 contributions hold out such a significant risk of corruption that the former is permitted and the latter is not."); *see also id.* at 433 ("Texas would still be unable to justify an *aggregate* limit—as opposed to per-candidate, per-committee, and per-party base limits—under the logic of *McCutcheon*.") (emphasis in original)

In the same way, during Austin's new blackout period, contributions of "any amount" are banned, effectively imposing even a temporal *base* limit of zero dollars on contributions from any single person, even though the same person may contribute up to the base limit during the last 365 days before the election.  The logic of *McCutcheon*, *Catholic Leadership*, and *Zimmerman* dictates that Austin may set an appropriate base limit, but restrictions unrelated to the danger of *large* financial transfers (at least, "large" as defined by the base limit) from one contributor simply do not address *quid pro quo* corruption.  134 S. Ct. at 1452; *Catholic Leadership*, 764 F.3d at 432.

If anything, the blackout period is even more severe a burden than the aggregate limits in *McCutcheon*.  Instead of limiting the aggregate contributions that a single rich individual may make to any number of candidates, Austin's blunt blackout period prohibits any candidate from accepting even tiny contributions from small-dollar contributors who may not give to any other campaigns or causes.  Even before *McCutcheon*, several courts identified temporal contribution bans as aggregate limits and invalidated them for failure to address any corruption threat.  *See Shrink Mo. Gov't PAC v. Maupin*, 922 F. Supp. 1413, 1424 (E.D. Mo. 1996) ("*Maupin II*") (stating that a ban on all contributions while the state legislature was in session "amounts to an imposition of an aggregate limit on total contributions incumbents and candidates receive during the banned time-period, in essence, a zero contribution limit"); *Zeller*, 909 F. Supp. at 1527 ("These restrictions amount to imposition of an aggregate limit on

the total contributions judicial candidates receive during that time—namely, nothing."). Even if an individual wanted to give $10 to Virden, the contribution is absolutely prohibited until November 8, 2021. *Zimmerman* correctly applied the reasoning of *McCutcheon* and *Catholic Leadership*, holding that Austin has a base limit and it cannot justify an additional, categorical ban on all contributions (within the base limit) based on temporal proximity to an election. 881 F.3d at 392-93. The Fifth Circuit recognized that the City conducts business year-round, and therefore the proffered danger (money flowing in before important votes) was not temporally related to the period of the blackout. The same is true today. One- and even two-year fundraising windows have been held invalid applying the same reasoning, *Zeller*, 909 F. Supp. at 1525, 1527 (one-year window for judicial campaigns invalidated even before *McCutcheon*); *Jones v. Jegley*, 947 F.3d 1100 (8th Cir. 2020) (two-year window in Arkansas statute), and this reasoning is now compelled in this Circuit by *Zimmerman*.

### 2. The true purpose behind the fundraising blackout appears to be something other than addressing corruption.

In *McCutcheon*, the Supreme Court said that "[t]he improbability of circumvention [of the federal base limits] indicates that the aggregate limits instead further the impermissible objective of simply limiting the amount of money in political campaigns." 134 S. Ct. at 1456; *see also Ariz. Free Enter.*, 131 S. Ct. at 2825 (noting "[t]here is ample support for the argument that the matching funds provision seeks to 'level the playing field," the "clearest evidence" being "the very operation of the provision"). Similarly here, the "very operation" of Austin's aggregate fundraising blackout belies any anticorruption interest and instead indicates it is aimed at some other impermissible purpose, such as limiting total fundraising and/or expenditures, or

maintaining an arbitrarily abridged campaign season, perhaps in the City's paternalistic impulse to prevent voters from being exposed to election advertisements too early. The fundraising blackout serves only to "handicap a candidate who lacked substantial name recognition or exposure of his views before the start of a campaign." *Davis*, 554 U.S. at 741 (quoting *Buckley*, 424 U.S. at 56-57). Whatever the true purpose, it is insufficient to support the serious First Amendment burden imposed.

### iv.  The blackout period is facially unconstitutional because it is not appropriately tailored.

Even if the blackout period were supported by a legitimate interest, it would be invalid for lack of tailoring. "In the First Amendment context, fit matters," *McCutcheon*, 134 S. Ct. at 1456, and *McCutcheon* demands a rigorous examination of whether the blackout period is any broader than necessary to address the proffered threat. *See id.* at 1456-59. In *Catholic Leadership*, the Fifth Circuit held that Texas's temporal contribution limit was not appropriately tailored because Texas could not explain (i) a justification for the particular parameters it chose (60 days rather than another time period), 764 F.3d at 429, 433; or (ii) why more narrowly-tailored base limits were not acceptable in lieu of an aggregate contribution ban. *Id.* at 433. Austin's new blackout period clearly fails for these same reasons, among others.

### 1.  There is no nexus between the period of Austin's ban and any corrupting activity.

Austin's blackout period is entirely arbitrary, as there is no nexus between the period of the ban (permitting fundraising only in the last year before the election) and any activity arguably posing an increased corruption threat, such as a Council session. The fact that Defendants cannot link the specific period of the ban to any corrupting activity is fatal. *Catholic Leadership* held the temporal ban on general purpose

committees was not "closely drawn" because the 60-day time period was arbitrary, 764 F.3d at 433 ("Texas does not provide any evidence supporting a *60-day* aggregate contribution cap as necessary") (italics in original), and because a temporal contribution limit that "kicks in regardless of...proximity...to a legislative session or judicial election is vastly overbroad." *Id. Zimmerman* rejected the City's argument in defense of the original blackout period by noting that the period of the ban does not coincide in any meaningful way with any increased threat of corruption, 881 F.3d at 392, and the same remains true today. *See also Gordon*, 2015 WL 138115, *12 (noting lack of "evidence showing a nexus between the...almost eleven-month temporal ban on soliciting and receiving contributions...and any activity arguably posing a risk of *quid pro quo* corruption or its appearance"); *Zeller*, 909 F. Supp. at 1525 (holding that the government "wholly failed to establish a sufficient nexus between the interest they are trying to further—preventing the actuality or appearance of corruption—to the blanket prohibition on solicitation and collection of judicial campaign contributions for a lengthy period of time"). *Cf. N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 716 (4th Cir. 1999) (upholding state moratorium on contributions to legislative incumbents and candidates because it was "narrowly tailored" in that the prohibition (i) applied only to "lobbyists and the political committees that employ them—the two most ubiquitous and powerful players in the political arena," and (ii) "last[ed] only during the legislative session, which typically, though not invariably, has covered just a few months in an election year.").[2]

---

[2] Even if the blackout period tracked a City Council session or some other similar time period, Austin still could not justify it in light of the option of using more narrowly-tailored base limits. *Catholic Leadership*, 764 F.3d at 433.

### 2.  Austin's 36-month ban is asymmetrical to any threat.

Austin's blackout lasts 36 months, allowing fundraising in only the last year of a mayoral or council election cycle.   Courts have preliminarily enjoined temporal contribution bans even when they are of far less severe duration.  *See* Jones, 947 F.3d at 1107 (affirming injunction against statute that allowed fundraising for final *two* years before election day); *Shrink Missouri Government PAC v. Maupin*, 922 F. Supp. 1413, 1419 (E.D. Mo. 1996) (granting preliminary injunction against state law that banned contributions for "four and one-half months" during session, which "would prevent candidates and political committees from amassing the resources necessary for effective advocacy").

### 3.  More narrowly-tailored base limits provide a less restrictive alternative.

Even if Austin could muster an explanation as to why it chose to ban fundraising for 36 months, as opposed to another time period, a complete fundraising blackout for *any* period of time is still too blunt an instrument because the City cannot "advance[] [any] reason why more narrowly-tailored base contribution limits" during its chosen period "would not similarly serve its interests."  *See Catholic Leadership*, 764 F.3d at 436.  This "would impose a lesser burden on First Amendment rights, as compared to aggregate limits that flatly ban contributions beyond" certain time periods.  *See McCutcheon*, 134 S. Ct. at 1458.

### 4.  Austin has already addressed the threat of *quid pro quo* corruption with narrow contribution bans and reporting requirements.

To the extent Austin can assert a legitimate interest in targeting contributions presenting a higher than normal risk of corruption, it has already done so by limiting

city lobbyists and their spouses to nominal contributions of $25, imposing an aggregate limit on the bundling activity of individuals associated with "business associations" that even hire a lobbyist, and requiring detailed reporting of such bundling activity. *See* VC ¶ 59, 69. Therefore, the blackout period is spectacularly overbroad in that it applies to everybody, while these purportedly high-risk contributors are already targeted with narrower measures. Any contribution restriction that applies globally rather than only against the specific threat proffered by the Government must be rejected for lack of tailoring. *See*, *e.g.*, *State v. Dodd*, 561 So.2d 263, 265 (Fla. 1990) (invalidating legislative-session contribution ban because it applied to all candidates, even nonincumbents who posed no *quid pro quo* threat). *See also FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 498 (1985) (invalidating expenditure restriction because even if "large pooling of financial resources…pose a potential for corruption," the law "is a fatally overbroad response" because "its terms apply equally to informal discussion groups that solicit neighborhood contributions"); *Family PAC*, *supra*, at 812-14. *Cf. Bartlett*, *supra*, at 716.

Moreover, city candidates are already required to electronically report all contributions of anything more than a *de minimus* amount according to a robust schedule, and these reports are posted on the internet almost immediately. The Supreme Court and the Fifth Circuit have repeatedly found that bans and limits are not appropriately tailored means of addressing corruption in light of technology permitting timely public access to campaign finance information. *See Catholic Leadership*, 764 F.3d at 429. Austin's "choice to enact a [36-month contribution] limit is badly 'asymmetrical' to its interest in preventing *quid pro quo* corruption." *Id.* (quoting *Citizens United*, 558 U.S. at 361).

***

The alternative means of addressing the threat of corruption which the City has already adopted provide examples of how the City may prevent corruption without unduly abridging associational rights.  *See McCutcheon*, 134 S. Ct. at 1458; *Catholic Leadership*, 764 F.3d at 429; *Zeller*, 909 F. Supp. at 1527.  The blackout period, layered atop these narrower provisions, is overkill.   "This prophylaxis-upon-prophylaxis approach requires that [the court] be particularly diligent in scrutinizing the law's fit." *McCutcheon*, 134 S. Ct. at 1458 (internal quotations omitted).[3]

## IV.        Plaintiff Will Suffer Irreparable Harm Without the Injunction

Without immediate relief, Plaintiff loses irreplaceable time for soliciting funds to (i) fund desired immediate speech regarding current issues and (ii) begin amassing as much as possible for her 2022 campaign, and all those who would contribute to her campaign are denied the right of political association. Even without such a looming electoral deadline, the Fifth Circuit has "repeatedly held...that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction."  *Texans for Free Enter.*, 732 F.3d at 539 (internal quotations omitted); *see also Free Market Found. v. Reisman*, 540 F. Supp.2d 751, 758 (W.D. Tex. 2008).

---

[3] The controlling *McCutcheon* opinion pointed out that "[i]t is worth keeping in mind that the base limits themselves are a prophylactic measure. As we have explained, restrictions on direct contributions are preventative, because few if any contributions to candidates will involve *quid pro quo* arrangements.  The aggregate limits are then layered on top, ostensibly to prevent circumvention of the base limits.  This prophylaxis-upon-prophylaxis approach requires that [the court] be particularly diligent in scrutinizing the law's fit."  134 S. Ct. at 1458.

## V.        Balancing of Harms

Without a preliminary injunction, Plaintiff and her would-be contributors will continue to suffer irreparable injury to their constitutional rights.  By contrast, the City suffers no comparable injury if the Court grants a preliminary injunction.  The result would simply be that candidates and their supporters would be permitted to associate up to the base limits Austin has already enacted upon signing of the order rather than waiting until November 8, 2021.  The Supreme Court has made clear that in any conflict between First Amendment rights and regulation, courts "must give the benefit of any doubt to protecting rather stifling speech," and that "the tie goes to the speaker, not the censor." *Wisc. Right to Life,* 551 U.S. at 469, 474.  "The harm and difficulty of changing a regulation cannot be said to outweigh the violation of constitutional rights it perpetuates. It would be far worse that an election continue under an unconstitutional regime than the [government agency] experience difficulty or expense in altering that regime." *Foster v. Dilger*, No. 3:10-CV-00041, 2010 WL 3620238, at *7 (E.D. Ky. Sept. 9, 2010) (not designated for publication).  Austin cannot even claim the type of administrative or logistical difficulty that can accompany an injunction in other contexts.  Moreover, "Defendant's legitimate interests can be protected by the reporting statutes if preliminary injunctive relief is granted."  *Free Market Foundation*, 540 F. Supp.2d at 759.

## VI.       Effect on the Public Interest

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter*., 732 F.3d at 539 (internal citation omitted).  *See also Laredo Rd. Co. v. Maverick County, Tex.*, 389 F. Supp.2d 729, 748 (W.D. Tex. 2005) ("[B]ecause its rights to free speech, as protected by the First Amendment, will be

curtailed...[t]he granting of a preliminary injunction in favor of the Plaintiff will not disserve the public's interest, as a government's constituents have a vested interest in their government enacting constitutionally sound laws.").

## VII.        The Court Should Waive the Bond Requirement of FRCP 65(c)

Under Federal Rule of Civil Procedure 65(c), "[t]he amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978).  Cases raising constitutional issues are particularly appropriate for a waiver of the bond requirement.  *See Ogden v. Marendt,* 264 F. Supp.2d 785, 795 (S.D. Ind. 2003); *Smith v. Bd. of Elec. Comm'rs,* 591 F. Supp. 70, 71 (N.D. Ill. 1984).  Because "there will be no monetary or other damages to any Defendant if a preliminary injunction is granted and later dissolved," the bond requirement is unnecessary.  *See Free Market Found. v. Reisman*, 540 F. Supp.2d at 759.  Accordingly, Plaintiff respectfully requests that the court waive the bond requirement in the event that it grants Plaintiff's motion for preliminary injunction.

CONCLUSION

For the reasons shown, after entertaining the City's response and hearing, this Court should grant a preliminary injunction preventing Defendant from enforcing the new blackout period, §2-2-7(G) of the Code of Ordinances, against Plaintiff or against any other candidate.  The Court should likewise enjoin enforcement of Charter article III, § 8(F)(4) and Code § 2-2-7(E), to the extent necessary to ensure the right to solicit and accept campaign contributions for an upcoming election.

Respectfully submitted,

*/s/ Jerad Najvar*
Najvar Law Firm PLLC
Jerad Wayne Najvar
Texas Bar No. 24068079
jerad@najvarlaw.com
Austin M.B. Whatley
Texas Bar No. 24104681
austin@najvarlaw.com
2180 North Loop West, Suite 255
Houston, TX 77018
Phone:        (281) 404-4696
Facsimile:    (281) 582-4138
jerad@najvarlaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF CONFERENCE

On March 31, 2021, the undersigned conferred by email with Anne Morgan and Meghan Riley of the City Attorney's Office of the City of Austin. Ms. Riley indicated that the City is opposed to this motion for injunction.

*/s/ Jerad Najvar*
Jerad Najvar

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Motion for Preliminary Injunction, and accompanying exhibits and proposed order, will be served in hard copy with service of process, with a courtesy copy to be served immediately upon filing by email on April 1, 2021:

**By email:**
anne.morgan@austintexas.gov
meghan.riley@austintexas.gov
City of Austin
301 West Second St.
Austin, TX 78701

*/s/ Jerad Najvar*
Jerad Najvar