**EXHIBIT 3**

Transcript of the Testimony of
# Jennifer Virden

September 21, 2022

Jennifer Virden v. City of Austin

Givens Court Reporting
sgivens@austin.rr.com
(512) 301-7088

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JENNIFER VIRDEN,                   §
                                   §
        Plaintiff,                 §
                                   §
                                   §  CIVIL ACTION NO.
v.                                 §
                                   §  1:21-CV-271-RP
THE CITY OF AUSTIN,                §
                                   §
        Defendant.                 §

* * * * * * * * * * * * * * * * * *

THE ORAL DEPOSITION OF
JENNIFER VIRDEN
SEPTEMBER 21, 2022

* * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF JENNIFER VIRDEN, produced
as a witness at the instance of the Defendant and duly
sworn, was taken in the above styled and numbered cause
on the 21st day of September 2022, from 12:15 p.m. to
3:27 p.m., before Sandra S. Givens, CSR, in and for the
State of Texas, reported by machine shorthand method,
at Austin City Hall, 301 W. 2nd Street, 4th floor,
Austin, Texas 78701, pursuant to the Federal Rules of
Civil Procedure.

Page 1

---

I N D E X

1
2
3   Appearances - - - - - - - - - - - - - - - - - - - - 2
4   Exhibits - - - - - - - - - - - - - - - - - - - - - 3
5   JENNIFER VIRDEN
6     Examination by Mr. Hicks - - - - - - - - - - - - 4
      Examination by Mr. Najvar - - - - - - - - - - 117
7     Further Examination by Mr. Hicks - - - - - - - 130
8   Changes and Signature - - - - - - - - - - - - - - 133
9   Reporter's Certification - - - - - - - - - - - - 134
10
11

E X H I B I T S

12
13  NO.  DESCRIPTION                                PAGE
14  Exhibit 1 - - - - - - - - - - - - - - - - - - - - 8
    6/17/21 Deposition Transcript of Jennifer Virden
15
16  Exhibit 2 - - - - - - - - - - - - - - - - - - - - 9
    Virden's Responses to City's First Request
16    for Admissions
17
18  Exhibit 3 - - - - - - - - - - - - - - - - - - - 14
    4/1/22 Memorandum from City Clerk to Candidates
    for 2022 City Council Election, Re: Annual
19    Adjustment of Campaign Finance Limits
20  Exhibit 4 - - - - - - - - - - - - - - - - - - - 16
    "Revised Order of Place on the Ballot for
21    General Election to be Held on November 8, 2022"
22  Exhibit 5 - - - - - - - - - - - - - - - - - - - 17
    "Application for a Place on the City of Austin
23    Nov. 3, 2020 General Election Ballot" for
    Austin City Council, District 10
24
25  Exhibit 6 - - - - - - - - - - - - - - - - - - - 17
    "Appointment of a Campaign Treasurer by a

Page 3

---

A P P E A R A N C E S

1
2
3   FOR THE PLAINTIFF:
4       Mr. Jerad Najvar
        NAVJAR LAW FIRM, PLLC
5       2180 North Loop West, Suite 255
        Houston, Texas 77018
6       (281) 404-4696
        jerad@najvarlaw.com
7
8   FOR THE DEFENDANT:
9       Mr. Renea Hicks
        LAW OFFICE OF MAX RENEA HICKS
10      P.O. Box 303187
        Austin, Texas 78731
11      (512) 480-8231
        rhicks@renea-hicks.com
12
        Ms. Laura Norton
13      Contract Legal Assistant
        (512) 917-6115
14      lnorton@austin.rr.com
15
16
17
18
19
20
21
22
23
24
25

Page 2

---

1   Exhibit 7 - - - - - - - - - - - - - - - - - - - 20
2     Plaintiff's Second Amended Complaint
3   Exhibit 8 - - - - - - - - - - - - - - - - - - - 22
      Ordinance No. 20171005-029 (Puts into
4     Law the One-Year Fundraising Limit)
5   Exhibit 9 - - - - - - - - - - - - - - - - - - - 23
      Austin City Charter Section 8 - "Limits on
6     Campaign Contributions and Expenditures"
7   Exhibit 10 - - - - - - - - - - - - - - - - - - - 27
      5/6/21 Email from Jennifer Virden to City Clerk
8     Attaching "Amendment:  Appointment of a
      Campaign Treasurer by a Candidate."
9
10  Exhibit 11 - - - - - - - - - - - - - - - - - - - 28
      6/23/21 Amendment to "Amendment: Appointment
      of a Campaign Treasurer by a Candidate"
11
12  Exhibit 12 - - - - - - - - - - - - - - - - - - - 28
      "Application for a Place on the Ballot for a
      General Election for a City, School District
13    or Other Political Subdivision"
14  Exhibit 13 - - - - - - - - - - - - - - - - - - - 31
      Plaintiff's Initial Disclosures
15
16  Exhibit 14 - - - - - - - - - - - - - - - - - - - 33
      Virden's Responses to Defendant's First Set
17    of Interrogatories
18  Exhibit 15 - - - - - - - - - - - - - - - - - - - 33
      Virden's First Supplemental Responses to
19    Defendant's First Set of Interrogatories
20  Exhibit 16 - - - - - - - - - - - - - - - - - - - 40
      Virden's Responses to Defendant's Second Set
21    of Interrogatories
22  Exhibit 17 - - - - - - - - - - - - - - - - - - - 40
      First Supplemental Verification of Jennifer
23    Virden
24  Exhibit 18 - - - - - - - - - - - - - - - - - - - 45
      Second Supplemental Verification of Jennifer
25    Virden

Page 4

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

```
 1   Exhibit 19 - - - - - - - - - - - - - - - - - - - 45
        Plaintiff's Opposed Motion for Temporary
 2      Restraining Order
 3   Exhibit 20 - - - - - - - - - - - - - - - - - - - 57
        Verifications/Declarations of Support from
 4      Austin Residents
 5   Exhibit 21 - - - - - - - - - - - - - - - - - - - 62
        Tweet Exchange Between @HendrixK1224 and
 6      @CariMarshallTX re:@Jennifer4Austin
 7   Exhibit 22 - - - - - - - - - - - - - - - - - - - 64
        Plaintiff's First Amended Complaint
 8
     Exhibit 23 - - - - - - - - - - - - - - - - - - - 70
 9      "Correction/Amendment Affidavit for Candidate/
        Officeholder" filed 10/27/20
10
     Exhibit 24 - - - - - - - - - - - - - - - - - - - 71
11      "Correction/Amendment Affidavit for Candidate/
        Officeholder" filed 6/18/21
12
     Exhibit 25 - - - - - - - - - - - - - - - - - - - 75
13      "Candidate/Officeholder Campaign Finance
        Report" Filed 1/15/21
14
     Exhibit 26 - - - - - - - - - - - - - - - - - - - 82
15      (Withdrawn)
16   Exhibit 27 - - - - - - - - - - - - - - - - - - - 83
        "Correction/Amendment Affidavit for Candidate/
17      Officeholder" filed 12/8/20
18   Exhibit 28 - - - - - - - - - - - - - - - - - - - 85
        "Candidate/Officeholder Campaign Finance
19      Report" Filed 7/15/21
20   Exhibit 29 - - - - - - - - - - - - - - - - - - - 95
        "Candidate/Officeholder Campaign Finance
21      Report" Filed 1/4/22
22   Exhibit 30 - - - - - - - - - - - - - - - - - - - 101
        "Candidate/Officeholder Campaign Finance
23      Report" Filed 7/13/22
24   Exhibit 31 - - - - - - - - - - - - - - - - - - - 103
        Screenshots from Jennifer Virden's Website
25
```

**Page 5**

```
 1              JENNIFER VIRDEN,
 2   having been first duly sworn, testified as follows:
 3                 EXAMINATION
 4   BY MR. HICKS:
 5       Q   Ms. Virden, just for the record, state your
 6   name and where you live.
 7       A   Jennifer Marie Virden, 8307 High Oak Drive,
 8   Austin, Texas 78759.
 9       Q   And you're here pursuit to an amended notice
10   of oral deposition.  Have you seen that?
11       A   Yes.
12       Q   Okay.  I'm Renea Hicks, an attorney for the
13   city in the case.  Let's just hop in.
14           So what did you do in preparation for
15   today's deposition?
16       A   Reread some filings, spoke with Jerad, my
17   attorney, and that's it.
18       Q   Okay.  Did you meet or discuss this
19   deposition in preparation for it with anyone else other
20   than Jerad?
21       A   No.
22       Q   Is one of the things you did in preparation
23   review the transcript of your prior deposition in --
24       A   Yes.
25       Q   -- this case?
```

**Page 6**

```
 1       A   Oh, sorry.  I will wait till you finish.
 2   Yes.
 3       Q   Okay.
 4           MR. HICKS:  So just so it's clear
 5   on the record, we -- as I said, I'm more organized than
 6   usual.  So we've actually tabbed for ourselves the
 7   exhibits I think we're probably going to use.  So if
 8   you hear me say tab something to Laura, that's so she
 9   can find it.  But the tab number may be different --
10   will be different usually than the actual exhibit
11   number in the deposition.  So the one we need to pay
12   attention to is the exhibit number that's attached to
13   it by the court reporter.  Okay?
14           MR. NAJVAR:  Okay.  And so just for
15   the record, can you -- you can refer to the tab as you
16   have it, but can you also when you're offering it or
17   talking about it refer to the exhibit?
18           MR. HICKS:  Oh, yeah.  No.  That's
19   what I'm going to do.  I'm just calling the tab up so
20   Laura can pull it out and give y'all copies of it.
21           MR. NAJVAR:  Okay.
22           MR. HICKS:  That's the only reason
23   I'm doing it.
24           MR. NAJVAR:  But then you'll mark
25   it as exhibit whatever?
```

**Page 7**

```
 1           MR. HICKS:  Oh, yeah.  Oh, yeah.
 2   No.  That's the plan.  Sorry.
 3           Okay.  Tab 15, will you mark that as
 4   Deposition Exhibit 1?
 5           (Exhibit No. 1 marked.)
 6       Q   Okay.  Ms. Virden, would you take a look at
 7   Deposition Exhibit 1?  Does that appear to be the
 8   transcript of your deposition in this case on whatever
 9   date it was, June 17th of 2021?
10       A   It appears to be so.  Yes.
11       Q   And in your review did you -- do you have any
12   changes after having reviewed it?
13       A   None that I can think of at the moment.
14       Q   Okay.  All right.  You're running for a
15   position in the Austin City Council; is this right?
16       A   I'm running for mayor.
17       Q   Okay.  And how long have you considered
18   yourself to be a candidate for mayor?
19       A   I believe since February or so of 2021.
20       Q   And what outward indication, I guess you
21   could say, to -- not just internal deliberations for
22   yourself.  What outward indications would anybody need
23   to look at to see that you had become a candidate for
24   mayor at that point?
25       A   Probably Twitter and Facebook and Constant
```

**Page 8**

GIVENS COURT REPORTING

6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

**Page 9**

1  Contact.  I believe I announced over Twitter.
2      Q    Okay.  Some of these questions are going to
3  be so obvious, but let's -- just to make sure they're
4  on the record.
5          So the mayor's race in Austin is a
6  citywide race, right?
7      A    Yes.
8      Q    All timely registered voters in Austin are
9  eligible to vote in that race, right?
10     A    Yes.
11         MR. HICKS:  Let's look at Tab 11.
12  This will be Exhibit 2.
13         (Exhibit No. 2 marked.)
14     A    This for me?
15     Q    This one.  Yes.  All right.  Deposition
16  Exhibit 2, and look if you will at response number 2.
17     A    Okay.
18     Q    It's the long narrative there.  You might
19  look at the question.
20     A    All right.
21     Q    "You have not been a candidate."
22     A    Okay.
23     Q    Okay.  You see there -- I'm not going to ask
24  you about the legal commentary there, but you see there
25  where you say you've been a candidate for Austin city

**Page 10**

1  office continuously since December 15th --
2      A    Yes.
3      Q    -- 2020?
4      A    Yes.
5      Q    What were you a candidate for starting on
6  December 15th, 2020?
7          MR. NAJVAR:  I'm going to object to
8  the extent it calls for a legal conclusion.  But
9  Jennifer, you can, you can answer.
10     A    Well, I think, as we discussed --
11         MR. NAJVAR:  If you know.
12     A    Okay.  Will you restate the question, please?
13     Q    (By Mr. Hicks)  Sure.  In that response
14  number 2 on Exhibit 2 it says there that you -- just to
15  make sure I quoted it, "Virden has been a candidate for
16  Austin office, under Texas and Austin law, continuously
17  since December 15, 2020."
18              What is your understanding of what you
19  were a candidate for at that time?
20     A    Well, I believe what we discussed previously
21  in my other deposition was that at the time I knew I
22  was going to be running for an office, either a
23  District 10 city council -- or whatever my district
24  number was going to be after remapping, but it's still
25  in the same residence -- or mayor.  And so yes, I have

**Page 11**

1  been continuously campaigning since the runoff, but I
2  think I, I think I announced my candidacy that I
3  determined to be mayor in February, I think.
4      Q    Okay.  While we're on this exhibit,
5  Deposition Exhibit 2, would you look at your response
6  to request number 1 where you say you've been at your
7  8307 High Oak Drive residence continuously since
8  October 2017?  You see that?
9      A    Yes.
10     Q    That's still true, correct?
11     A    Yes.
12     Q    How long have you resided at that address?
13     A    I think, well, about 13 years.
14     Q    Okay.  And did you reside in Austin before
15  that?
16     A    Yes.
17     Q    Okay.  How long?
18     A    Forever.
19     Q    Forever?
20     A    55 years or -- I've been here 55 years.
21     Q    Okay.  And when did you start to take what I
22  would broadly characterize as an active interest in
23  Austin politics?
24     A    Probably 2008.
25     Q    What, what was the occasion for that?

**Page 12**

1      A    I just started being more politically
2  engaged, paying more attention.  But, and then it
3  evolved from 2008 to 2012 to 2016.  It just evolved.
4      Q    And is there any particular issue or event --
5      A    Well --
6      Q    -- that you recall in 2008 or 2012 or 2016?
7      A    Nothing in particular way back then, but I
8  will say it was the lifting of the camping ban and
9  defunding the police that -- in 2019 and 2020.
10     Q    Right.  But I'm looking before that.
11     A    I couldn't tell you back then anything.  I
12  just --
13     Q    Okay.
14     A    -- became more interested.
15     Q    And what did you do in connection with being
16  interested?
17     A    Just reading and following, but nothing --
18     Q    Local news?
19     A    Yes.
20     Q    Local coverage, TV and radio and newspaper I
21  suppose?
22     A    Yes.
23     Q    Okay.  Anything else that stands out for you
24  in terms of actively following?
25     A    No.

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

Page 13

```
1    Q    Were you participating in any political clubs
2  at that time?
3    A    Yes.
4    Q    What?
5    A    The Young Americans for Liberty.  My son was,
6  I believe he was a -- he restarted the chapter of Young
7  Americans for Liberty on the UT campus.
8    Q    And when was that?
9    A    Let's see.  He graduated in 2015, so 2012 or
10 so.
11   Q    Any other clubs that you can think of?  Any,
12 any particular club or association or organization that
13 was focused more on City of Austin politics than, and
14 policy, than broader matters?
15   A    I don't recall any.
16   Q    Okay.  So election day -- you can put that
17 exhibit back if you want.  Election day for mayor is
18 November 8th, 2022, correct?
19   A    Yes.
20        MR. HICKS:  Okay.  Let's look at
21 Tab 5.
22   A    Did you say you want to give these back to
23 her?
24   Q    You can slide them back.  I don't think we'll
25 ever come back to them.
```

Page 13

Page 14

```
1        MR. NAJVAR:  Is this your copy?
2        MR. HICKS:  That's your copy.
3        MS. NORTON:  That's y'all's.
4        (Exhibit No. 3 marked.)
5    Q    The court reporter's going to hand you an
6  exhibit marked Exhibit 3 for your deposition.  Do you
7  see what that is and understand the --
8    A    I'm just -- I just need to read it.  I assume
9  it's when they -- hold on.  I actually don't assume
10 that.  Let me read this.
11        Okay.  It's about maximum contribution
12 limits.
13   Q    It's the city clerk's determination --
14   A    Mm-hm.
15   Q    -- for the purposes of this election of what
16 the contribution limits are?
17   A    Yes.
18   Q    And the individual contribution limits it
19 shows for the November 8th election are $400, right?
20   A    Correct.
21   Q    And there's something called an aggregate cap
22 or aggregate limit?
23   A    Yes.
24   Q    It's at $41,000, and that concerns
25 contributions outside -- if you'll turn to the second
```

Page 14

Page 15

```
1  page -- those area codes?
2    A    Yes.
3    Q    From outside the area?  Okay.  And then
4  there's the exhibit also shows separate caps,
5  individual (indistinct) for any runoff election that
6  may happen, right?
7    A    Yes.
8    Q    Okay.  As I said, some of this is just basic
9  stuff.
10        Now, the formal opening in terms of the
11 time in which you can file to run for the office of
12 mayor with the city was July 22nd; is that correct?
13   A    I believe so.  I believe it was in July.  I
14 don't remember the exact date, but yes.
15   Q    Okay.  I'll represent to you that it is.
16   A    Okay.
17   Q    Great.  And then there was -- it's a 30-day
18 window to file, correct?
19   A    Mm-hm.
20   Q    So it was until August 22nd of 2022 --
21   A    Yes.
22   Q    -- to file.  And after those filings --
23        MR. HICKS:  Tab 7.
24   Q    -- the council drew for order of names on the
25 ballot, correct?
```

Page 15

Page 16

```
1    A    Yes.
2        (Exhibit No. 4 marked.)
3    Q    And you're now looking at Deposition Exhibit
4  No. 4, and this is the revised version, correct --
5    A    Yes.
6    Q    -- of that?  Because somebody dropped out?
7    A    Yes.
8    Q    Okay.  So it shows how many people running
9  for mayor?
10   A    Six.
11   Q    And where, where are you on the ballot?
12   A    Five.
13   Q    Are you -- can you identify any of the people
14 in that list on Exhibit 4 that are incumbents, either
15 for -- either sitting city council members or sitting
16 mayor?
17   A    No.
18   Q    None are, right?
19   A    None are.
20   Q    Am I correct that, am I correct that you've
21 only run for public office once before?
22   A    Yes.
23   Q    That was in the race for Council District 10
24 in 2020, right?
25   A    Yes.
```

Page 16

4 (Pages 13 to 16)

```
 1              MR. HICKS:  Let's look at Tabs 2
 2    and 28.
 3              (Exhibit No. 5 marked.)
 4              THE REPORTER:  That's 5 and 6.
 5        Q    (By Mr. Hicks)  You have now in front of you
 6    two deposition exhibits, 5 and 6.
 7              MR. NAJVAR:  Renea, can we identify
 8    which is which just for the record?
 9              MR. HICKS:  Sure.  I can't, because
10    I can't read upside down very well.  Deposition Exhibit
11    5 is an application by Ms. Virden for a place on the
12    City of Austin ballot for November 3, 2020, and the
13    Exhibit 6 is her appointment of a campaign treasurer.
14        Q    Those two exhibits reflect that you entered
15    the race on August 17th -- to be able to raise funds on
16    August 17, 2020, correct?
17        A    Yes.
18        Q    Do you consider that rather late in the
19    process to have come in?
20        A    No.
21        Q    Why is that?
22        A    Because it was still in the filing window.
23        Q    And in terms of getting a campaign up and
24    going, though, do you consider it rather late?
25        A    For a first-time candidate just jumping in,
```

Page 17

```
 1    you are, you're not thinking about timing of
 2    everything.  This was my first run, and I knew I had
 3    until that date to make my decision.  And so that was
 4    what played into this decision, was just making sure
 5    that I wanted to run for District 10 city council.
 6        Q    Right.
 7        A    There's not a lot of strategy when you're a
 8    brand-new candidate.
 9        Q    I'm not sure what that means.
10        A    There wasn't -- I don't know what you want to
11    know about it.  Just maybe ask me a specific question.
12        Q    Well, I mean I want to know what you meant
13    when you're just not strategy.
14        A    All I knew at the time was I had until August
15    17th to do any of it.  I knew that we had a window, and
16    so I made sure and took my time to make sure that's
17    what I wanted to do, so...
18        Q    Looking back now that you've had more
19    experience as a candidate, do you consider that rather
20    late to enter into a race in terms of political
21    advantages?
22        A    A political advantage would have been to file
23    sooner, for sure, to do all the things that we needed
24    to do to fundraise and just announce to the world that
25    we're running.  Yeah.  It would, it would have been
```

Page 18

```
 1    better to announce sooner, yes, to file and start
 2    running sooner.
 3        Q    So had your personal financial situation
 4    changed in any way around that time?
 5        A    Not significantly at that time.  No.
 6        Q    And what about between then and now?
 7        A    Yes.
 8        Q    In what way?  And generally; I'm not looking
 9    for great detail.
10        A    I don't know how to state that.  It's, it's
11    not -- I don't --
12              THE WITNESS:  How am I supposed to
13    answer that?
14              MR. NAJVAR:  Well, let me just --
15    like he said, he's not looking for specific details.  I
16    think he's just asking a general question about your
17    financial situation.  Maybe he can --
18              MR. HICKS:  I don't mind asking
19    more detail.  I was trying not to go into as much
20    detail.
21        Q    So what I'm trying to get at is, were
22    you -- do you consider yourself more financially secure
23    now than you did back when you ran for the District 10
24    race?
25        A    More, yes, but I was financially secure back
```

Page 19

```
 1    then as well.
 2        Q    Okay.  Okay.  That's really all I wanted.
 3              MR. HICKS:  Let's look at Tab 19.
 4              (Exhibit No. 7 marked.)
 5        Q    You have in front of you Deposition
 6    Exhibit 7.  That's the Plaintiffs', plural, Second
 7    Amended Complaint.
 8        A    Mm-hm.
 9        Q    Do you see that?
10        A    Yes.
11        Q    You're familiar with this document?
12        A    Yes.
13        Q    Okay.  In this document, generally speaking,
14    you sued the city and you claim that two of its rules,
15    one that's in the city code and one in the city
16    charter, are violations of your First Amendment rights;
17    is that correct?
18        A    Yes.
19        Q    The main, what I call the main challenge --
20    the other one's kind of provisional.  The main
21    challenge is to a rule that a candidate for city office
22    may only solicit and accept contributions during the
23    365-day period before election day for that office,
24    right?
25        A    Yes.
```

Page 20

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1  Q   And if you look at paragraph 3 on page 2 of
2  that exhibit, you'll see there -- page 2 of paragraph
3  3 -- yeah.  In there you, you refer to that -- or your
4  attorney in drafting this refers to that by the
5  shorthand the "new blackout period."
6  A   Mm-hm.
7  Q   Do you see that?
8  A   Yes.
9  Q   Okay.  And if you go back to page 18 -- I'm
10 sorry -- yeah, page 18, which is the last, the last or
11 next to the last page, and in paragraphs 1 through 3 of
12 the Prayer for Relief there's where you level the
13 challenge against, your claim against and ask for
14 relief as to the new, what you call the new blackout
15 period, right?
16 A   Let me read that, please.
17 Q   Uh-huh.
18 A   Yes.
19 Q   Okay.  There's also a challenge to the city
20 charter provision leveled in here.  I'm getting into
21 more details later, but I'm just trying to get a
22 general picture.  There's also a challenge to the city
23 charter provision that has some rules about campaign
24 finance that you level only to the extent and if it
25 sets a one-year fundraising limit.  Do you recall that?

Page 21

1  that ordinance and subsection, the subsection of it
2  that adds (B) to 2-2-7 of the city code.  Do you see
3  that?
4  A   Mm-hm.
5  Q   That's the provision you're saying is
6  unconstitutional, correct?
7  A   Yes.
8  Q   Just read it if you don't mind.  It's in the
9  record.
10 A   "The campaign period for a general election
11 begins the 365th day before the date of the general
12 election."
13 Q   Okay.
14       MR. HICKS:  Now let's look at Tab
15 1A.
16       (Exhibit No. 9 marked.)
17       MR. NAJVAR:  Is this Exhibit 8 now?
18       THE WITNESS:  This is 9.
19       MR. HICKS:  This is Exhibit 9.
20       THE WITNESS:  This one.
21       MR. HICKS:  Exhibit 8 is the city
22 ordinance of 2017.
23       MR. NAJVAR:  Okay.
24       MR. HICKS:  And Laura is keeping a
25 running tab if you want to check with her.

Page 23

1  A   Yes.
2  Q   That's the way I feel about it too.  And in
3  that, in the shorthand version for that -- and we can
4  go into more detail about it, but the shorthand version
5  for that, and you can look at -- well, you don't need
6  to look -- is that it allows unsuccessful candidates
7  for city office to raise funds to pay off campaign
8  expenses and some unreimbursed expenditures, right?
9  A   Yes.
10 Q   Okay.  Now let's look at the two sets of
11 rules.
12       MR. HICKS:  Let's look at Tab 1.
13       (Exhibit No. 8 marked.)
14       THE REPORTER:  Exhibit 8.
15 Q   That's the city ordinance that put into law
16 the one-year fundraising limit you're challenging,
17 correct?
18 A   It appears to be.  Yes.
19 Q   It was enacted on October 5th, 2017, to take
20 effect on October 16th, 2017, correct?  Take a second
21 to look if you want.
22 A   It takes effect on October 16th, 2017.
23 Q   Enacted on October 5th, correct --
24 A   Yes.
25 Q   -- by the council?  Okay.  Look at Part 2 of

Page 22

1       MR. NAJVAR:  Okay.
2  Q   (By Mr. Hicks)  Okay.  You've got in front of
3  you Exhibit 9 now.  That is -- I'll represent to you I
4  copied that and pasted it.  So that is, this is the
5  city charter provision that you're provisionally, I'll
6  call it provisionally challenging.  This uses the term
7  "unsuccessful candidate."  Do you see that?
8  A   Yes.
9  Q   The first time you were an unsuccessful
10 candidate was after the December 2020 runoff election
11 for District 10, right?
12 A   Yes.
13 Q   Did you have unpaid expenses after that race?
14 A   Well, I had, I had loaned myself money, and I
15 paid myself back with remaining campaign funds.  I
16 don't know if that's the same as unpaid expenses, but I
17 don't --
18 Q   Okay.  Aside from that.
19 A   I, I paid any expenses from the, the leftover
20 campaign funds, so I don't know at what point were they
21 unpaid.  They weren't unpaid after I paid them.
22 Q   Well, I mean were they unpaid -- here.
23       After the runoff concluded and the
24 results were announced --
25 A   Mm-hm.

Page 24

6 (Pages 21 to 24)

**Page 25**

```
1       Q      -- did you have any remaining unpaid expenses
2  from your campaign other than the loan issue which we
3  are --
4       A      Yes.  Yes.
5       Q      -- which we are --
6       A      Oh, sorry.
7       Q      -- addressing?  Go ahead.
8       A      Yes.
9       Q      Okay.
10      A      I had to pay some bills after the runoff
11 election.
12      Q      Okay.  And do you recall what they were?
13      A      They were --
14      Q      I don't mean specifically.
15      A      Yeah.  Just regular campaign expenses.  I
16 can't think exactly what they were, but I remember
17 writing some checks.
18      Q      Okay.
19      A      Nothing that seemed out of the ordinary to
20 me.
21      Q      Did you have unreimbursed campaign
22 expenditures from personal funds that were made with
23 the intent to seek reimbursement from political
24 contributions?
25      A      I don't recall that after the runoff.  I do
```

**Page 26**

```
1  recall in one of my C&Es that I did have some --
2                  THE REPORTER:  In one of your what?
3                  THE WITNESS:  C&E, C and E.
4                  THE REPORTER:  Thank you.
5       A      I don't remember which C&E report that was.
6       Q      What is a C&E report?
7       A      Contributions and expenditures.
8       Q      Oh, okay.
9       A      In one or more of my C&Es I did have
10 person- where I had to reimburse myself for expenses I
11 paid out of personal funds, but I don't remember how
12 many or which reports those were.
13      Q      Okay.  And after the results of the runoff
14 election were official -- I guess that would be after
15 the city canvass --
16      A      Mm-hm.
17      Q      -- did you solicit and accept political
18 contributions to pay these expenses or unreimbursed
19 expenditures?
20      A      No.
21      Q      So looking back at Exhibit 8 -- actually it's
22 Part (B), the part you're challenging, 2-2-7(B) -- did
23 that have any effect on your 2020 council race?
24      A      No.
25                  MR. HICKS:  Now let's look at Tab
```

**Page 27**

```
1  3, which would be Deposition Exhibit 10.
2                  (Exhibit No. 10 marked.)
3       Q      It's a cover email from you sending what?
4       A      "Please confirm your receipt of the attached
5  form."  That was the amendment to the Appointment of a
6  Campaign Treasurer by a Candidate.
7       Q      Okay.  And you sent it on May 6; it
8  technically shows up on the second page to being filed
9  on May 10th of 2021, right?
10      A      Correct.
11      Q      And the only thing that changed there with
12 regard to the campaign treasurer is your designation of
13 the office sought, correct?
14      A      Correct.
15      Q      And you changed it from Austin City Council
16 District 10 to what?
17      A      "November 2022 Mayor or Council District."
18      Q      Okay.  Which council district were you
19 referring to, if you recall?
20      A      At the time it would have been 10, because
21 that's where I lived, and it is still 10.  But it could
22 have changed during remapping.
23      Q      Okay.
24      A      The council district number could have
25 changed.
```

**Page 28**

```
1                  MR. HICKS:  Tab 4.
2                  (Exhibit No. 11 marked.)
3       Q      Now I'm going to hand you Deposition
4  Exhibit 11.  It's another amendment, am I correct, to
5  the designation of campaign treasurer?
6       A      Yes.
7       Q      And there's again only one change that you're
8  making, correct?
9       A      Yes.
10      Q      And that is from "November 2022 Mayor or
11 Council District" to what?
12      A      "Mayor of Austin."
13      Q      Okay.
14                  MR. HICKS:  Tab 6.
15                  (Exhibit No. 12 marked.)
16      Q      You now have in front of you Deposition
17 Exhibit 12, and can you just briefly describe what that
18 is?
19      A      "Application for a Place on the Ballot for a
20 General Election for a City, School District or Other
21 Political Subdivision."
22      Q      And this is your application that you filed
23 to run for mayor, right?
24      A      Yes.
25      Q      And you filed it on August 19th, 2022,
```

7 (Pages 25 to 28)

1    correct?
2         A    Yes.
3         Q    Why did you wait till nearly the end of the
4    30-day period to file this?
5         A    Because I wanted to wait to see who else was
6    going to throw their name in the hat and see if it made
7    any difference for whether or not they were going to do
8    it.
9         Q    Why would it make a difference to you whether
10   they're doing that, since you'd already decided to run
11   for mayor?
12        A    Because I wanted to know if -- let me, let me
13   think about how to word that.  I think it would have
14   affected who would ultimately decide to file to run
15   also.
16        Q    I'm not sure I follow.
17        A    Well, for example, in 2020 when Robert Thomas
18   filed to run, he filed the run I think two or three
19   days before the end of the filing period in my
20   district.
21        Q    Yes.
22        A    And I don't think he would have chosen -- I
23   think he would have thought different about filing to
24   run if he had known I was going to also throw my hat in
25   the ring, and I really just wanted to file on the next

                                              Page 29

1    to the last day or the last day this time just because
2    I didn't -- I wanted my potential opponents to wonder
3    whether or not she was really going to file to run.  It
4    was a strategic move.
5         Q    Just trying to figure out the strategy.  It
6    was a strategic move to try to keep other candidates
7    from potentially filing?
8         A    It was a strategic move to anybody who was
9    still thinking about filing to run.  I don't want them
10   to know what I'm going to do until the very last
11   minute, and that's what I did.
12        Q    But you had announced you were running for
13   mayor a year before.
14        A    Right, but they also -- in this circle when
15   you file everybody's watching:  Has she filed yet?  Has
16   he filed yet?  It's just, it's a thing.  I mean --
17        Q    Well, I don't know what the thing is.
18        A    Well, it's obvious that -- because you're not
19   committed until you have actually gone to file.
20        Q    Right.
21        A    And so your opponents are out there
22   wondering:  Was she just saying she's going to run, or
23   is she actually going to run?  And so it's just a
24   strategy move.
25                  MR. HICKS:  Tab 8.

                                              Page 30

1                  (Exhibit No. 13 marked.)
2         Q    You have in front of you Deposition Exhibit
3    13.  Those are, I'll let you know, your -- this is
4    before Mr. Clark became a plaintiff -- your initial
5    disclosures in this case.
6                  MR. HICKS:  I've forgotten the date
7    off the top of my head.  What's the date of it?
8                  MS. NORTON:  3/15.
9         Q    March 15 of 2022.  Will you look at, first
10   look at Tab A -- or I don't know what to call it.
11   Paragraph A we'll call it -- where you designate
12   people -- your lawyer actually designates people with
13   potentially relevant knowledge of the facts of the
14   case.  Do you see anything in that list to either add
15   to or subtract from?
16        A    As far as --
17        Q    Would you add anyone or subtract anyone
18   from --
19        A    With relevant knowledge to the case?
20        Q    Potentially.  Yeah.
21                  MR. NAJVAR:  Well, and just for the
22   record, Jennifer and Renea, I'm going to object to the
23   question to the extent it calls for a legal conclusion,
24   and I think it's a question really directed to an
25   attorney.

                                              Page 31

1                  MR. HICKS:  Well, I just, I'm going
2    to see, because it hasn't been updated, so I just want
3    to see.
4                  MR. NAJVAR:  Well, okay, but my
5    issue is --
6                  MR. HICKS:  I understand, and you
7    can object.  She can answer as best she can.  I don't
8    want to know the legal conclusion.
9                  MR. NAJVAR:  Okay.  But just, just
10   for the record, I think it's, it's, I don't want to use
11   the term misleading, I'm not suggesting you're trying
12   to mislead her, but I'm just saying it's unclear.  When
13   you're asking her if, if anybody should be added to
14   this, you have to, you have to -- in order to answer
15   that question you would have to know legally what this
16   question calls for, and that's really a rules-based
17   issue.
18                  MR. HICKS:  Well, okay.  I'm still
19   asking the question.  So I understand your objection.
20                  MR. NAJVAR:  Okay.
21                  MR. HICKS:  And I'm not trying
22   to -- this is not a trick question.  I'm just trying to
23   find out.
24        Q    So are you aware of anybody you think should
25   be taken off that list or added to it as you sit here

                                              Page 32

8 (Pages 29 to 32)

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

**Page 33**

```
1   today?
2       A   I am not aware.
3       Q   Okay.  Look at paragraph B.  Now I have to
4   remember what paragraph B says.  Are you aware of any
5   changes that need to be made to paragraph B as you sit
6   here today?
7              MR. NAJVAR:  Same objection.
8       A   I'm not aware.
9       Q   (By Mr. Hicks)  Okay.  I'll come back to C
10  later, so you can put that aside if you want to.
11             I'm next going to hand you two exhibits.
12  The first one is --
13             (Exhibit No. 14 marked.)
14      Q   Exhibit 14 are your responses to the city's
15  first set of interrogatories in the case, and
16  Exhibit 15, which you're going to be handed in just a
17  second --
18             (Exhibit No. 15 marked.)
19      Q   -- are your responses to, supplemental
20  responses to the first set of interrogatories.  Do you
21  have those in front of you?
22      A   Yes.
23      Q   And I'm just going to -- I'm not going to ask
24  whether you want to make changes.  I'm just going to
25  assume for now that you don't have any and your
```

**Page 34**

```
1   attorney will make the decision.
2              Look at your response to Interrogatory
3   No. 10, and I think you can look on the supplemental
4   response, the second set, 15.  Yeah.  I think it starts
5   on page 4, bottom of page 4.  I may have that wrong.
6       A   Tell me -- I'm sorry.  Bottom of page 4?
7       Q   Yeah.  You've got a series -- it's response
8   to number 10.
9       A   Okay.  I see it.  Yes.  Okay.
10      Q   And it starts -- that response is a long list
11  of campaign communications, right?
12      A   Yes.  Yes.
13      Q   And they run from pages 4 through 16 of
14  Exhibit 15.
15      A   Yes.
16      Q   And in the answer to number 11 there -- you
17  can go look if you want -- you say those things are
18  political advertisements that you've listed there.
19  Okay?
20      A   Yes.
21      Q   Okay.  And you list different mediums through
22  which you make these communications.  You see that?
23      A   Yes.
24      Q   Constant Contact, Facebook, Twitter, radio,
25  and a live policy forum, correct?
```

**Page 35**

```
1       A   Yes.
2       Q   You can look.  Take your time.
3       A   I have to remember the live policy forum.
4       Q   Westminster.
5       A   Oh, yes.  Okay.
6       Q   Where people like me hang out.  Okay.  So
7   what is Constant Contact?
8       A   It is an email service, an email blast
9   service.
10      Q   How does it work?
11      A   You can upload email lists and send one email
12  to a group of people.
13      Q   Where do you get the list?
14      A   You hopefully obtain them through your
15  campaign website when people go to subscribe to your
16  email blasts.  That's --
17      Q   Is that the principal way?
18      A   That's the principal way.
19      Q   Do you know -- how much does it cost?
20      A   Just for that it would cost to set up your
21  website and make --
22      Q   Not the website part.  I'm sorry.  Constant
23  Contact, using it.
24      A   Oh.  I think the cost of Constant Contact,
25  actually, the cost to use it depends on how many emails
```

**Page 36**

```
1   you are actually sending.
2       Q   Okay.  And how many were you sending,
3   roughly?
4       A   I think it started out around 2,500 persons,
5   maybe got up to 5,000 maybe.  I don't -- maybe, maybe
6   just 3,500.  I can't remember.
7       Q   Okay.  And the Facebook communications you
8   list here, are they -- I don't do Facebook, so, sorry,
9   I'm going to ask really stupid questions about this.
10  But did you create a special site for your campaign for
11  Facebook communications, or did you use your personal
12  Facebook page?
13      A   I have a campaign Facebook page.
14      Q   And is there a cost associated with
15  maintaining that page?
16      A   No.
17      Q   And can you tell how many people view it or
18  access it?
19      A   You can tell how many followers you have.
20      Q   And how many did you have -- do you have?
21  Did you have, is a better way to ask.
22      A   I don't know how many I had in --
23      Q   Roughly?
24      A   -- 2020, not even roughly.
25      Q   In 2021 do you know?
```

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1     A   I do not know.
2     Q   In 2022 do you know?
3     A   I want to say 1,400.  That may or may not be
4  correct.
5     Q   Is that a situation where you let them follow
6  you, or they choose to follow you whether you want them
7  to or not?
8     A   They can follow you, or you can invite them
9  to follow you and -- yes.  That's how that works.
10     Q   Okay.  And then you have communications
11  through via Twitter.  Is there a cost associated with
12  maintaining your Twitter account?
13     A   No.
14     Q   And is the Twitter account you're referring
15  to here one specially created for your campaign, or is
16  it just whatever you say regardless of your campaign?
17     A   It's my campaign Twitter account.
18     Q   Okay.  And can you tell how many people
19  access your tweets on your campaign account?
20     A   You can.  I cannot now, though, because I
21  cannot access the analytics for some reason, but
22  typically you can tell.
23     Q   When you could, how many were you reaching?
24     A   It could vary widely from 20 to -- it's been
25  so long since I've been able to access the analytics, I

Page 37

1     A   No.
2     Q   Look at pages 4 through 5, item 3 of
3  Exhibit 15 I think.
4     A   I'm sorry, what page?
5     Q   Bottom of page 4 over to, running over to
6  page 5.
7     A   Okay.
8     Q   Is that item 3, is that a -- let me just see
9  if I see it.
10     A   Yes.
11     Q   Yes.  I'm sorry.  May I see that again?
12  Yeah.  So what is, what is that referring to?
13     A   That is a Constant Contact email.
14     Q   About what?
15     A   "Subject:  For Immediate Release:  Virden
16  Takes Action in Federal Court."
17     Q   All right.  So your response there
18  characterizes that as a political communication.  Why
19  did you consider that a political communication?
20          MR. NAJVAR:  Objection to the
21  extent it calls for a legal conclusion, but you can
22  answer, Jennifer, if you know.
23     A   Question again, please?
24     Q   (By Mr. Hicks)  That's a political
25  advertisement, according to your answer there.

Page 39

1  can't remember.  A couple thousand, 2,500, I think, or
2  so.
3     Q   Okay.  And then you mentioned radio ads.  Do
4  you -- you may have said somewhere in here and I may
5  have missed it, but do you recall the cost of those
6  radio ads?
7     A   About $100 for 30 seconds.
8     Q   And how many did you run?  How many times did
9  you run them?
10     A   I don't recall exactly how many.
11     Q   Okay.  And on the Westminster forum that we
12  talked about were you the only person on the panel
13  presenting, or were there others?
14     A   Just me.  Yes.
15     Q   And how many people attended that you recall?
16     A   40, 30 or 40.
17     Q   How long did it last, roughly?
18     A   45 to 60 minutes.
19     Q   So for the communications and any costs
20  associated with them that you used before -- between
21  December 15th, 2020 and November 8th, 2021, what source
22  of funds did you use to pay for that?
23     A   I had leftover campaign funds from the 2020
24  run.
25     Q   Any other source?

Page 38

1     A   Mm-hm.
2     Q   Why do you consider telling people about the
3  lawsuit being filed a political advertisement?
4     A   It's politically related, and I think I
5  probably wanted to inform my campaign supporters that
6  I was taking action regarding something that's
7  politically related regarding campaign contributions.
8     Q   I guess what I'm trying to understand is, are
9  you saying that this lawsuit is part of your political
10  campaign?
11     A   I think it would be considered an issue, just
12  like things that are coming across the City of Austin
13  dais about political goings-on in Austin and, I mean,
14  it is politically related.  It has to do with campaign
15  contributions in the city of Austin.
16     Q   Okay.  And now I'm going to show you what's
17  been marked as Deposition Exhibit 16.
18          (Exhibit No. 16 marked.)
19     Q   This is a really easy one.  Do you have any
20  change to make to that response?
21     A   I don't have any changes.
22     Q   Okay.  Next, Deposition Exhibit 17 is being
23  shown to you.
24          (Exhibit No. 17 marked.)
25     Q   It's headed "First Supplemental Verification

Page 40

10  (Pages 37 to 40)

**Page 41**

1  of Jennifer Virden."  Do you see that?
2      A  Yes.
3      Q  Filed April 1st, 2021 in this lawsuit?
4      A  Yes.
5      Q  Okay.  Okay.  Look at paragraph 3 there, and
6  this is, as I said, April 1, 2021.  You say that you
7  want to raise funds to pay for advertisements to run
8  for city office for November 2022 election.  Do you see
9  that?
10     A  Yes.
11     Q  And this was, you agree, about seven months
12  before the fundraising window under the rules opened,
13  correct?
14     A  Yes.
15     Q  There's a discussion in this paragraph.  You
16  say that what you mean by wanting to do this is, you
17  want to provide your positions and ideas regarding
18  current issues in Austin.  You were free to do that
19  anyway, right, regardless of the fundraising?
20     A  Yes.
21     Q  And is it your position that the fundraising
22  window being closed kept you from being able to do it
23  as much or broadcast as much as you want -- wanted to?
24     A  Correct.
25     Q  In fact, though, you did spend money staking

**Page 42**

1  that position before November 8, 2021, didn't you, on
2  public issues in Austin?
3      A  Yes.
4      Q  Do you have some understanding, or did you
5  then have some understanding, of how much more you
6  thought you needed to spend or wanted to spend to do
7  that?
8      A  Wanted to receive contributions --
9      Q  How much --
10     A  -- and plan on my plan spending.  Yes.
11     Q  How much more?
12     A  As much as possible.
13     Q  Well, I mean, did you have any estimation in
14  mind when you wrote this of how much it was?
15     A  If I were going to be running for mayor, I
16  knew historically that it takes a million-plus dollars
17  to run for mayor typically in this town, and I knew I
18  wanted to start raising money as soon as possible to
19  build my funds and then as quickly as possible to also
20  know how I could budget them throughout the campaign
21  before November 8th, 2022.
22     Q  But did you know how much more you needed to
23  raise in this period between this declaration and the
24  November 8th period?  Did you have an estimation of it?
25     A  I'm going to say yes.  I wanted to -- my goal

**Page 43**

1  was a million dollars.
2      Q  Before November 8th?
3      A  Before November 8th?
4      Q  2021.
5      A  2021?  Yes.  I already knew how much it cost
6  to run for mayor.
7      Q  No.  That -- my -- was your goal to raise a
8  million dollars before November 8th, 2021 in order to
9  be able to get the word out the way you wanted to?
10     A  The goal is to --
11     Q  No.  Wait.  Answer that question.
12     A  Say it again.
13     Q  Okay.  Was your goal to raise a million
14  dollars for your mayoral campaign before November 8th,
15  2021 in order to get the word out on issues the way you
16  wanted to?
17     A  Are you asking me if I wanted to, like,
18  already have obtained the goal of one million dollars
19  by that date?
20     Q  Did you, did you have a goal in mind of that
21  amount?
22     A  Yes.
23     Q  Okay.  And did you have any understanding or
24  reasonable basis for expecting that you could raise a
25  million dollars for your mayoral campaign before

**Page 44**

1  November 8th, 2021 without the fundraising-window
2  restriction?
3      A  Are you saying if it weren't in place --
4      Q  Yes.
5      A  -- would I have expected to be able to do
6  that?
7      Q  By November 8th, 2021, yes.
8      A  Well, are you saying that I would have
9  expected to have raised a million dollars by November
10  8th, 2021?
11     Q  Yes.
12     A  No.  I don't believe so.
13     Q  How much did you expect you would have been
14  able to raise?
15     A  I didn't have any dollar amount expectation
16  exactly.  I just didn't.
17     Q  Why?
18     A  Because the goal in my mind was to raise as
19  much as possible.  It wasn't an exact dollar amount.
20  And also, it gets raised -- it doesn't all come in an
21  even pace.
22     Q  Right.  But how much -- I mean, you're saying
23  that the restriction kept you from getting the word out
24  the way you wanted to because you couldn't raise the
25  money you wanted to.  So I would assume, and this is

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

**Page 45**

1  what I'm trying to get clarity on, that you had some
2  sense of how much was enough for you to be able to get
3  the word out the way you wanted to before November 8th,
4  2021.  Can you tell me that?
5      A    No.
6           MR. HICKS:  Let's look at Tab 13.
7           (Exhibit No. 18 marked.)
8      Q    You now have before you Deposition
9  Exhibit 18.  This is your second supplemental
10  verification, right?
11     A    Yes.
12     Q    And in there you describe some political ads
13  you ran and state that you paid $2,205 in leftover
14  funds from your District 10 race account?
15     A    Yes.
16     Q    And then you say -- and if I'm saying this
17  wrong, correct me.  Then you say that you would have
18  spent more for ads but couldn't because you couldn't
19  raise funds.  Do you see that?
20     A    Yes.
21     Q    And do you stick by that assertion today?
22     A    Yes.
23           (Exhibit No. 19 marked.)
24     Q    You have Deposition Exhibit 19.  Now, the
25  first few pages of that are a pleading; it's your

**Page 46**

1  applications for a temporary restraining order that
2  your attorney filed.  But the last two pages I believe
3  of it -- last page -- is a verification dated May 26,
4  2021 by you saying all the facts stated in the
5  application are true and within your knowledge.  Do you
6  see that?
7      A    Yes.
8      Q    In the text of the pleading you assert, and
9  I'll find the page, that not being able to raise funds
10  in the pre-November 8, 2021 period irreparably injured
11  you.  You can read that if you want to.
12           What does -- what's your understanding
13  of how you were irreparably injured in your mayoral
14  campaign by not being able to raise founds before
15  November 8, 2021?
16     A    There are several ways, actually.  First of
17  all, I was not able to parlay the momentum that I had
18  coming out of that District 10 runoff in which I
19  nearly defeated a very well-funded incumbent as a
20  first-time candidate.  So then I lost the momentum with
21  all -- with my supporters.  When you're not able to
22  continue to receive contributions when everybody's
23  fired up about your platform, they assume the cycle's
24  over.  But if they're still -- if they're allowed to
25  continue to make contributions, that's how your

**Page 47**

1  supporters actually contribute to the political
2  movement.  That's the part that they do.  They, they
3  give me money, and then I go out and I'm the figurehead
4  and the speaker for the movement, and I'm the candidate
5  that they're supporting.
6           But when they're not able to do the part
7  that they do, which is give you money so that you can
8  spread the message that's completely in direct
9  contradiction to what's actually happening in the city
10  of Austin in the lockstep, unison voice on the City of
11  Austin dais, then it just sucks the oxygen right out of
12  the campaign.  It just kills it.
13           And then, so then you've got to wait.
14  In my case I had to wait, what, 10 or 11 months before
15  I could start receiving money again?  So then meanwhile
16  all your supporters have com- they've just completely
17  disengaged from -- they think that the cycle's over,
18  we're not doing anything until November 8th.  So then
19  I've got to go restart everybody, recontact everybody,
20  get everybody back engaged.
21           And also, that's 11 months when I don't
22  have time to continue building up my, my campaign war
23  chest to compete against incumbents, or anybody who
24  happens to be even a candidate who is not an incumbent
25  who is actually a member of Austin's political

**Page 48**

1  establishment, and that's the anointed one.  We have a
2  group of Austinites, very well-funded, that when they
3  decide that they have anointed their chosen candidate,
4  they as a couple contribute the max -- in this case now
5  it's $900 per couple -- and that's what they do.  They
6  get behind.
7           So they -- and in this case I think we
8  can -- we'll just say we know it's Kirk Watson in the
9  mayoral race.  So now I'm, I'm not the anointed one, so
10  I could definitely have used another 11 months to keep
11  receiving my campaign contributions from a whole lot
12  more people, because not everybody is able to afford to
13  contribute the max, especially as a couple.  So now I
14  could have used, as a challenging candidate to the
15  in-unison voice of the City of Austin, I could have
16  used that additional time to get hundreds if not
17  thousands of more smaller-dollar donations, whereas the
18  anointed ones with the political establishment here in
19  Austin, it's a few hundred -- it's a few thousand
20  people that have to max out at $450 per person.
21           It's just not, it's not -- the whole
22  reason that I understand that we have this temporal
23  window is to prevent corruption, when in fact, in my
24  opinion as an experienced candidate now, it is
25  completely -- works completely in direct contradiction

1   to preventing corruption.  Because now we have a
2   political establishment in Austin of a few hundred
3   people who get together, decide who their chosen
4   candidate is, and then they immediately throw max
5   contributions at that candidate, making it very
6   difficult for people like me, a challenging candidate,
7   to fundraise equally, because we have a limited number
8   of people in Austin that actually make political
9   contributions.
10      Q    This deposition may go on a little longer
11  than I thought if every answer's that long.  So --
12      A    That's an important answer.
13      Q    Okay.  So you said it killed your campaign,
14  but you're still campaigning.  Can you explain that?
15      A    Still campaigning?
16      Q    Yeah.  You said --
17      A    I'm still campaigning.
18      Q    You said this rule killed your campaign.
19      A    It sucks the oxygen out of it.
20      Q    Well, you said it killed the campaign.  I
21  want to know what you meant.
22      A    Okay.  So I rephrase that:  Slowed the
23  momentum.
24      Q    Okay.  And this started off with the question
25  how did it irreparably harm it.  Not how did it harm

Page 49

1   it; how did it irreparably --
2       A    It irreparably --
3       Q    -- harm it?
4       A    I can't go back 11 months and tell everybody,
5   Oh, hey, by the way, Kirk Watson's going to enter in a
6   few months, because I didn't know.  So, you know, if
7   you -- that was strategic on his part.  He knew that
8   he, he was already -- he's in the ex-mayor's club.
9   They go to lunch once a month.  Every single ex-mayor
10  in Austin goes to lunch once a month.  They're all in
11  the political establishment.
12           When you have a candidate who happens
13  to be an ex-mayor, that's a problem.  Obviously he's
14  going to be the political establishment's chosen
15  candidate, because they already know from 1997 to 2021
16  exactly how he's going to vote on every issue.  He's
17  the predictable candidate.  He's in the good old boy's
18  club, the political establishment.  He's the one that
19  they trust, and he's the one that's going to get the
20  majority of the political contributions.
21      Q    So would --
22      A    And that's just reality.
23      Q    And so that reality would apply pre-November
24  8, 2021 too, right?
25      A    If I had been able to --

Page 50

1       Q    Wait, wait.  Answer my question.
2            MR. NAJVAR:  You can answer it the
3   way you want to answer it.
4       Q    (By Mr. Hicks)  No.  You have to answer it
5   truthfully, and you have to answer the question.
6       A    Please restate the question.
7       Q    So the reality you've described about the way
8   the political establishment operates here and the
9   ability to raise funds by those people -- you use Kirk
10  Watson as an example -- that reality was there
11  pre-November 8, 2021, correct?  Correct?
12      A    Correct.
13      Q    Okay.  Now, you also said in your answer
14  earlier that -- you said, Hey, the justification given
15  for this -- your lawyer can ask you.
16      A    No.  I'd like to --
17      Q    Your lawyer can ask you a question if you
18  need to clarify.  The, the -- you said -- you
19  referred to the justification for the temporal
20  restriction as being to prevent corruption or the
21  appearance -- we didn't say "appearance of corruption";
22  that's part of it too.  You said this is in direct
23  contradiction to that, this arrangement --
24      A    Mm-hm.
25      Q    -- because of what you went through.  So

Page 51

1   direct contradiction, it sounds like you're saying it
2   causes corruption; is that correct?  Is that what
3   you're saying?
4       A    I think it exacerbates corruption.
5       Q    Okay.  And what is the corruption?
6       A    It prevents challengers like me --
7       Q    No.  What is the corruption that it
8   exacerbates?
9       A    They, they know that if you're within one
10  year of an election, that gives -- and they -- I've
11  even had them tell me that.  They like it to be that
12  way because they like to evaluate the slate of
13  candidates so they can choose the one that they want to
14  get behind.  I've actually had them tell me that.
15      Q    Yeah.  And --
16      A    So I know it's true.
17      Q    And you consider that corruption.
18      A    I consider it manipulation.  I consider it, I
19  consider it keeping the smaller donors who would more
20  likely be able to make a difference in a campaign over
21  a longer period of time.  When you just shrink it down
22  to a year, I don't -- I, I think it plays much more in
23  favor of the political establishment.
24      Q    Is that corruption, is my question.  You used
25  the term.

Page 52

13  (Pages 49 to 52)

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

1      A   I used the term because that's my
2  understanding, that the reason we have a fundraising
3  window is to prevent corruption.  Is that correct?  I
4  don't know.  That's my understanding.
5      Q   You said this is in contradiction to that,
6  which suggested to me, as I prefaced the question, that
7  you think this is a corrupt arrangement.  And my
8  question is, how is it corrupt?
9      A   So I --
10      Q   You described things you don't like about it.
11  I'm just asking how --
12      A   Okay.  So let --
13      Q   -- it's corrupt.
14      A   So I'll, I'll change that.  Maybe I don't
15  know if it's corrupt or not.  I just in my opinion as a
16  candidate, I do not think it's fair.
17      Q   Okay.  Also in the Exhibit 19 -- and I need
18  to look at it to find the page to refer to.
19                    MR. HICKS:  What tab is that?
20                    MS. NORTON:  It's Exhibit No. 19.
21                    MR. HICKS:  I've got it.
22      Q   Sorry.  Just give me one second to find the
23  reference I wanted to ask you about.  Go to page 3 of
24  that exhibit, and it's under Roman numeral II, the
25  second paragraph.  It speaks of you verifying your

Page 53

1      Q   Okay.  So what does actually affecting city
2  decisions have to do with your campaign for mayor?
3  That is, one is actually governance in a sense right?
4  And one is:  I'm running on these issues.  Can we --
5  I'm not doubting it.  I just want you to explain what
6  the link is.
7      A   By that time I had my political -- my
8  platform did run contradictory to most of the Austin
9  city council members, and we --
10      Q   You mean their positions?
11      A   Their positions.  And because my District 10
12  city council race was so high profile and because we
13  nearly did flip that seat, just like in District 6,
14  people were paying attention to the things I had to
15  say.  And I do believe that council members would take
16  a moment to look into the -- see what Jennifer Virden
17  had said about a certain issue and possibly...
18      Q   So who are the people that are paying
19  attention to what you had to say?  You mean in District
20  10?
21      A   I think District 10 was paying attention.  I
22  think that city council members were paying attention
23  or were interested to see what I had to say about
24  certain things.
25      Q   What more could you ask?

Page 55

1  desire to speak on issues in a timely manner.  Do you
2  see that?
3      A   Yes.
4      Q   "As they arise in Austin politics and
5  discussions."
6      A   Mm-hm.  Yes.
7      Q   You did speak out, did you not, on Austin
8  politics and discussions at the time --
9      A   Yes.
10      Q   -- they were made, didn't you?
11      A   Yes.
12      Q   Okay.  This didn't keep you from speaking
13  out.
14      A   It didn't -- it kept me from speaking out as
15  broadly as I would have much more preferred.
16      Q   But it didn't keep you from speaking out,
17  correct?
18      A   Correct.
19      Q   And in here, and I can go find the exact spot
20  if you want, you also say that raising money and
21  speaking on these issues in a timely manner would let
22  you build momentum that could affect city decisions.
23      A   Mm-hm.  Yes.
24      Q   Do you recall that?
25      A   Yes.

Page 54

1      A   What more could I ask?
2      Q   You got their attention, the city council's
3  attention with your issues, right?
4      A   Getting the city council's attention is
5  completely different than campaigning and winning an
6  election.
7      Q   Right.  Well, that's the reason, that's the
8  reason I started this question.  You said you wanted to
9  affect their decisions.  That's completely different
10  than running and winning an election, right?
11      A   Say that again?
12      Q   I'd asked you what the connection is, the
13  link is between affecting city decisions and running
14  the campaign, and I thought you just then said they're
15  two completely different things.
16      A   Affecting their decisions, I don't know if I
17  affected anyone's decision on city council --
18      Q   No, no.  That's not my question though.
19  I'm not asking did you affect them, but if you did
20  affect them or whether you did or not, that's a
21  different question than something about the campaign
22  itself, as I understood your answer just then.  You can
23  say what -- correct it any other way you want.  Am I
24  right about that statement?
25      A   Say the statement again?

Page 56

14 (Pages 53 to 56)

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1  Q   Okay.  Let's, let's start -- I won't say it
2  back.  I'll just try to phrase it clearer.
3       Is there a link between actually
4  affecting city decisions, which is one of the things
5  you say in Exhibit 19 that you wanted to be able to do
6  but couldn't because of the fundraising-window rule,
7  and actually conducting and trying to win a campaign?
8  A   Is there a link between those two?
9  Q   Yes.
10 A   I can't -- I don't, I don't understand that
11 question.
12 Q   Okay.  So do you stand by the answer you've
13 given so far?
14 A   Yes.
15 Q   Okay.  All right.
16                (Exhibit No. 20 marked.)
17 Q   So you have in front of you Deposition
18 Exhibit 20, and I'll tell you what it is and you can
19 tell me if I'm getting it wrong, and your attorney can
20 too.
21       These -- this is a set of 10
22 declarations from individuals.  I think you're probably
23 familiar with them.
24 A   Yes.
25 Q   These are declarations that were submitted in

Page 57

1  the prior pleadings in this case as attachments.
2  A   Yes.
3  Q   Primarily during the time of the temporary --
4  of the preliminary injunction efforts.  And I won't go
5  through what they're saying, yet anyway.
6       My question is, did you personally know
7  any of these people?
8  A   Yes.
9  Q   Which ones?
10 A   Robert Davis, Gean Oliphint, Kevin Dunlevy,
11 Linda Durnin, Susan Friedrich, William Clark, John
12 Fisher.
13 Q   Who's -- Fisher?  That was the last name?
14 A   John Fisher.
15 Q   So did you ask them to submit these
16 declarations?
17 A   I did ask them if they would be -- if this
18 spoke to them and, if it did, please sign it and give
19 it back to me.
20 Q   So you had a draft, and I don't want to know
21 about your communications with your attorney, but I'm
22 fairly confident you probably worked with him closely
23 on this.  But you had a draft of a declaration to say,
24 If you think this is true for you, will you sign this?
25 Is that basically?

Page 58

1  A   Yes.
2  Q   And then you let them fill in the blank on
3  the amount they would be willing -- I mean, you let
4  them do what they wanted to do, but you left a blank
5  for them to fill for the amount they'd be willing to
6  do, correct?
7  A   Yes.
8  Q   What about the three people you didn't list
9  as not knowing them personally?  How did you reach
10 them?
11 A   Well, I believe, for example, possibly Robert
12 Davis knew Cody Penna.
13 Q   Uh-huh.
14 A   And maybe he asked him if he wanted to.  I
15 don't remember Richard Wempe, so I don't know how he
16 got his.  William Hertel, the name is familiar, but I
17 don't remember how he got his.
18 Q   Okay.  Are you still in touch with these
19 people in connection with this campaign, any of these
20 people?
21 A   Yes.
22 Q   Which ones?
23 A   Let's see.  I could be with Robert if I
24 wanted to.
25 Q   What does that mean?

Page 59

1  A   I mean, I mean I know where he is.  We don't
2  stay in touch.  I mean I know where he works and
3  everything.  I don't believe I've spoken with Richard
4  or Cody.
5  Q   Can you say the last names --
6  A   Yeah.  Sure.
7  Q   -- just so it's clear?
8  A   So I don't believe I've spoken with Cody
9  Penna; I haven't spoken with Robert Davis in a few
10 months; Richard Wempe, I don't recall speaking with
11 him; Gean Oliphint, we keep in touch on social media;
12 Kevin Dunlevy, we keep in touch on social media.  I
13 actually saw Gean not too long ago.  William Hertel I
14 don't recall; Linda Durnin, I see her out and about,
15 and she's also on social media; Susan Friedrich, I see
16 her out and about, and she's also on social media; Will
17 Clark, William Clark is -- I still keep in touch with
18 him by text and phone and social media; and John
19 Fisher, I keep in touch with him also.
20 Q   Okay.  On Mr. Clark, and I can find the exact
21 document, which I have --
22 A   Mm-hm.
23 Q   -- but he -- the records reflect that he was
24 also paid by your 2020 campaign, correct?
25 A   Mm-hm.  Yes.

Page 60

15 (Pages 57 to 60)

**Page 61**

```
 1      Q    And he was paid for doing what?
 2      A    He was my volunteer coordinator.
 3      Q    Does he -- is he a paid worker on
 4 your 20 -- on this campaign, the --
 5      A    No.
 6      Q    -- mayor campaign?
 7           MR. NAJVAR:  Renea, just -- can you
 8 aim for a break in a few minutes?
 9           MR. HICKS:  Sure.  Whenever.  Let
10 me, let me -- I'm about finished with this little
11 section, so --
12           MR. NAJVAR:  Okay.  Sure.  Yeah.
13           MR. HICKS:  In fact, just two quick
14 things, and I think then would be a good breaking
15 point.  Is that okay?
16           MR. NAJVAR:  That's fine.  Yeah.
17      Q    (By Mr. Hicks)  So beyond these 10 people,
18 did you contact other people and ask them to sign a
19 similar declaration and then they said they didn't want
20 to?
21      A    Possibly a few.  Not many, if so.
22      Q    Do you know any of them?  Can you name any of
23 them?
24      A    No.
25      Q    How many?
```

**Page 62**

```
 1      A    Less than a handful I would think.
 2      Q    Okay.  So you contacted, so you contacted 15
 3 people, roughly, to sign these declarations, right?
 4      A    I may have only contacted these people, but I
 5 may have contacted five more.  I don't recall.
 6      Q    Okay.  What evidence do you have other than
 7 guesswork that anyone beyond these 10 people was ready
 8 to contribute money to your campaign before November
 9 2021?
10      A    Phone calls, just, just running into people,
11 phone calls, that kind of thing.  I mean, it was
12 people, Hey, can we contribute?
13      Q    Do you know how many?
14      A    I do not know how many.
15           MR. HICKS:  This will be the last
16 one before the break, Tab 17.
17           (Exhibit No. 21 marked.)
18      Q    Okay.  Deposition Exhibit 21 is in front of
19 you.  This is an exhibit I believe y'all offered at the
20 preliminary injunction hearing.  You see what it is, a
21 tweet exchange -- I don't know whether that's the right
22 phraseology -- between you and a gentleman.  I can't
23 tell what his name is.  Is it Hendrix, is the last name
24 Hendrix?  Anyway, HendrixK1234 [sic: 1224].  Do you see
25 that?
```

**Page 63**

```
 1      A    Yes.  I see this.
 2      Q    Do you know this person?
 3      A    I don't.
 4      Q    How did this come onto your radar screen, so
 5 to speak?
 6      A    It's a tweet.  It was a response to a tweet,
 7 or he -- let's see.  He was replying to CariMarshallTX.
 8 "Thanks for getting the word out for @Jennifer4Austin,
 9 now I can go donate to her campaign."  So that was
10 Hendrix replying to Cari Marshall.  Perhaps Cari
11 Marshall had said something about my campaign.
12      Q    Okay.  I just couldn't follow it.  Do you, do
13 you know either -- you don't know Mr. Hendrix, right?
14      A    I do not.
15      Q    And do you know Cari Marshall?
16      A    I do not.
17      Q    Okay.  And there's a picture of this fellow
18 there in between.  Is that Jerad Najvar?
19      A    It looks like him.
20           MR. NAJVAR:  Yeah.
21      Q    (By Mr. Hicks)  Do you know why he's in this
22 tweet?
23      A    I do not know.
24      Q    Tweet stream, is that what you call it?
25      A    Thread maybe.  I don't know.
```

**Page 64**

```
 1      Q    Thread, that's a good -- better word.
 2           MR. HICKS:  Okay.  Let's take a
 3 break.
 4           (At 1:32 p.m. the proceedings
 5 recessed, continuing at 1:40 p.m.)
 6           (Exhibit No. 22 marked.)
 7      Q    (By Mr. Hicks)  Okay.  I'm going to show you
 8 Deposition Exhibit 22.  You see this is your first
 9 amended complaint?
10      A    Yes.
11      Q    Filed still before Mr. Clark was added as a
12 co-plaintiff, you see that?
13      A    Yes.
14      Q    Look at paragraph 23.  And I probably should
15 have looked to see if the same paragraph is in the
16 amended exhibit -- I mean in the second amended
17 complaint, but let's go with this one for now.  In
18 paragraph 23 on page 6 --
19      A    I'm skipping.
20      Q    Well, read that to yourself, that paragraph
21 to yourself.
22      A    I did.
23      Q    Okay.  This is a new paragraph that was added
24 in the amended complaint.  Do you recall adding it?
25      A    (Shaking head)
```

16 (Pages 61 to 64)

1    Q    No?

2    A    I do not recall that.

3    Q    Okay.

4    A    But we're talking about paragraph 23, right?

5    Q    Yeah.  23, yeah.  There's not an

6    allegation -- I'll just represent to you, and the

7    record can show, the original complaint did not have an

8    allegation about making campaign contributions by you.

9    But that's just me talking to you, that's not you

10   testifying.  So that's the reason I'm asking you about

11   it though.

12        You said that in addition, you wanted to

13   be able to -- you basically say, and to your claims

14   that you want to be able to raise funds as a candidate,

15   here you say you desire "to be free to make campaign

16   contributions to other candidates for Austin office

17   that those candidates can accept and use more than a

18   year in advance of the relevant election date."  Do you

19   see that that's a fair summary of what you say there?

20   A    Yes.

21   Q    Now, you made this allegation in April of,

22   April 26 of 2022, and at that time the fundraising

23   window was open, correct?

24   A    Yes.

25   Q    So this is necessarily, it seems to me,

Page 65

---

1    could have done to me prior to the fundraising window

2    opening.

3    Q    But for that kind of contribution to happen

4    it has to be somebody that fits the bill for your

5    support, correct?

6    A    Correct.

7    Q    And right now we don't know if there's anyone

8    of that sort, right?

9    A    Correct.

10   Q    Okay.  For you thinking about this thing you

11   want to do in the future, what does it mean to you to

12   be able to contribute money to somebody you support

13   outside the window?

14   A    Well, I wouldn't support anybody financially

15   outside of a window.

16   Q    But you know what I mean.  Okay.

17   A    But --

18   Q    All right.  Outside the fundraising window,

19   that's --

20   A    Because now I know --

21   Q    -- a good joke there.

22   A    Now I know how important it is.  Now that

23   I've been a candidate now I understand why we need to

24   be financially contributing to candidates that we

25   support so that they can build their war chest and

Page 67

---

1    correct me if I'm wrong, referring to future campaign

2    contributions you may want to make, right?

3    A    Yes.

4    Q    Okay.  In city races.

5    A    Yes.

6    Q    Okay.  This would be races after November

7    8th, 2022 and any runoff that may come from that.

8    A    Yes.

9    Q    Do you know as you sit here who those other

10   candidates might be?

11   A    No.

12   Q    Why do you not know?

13   A    Who the other candidates are going to be

14   after this election?

15   Q    Yeah.  I know this sounds like a silly

16   question, but you say you want to, and I just want to

17   know if you have any in mind.

18   A    I do not.

19   Q    Okay.  So how can you know that you want to

20   make contributions to them outside the window if you

21   don't know who they are?

22   A    Because now that I've been a candidate I want

23   to in the future be able to contribute to candidates

24   who I feel like are representing my wishes in -- for

25   the future of Austin just like I wish my supporters

Page 66

---

1    have -- and know how much money they're going to have

2    over the entire cycle to budget and how they're going

3    to spend it and when they're going to spend it.

4    Q    So if this rule came to pass and you were

5    able to do this, this would also mean that I could do

6    it too, correct?

7    A    Yes.

8    Q    As an Austin citizen, Austin resident.  In

9    fact, Laura Norton can do it even as a Dripping Springs

10   resident, right?

11   A    Yes.  Up to $41,000 or whatever it is.  Yeah.

12   Q    She's in the zip code I think.

13   A    Okay.

14   Q    So this would apply also to those who are

15   kind of the go-to contributors for what you described

16   in your earlier, I'll call it peroration --

17        THE REPORTER:  What was that?  I'm

18   sorry?

19        MR. HICKS:  P-E-R-O-R-A-T-I-O-N.

20   Q    -- that you described as the Austin

21   establishment, right?  The go-to well of people to get

22   money from would also be able to do this, right?

23   A    Yes.

24   Q    And I thought your concern was those people

25   have an unfair fundraising advantage because they've

Page 68

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

**Page 69**

1  got this go-to set of people and you're new.  So why
2  doesn't that hurt you even more?
3       A     Because if the fundraising window had been
4  open before Kirk Watson decided he was going to run for
5  mayor, those people would have contributed to me like
6  they did in my District 10 run.  They were supporters
7  of mine through District 10, and they didn't know Kirk
8  was going to run yet.  But because that window got
9  small within one year, just like they like it, just
10 like they told me they like it -- they don't want it to
11 be any bigger than one year, because they want to know
12 what the final slate is so they can pick their
13 candidate and, and get a hundred percent behind that
14 candidate.  It's just unfair to challengers.
15      Q     That's not my question.
16      A     Not, not politically well-connected --
17              MR. HICKS:  Objection,
18 nonresponsive.
19      Q     So my question was about those candidates
20 that are -- you're, you're calling them Kirk Watson
21 type candidates, basically, right?
22      A     He's an example.  Yes.
23      Q     Yes.  So they can also raise money during
24 that same period and, from the way you're describing
25 it, swamp your fundraising, right?  During the

**Page 70**

1  pre-window period.
2       A     Yes.
3       Q     Okay.  And you're okay with that, with
4  it -- with them being able to do that?
5       A     I just think it needs to be fair to
6  everybody.
7       Q     Right.  So you think it's okay that they be
8  able to tap into the well of supporters, the ready-made
9  contributors that they have waiting in the wings as
10 soon as any fundraising is permitted, right?
11      A     Yes.
12      Q     You think that's okay.
13      A     Yes.
14              MR. HICKS:  Let's look at Tab 20.
15              (Exhibit No. 23 marked.)
16      Q     Okay.  You've got before you Deposition
17 Exhibit --
18              THE REPORTER:  23.
19      Q     -- 23.  And just to let you know, it's a
20 two-sided copy --
21      A     Okay.
22      Q     -- unlike -- this is the first two-sided copy
23 that we have.  Look at -- this is the corrected
24 campaign finance report for your 2020 District 10 race,
25 correct?

**Page 71**

1       A     Yes.
2       Q     And it's dated October 27, 2020.
3       A     Correct.
4       Q     Filed then, right?
5       A     Correct.
6       Q     Okay.  Look at the third page.  They aren't
7  numbered, so it makes it a little difficult.  And by
8  the third page, that -- the third page would be the
9  second page you turn to.  Yeah.
10      A     Okay.
11      Q     Okay.  Look at box 6.
12      A     Yes.
13      Q     It shows a $50,000 loan to the campaign,
14 right?
15      A     Yes.
16      Q     And it was still outstanding as of October
17 24, 2020, correct?
18      A     Yes.
19      Q     Okay.  Hold that exhibit in front of you, but
20 I'm going to give you another exhibit.
21              (Exhibit No. 24 marked.)
22      Q     So now look at Exhibit --
23              THE REPORTER:  24.
24      Q     -- 24.  This is -- this is two-sided
25 also -- a campaign finance report filed by you on June

**Page 72**

1  18th, 2021, correct?
2       A     Yes.
3       Q     Look on the second page there.  In box 6 it
4  shows then --
5       A     Hold on.  You mean this one?  Yeah.  Okay.
6       Q     The second page there will be --
7       A     All right.
8       Q     That's the problem, it's a two-sided copy
9  that we did.  You see box 6 there?
10      A     Yes.
11      Q     Okay.  And that shows --
12              MR. NAJVAR:  She's looking at the
13 wrong page.
14      Q     (By Mr. Hicks)  Let's make sure we have the
15 right exhibit first.  This is Exhibit -- which one are
16 you looking at?
17      A     24.
18      Q     Okay.  24 -- make sure I'm looking at the
19 right one.  Okay.  It's the third page.  Sorry.
20      A     Okay.
21      Q     It is the -- you probably were already there
22 anyway.
23      A     I think so.
24      Q     Box 6, and it shows $50,000 in outstanding
25 loans, correct?

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

**Page 73**

1    A    Correct.
2    Q    All right.  Now go to -- this is unfair, but
3  the 75th page, which is, it's the, it's the Schedule E
4  for Loans.
5    A    Okay.  Yeah.  I have it.
6    Q    Did you find it?  I haven't found it yet.
7  That shows that you made the loan to your campaign on
8  September 23, 2020, correct?
9    A    Correct.
10   Q    And it shows a maturity date of December
11 15th, 2020.  What is a maturity date here?
12   A    Maturity date is when a note matures, but I
13 figured that was the runoff date.  I guess that's why I
14 put that in there, the runoff date.
15   Q    So did you intend this loan to be to the
16 general election campaign, not to the runoff campaign?
17   A    That's a good question.  Did I intend the
18 loan -- ask it again, please?
19   Q    Did you intend the loan to be just for the
20 general election campaign or for the runoff campaign,
21 or for whatever you were in at the time?
22   A    I didn't really determine that that way.  I
23 determined it knowing that I was going to pay myself
24 back at the -- when we were closing out the books for
25 the campaign, because -- well, see, when did I make the

**Page 74**

1  loan again, September?
2    Q    It shows on that Exhibit 24 on the 75th page,
3  which is the --
4    A    So when I made myself the loan --
5    Q    Right.  Let me just finish that.  It shows
6  September 23rd, 2020.
7    A    So when I did loan my campaign money I didn't
8  know yet whether or not I was going to make the runoff.
9    Q    Right.
10   A    But...
11   Q    I'm not -- it's no trick.
12   A    But that --
13   Q    I'm just trying to understand.
14   A    But that's where that date came from.
15   Q    Yeah.  Okay.
16   A    I knew that that was the runoff date.
17   Q    But you just, you made the loan to your
18 campaign for use in any campaign activity you needed it
19 for, needed the money for, right?
20   A    Yes.
21   Q    Okay.  Now, you said you knew you were going
22 to be paid back that loan.  How did you know you'd have
23 enough money to pay it back?
24   A    Because I was getting contributions in so
25 well and I knew that I wasn't going to need that.  I

**Page 75**

1  didn't feel like I was going to need to have to spend
2  that money and not be paid back from contributions.
3    Q    And when did that realization happen?
4    A    It didn't take long.  I was only in this
5  thing three and a half months.
6    Q    I know, but when?
7    A    I don't know.  It was the three and a half
8  months from beginning to end.
9    Q    Okay.
10            MR. HICKS:  All right.  Let's look
11 at Tab 21.
12            (Exhibit No. 25 marked.)
13   Q    Now look at Deposition Exhibit 25.  It's
14 another --
15            THE REPORTER:  21.
16            THE WITNESS:  No.  It's 25.
17            MR. HICKS:  25.
18            THE REPORTER:  Did I write that
19 down wrong?  Sorry.  Go ahead.
20            THE WITNESS:  Yeah, tricked Sandy.
21 You said 21 because I said Tab 21.
22            THE REPORTER:  You're right.
23 That's what I did.
24   Q    So look on the second page there.  I believe
25 there's another box 6, is there not?

**Page 76**

1    A    Yes.
2    Q    Now, let's go back just for a second.  This
3  is dated January 15th, 2021.
4    A    Correct.
5    Q    And it shows on the second page that there's
6  no outstanding loan.
7    A    Correct.
8    Q    So when was the loan paid off?
9    A    Let me look back at the dates here.
10   A    I just had a hard time following this.
11   A    Okay.  Let me look.  I don't really know for
12 sure.
13   Q    Take your time.
14   A    (Crosstalk) deduce it.  Okay.  So we have
15 2020...
16   Q    I have my window of when it may have been --
17   A    Okay.
18   Q    -- if that will help you.  So it looks like
19 to me from looking at these three exhibits --
20   A    Mm-hm.
21   Q    -- that we're just talking about, which are
22 23, 24, and 25, that this $50,000 loan, which was for
23 the District 10 race, was paid off somewhere between
24 September 23rd, 2020 and January 15th, 2021, somewhere
25 in there, in that window; is that right?

19 (Pages 73 to 76)

1    A   I can't say yes or no.  Let me look at these
2  dates again.  Okay.  So 2020, 1/15/2021.  So when do
3  you think it was paid off?
4    Q   Best I can tell, somewhere between September
5  23rd, 2020 and January 15th, 2021, and I can tell you
6  how I got there.  You show you made a loan to your
7  campaign on September 23rd, 2020 --
8    A   Mm-hm.
9    Q   -- in one of those exhibits.
10   A   Mm-hm.
11   Q   And then on January 15th, 2021 you show a
12  zero balance.
13   A   Mm-hm.  Yes.
14   Q   Actually, we can narrow it even further,
15  because Exhibit 23 I believe shows that it was still
16  outstanding as of October 24th, 2020.
17   A   Mm-hm.  Yes.
18   Q   Well, we can narrow it further, because this
19  is where I'm confused.  Exhibit 24 shows a balance of
20  $50,000, but this is a June 18th, 2021 filing.
21   A   Mm-hm.
22   Q   This is not playing tricks.  I'm just trying
23  to understand.
24   A   No.  It's no trick.
25   Q   So it appears that something's messed up

Page 77

1  here; am I right?
2    A   I'm just wondering did I file a correction?
3    Q   And you didn't correct this I bet.
4    A   Well, that is a correction.
5    Q   Hard to say?
6    A   Hard to say.
7    Q   Okay.  But whenever it was, it was paid -- do
8  you -- it was paid off at the latest by January 15th,
9  2021, correct?
10   A   Yes.
11   Q   That's when you show zero balance.
12   A   Let me think about that.  Yes.  I actually
13  don't know why --
14   Q   Okay.
15   A   -- this is reflected this way.
16   Q   This is --
17   A   So I think you ask me these questions and
18  we're going to -- I think we --
19   Q   I don't know that it matters to a blasted
20  thing in the world either, but I just want to try to
21  get some clarity on it.
22           So what was the source of the loan
23  repayment?
24   A   Campaign contributions.
25   Q   And only that, right?

Page 78

1    A   Yes.
2    Q   And it was fully paid off, right?
3    A   Yes.
4    Q   Okay.  Now we're going to look at the same
5  three exhibits.  Look at 23 first.
6    A   Okay.
7    Q   And at -- let's see.  For Exhibit 23 --
8    A   Yes.
9    Q   -- I'll represent to you, and you're welcome
10  to look through if you want, that I did a word search
11  for each of the 10 people in Exhibit 20 --
12   A   Okay.
13   Q   -- and found that none of them made
14  contributions to you in -- listed as having made
15  contributions to you during that period covered by that
16  report.
17   A   Okay.
18   Q   Do you have any reason to doubt that?
19   A   Well, it would surprise me that Will Clark
20  didn't, but...
21   Q   He was paid $2,000 in that period.
22   A   Oh, maybe he had already maxed out.  Let's
23  see.
24   Q   No.  There's no record of contributions by
25  him.

Page 79

1    A   Okay.  Well, I believe you.
2    Q   Anyway, if you have reason to think -- I
3  understand -- what I'm saying is in there is not
4  evidence.  What it's in there is evidence.  I get that.
5  I'm just trying to help us work through this so I can
6  understand.
7           MR. NAJVAR:  And which report are
8  you saying it's not in?
9           MR. HICKS:  Exhibit -- there is no
10  record in Exhibit 23 of any of the 10 individuals in
11  Exhibit --
12           MS. NORTON:  20.
13   Q   -- 20 that have declarations there, having
14  made a contribution to you during the period covered by
15  that.
16   A   Okay.
17   Q   Now look at Exhibit 24.  All right.  Now look
18  at Exhibit 24.  Yeah.  And I, I've looked in that
19  report, and I find only two of the 10 individuals we've
20  been talking about made contributions.  One is
21  Mr. Clark, and I can tell you the page number if it
22  helps you.  It's on the 14th page of the PDF.  It shows
23  a $200 contribution from Mr. Clark on August 31, 2020.
24   A   Okay.
25   Q   And you can doublecheck if you want.  And on

Page 80

20  (Pages 77 to 80)

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

**Page 81**

```
 1  the 22nd page it shows a $50 contribution from Susan
 2  Friedrich.  Is it FREED-rik or FREED-rich?
 3       A    FREED-rik is what I say.
 4       Q    Okay.  $50 on September 18th, 2020.
 5       A    Mm-hm.
 6       Q    Does that sound --
 7       A    I'm sorry, I'm looking for one more thing.
 8  Just one second, please.
 9       Q    Okay.  It's the 14th page, which --
10       A    I believe you, I'm just --
11       Q    Do you see --
12       A    So I want, I want --
13       Q    They aren't numbered, so --
14       A    No.  But I did want to point out something.
15       Q    Okay.
16       A    So, well, it is just Will Clark, but his, his
17  wife did also contribute.  She has a hyphenated last
18  name.  And then you wanted me to look for Friedrich?
19       Q    Susan Friedrich.  She's on the 22nd page, $50
20  on September 18th, 2021.
21       A    Okay.  All right.
22       Q    And I see no contributions from any of the
23  other individuals.
24       A    Okay.
25       Q    All right.  Then for Exhibit --
```

**Page 82**

```
 1                 MS. NORTON:  Tab 20?
 2                 MR. HICKS:  Tab 23.
 3                 MS. NORTON:  Oh, Tab 23?  Oh, we
 4  don't have that one in there (inaudible).
 5                 MR. HICKS:  Let me do it.
 6       Q    So I'm going to show you a new exhibit.
 7                 MS. NORTON:  Okay, 23.
 8                 (Exhibit No. 26 marked.)
 9                 THE REPORTER:  26.
10                 MR. HICKS:  And this is Exhibit 26.
11                 MR. NAJVAR:  I'm still a little
12  confused.
13                 MR. HICKS:  Let me take this one
14  back.
15                 MR. NAJVAR:  Just so -- to make
16  sure I've got it straight, because you were asking her
17  about these Exhibits 23 and 24, which cover the
18  campaign in 2020 --
19                 MR. HICKS:  Yeah.
20                 MR. NAJVAR:  -- before those
21  contributors gave those (crosstalk) --
22                 MR. HICKS:  I understand.  Yeah.
23  No, I understand.
24                 MR. NAJVAR:  I'm just --
25                 MR. HICKS:  Yeah.  I'm just trying
```

**Page 83**

```
 1  to get some clarity on who's who and where.
 2                 MR. NAJVAR:  Okay.  Yeah.  Just it
 3  was confusing me.
 4       A    So are we done with these?
 5       Q    (By Mr. Hicks)  I think so.  Yeah.  But let's
 6  look now at Exhibit --
 7       Q    27?
 8       Q    Let me just make sure.  Yes.  27.
 9                 (Exhibit No. 27 marked.)
10       Q    And I'll represent to you that I've gone
11  through and I find only two contributions -- I mean
12  only two of them, of the 10 people, contributing: Will
13  Clark $400 on November 5th, 2020.  That's for the
14  runoff.
15       A    Mm-hm.
16       Q    It's the day after the election I think, the
17  general election.  That's on the 25th page.  The 31st
18  page Kevin Dunlevy $400 on November 20th, 2020 for the
19  runoff.  Does that sound right to you?
20       A    Yes.
21       Q    Okay.  So did you not know the other people,
22  the other people that didn't contribute during these
23  periods of the, of the 10 people?  Did you not know
24  them or have communications with them back then?
25       A    I didn't know all of them, but I did know
```

**Page 84**

```
 1  some of them.
 2       Q    Do you know why the ones you knew didn't make
 3  contributions to your campaign?
 4       A    No.
 5       Q    Do you know what changed between that period
 6  and the time that they made these declarations that we
 7  have in evidence that made them decide they would want
 8  to contribute to your campaign?
 9       A    No.
10       Q    And we looked at Exhibit 21.  That's the
11  tweet exchange --
12       A    Mm-hm.
13       Q    -- between you, Twitter exchange between you
14  and Mr. Hendrix.
15       A    Mm-hm.
16       Q    Do you know whether he ever made a
17  contribution to you?
18       A    I don't.
19       Q    I'll just represent I looked through and
20  can't find it, but I also don't know what his name is.
21       A    Yeah.  We don't know what his name is.
22       Q    Okay.  Now we're to what Jerad wanted to talk
23  about.
24                 MR. HICKS:  Tab 24.
25                 MS. NORTON:  Okay.
```

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

**Page 85**

1               (Exhibit No. 28 marked.)

2        THE REPORTER:  28, it's 28.

3    Q   So now you have in front of you Deposition

4 Exhibit 28.  That's a campaign finance report filed by

5 you on July 15th, 2021 in connection with the mayoral

6 race, correct?

7    A   Yes.

8    Q   If you look on the third page, box 5 -- no.

9 Second page, box 5 -- no.  Third page.  Sorry.  Third

10 page, box 5, Schedule F1.

11    A   Yes.

12    Q   Shows the total for "Political Expenditures

13 from Political Contributions" of $18,887.39.  Is it

14 correct that these con- that the contributions covering

15 these expenditures were leftover contributions from

16 your District 10 race?

17    A   No.

18    Q   Okay.  And was this before or after -- well,

19 okay.  So this was filed before the fundraising window

20 opened, correct?

21    A   Oh, I'm sorry.  This is 2021.  I was thinking

22 it was this year.

23    Q   Okay.

24    A   Sorry.  Can you repeat the question then?

25    Q   Okay.

**Page 86**

1    A   The last question, I think I need to go back

2 to --

3    Q   Okay.  We're still -- just so the record is

4 clear, this is Deposition Exhibit 28.

5    A   Mm-hm.

6    Q   And I've asked you to look at the third page,

7 box 5 --

8    A   Okay.

9    Q   -- which shows nearly $19,000 in expenditures

10 from contributions.

11    A   Yes.

12    Q   And this fundraising window was still closed

13 here for the mayoral race, right?

14    A   Yes.

15    Q   So what was the source of these con- the

16 contributions for these expenditures?

17    A   These were leftover contributions --

18    Q   Okay.

19    A   -- from the 2020 campaign.

20    Q   Okay.  And were these made before or after

21 repayment of the $50,000 loan whose date we haven't

22 been clear on yet?

23    A   Let me look through these.  So these I

24 believe were made after I repaid my -- the loan to

25 myself.

**Page 87**

1    Q   And what makes you think that?

2    A   Because I'm pretty sure I paid myself back

3 right after the runoff.

4    Q   While you still had some money, right?

5    A   Yeah.

6    Q   Okay.  In the account.  Okay.  Go to the

7 fourth page now, and that's the page that talks about

8 unitemized -- "Pledged Contributions."  Do you see

9 that?

10    A   Yes.

11    Q   And you showed zero in pledges.

12    A   Correct.

13    Q   What is a pledge, an unitemized pledge, to

14 your understanding?

15    A   To my understanding it's a promised

16 contribution in the future.

17    Q   Okay.  This was before the window opened, and

18 you had no promised contributions, correct?

19    A   Correct.

20    Q   What would be, in your understanding, what

21 would be a promised contribution?

22    A   Somebody who was going to make a contribution

23 in the future.

24    Q   Can you pull out Exhibit 20?  Thank you.

25 Okay.  So look at Exhibit 20 again.  These are the 10

**Page 88**

1 declarations.  These are all declarations signed before

2 the July 15th report, correct?

3    A   Yes.

4    Q   Why did you not treat these declarations as

5 promised contributions in that report in Exhibit 28?

6    A   I don't think they are promised

7 contributions.  I think they're saying that they would

8 if they could if the fundraising window were open.  And

9 again, I didn't solicit pledged contributions.

10    Q   So you see a pledged contribution as one that

11 you've at least solicited?

12    A   Yeah.  That I would actually say -- just like

13 at church, a pledged contribution -- I promise I'm

14 going to contribute this on this date.  And I never

15 actively solicited pledged contributions.

16    Q   So what is the difference in your

17 understanding between a pledged contribution of the

18 sort covered by that particular part of Exhibit 28 and

19 what the people are saying here with respect to their

20 contributions in Exhibit 20?  Why are --

21    A   I, I --

22    Q   -- they not pledged contributions?

23    MR. NAJVAR:  And before you -- I'm

24 going to object to the extent it calls for a legal

25 conclusion.  But you can answer as far as you

22 (Pages 85 to 88)

1  understand it or know it.

2     A    I think they're just different.  To my

3  opinion, I think this is somebody saying that they

4  would if they could.

5     Q    (By Mr. Hicks)  When you say "this" can you

6  say what it is?

7     A    Oh.  The verifications.

8     Q    Exhibit 20?

9     A    Exhibit 20.  I think these are people who are

10  saying they would if they could if the fundraising

11  window were open.  And, and I quite frankly never -- I

12  don't understand how pledged contributions work.  I've

13  never used them and never asked about them, so I don't

14  know.

15     Q    Is there anything in your understanding, and

16  I understand there can be legal questions involved in

17  this, but I want to know your understanding, not a

18  lawyer's, of anything that would have stopped you from

19  asking these people in Exhibit 20 to make those pledged

20  contributions, to pledge those contributions.

21     A    It's never crossed my mind to ask for a

22  pledged contribution until this very moment.

23     Q    Okay.  See, I'm helping your campaign.

24     A    Thank you.

25     Q    Let's see.  Okay.  Go to the 10th page of

Page 89

---

1     Q    (By Mr. Hicks)  It's here.

2     A    Okay.  I'm still looking.  All right.

3     Q    Do you see that?  It's F1 on the 10th page.

4     A    F1 on the 10th page.  I don't --

5     Q    May I find it for you?

6     A    Yes, please.

7     Q    Make it a little easier I think.  There it

8  is.

9     A    Okay.

10     Q    Okay.  Do you see you show you have an entry

11  there on that page that the payee on 2 -- February 2nd,

12  2021 you paid the Najvar Law Firm $10,000 in legal

13  fees?

14     A    Yes.

15     Q    Was that in connection with this case?

16     A    Yes.

17     Q    And so this relates back to an earlier

18  question I was asking.  So you consider the legal work

19  being done by your lawyer in this case to be part of

20  your political effort in the campaign?

21     A    Yes.

22     Q    So the lawsuit, the record will reflect that

23  the lawsuit was not filed until March 25, 2021, nearly

24  two months later.  Do you know why you waited two

25  months to file the suit?

Page 91

---

1  Exhibit 28.

2     A    What does it say on the top of it?

3     Q    It's, it's campaign expenditures, and it's

4  one of the entries there.

5     A    Okay.  Uh --

6     Q    Let me find it for you and show it to you.

7  It's from Jerad's law firm.

8     A    Okay.

9     Q    To Jerad's law firm, to Mr. Najvar's law

10  firm.  Sorry.

11     A    Okay.

12     Q    To not be so informal here.

13     A    I still don't see it.  I know --

14     Q    I'm going to have to find it.

15     A    -- it's here.

16     Q    I'm going to have to count.

17             MR. HICKS:  What exhibit number are

18  we at?

19             MS. NORTON:  28.

20     Q    28, would you look at 28?

21     A    Yes.

22     Q    Okay.

23             MR. NAJVAR:  I think they're in

24  alphabetical order, if that helps.  Like the payee name

25  is arranged in alphabetical order.

Page 90

---

1     A    It took us awhile to get the, the paperwork

2  drawn up I guess.  Yeah.  I just --

3     Q    And I don't want to know any conversations

4  you had with your lawyer about it, but if you, if you

5  know factually why.

6     A    I don't know factually why.  I just know it

7  took time.

8     Q    Okay.  Let's go to -- I hate to do this.

9  These things are just not numbered easily, but the 22nd

10  through the 27th pages, this is where you itemized

11  political expenses from personal funds.

12     A    Okay.

13     Q    Did you find it?

14     A    Yes.

15     Q    Do I understand that these expenditures are

16  not from contributions from other people?  Correct?

17     A    Correct.  These are -- I made these with

18  credit card payments, personal credit card payments.

19     Q    And that these weren't loans either, right?

20     A    No.

21     Q    And you never get reimbursed for these,

22  right?

23     A    No.  You do.

24     Q    How?

25     A    Through all these reports.  Political

Page 92

GIVENS COURT REPORTING

6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

Page 93

1  expenditures from personal funds, let me remember how
2  that was done.  I really don't recall, it's been so
3  long since I did this, but I do believe that I got
4  repaid for these.
5      Q    Out of campaign contributions?
6      A    Yes.
7      Q    So they function as a loan, correct?
8              MR. NAJVAR:  Objection to the
9  extent that calls for a legal conclusion, but you can
10  answer as far as you know.
11      A    I don't think they -- I don't think on these
12  campaign forms that --
13      Q    (By Mr. Hicks)  I know that.  I'm not asking
14  that --
15      A    Well, I mean --
16      Q    -- legal question.
17      A    -- there's a loan, there's a personal loan
18  form that we use, and then if you do it, if you do it
19  through a credit card, I don't know that it's actually
20  counted for the same as, like, a $50,000 loan was.
21      Q    Let me ask it this way.  So back, for
22  example -- this is on Exhibit --
23      A    It's 28.
24      Q    28.  Under the category "Political
25  Expenditures from Personal Funds," just as an example,

Page 94

1  you have a March 17, 2021 entry, right?
2      A    Yes.
3      Q    Do you see it?
4      A    I'm sorry.  Which -- what was the date on it?
5  March 17th?  Okay.
6      Q    This is just an example.
7      A    Okay.  Go ahead.
8      Q    Could be any of them.
9      A    Yeah.
10      Q    And, and it shows on that date you paid $7.03
11  to Capital One, right?  Now, that was before the
12  fundraising window opened.
13      A    Yes.
14      Q    At that time did you have an expectation that
15  once you could begin raising contributions, that you
16  could get reimbursed out of those contributions at the
17  time you made this payment?
18      A    I --
19      Q    I'm as perplexed as you are about this.
20      A    No.  Yes.  And I -- yes.  I did expect to get
21  repaid for that.  Yes.
22      Q    Okay.  And do you see a difference, from your
23  personal perspective, not from a legal perspective, a
24  difference between that and a loan?
25      A    I, I do.

Page 95

1      Q    What's the difference?
2      A    Well, the only reason I do is because of the
3  way we do these forms.
4      Q    The reports.
5      A    Yes.
6      Q    Okay.
7      A    Yeah.
8      Q    So it's your understanding you don't have to
9  report this as a loan even if you're expecting a
10  repayment from the campaign?
11      A    That's my understanding.
12      Q    Okay.
13              MR. HICKS:  Tab 25.
14              (Exhibit No. 29 marked.)
15      Q    Now, you've got before you Exhibit 29.  It's
16  another campaign finance report.  It's for the mayoral
17  race, and it was filed January 4th, 2022, correct?
18      A    Yes.
19      Q    This is your last campaign finance report
20  that you have filed in the case -- I mean in the race,
21  right?  It's the most --
22      A    No.  We did one on --
23      Q    The most recent one.
24      A    We did one on July 15th also, or right before
25  July 15th.

Page 96

1      Q    You're right.  Sorry.  I got ahead of myself.
2      A    Okay.
3      Q    Okay.  Now, this one on the second page, box
4  6 you show a $300,000 loan from you to the campaign.
5      A    Correct.
6      Q    Is that correct?
7      A    Yes.
8      Q    And now look back at the schedule, Schedule
9  E, which I can't find.
10      A    Okay.
11      Q    Did you find it?
12      A    Yes.
13      Q    Okay.  That's the 58th page.  It shows you
14  made this loan in that amount on December 20, 2021,
15  correct?
16      A    Yes.
17      Q    And you show no maturity date for this loan,
18  right?
19      A    Correct.
20      Q    Do you know why?
21      A    I do not know why.  I guess because it's not
22  a required cell to complete, and maybe the last time I
23  did it I thought it was.
24      Q    Okay.  So this loan, based on what you -- the
25  record here shows, and you just agreed with it, was

24 (Pages 93 to 96)

**Page 97**

1  made 42 days after the fundraising window opened --
2      A    Mm-hm.
3      Q    -- right?
4      A    Correct.  I guess that's the correct number
5  of days.
6      Q    And you didn't make a loan to the campaign in
7  any amount, much less $300,000, before the fundraising
8  window opened, correct?
9      A    Correct.
10     Q    Can you explain why?
11     A    No.
12     Q    You could have, right?
13     A    Yes.
14     Q    Look on back to the second page again, boxes
15 4 and 5 there.  Do you see those?
16     A    Yes.
17     Q    And I'll just round the numbers up.  You show
18 total political expenditures of about $21,000 and total
19 political contributions of about $327,000, right?
20     A    Correct.
21     Q    Why is there such a small amount of
22 expenditures in comparison to the money that's
23 available in the contributions?
24     A    Why is there such a small amount of
25 expenditures?

**Page 98**

1      Q    Yes.
2      A    Well --
3      Q    You had plenty of money in your coffers at
4  that point.
5      A    For one thing, we hadn't hired yet, hadn't
6  hired the general consultant yet and some staff
7  members, and that's part of the reason why we were
8  being careful with the money, because we knew we were
9  going to need to hire staff, and we were trying to make
10 sure that we budgeted money.  It's just about budgeting
11 and timing and...
12     Q    So why hadn't you hired that staff by this
13 point in the campaign?
14     A    Well, we were looking for people.
15     Q    Right.
16     A    And when you only have $20,000 it's -- you
17 know, it's not cheap to hire campaign staff.
18     Q    What do you mean you only have $20,000?
19     A    $326,000, but $300,000 was my own, and I
20 didn't necessarily want to get into it.
21     Q    So at this point the $300,000 is a political
22 contribution.
23     A    The $300,000 is a loan to myself, yes, to my
24 political campaign.
25     Q    But you've included the $300,000 in the

**Page 99**

1  contribution balance.
2           MR. NAJVAR:  Objection to the
3  extent the question calls for a legal conclusion.
4      Q    (By Mr. Hicks)  Well, that's a fact question.
5  Is the $326,847.69 that's on the second page of
6  Exhibit 29 in box 5, does that total include your --
7      A    Yeah.
8      Q    -- $300,000 loan?
9      A    That would include my $300,000 loan to
10 myself, to my campaign.
11     Q    Okay.  But that $300,000 loan, to the extent
12 you're treating it as a contribution here, would not
13 have been forbidden to be made before the fundraising
14 window opened, correct?
15     A    Okay.  Repeat that?
16     Q    That's kind of convoluted.  You could have
17 made the $300,000 loan to your campaign before, legally
18 speaking, before the November 8, 2021 window opened for
19 fundraising, right?
20     A    Before the window opened?  I wouldn't have.
21     Q    You wouldn't have been able to make the loan?
22     A    I wouldn't have.  I don't even know, but I
23 know I wouldn't have.
24     Q    Why?
25     A    Because I don't know if it would have been

**Page 100**

1  legal or not.  I don't think it is.
2      Q    Okay.  So you -- did you consult a lawyer to
3  find out if you could?
4      A    No.  Because I didn't -- I knew I didn't want
5  to do it until after November --
6      Q    Anyway.
7      A    -- 8th.  Yeah.
8      Q    I'm sorry.  I interrupted.  Until after
9  November what?
10     A    Until after the fundraising window opened.
11     Q    And why did you not -- put aside the legality
12 issue.  Why did you not want to do it anyway?
13     A    Well, I didn't need to do it sooner.  I
14 mean --
15     Q    Okay.  All right.  Okay.  Now let's go
16 to -- this is still in that Exhibit 29.  And this is
17 again about the 10 people on the declaration to this in
18 Exhibit --
19          MS. NORTON:  Number 20.
20     Q    Exhibit No. 20.  I've gone through, and I see
21 the only contributors out of the list of the 10
22 declarants that I see are Will Clark -- you can find it
23 on the 12th page -- $400 on November 8, 2021, which is
24 the day the fundraising window opened; and John
25 Fisher -- on the 17th page you can find it -- $250 on

1  that same day.
2       A    Mm-hm.
3       Q    Right?  Those are the only two I've found.
4  None of the others, as far as this record reflects,
5  made contributions to you in that period.  Does that
6  sound right to you?
7       A    I believe you.  Yes.
8       Q    Okay.  Do you know why they didn't?
9       A    No.
10       Q    These are the same people, correct, that
11  said, If I could do it before the fundraising window
12  opened, I would give this -- whatever amounts they
13  designated in that Exhibit 20.  But yet, after the
14  fundraising window opened they had still not given you
15  money at the time you submitted this report, correct?
16       A    Correct.
17       Q    And you don't know why.
18       A    I don't know why, but it sure would have been
19  nice if the fundraising window had been open so I could
20  have struck while the iron was hot when they wanted to
21  give me money.
22       Q    Okay.  Okay.
23            (Exhibit No. 30 marked.)
24       Q    Now you have before you Exhibit 30,
25  Deposition Exhibit 30.  Turn to the second page, box 6.

Page 101

1  on May 12th, 2022; John Fisher on the 32nd page, $150
2  on April 15, 2022; and Gean Oliphint on the 74th page,
3  $200 on June 1, 2022.
4       A    Mm-hm.  Yes.
5       Q    See those?  So -- and Will Clark had already
6  maxed out at this point.  So for the others, six
7  others, then, that are in the declarations, they still
8  haven't contributed and we're nine months into the
9  fundraising window being opened.  Do you know why?
10       A    No.
11       Q    And if you look and compare, Gean Oliphint's
12  declaration says that she would give $400, and yet she
13  has only given $200.  Do you know why?
14       A    No.
15            (Exhibit No. 31 marked.)
16       Q    Okay.  You've now got in front of you
17  Exhibit 31, and it's a three-page document.  I'll
18  represent to you these are screenshots from your
19  campaign website that were taken on September 15th of
20  2022.
21       A    Okay.
22       Q    I haven't checked to see if they're still
23  there.  I suspect they are, but I don't know.  And
24  they're -- you click through to get there, with 1 is
25  the opening -- the first page is the opening page --

Page 103

1  It shows the $300,000 -- oh, this is dated July 13,
2  2022, correct?
3       A    Yes.
4       Q    And it still shows the $300,000 loan
5  outstanding --
6       A    Yes.
7       Q    -- correct?
8       A    Yes.
9       Q    And as far as you know sitting here today, is
10  it still outstanding?
11       A    Yes.
12       Q    That full amount?
13       A    Yes.
14       Q    Boxes 4 and 5 show $62,000, roughly, in
15  expenditures, and contributions of nearly $350,000; is
16  that correct?
17       A    Yes.
18       Q    Does that $350,000 still include in its total
19  the $300,000 loan?
20       A    Yes.
21       Q    Okay.  Still looking at this exhibit, and
22  this goes back to the 10 people in Exhibit --
23       A    20.
24       Q    -- 20, I see -- I found three contributors
25  from that list:  Kevin Dunlevy on the 29th page, $400

Page 102

1  tell me if I get this wrong.  First page is the opening
2  page --
3       A    Mm-hm.
4       Q    -- the second page is a list of issues
5  that -- a page for issues, screen for issues; and then
6  the third page is that -- one of the issues there in
7  detail which is headed, what is it called, "Service &
8  Leadership."
9       A    Yes.
10       Q    You see that?
11       A    Yes.
12       Q    And these represent, these statements
13  represent your position during -- in the campaign right
14  now, right?
15       A    Yes.
16       Q    Okay.  You start off there on the third page
17  by saying, "In many ways, politicians have become
18  corrupt."  See that word?
19       A    Yes.
20       Q    Are you referring to any particular people?
21       A    No.
22       Q    And what do you mean by the word "corrupt" as
23  you use it there?
24       A    Maybe not altruistic and true public service.
25       Q    Okay.  So that's your understanding of what a

Page 104

26 (Pages 101 to 104)

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

**Page 105**

1  corrupt politician category would be, right?

2      A   I'm not accusing every politician of being

3  corrupt.

4      Q   I understand that.  No.  I understand.

5      So restate the question, please?

6      Q   Well, I'm just trying to understand what your

7  understanding of what corrupt, corruption is in a

8  politician, and so I just want --

9      A   Self-serving and maybe dishonest or just not

10  good.

11      Q   Okay.  In the last bullet point there on that

12  third page of Exhibit 31 you state that if elected you

13  will champion, quote, "anti-corruption measures."  You

14  see that?

15      A   (Nodding head)

16      Q   And then you list some examples; one of them

17  is disclosures.

18      A   Yes.

19      Q   Disclosures of what?

20      A   Disclosures that they're taking campaign

21  contribution or they're going to vote on something on

22  the dais that actually will benefit their campaign

23  contributors, for example.

24      Q   Okay.  And you think that is a legitimate

25  anti-corruption measure, right?

**Page 106**

1      A   Yes.

2      Q   You mention lobbying prohibitions, and then

3  you also mention eliminating favoritism.  That's the

4  phrase, "eliminating favoritism."  What do you mean

5  eliminating favoritism?

6      A   Well, I think that no-bid contracts or

7  getting one bid for a contract could be a source of

8  favoritism, just for example.

9      Q   Okay.  And so why is it that you see -- for

10  instance, your example on the disclosures limitation,

11  disclosures about contributions from people who benefit

12  from a vote of council, why is that an anti-corruption

13  measure that you support, and a temporal restriction

14  such as at issue here that you're challenging not one?

15  What's the difference?

16      A   Okay.  Can you repeat that?

17      Q   Probably not.  What is the difference in

18  terms of anti-corruption, battling anti-corruption --

19  battling corruption, between a disclosure requirement

20  for council member votes on items that benefit

21  contributors and the temporal restriction you're

22  challenging here?

23      A   I have no idea what that question means.

24      Q   Okay.  I'm really trying to understand what

25  you mean by anti-corruption measure.  I guess that's

**Page 107**

1  what -- what do you mean by anti-corruption measure?

2      A   More transparency.

3      Q   And that's it, transparency is the only --

4      A   That's not it, just it.

5      Q   Okay.  What else?

6      A   It's part of it.

7      Q   This case is about an anti-corruption measure

8  and is it good or not under the constitution.  So it's

9  a legitimate question to ask you:  What do you

10  understand an anti-corruption measure to be, a

11  legitimate one?  What is it?

12      A   A legitimate --

13      Q   Beyond, beyond transparency issues.

14      A   For example, contracts.

15      Q   Uh-huh.

16      A   They should be open for bid on a fair playing

17  field without artificial or arbitrary boundaries of

18  some sort.

19      Q   Okay.  So this is not about any particular

20  exhibit.  You understand, I take it, that there has

21  been a temporal restriction on campaign fundraising in

22  Austin city elections since 1997, correct?

23      A   Correct.

24      Q   Okay.  For the first 20 years or so it

25  was -- it only allowed fundraising within 180 days of

**Page 108**

1  the election.  Then after the Zimmerman case was

2  decided at the district court level, the city council

3  changed it and enacted the provision that you're

4  challenging here, which set it for 365 days.

5      So given that this has been in effect,

6  this kind of -- there has been one in effect

7  continuously for about 25 years, what is your

8  understanding of how one would determine whether it is

9  successfully fighting corruption or not?

10      A   Well, how I would ask you how do you

11  know that this temporal --

12      Q   No.  Don't ask me back the question.  I need

13  to know your --

14      A   It's completely arbitrary.  It's completely

15  arbitrary, and it is an unfair advantage to a more

16  politically connected candidate.  When you shorten the

17  window, any kind of arbitrary window, why is there a

18  window at all?

19      Q   Okay.  So your position is there should be no

20  window?

21      A   Yes.

22      Q   Starting, starting, like, right now for the

23  race in 2024, for instance?

24      A   I haven't given it that, I haven't given it

25  that exact thought.  In my mind I can see it being as

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

**Page 109**

1  soon as an election happens, then the window should
2  open for the next election.
3      Q   Have you ever seen, to your understanding of
4  corruption as you've described it, any corruption in
5  Austin city elections, or the appearance of it, with
6  respect to the timing of fundraising?
7      A   I have not.
8      Q   Okay.  And you started paying closer
9  attention in 2008, correct, as you testified at the
10 beginning?  Is that right?
11     A   Yes.
12     Q   That's about 10 years after the temporal
13 restriction went into effect, right?
14     A   Yes.
15     Q   So why doesn't that suggest to you that it's
16 working in terms of preventing corruption?
17     A   Because I am just now a second-time candidate
18 not paying attention to how fundraising works, and
19 until you have been involved and been a candidate and
20 understand how fundraising works for you and against
21 you, it's, it's not just the average person who's
22 watching politics can understand exactly what goes on.
23 They have no even idea about these reports you have to
24 file.  There's a lot to learn.
25     Q   Right.  Okay.  So this is the last set of

**Page 110**

1  questions I think I have.  I reserve the right to think
2  for three seconds and see if there are more.
3          So I'm trying to figure out, and I'll
4  tell you where this is going, trying to figure out what
5  relief you're seeking from the city -- you are seeking
6  from the city, not Mr. Clark, just you.  Okay?  So
7  that's what these questions are going for.  Let's look
8  at...
9              MR. NAJVAR:  Would you mind if I
10 run to the restroom before you --
11             MR. HICKS:  Not at all.  We can
12 take a break.
13             (At 2:41 p.m. the proceedings
14 recessed, continuing at 2:51 p.m.)
15     Q   (By Mr. Hicks)  Okay.  Looking at Exhibit 13,
16 those are your disclosures that we've talked about
17 before.  Look at paragraph C.  There you represent that
18 you anticipate you'll be filing an amended complaint
19 which might remove the claim for compensatory damages,
20 and if you don't, you'll amend the disclosures to
21 provide the relevant computation.
22     A   I need to read that again.  Okay?
23     Q   Sure.
24     A   Okay.
25     Q   So to your knowledge, and I can represent to

**Page 111**

1  you that it hasn't happened, you haven't filed amended
2  disclosures to provide the relevant computation,
3  correct?
4      A   Correct.
5      Q   Okay.  Now look at your first amended
6  complaint, which is Exhibit 22.
7      A   Okay.
8      Q   This was filed a little over a month after
9  the disclosures were submitted.  All right.  Look on
10 page --
11     A   The, the affidavits?  The disclosures?
12     Q   The disclosures.  Yeah.
13     A   Okay.
14     Q   Yeah.  If you look, I don't remember the
15 exact date, but it's about a month and several days
16 later.
17     A   Okay.
18     Q   All right.  So the first amended complaint,
19 Exhibit 22, look at page 17, paragraph 5 of the Prayer
20 for Relief.
21     A   Okay.
22     Q   There you ask for compensatory and nominal
23 damages, correct?
24     A   Yes.
25     Q   Now look at Exhibit 15, and look

**Page 112**

1  at -- it's dated June 22, 2022, correct?  It's a month,
2  a couple months after your first amended complaint was
3  filed, right?
4      A   I don't know what the dates are.  Sorry.
5      Q   You can look at the back.  Go to the back,
6  you can see the date it was served, Certificate of
7  Service there.
8      A   Okay.  Okay.  Got you.
9      Q   Okay.  So look at your responses to numbers 8
10 and 9, Interrogatories No. 8 and 9.  Let me find it for
11 you, make it go faster.
12     A   Okay.
13     Q   Look at the last sentence of each of those
14 two responses.  Do you see that?
15     A   Yes.
16     Q   Okay.  And you verified these, and so you're
17 swearing that you aren't seeking compensatory damages
18 in either your personal or candidate capacity, right?
19     A   Yes.
20     Q   That's what it says.  Okay.  Now look at
21 Exhibit 7 filed September 12th --
22     A   Yes.
23     Q   -- 2022, which is just two and a half months
24 or so after those responses we just talked about,
25 right?

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1     A    Okay.

2     Q    Look at page 19, paragraph 5.

3     A    Okay.

4     Q    There it says "Plaintiffs," and it doesn't

5     have an apostrophe in it, "constitutional rights."   It

6     refers to those, it says compensatory damages are

7     claimed for them, right?

8     A    Yes.

9     Q    So do you know whether that reference

10    includes you or not?

11    A    I do not know for sure.

12    Q    Okay.  So the upshot of this is, are you

13    seeking compensatory damages from the city or not?

14           MR. NAJVAR:  And Jennifer, you can

15    answer to the extent you know the answer.  If it's

16    something you don't know, then you can just say

17    whatever your answer is or your thought is.  I would

18    object to it to the extent it calls for a legal

19    conclusion.

20           MR. HICKS:  It's not asking for a

21    legal conclusion.  She knows whether she's asking for

22    compensatory damages or not.

23           MR. NAJVAR:  Well, I know, but

24    there's nominal damages are also --

25           MR. HICKS:  I'm only asking about

Page 113

1     compensatory, not nominal.

2           MR. NAJVAR:  I mean --

3     A    I'm confused whether or not I am now.

4     Q    (By Mr. Hicks)  Okay.  So I need to know, is

5     the short answer, because I've got a long series of

6     questions to ask you if you're asking for compensatory

7     damages, and we're going to have to reconvene the

8     depositions at a later date after you've done

9     disclosures with respect to damages, amended your

10    interrogatory responses and so on.  So I need to know

11    the answer to that.

12           I understand you have to consult with

13    your lawyer about it.  I get that, but that needs to

14    happen, because I've pointed this out I don't know how

15    many times, and it's never been clarified, and y'all

16    keep going back and forth in the way you say it.  And I

17    don't feel like deposing you, I don't feel like, on

18    damages if you aren't seeking them.  I don't feel like

19    getting an expert to testify about damages if you

20    aren't seeking them.  But there needs to be some

21    clarification, and I don't understand why I can't get

22    it.

23           MR. NAJVAR:  Okay.  Well, you're,

24    you're springing what is really a legal question on --

25           MR. HICKS:  It's not a legal

Page 114

1     question.  She knows whether she wants --

2           MR. NAJVAR:  It is.

3           MR. HICKS:  -- compensatory damages

4     or not.

5           MR. NAJVAR:  Compensatory damages

6     is a term of art.  It can mean a lot of things.

7           MR. HICKS:  Well, can you give me

8     an answer or not?

9           MR. NAJVAR:  You can rely on the

10    answer that's in the interrogatory responses, and if

11    you need further --

12           MR. HICKS:  Okay.  No, no, no.

13    That's fine.  If that's -- that's good.  I mean, I'm

14    not opposed to it, but the problem is that you filed

15    your second amended complaint after those interrogatory

16    responses, and it is ambiguous what you're seeking on

17    behalf of Ms. Virden against the city with respect to

18    compensatory damages.

19           So may I say it back to you?  Let me see

20    Exhibit -- hold on, because if we can get this cleared,

21    that's great -- Exhibit 15.  Thank you.  Okay.

22    Exhibit 15 is your supplemental responses to

23    defendant's first set of interrogatories, and in your

24    response to Interrogatory No. 8 you say, "Virden does

25    not seek any monetary damages in her personal capacity

Page 115

1     other than nominal damages."  Last sentence of 9 says,

2     "Virden does not seek any monetary damages in her

3     capacity as a candidate other than nominal damages."

4           So do I understand, Jerad, from what you

5     just said that that is your position, notwithstanding

6     second amended complaint allegations?

7           MR. NAJVAR:  That's right.

8           MR. HICKS:  Okay.  That's good.  I

9     think it -- can we go off the record for a minute?

10           (At this time the proceedings went

11    momentarily off the record.)

12           MR. HICKS:  After a discussion

13    Mr. Najvar and I had, it is stipulated as between

14    Ms. Virden and the City of Austin that as of today

15    Virden does not seek any monetary damages in her

16    personal capacity other than nominal damages against

17    the city and that Virden does not seek any monetary

18    damages in her capacity as a candidate other than

19    nominal damages against the city.

20           MR. NAJVAR:  That's correct.  And

21    of course, with the proviso that she is seeking

22    attorney's fees and costs, and those are not -- you

23    know, that's not stipulated as not being sought.

24           MR. HICKS:  I understand.

25           MR. NAJVAR:  Okay.

Page 116

29  (Pages 113 to 116)

1          MR. HICKS:  Yeah.  Okay.  That
2    helps.
3      A    Do I need to put that back in this pile?
4          MR. HICKS:  Oh, I need to give that
5    back to you, and I pass the witness.
6               EXAMINATION
7    BY MR. NAJVAR:
8      Q    Okay.  Ms. Virden, I'm just going to have a
9    few follow-up questions.  First I want to talk about
10   the $300,000 loan that you gave the campaign.  We
11   talked earlier, and I think the C&E reports show that
12   you made that loan in December of 2021; is that right?
13     A    I think so.  Sounds right.
14     Q    So, you know, early in the case you were
15   trying -- I mean, the fundraising window now has been
16   open since November of 2021, but you filed the case in
17   order to try to get the fundraising window lifted,
18   right?
19     A    Yes.
20     Q    Why -- well, let me just ask you, why did you
21   not make that $300,000 loan to your campaign earlier
22   when the fundraising window was closed?
23     A    When the fundraising -- well, I wouldn't have
24   done it when the fundraising window is closed, because
25   I wouldn't have known whether or not that was legal.

Page 117

1    think I heard you say, is it fair to characterize -- or
2    I'm trying to drill down to sort of one of the points
3    you made.  Are you saying that you sort of reluctantly
4    made the loan?  Like, that is to say, you're more
5    likely to make the loan earlier if you can gauge your
6    potential support and, and your ability to repay the
7    loan?
8      A    Yes.  I could have been able to tell sooner
9    if the donations -- like, if I could have been able to
10   take donations and judge the pace of donations better,
11   had a longer-term period to do that.  But another thing
12   about -- I don't, I don't really want to make my -- I
13   don't really want to make a $300,000 loan and actually
14   spend my own money on my campaign.  That is something I
15   did as a strategic move for my opponents to see that I
16   had $300,000 to spend if I wanted to.  It was, it was a
17   strategic move, because I'm not likely to spend money
18   that I don't think I can get repaid with donations.
19     Q    Okay.  And you were testifying earlier too
20   about, you know, getting your contributors to, I think
21   you, you called it -- well, I don't know if you used
22   this term or it's in my mind, but your contributors
23   when they make contributions, how does that benefit
24   your campaign, other than the money that's being sent
25   to the campaign?

Page 119

1    So I wouldn't have done that without asking someone
2    first, and I just didn't.  But the other -- let's see.
3    That's the answer to that question I guess.
4      Q    Well, is there any difference between,
5    like -- as far as your campaign goes, running your
6    campaign, is there any difference between money that
7    you yourself put into your campaign versus money that
8    comes from your supporters?
9      A    Yes.  It's very different.  The, the money
10   that -- so donations are money that I really want to
11   use to spend on the campaign and further the message
12   and be the figurehead for the whole political movement.
13   I'm very much less enthused about spending my own money
14   on a campaign, and if I'm not able to determine whether
15   or not the donations are going to come in the way I
16   need them to come in, in order to repay the loan to my
17   campaign, then I'm much more -- much less likely to use
18   the loan money.  But another thing also about the
19   $300,000 is -- well, I'll stop there.
20     Q    Okay.
21     A    Does that answer your question?
22     Q    Yes.  And I may follow up a little bit.  Just
23   one second while I check the dates on this report
24   again.
25          I mean, is it, is it -- one thing I

Page 118

1      A    It feeds on itself on a campaign.  When
2    other potential politically active people in Austin
3    see that somebody else is making campaign contributions
4    to a campaign, it demonstrates viability.  It
5    demonstrates -- as a candidate.  And it also just tends
6    to generate more and more interest.  It just feeds on
7    itself.
8      Q    Okay.  And we can go back to -- let's see.
9    If I can get these campaign reports in the right order
10   here, I'm going to go back to the $50,000 loan issue
11   that we were talking about earlier.  So I have
12   reports -- I'm going to go back through, I believe it's
13   going to be Exhibits 24, 23, and 25, and Exhibit 24
14   actually sequentially or chronologically is first.
15   That covers the period from July 1st, 2020 through
16   September 24th, 2020?
17     A    Mm-hm.
18     Q    I'll just give you a moment to find it.
19     A    Yeah.  I can just put them in order.  Okay.
20     Q    Okay.  So if we look at Exhibits 24, 23, and
21   25, 24 covers July 1st, 2020 through September 24th,
22   2020, right?
23     A    Mm-hm.
24     Q    And then Exhibit 23 covers -- this is a
25   corrected report that covers September 25th, 2020

Page 120

30 (Pages 117 to 120)

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1  through October 24th, 2020 --
2      A   Yes.
3      Q   -- right?  And then Exhibit 25 covers -- that
4  starts on December 6th, 2020, right?  If you look at
5  the period covered in box 9?
6      A   Oh, gosh.  Yes.
7      Q   Okay.  So because there was some discussion
8  earlier.  We were trying to find where this loan or
9  when this $50,000 was repaid to yourself?
10     A   Yes.
11     Q   Did you file a runoff report in between
12 there?  In between Exhibits 23 and 25 was there another
13 report that you filed?
14     A   Hold on.  So this is through, this is through
15 the 31st.  So that would be -- that includes the
16 runoff, right?
17     Q   Well, if we look at --
18     A   Is there another report?  I can't remember.
19     Q   If we look at Exhibit 23, that ends on
20 October 24th, 2020.  The period covered --
21     A   Yes.
22     Q   -- that ends on October 24th.
23     A   Right.
24     Q   And then the next report we have, Exhibit 25,
25 doesn't begin until December 6, 2020.

Page 121

1      A   Right.
2      Q   So --
3      A   So there is another report in there.  Yes.
4  Okay.  Got it.
5      Q   So is it, is it possible or likely that that
6  loan repayment might be reflected on that intervening
7  report?
8      A   It is possible.
9          MR. NAJVAR:  I don't have that
10 report here with me, but I just --
11         MR. HICKS:  Can we go off the
12 record just a second?
13         MR. NAJVAR:  Sure.
14         (At 3:10 p.m. time the proceedings
15 went off the record, continuing at 3:13 p.m.)
16     Q   (By Mr. Najvar)  And just one second.  I'm
17 going to just review my notes and see if there's
18 another question I have.  I might be done.
19         Do you -- in running a campaign for
20 office one of the things we discussed on the record is,
21 you know, your interest in talking about issues as
22 they're being discussed in politics, right?
23     A   (Nodding head)
24     Q   In Austin politics.  Do you think if the
25 campaign -- if your campaign had the ability to talk as

Page 122

1  much as you want about whatever policy being debated is
2  on the dais at a particular time, point in time, let's
3  just -- let's say the city was, you know, influenced by
4  the debate that you're involved in to go the way you
5  suggest they go.  Do you think that would have an
6  effect on your campaign itself?
7      A   Yeah.  It would have a positive effect on my
8  campaign if I'm able to affect the direction that the,
9  that the council takes, if I'm able to influence it to
10 go more in the direction that I'm in favor of.  Yes.  I
11 think that would be a benefit to the campaign, my
12 campaign.
13     Q   Well, why?  Can you elaborate a little bit?
14 Why?
15     A   Well, I think if it's something that I
16 support and my, my campaign supporters are in favor of
17 as well, that'll demonstrate my ability to influence
18 the dais as a whole, especially the mayor, to have a
19 positive influence as far as my campaign is concerned
20 on the policies being made at council.
21     Q   Okay.  And last question, Mr. Hicks was
22 pointing out earlier that when you testified that you
23 wanted the window to open sooner, he, he pointed out
24 that that would also allow -- it would apply to
25 everybody.  So it would allow even the establishment

Page 123

1  donors, which you referred to earlier, to donate
2  earlier, right?
3          That being the case, how would you -- do
4  you, do you still think that opening the window to
5  allow more time for fundraising benefits challengers
6  versus the establishment-type anointed candidates, or
7  there's no, no effect?
8      A   I think what happens if you open up the
9  window sooner, just say at the end of the last
10 election, the first, the first people who jump in
11 and -- say, like first me, I had the establishment
12 donors behind me in the District 10 race, and if I'd
13 had the whole entire since -- the whole 11 months that
14 I didn't have plus another few months before Kirk
15 Watson announced he was going to run, I would have made
16 tens of thousands of dollars more, hundreds of
17 thousands of -- tens of thousands, probably even
18 hundreds of thousands more if those people didn't
19 already know -- because they didn't know he was going
20 to enter the race yet, so they would have been behind
21 me.  I mean, it cost me a lot of money, because I
22 couldn't fundraise after the District 10 run when
23 everybody was still hyped up about my run, and then
24 they left the platform.
25     Q   Well, is it, is it relatively easier or

Page 124

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

**Page 125**

1  harder for somebody who's not tied into the
2  establishment donor list to get a fundraising list up
3  and running, you know, a fundraising --
4      A    Most definitely.
5      Q    Why is it harder?
6      A    Well, it's harder because I'm not a -- like
7  for me, I'm not a -- I'm not in the political
8  establishment.  I don't have everybody's email address
9  and everybody's phone number.  They have an established
10  group of people, mostly good old boys, that stick
11  together and like to direct how politics go in Austin.
12      Q    Well, so not having access to that list
13  yourself, how do you, how do you go about generating a
14  list to use?  How do you go about building a
15  fundraising operation?
16      A    Through the website is a lot of it, and we
17  look back at old -- well, email addresses are hard to
18  get, but we look at other candidates' filings to get I
19  guess PACs and things like that, look at donors, find
20  out who donated to what PACs.  And we can do snail mail
21  to them.
22      Q    Well --
23      A    Email -- emails are not easy to get.
24      Q    Do your, do your own campaign communications
25  when you're out talking about issues, does that tie --

**Page 126**

1  how, how does that relate to your fundraising success?
2      A    Say that again?
3      Q    Like, you're -- when you're out communicating
4  about issues that are currently on the dais and maybe
5  controversial, if Jennifer Virden's out there talking
6  about those things, how does that affect or how does
7  that relate to your fundraising capabilities?
8      A    I think that I'm speaking about issues that
9  people care about, which is my platform really,
10  everything that people care about.  If they hear what
11  I'm speaking about, then they're more likely to donate
12  to it.  I mean, it's just -- I'm not exactly sure what
13  the question is, but --
14      Q    Well, when somebody -- let me ask you this.
15  When somebody gives to your campaign do you, do you,
16  like, retain that information so that --
17      A    Oh.  No.  Okay.  I get it.  Yes.  If somebody
18  makes a contribution, yes.  Then you can, you can ask
19  for their contact information and you can build your
20  email list that way.
21      Q    Okay.  So you build an email list, like,
22  cumulatively over the campaign?
23      A    Yes.
24      Q    Okay.  So, and do most of your individual
25  contributors, do they max out with their first

**Page 127**

1  contribution, or do they give you a smaller amount?
2      A    It can vary.  It's smaller typically.
3      Q    So if somebody gives you a smaller amount,
4  does your campaign follow up with them after that
5  to -- you know, for another, another contribution?
6      A    Yes, we do.  We try to encourage people and
7  follow up, especially, like, via Constant Contact.
8  We'll say things, If you haven't already maxed out,
9  please consider doing so.
10      Q    Okay.  But I would, I would imagine normally,
11  like, those kind of follow-ups, they, like -- well, how
12  long after the initial contribution from, let's say
13  Individual A, how long after they give their first
14  contribution would you, you know, engage them again and
15  ask for a follow-up contribution if they haven't maxed
16  out?  Is it immediate, or is it --
17      A    Well, no, it's not immediate.  Actually it
18  tends to be more right before our filing deadline for
19  one of these reports.
20      Q    Okay.
21      A    That's when -- it's a lot easier to get
22  people to actually go to the computer and make the
23  contribution that they know you're trying to meet a
24  filing deadline, to have the best report you can before
25  the filing deadline.

**Page 128**

1      Q    Well, can, can debates on issues of interest
2  to the public serve as that kind of a, you know,
3  motivator also?
4      A    Yes.  If it's a hot issue, yes.
5      Q    Okay.
6      A    If it's top of mind, like homeless, police
7  staffing, property taxes.
8           THE REPORTER:  Police what?  I'm
9  sorry?
10           THE WITNESS:  Police staffing,
11  property taxes.
12      Q    Okay.  I believe that's all I have.
13           THE WITNESS:  Be sure you get my
14  platform on the record.
15      Q    Oh, on -- so you said earlier, I think you
16  agreed with Mr. Hicks that to have, like, your campaign
17  Facebook account, you don't have to pay Facebook to
18  have that account itself, right?
19      A    Correct.
20      Q    But are there things you can do on Facebook
21  that do cost money?
22      A    Yes.  We boost and advertise, and that costs
23  a lot.
24      Q    Is Twitter the same way?
25      A    I don't think Twitter allows political

32 (Pages 125 to 128)

**Page 129**

```
 1   listing.
 2       Q   Okay.  And have you ever considered -- you
 3   talked about the radio, and the record shows that you did
 4   some radio ads back in May of 2021 about the prop
 5   elections at the time.
 6           But if you had more money available at
 7   the time early in a cycle like that, would you consider
 8   doing, like, you know, other types of communications
 9   that may cost more?
10       A   Other types other than radio?
11       Q   Like, you know, I don't know, the different
12   kind of things campaigns can do, like mail pieces?
13       A   Yeah.  Yeah.  USPS mailers.  Yes.  Most
14   definitely.
15       Q   Why didn't you --
16       A   And to go citywide just to, just to target a
17   few precincts is $32,000 per mailer.  That adds up
18   really quickly.
19       Q   To send one mailer to --
20       A   Not even citywide, just, that was just a
21   targeted, just one mailer.  Yeah.  Yeah.  We definitely
22   would do USPS mailers for sure.
23       Q   Okay.
24       A   We'd do TV, which, you know, that would be
25   great.  I'd do a ton more radio.
```

**Page 130**

```
 1           MR. NAJVAR:  Pass the witness.
 2           FURTHER EXAMINATION
 3   BY MR. HICKS:
 4       Q   I've got a few questions.  So as you sit here
 5   today, do you anticipate that you'll raise sufficient
 6   money and contributions to your mayoral race that
 7   you'll be able to repay your $300,000 loan, what's left
 8   over?
 9       A   I don't know.
10       Q   How much have you received in contributions
11   so far?
12       A   About $155,000 since the window opened.
13       Q   So I want to go back to -- we keep using Kirk
14   Watson as the example to your -- you keep using him as
15   an example, so I'll use him as an example here too.
16           So as I understood what you were saying
17   in response to your attorney's questions a few minutes
18   ago, if the fundraising window -- if there had not been
19   a fundraising window that had opened and closed, if
20   just you could start raising immediately after,
21   fundraising immediately after your District 10 race and
22   if you had known you were running for mayor -- let's
23   assume those two things -- I understood you to be
24   saying, Well, at that point I would get establishment
25   money because they wouldn't know Kirk Watson's running,
```

**Page 131**

```
 1   right?
 2       A   Yes.
 3       Q   Okay.  So at that point, though, if there
 4   weren't a fundraising window, the dynamic of when you
 5   say you were running would change too, wouldn't it?
 6       A   Possibly.
 7       Q   So you're saying that before people know
 8   who's running for mayor you have a chance of raising
 9   money, and when you're running for mayor if the
10   window's open and everybody says, I don't care, I'm
11   going to act like there's no such thing -- that the
12   window really doesn't open until later?
13       A   I don't understand the question.
14       Q   Okay.  As I understood your testimony about
15   this, the reason you thought you would benefit is
16   because people wouldn't know that somebody they really
17   support and want to give money to is going to be
18   running later and you'll get it instead.
19       A   Yes.  Because they love me.
20       Q   Yeah.  Even though they --
21       A   And they would have wanted, and they would
22   have wanted to give me money right then, because they
23   were super excited.
24       Q   But if they had known Kirk Watson was
25   running, they wouldn't have given it to you, right?
```

**Page 132**

```
 1       A   How do we know?
 2       Q   That's what --
 3       A   Because --
 4       Q   -- I thought you were saying.
 5       A   I just don't know.  All I know is how it, how
 6   it affected me is I feel like those people would have
 7   given me money right off the bat --
 8       Q   But you don't --
 9       A   -- right when the new cycle started.
10       Q   But you don't know that any more than you
11   know the answer to what would have happened if Kirk
12   Watson was running, right?  You do not know.
13       A   I do not know.
14       Q   Okay.
15           MR. HICKS:  I have no further
16   questions.
17           MR. NAJVAR:  No further.  We'll
18   reserve our questions for trial.
19           (At 3:27 p.m. the proceedings
20   adjourned.)
21
22
23
24
25
```

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

```
 1        CHANGES AND SIGNATURE
 2           JENNIFER VIRDEN
 3          September 21, 2022
 4
 5   PAGE   LINE   CHANGE              REASON
 6        _____
 7        _____
 8        _____
 9        _____
10        _____
11        _____
12        _____
13        _____
14        _____
15        _____
16        _____
17        _____
18        _____
19        _____
20        _____
21        _____
22        _____
23        _____
24        _____
25        _____
```

Page 133

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3        I, JENNIFER VIRDEN, do hereby certify that I have
 4   read the foregoing pages and that the same is a correct
 5   transcription of the answers given by me to the
 6   questions therein propounded, except for the
 7   corrections or changes in form or substance, if any,
 8   noted in the attached Changes and Signature Page
 9   (Errata).
10
11
12
13               JENNIFER VIRDEN
14
15               DATE
16
17
18
19
20
21
22
23
24
25
```

Page 134

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
 2                  AUSTIN DIVISION
 3
     JENNIFER VIRDEN,            §
 4                              §
          Plaintiff,            §
 5                              §  CIVIL ACTION NO.
     v.                         §
 6                              §  1:21-CV-271-RP
     THE CITY OF AUSTIN,        §
 7                              §
          Defendant.            §
 8
 9        REPORTER'S CERTIFICATION OF THE
10        ORAL DEPOSITION OF JENNIFER VIRDEN
11               September 21, 2022
12
13        I, Sandra S. Givens, Certified Shorthand Reporter
14   in and for the State of Texas, hereby certify to the
15   following:
16        That the witness, JENNIFER VIRDEN, was duly sworn
17   by the officer and that the transcript of the oral
18   deposition is a true record of the testimony given by
19   the witness;
20        That the original deposition transcript was
21   submitted to: JENNIFER VIRDEN;
22        That a copy of this certificate was served on all
23   parties and/or the witness shown herein on September
24   26, 2021.
25        I further certify that pursuant to FRCP Rule
```

Page 135

```
 1   30(f)(1) that the signature of the deponent was
 2   requested and that the signature is to be returned
 3   within 30 days from the date of receipt of the
 4   transcript.  If returned, the attached Changes and
 5   Signature Page contains any changes and the reasons
 6   therefor:
 7        That $       is the deposition officer's charges
 8   to the City of Austin for preparing the original
 9   deposition transcript and any copies of exhibits;
10        That the amount of time used by each party at the
11   deposition is as follows:
12        Renea Hicks - 2 hours, 29 minutes
          Jerad Najvar - 19 minutes
13
14        That pursuant to information given to the
15   deposition officer at the time said testimony was
16   taken, the following includes counsel for all parties
17   of record:
18        Renea Hicks - Attorney for Defendant
          Jerad Najvar - Attorney for Plaintiff
19
20        I further certify that I am neither counsel for,
21   related to, nor employed by any of the parties or
22   attorneys in the action in which this proceeding was
23   taken, and further, that I am not financially or
24   otherwise interested in the outcome of the action.
25
```

Page 136

34 (Pages 133 to 136)

```
 1       Certified to by me this 26th day of September
 2  2022.
 3
                    GIVENS COURT REPORTING
 4                  6549 Fair Valley Trail
                    Austin, Texas 78749
 5                  (512) 301-7088
 6
 7
 8                  SANDRA S. GIVENS, CSR
                    Certification No. 5000
 9  # sg-1967       Certificate Expires 1/31/24
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 137

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

**A**

**ability** 51:9
119:6 122:25
123:17
**able** 17:15 37:25
41:22 43:9
44:5,14 45:2
46:9,14,17,21
47:6 48:12
50:25 52:20
57:5 65:13,14
66:23 67:12
68:5,22 70:4,8
99:21 118:14
119:8,9 123:8
123:9 130:7
**accept** 20:22
26:17 65:17
**access** 36:18
37:19,21,25
125:12
**account** 37:12
37:14,17,19
45:14 87:6
128:17,18
**accusing** 105:2
**ACKNOWLE...**
134:1
**act** 131:11
**action** 1:5 39:16
40:6 135:5
136:22,24
**active** 11:22
120:2
**actively** 12:24
88:15
**activity** 74:18
**actual** 7:10
**add** 31:14,17
**added** 32:13,25
64:11,23
**adding** 64:24
**addition** 65:12
**additional** 48:16
**address** 11:12
125:8
**addresses**

125:17
**addressing** 25:7
**adds** 23:2
129:17
**adjourned**
132:20
**Adjustment**
3:19
**Admissions** 3:16
**ads** 38:3,6 45:12
45:18 129:4
**advance** 65:18
**advantage** 18:22
68:25 108:15
**advantages**
18:21
**advertise** 128:22
**advertisement**
39:25 40:3
**advertisements**
34:18 41:7
**affect** 54:22 56:9
56:19,20 123:8
126:6
**Affidavit** 5:9,11
5:16
**affidavits**
111:11
**afford** 48:12
**aggregate** 14:21
14:22
**ago** 60:13
130:18
**agree** 41:11
**agreed** 96:25
128:16
**ahead** 25:7
75:19 94:7
96:1
**aim** 61:8
**allegation** 65:6,8
65:21
**allegations**
116:6
**allow** 123:24,25
124:5
**allowed** 46:24

107:25
**allows** 22:6
128:25
**alphabetical**
90:24,25
**altruistic** 104:24
**ambiguous**
115:16
**amend** 110:20
**amended** 4:2 5:7
6:9 20:7 64:9
64:16,16,24
110:18 111:1,5
111:18 112:2
114:9 115:15
116:6
**amendment** 4:8
4:10,10 20:16
27:5 28:4
**Americans** 13:5
13:7
**amount** 43:21
44:15,19 59:3
59:5 96:14
97:7,21,24
102:12 127:1,3
136:10
**amounts** 101:12
**analytics** 37:21
37:25
**and/or** 135:23
**announce** 18:24
19:1
**announced** 9:1
11:2 24:24
30:12 124:15
**Annual** 3:18
**anointed** 48:1,3
48:9,18 124:6
**answer** 10:9
19:13 32:7,14
34:16 39:22,25
43:11 49:12
51:1,2,3,4,5,13
56:22 57:12
88:25 93:10
113:15,15,17

114:5,11 115:8
115:10 118:3
118:21 132:11
**answer's** 49:11
**answers** 134:5
**anti-corruption**
105:13,25
106:12,18,18
106:25 107:1,7
107:10
**anticipate**
110:18 130:5
**anybody** 8:22
30:8 32:13,24
47:23 67:14
**anyone's** 56:17
**anyway** 41:19
58:5 62:24
72:22 80:2
100:6,12
**apostrophe**
113:5
**appear** 8:7
**appearance**
51:21,21 109:5
**Appearances**
3:3
**appears** 8:10
22:18 77:25
**application** 3:22
4:12 17:11
28:19,22 46:5
**applications**
46:1
**apply** 50:23
68:14 123:24
**appointment**
3:25 4:8,10
17:13 27:5
**April** 41:3,6
65:21,22 103:2
**arbitrary**
107:17 108:14
108:15,17
**area** 15:1,3
**arranged** 90:25
**arrangement**

51:23 53:7
**art** 115:6
**artificial** 107:17
**aside** 24:18
33:10 100:11
**asked** 56:12
59:14 86:6
89:13
**asking** 19:16,18
32:13,19 43:17
53:11 56:19
65:10 82:16
89:19 91:18
93:13 113:20
113:21,25
114:6 118:1
**assert** 46:8
**assertion** 45:21
**Assistant** 2:13
**associated** 36:14
37:11 38:20
**association**
13:12
**assume** 14:8,9
33:25 44:25
46:23 130:23
**attached** 7:12
27:4 134:8
136:4
**Attaching** 4:8
**attachments**
58:1
**attended** 38:15
**attention** 7:12
12:2 55:14,19
55:21,22 56:2
56:3,4 109:9
109:18
**attorney** 6:12,17
21:4 31:25
34:1 46:2
57:19 58:21
136:18,18
**attorney's**
116:22 130:17
**attorneys**
136:22

**August** 15:20
17:15,16 18:14
28:25 80:23
**Austin** 1:2,6,21
1:22 2:10 3:22
3:23 4:5 5:4
6:8 8:15 9:5,8
9:25 10:16,16
11:14,23 13:13
17:12 27:15
28:12 40:12,13
40:15 41:18
42:2 47:10,11
48:15,19 49:2
49:8 50:10
54:4,7 55:8
65:16 66:25
68:8,8,20
107:22 109:5
116:14 120:2
122:24 125:11
135:2,6 136:8
137:4
**Austin's** 47:25
**Austinites** 48:2
**available** 97:23
129:6
**average** 109:21
**aware** 32:24
33:2,4,8
**awhile** 92:1

**B**

**B** 3:11 23:2
26:22 33:3,4,5
**back** 12:7,11
13:17,22,24,25
18:18 19:23,25
21:9 24:15
26:21 33:9
47:20 50:4
57:2 58:19
73:24 74:22,23
75:2 76:2,9
82:14 83:24
86:1 87:2
91:17 93:21
96:8 97:14

102:22 108:12
112:5,5 114:16
115:19 117:3,5
120:8,10,12
125:17 129:4
130:13
**balance** 77:12
77:19 78:11
99:1
**ballot** 3:20,23
4:12 15:25
16:11 17:12
28:19
**ban** 12:8
**based** 96:24
**basic** 15:8
**basically** 58:25
65:13 69:21
**basis** 43:24
**bat** 132:7
**battling** 106:18
106:19
**beginning** 75:8
109:10
**begins** 23:11
**behalf** 115:17
**believe** 8:19 9:1
10:20 13:6
15:13,13 44:12
46:2 55:15
59:11 60:3,8
62:19 75:24
77:15 80:1
81:10 86:24
93:3 101:7
120:12 128:12
**benefit** 105:22
106:11,20
119:23 123:11
131:15
**benefits** 124:5
**best** 32:7 77:4
127:24
**bet** 78:3
**better** 19:1
36:21 64:1
119:10

**beyond** 61:17
62:7 107:13,13
**bid** 106:7 107:16
**bigger** 69:11
**bill** 67:4
**bills** 25:10
**bit** 118:22
123:13
**blackout** 21:5
21:14
**blank** 59:2,4
**blast** 35:8
**blasted** 78:19
**blasts** 35:16
**books** 73:24
**boost** 128:22
**bottom** 34:5,6
39:5
**boundaries**
107:17
**box** 2:10 71:11
72:3,9,24
75:25 85:8,9
85:10 86:7
96:3 99:6
101:25 121:5
**boxes** 97:14
102:14
**boy's** 50:17
**boys** 125:10
**brand-new** 18:8
**break** 61:8
62:16 64:3
110:12
**breaking** 61:14
**briefly** 28:17
**broadcast** 41:23
**broader** 13:14
**broadly** 11:22
54:15
**budget** 42:20
68:2
**budgeted** 98:10
**budgeting** 98:10
**build** 42:19
54:22 67:25
126:19,21

**building** 47:22
125:14
**bullet** 105:11

**C**

**C** 2:1 26:3 33:9
110:17
**C&E** 26:3,5,6
117:11
**C&Es** 26:1,9
**call** 20:19 21:14
24:6 31:10,11
63:24 68:16
**called** 14:21
104:7 119:21
**calling** 7:19
69:20
**calls** 10:8 31:23
32:16 39:21
62:10,11 88:24
93:9 99:3
113:18
**campaign** 3:19
3:25 4:6,8,10
5:13,18,20,22
17:13,23 21:23
22:7 23:10
24:15,20 25:2
25:15,21 27:6
27:12 28:5
34:11 35:15
36:10,13 37:15
37:16,17,19
38:23 40:5,7
40:10,14 42:20
43:14,25 46:14
47:12,22 48:11
49:13,18,20
52:20 55:2
56:14,21 57:7
59:19 60:24
61:4,6 62:8
63:9,11 65:8
65:15 66:1
70:24 71:13,25
73:7,16,16,20
73:20,25 74:7
74:18,18 77:7

78:24 82:18
84:3,8 85:4
86:19 89:23
90:3 91:20
93:5,12 95:10
95:16,19 96:4
97:6 98:13,17
98:24 99:10,17
103:19 104:13
105:20,22
107:21 117:10
117:21 118:5,6
118:7,11,14,17
119:14,24,25
120:1,3,4,9
122:19,25,25
123:6,8,11,12
123:16,19
125:24 126:15
126:22 127:4
128:16
**campaigning**
11:1 49:14,15
49:17 56:5
**campaigns**
129:12
**camping** 12:8
**campus** 13:7
**candidacy** 11:2
**candidate** 4:8,10
8:18,23 9:21
9:25 10:5,15
10:19 17:25
18:8,19 20:21
24:7,10 27:6
46:20 47:4,24
48:3,14,24
49:4,5,6 50:12
50:15,17 53:16
65:14 66:22
67:23 69:13,14
108:16 109:17
109:19 112:18
116:3,18 120:5
**Candidate/** 5:9
5:11,16
**Candidate/Of...**

5:13,18,20,22
**candidates** 3:18
22:6 30:6
52:13 65:16,17
66:10,13,23
67:24 69:19,21
124:6
**candidates'**
125:18
**canvass** 26:15
**cap** 14:21
**capabilities**
126:7
**capacity** 112:18
115:25 116:3
116:16,18
**Capital** 94:11
**caps** 15:4
**card** 92:18,18
93:19
**care** 126:9,10
131:10
**careful** 98:8
**Cari** 63:10,10,15
**CariMarshall...**
5:6 63:7
**case** 6:13,25 8:8
31:5,14,19
33:15 47:14
48:4,7 58:1
91:15,19 95:20
107:7 108:1
117:14,16
124:3
**category** 93:24
105:1
**cause** 1:17
**causes** 52:2
**cell** 96:22
**certain** 55:17,24
**certificate** 112:6
135:22 137:9
**Certification** 3:9
135:9 137:8
**Certified** 135:13
137:1
**certify** 134:3

135:14,25
136:20
**challenge** 20:19
20:21 21:13,19
21:22
**challengers** 52:6
69:14 124:5
**challenging**
22:16 24:6
26:22 48:14
49:6 106:14,22
108:4
**champion**
105:13
**chance** 131:8
**change** 28:7
40:20 53:14
131:5 133:5
**changed** 19:4
27:11,15,22,25
84:5 108:3
**changes** 3:8 8:12
33:5,24 40:21
133:1 134:7,8
136:4,5
**chapter** 13:6
**characterize**
11:22 119:1
**characterizes**
39:18
**charges** 136:7
**charter** 4:5
20:16 21:20,23
24:5
**cheap** 98:17
**check** 23:25
118:23
**checked** 103:22
**checks** 25:17
**chest** 47:23
67:25
**choose** 37:6
52:13
**chosen** 29:22
48:3 49:3
50:14
**chronologically**

120:14
**church** 88:13
**circle** 30:14
**citizen** 68:8
**city** 1:6,21 3:18
3:18,22,23 4:5
4:7,12 6:13
8:15 9:25
10:23 13:13
14:13 15:12
16:15 17:12
18:5 20:14,15
20:15,21 21:19
21:22 22:7,15
23:2,21 24:5
26:15 27:15
28:20 40:12,15
41:8 47:9,10
48:15 54:22
55:1,9,12,22
56:2,4,13,17
57:4 66:4
107:22 108:2
109:5 110:5,6
113:13 115:17
116:14,17,19
123:3 135:6
136:8
**city's** 3:16 33:14
**citywide** 9:6
129:16,20
**Civil** 1:5,23
135:5
**claim** 20:14
21:13 110:19
**claimed** 113:7
**claims** 65:13
**clarification**
114:21
**clarified** 114:15
**clarify** 51:18
**clarity** 45:1
78:21 83:1
**Clark** 31:4
58:11 60:17,17
60:20 64:11
79:19 80:21,23

81:16 83:13
100:22 103:5
110:6
**clear** 7:4 60:7
86:4,22
**cleared** 115:20
**clearer** 57:2
**Clerk** 3:18 4:7
**clerk's** 14:13
**click** 103:24
**closed** 41:22
86:12 117:22
117:24 130:19
**closely** 58:22
**closer** 109:8
**closing** 73:24
**club** 13:12 50:8
50:18
**clubs** 13:1,11
**co-plaintiff**
64:12
**code** 20:15 23:2
68:12
**codes** 15:1
**Cody** 59:12 60:4
60:8
**coffers** 98:3
**com-** 47:16
**come** 13:25
17:19 33:9
44:20 63:4
66:7 118:15,16
**comes** 118:8
**coming** 40:12
46:18
**commentary**
9:24
**committed**
30:19
**communicating**
126:3
**communication**
39:18,19
**communicatio...**
34:11,22 36:7
36:11 37:10
38:19 58:21

83:24 125:24
129:8
**compare** 103:11
**comparison**
97:22
**compensatory**
110:19 111:22
112:17 113:6
113:13,22
114:1,6 115:3
115:5,18
**compete** 47:23
**complaint** 4:2
5:7 20:7 64:9
64:17,24 65:7
110:18 111:6
111:18 112:2
115:15 116:6
**complete** 96:22
**completely** 47:8
47:16 48:25,25
56:5,9,15
108:14,14
**computation**
110:21 111:2
**computer**
127:22
**con-** 85:14 86:15
**concern** 68:24
**concerned**
123:19
**concerns** 14:24
**concluded** 24:23
**conclusion** 10:8
31:23 32:8
39:21 88:25
93:9 99:3
113:19,21
**conducting** 57:7
**confident** 58:22
**confirm** 27:4
**confused** 77:19
82:12 114:3
**confusing** 83:3
**connected**
108:16
**connection**

Page 141

59:19 85:5
91:15
**consider** 17:18
17:24 18:19
19:22 39:19
40:2 52:17,18
52:18,19 91:18
127:9 129:7
**considered** 8:17
40:11 129:2
**Constant** 8:25
34:24 35:7,22
35:24 39:13
127:7
**constitution**
107:8
**constitutional**
113:5
**consult** 100:2
114:12
**consultant** 98:6
**contact** 9:1
34:24 35:7,23
35:24 39:13
61:18 126:19
127:7
**contacted** 62:2,2
62:4,5
**contains** 136:5
**continue** 46:22
46:25 47:22
**continuing** 64:5
110:14 122:15
**continuously**
10:1,16 11:1,7
108:7
**contract** 2:13
106:7
**contracts** 106:6
107:14
**contradiction**
47:9 48:25
51:23 52:1
53:5
**contradictory**
55:8
**contribute** 47:1

48:4,13 62:8
62:12 66:23
67:12 81:17
83:22 84:8
88:14
**contributed**
69:5 103:8
**contributing**
67:24 83:12
**contribution**
14:11,16,18
67:3 80:14,23
81:1 84:17
87:16,21,22
88:10,13,17
89:22 98:22
99:1,12 105:21
126:18 127:1,5
127:12,14,15
127:23
**contributions**
4:6 14:25
20:22 25:24
26:7,18 40:7
40:15 42:8
46:22,25 48:11
49:5,9 50:20
65:8,16 66:2
66:20 74:24
75:2 78:24
79:14,15,24
80:20 81:22
83:11 84:3
85:13,14,15
86:10,16,17
87:8,18 88:5,7
88:9,15,20,22
89:12,20,20
92:16 93:5
94:15,16 97:19
97:23 101:5
102:15 106:11
119:23 120:3
130:6,10
**contributors**
68:15 70:9
82:21 100:21

102:24 105:23
106:21 119:20
119:22 126:25
**controversial**
126:5
**conversations**
92:3
**convoluted**
99:16
**coordinator**
61:2
**copied** 24:4
**copies** 7:20
136:9
**copy** 14:1,2
70:20,22 72:8
135:22
**correct** 11:10
13:18 14:20
15:12,18,25
16:4,20,20
17:16 20:17
22:17,20,23
23:6 27:10,13
27:14 28:4,8
29:1 34:25
37:4 41:13,24
45:17 51:11,11
51:12 52:2
53:3 54:17,18
56:23 59:6
60:24 65:23
66:1 67:5,6,9
68:6 70:25
71:3,5,17 72:1
72:25 73:1,8,9
76:4,7 78:3,9
85:6,14,20
87:12,18,19
88:2 92:16,17
93:7 95:17
96:5,6,15,19
97:4,4,8,9,20
99:14 101:10
101:15,16
102:2,7,16
107:22,23

109:9 111:3,4
111:23 112:1
116:20 128:19
134:4
**corrected** 70:23
120:25
**correction** 78:2
78:4
**Correction/A...**
5:9,11,16
**corrections**
134:7
**corrupt** 53:7,8
53:13,15
104:18,22
105:1,3,7
**corruption**
48:23 49:1
51:20,21 52:2
52:4,5,7,17,24
53:3 105:7
106:19 108:9
109:4,4,16
**cost** 35:19,20,24
35:25 36:14
37:11 38:5
43:5 124:21
128:21 129:9
**costs** 38:19
116:22 128:22
**council** 3:18,23
8:15 10:23
15:24 16:15,23
18:5 22:25
26:23 27:15,17
27:18,24 28:11
55:9,12,15,22
56:17 106:12
106:20 108:2
123:9,20
**council's** 56:2,4
**counsel** 136:16
136:20
**count** 90:16
**counted** 93:20
**couple** 38:1 48:4
48:5,13 112:2

**course** 116:21
**court** 1:1 7:13
14:5 39:16
108:2 135:1
137:3
**cover** 27:3 82:17
**coverage** 12:20
78:4
**covered** 79:15
80:14 88:18
121:5,20
**covering** 85:14
**covers** 120:15
120:21,24,25
121:3
**create** 36:10
**created** 37:15
**credit** 92:18,18
93:19
**crossed** 89:21
**crosstalk** 76:14
82:21
**CSR** 1:19 137:8
**cumulatively**
126:22
**current** 41:18
**currently** 126:4
**cycle** 68:2 129:7
132:9
**cycle's** 46:23
47:17

---

### D

**D** 3:1
**dais** 40:13 47:11
105:22 123:2
123:18 126:4
**damages** 110:19
111:23 112:17
113:6,13,22,24
114:7,9,18,19
115:3,5,18,25
116:1,2,3,15
116:16,18,19
**date** 8:9 15:14
18:3 23:11
31:6,7 43:19
65:18 73:10,11
73:12,13,14

74:14,16 86:21
88:14 94:4,10
96:17 111:15
112:6 114:8
134:15 136:3
**dated** 46:3 71:2
76:3 102:1
112:1
**dates** 76:9 77:2
112:4 118:23
**Davis** 58:10
59:12 60:9
**day** 1:18 13:16
13:17 20:23
23:11 30:1,1
83:16 100:24
101:1 137:1
**days** 29:19 97:1
97:5 107:25
108:4 111:15
136:3
**deadline** 127:18
127:24,25
**debate** 123:4
**debated** 123:1
**debates** 128:1
**December** 10:1
10:6,17 24:10
38:21 73:10
96:14 117:12
121:4,25
**decide** 29:14
48:3 49:3 84:7
**decided** 29:10
69:4 108:2
**decision** 18:3,4
34:1 56:17
**decisions** 54:22
55:2 56:9,13
56:16 57:4
**declarants**
100:22
**declaration**
42:23 58:23
61:19 100:17
103:12
**declarations**

57:22,25 58:16
62:3 80:13
84:6 88:1,1,4
103:7
**deduce** 76:14
**defeated** 46:19
**Defendant** 1:7
1:16 2:8 135:7
136:18
**defendant's**
4:16,18,20
115:23
**definitely** 48:10
125:4 129:14
129:21
**defunding** 12:9
**deliberations**
8:21
**demonstrate**
123:17
**demonstrates**
120:4,5
**depends** 35:25
**deponent** 134:1
136:1
**deposing** 114:17
**deposition** 1:10
1:15 3:14 6:10
6:15,19,23
7:11 8:4,7,8
9:15 10:21
11:5 14:6 16:3
17:6,10 20:5
27:1 28:3,16
31:2 40:17,22
45:8,24 49:10
57:17 62:18
64:8 70:16
75:13 85:3
86:4 101:25
135:10,18,20
136:7,9,11,15
**depositions**
114:8
**describe** 28:17
45:12
**described** 51:7

53:10 68:15,20
109:4
**describing** 69:24
**DESCRIPTI...**
3:13
**designate** 31:11
**designated**
101:13
**designates** 31:12
**designation**
27:12 28:5
**desire** 54:1
65:15
**detail** 19:9,19,20
22:4 104:7
**details** 19:15
21:21
**determination**
14:13
**determine** 73:22
108:8 118:14
**determined** 11:3
73:23
**difference** 29:7
29:9 52:20
88:16 94:22,24
95:1 106:15,17
118:4,6
**different** 7:9,10
29:23 34:21
56:5,9,15,21
89:2 118:9
129:11
**difficult** 49:6
71:7
**direct** 47:8
48:25 51:22
52:1 125:11
**directed** 31:24
**direction** 123:8
123:10
**disclosure**
106:19
**disclosures** 4:14
31:5 105:17,19
105:20 106:10
106:11 110:16

110:20 111:2,9
111:11,12
114:9
**discuss** 6:18
**discussed** 10:10
10:20 122:20
122:22
**discussion** 41:15
116:12 121:7
**discussions** 54:5
54:8
**disengaged**
47:17
**dishonest** 105:9
**district** 1:1,1
3:23 4:12
10:23,23 16:23
18:5 19:23
24:11 27:16,17
27:18,24 28:11
28:20 29:20
45:14 46:18
55:11,13,19,21
69:6,7 70:24
76:23 85:16
108:2 124:12
124:22 130:21
135:1,1
**DIVISION** 1:2
135:2
**document** 20:11
20:13 60:21
103:17
**doing** 7:23 29:10
47:18 61:1
127:9 129:8
**dollar** 44:15,19
**dollars** 42:16
43:1,8,14,18
43:25 44:9
124:16
**donate** 63:9
124:1 126:11
**donated** 125:20
**donations** 48:17
118:10,15
119:9,10,10,18

**donor** 125:2
**donors** 52:19
124:1,12
125:19
**doublecheck**
80:25
**doubt** 79:18
**doubting** 55:5
**draft** 58:20,23
**drafting** 21:4
**drawn** 92:2
**drew** 15:24
**drill** 119:2
**Dripping** 68:9
**Drive** 6:7 11:7
**dropped** 16:6
**duly** 1:16 6:2
135:16
**Dunlevy** 58:10
60:12 83:18
102:25
**Durnin** 58:11
60:14
**dynamic** 131:4

─────────

**E**

**E** 2:1,1 3:1,11
26:3 73:3 96:9
**earlier** 51:14
68:16 91:17
117:11,21
119:5,19
120:11 121:8
123:22 124:1,2
128:15
**early** 117:14
129:7
**easier** 91:7
124:25 127:21
**easily** 92:9
**easy** 40:19
125:23
**effect** 22:20,22
26:23 108:5,6
109:13 123:6,7
124:7
**effort** 91:20
**efforts** 58:4

**either** 10:22
16:14,15 31:14
63:13 78:20
92:19 112:18
**elaborate**
123:13
**elected** 105:12
**election** 3:18,21
3:23 4:12
13:16,17 14:15
14:19 15:5
20:23 23:10,12
24:10 25:11
26:14 28:20
41:8 52:10
56:6,10 65:18
66:14 73:16,20
83:16,17 108:1
109:1,2 124:10
**elections** 107:22
109:5 129:5
**eligible** 9:9
**eliminating**
106:3,4,5
**email** 4:7 27:3
35:8,8,11,11
35:16 39:13
125:8,17,23
126:20,21
**emails** 35:25
125:23
**employed**
136:21
**enacted** 22:19
22:23 108:3
**encourage** 127:6
**ends** 121:19,22
**engage** 127:14
**engaged** 12:2
47:20
**enter** 18:20 50:5
124:20
**entered** 17:14
**enthused** 118:13
**entire** 68:2
124:13
**entries** 90:4

**entry** 91:10 94:1
**equally** 49:7
**Errata** 134:9
**especially** 48:13
123:18 127:7
**established**
125:9
**establishment**
48:1,18 49:2
50:11,18 51:8
52:23 68:21
123:25 124:11
125:2,8 130:24
**establishment's**
50:14
**establishment...**
124:6
**estimation** 42:13
42:24
**evaluate** 52:12
**event** 12:4
**everybody** 47:19
47:19,20 48:12
50:4 70:6
123:25 124:23
131:10
**everybody's**
30:15 46:22
125:8,9
**evidence** 62:6
80:4,4 84:7
**evolved** 12:3,3
**ex-mayor** 50:9
50:13
**ex-mayor's** 50:8
**exacerbates**
52:4,8
**exact** 15:14
44:19 54:19
60:20 108:25
111:15
**exactly** 25:16
38:10 44:16
50:16 109:22
126:12
**Examination**
3:6,6,7 6:3

117:6 130:2
**example** 29:17
51:10 59:11
69:22 93:22,25
94:6 105:23
106:8,10
107:14 130:14
130:15,15
**examples** 105:16
**exchange** 5:5
62:21 84:11,13
**excited** 131:23
**exhibit** 3:14,15
3:17,20,22,24
4:1,3,5,7,9,11
4:14,15,17,19
4:21,23 5:1,3,5
5:7,8,10,12,14
5:16,18,20,22
5:24 7:10,12
7:17,25 8:4,5,7
9:12,13,16
10:14 11:4,5
13:17 14:4,6,6
15:4 16:2,3,14
17:3,10,13
20:4,6 21:2
22:13,14 23:16
23:17,19,21
24:3 26:21
27:1,2 28:2,4
28:15,17 31:1
31:2 33:13,14
33:16,18 34:14
39:3 40:17,18
40:22,24 45:7
45:9,23,24
53:17,20,24
57:5,16,18
62:17,18,19
64:6,8,16
70:15,17 71:19
71:20,21,22
72:15,15 74:2
75:12,13 77:15
77:19 79:7,11
80:9,10,11,17

80:18 81:25
82:6,8,10 83:6
83:9 84:10
85:1,4 86:4
87:24,25 88:5
88:18,20 89:8
89:9,19 90:1
90:17 93:22
95:14,15 99:6
100:16,18,20
101:13,23,24
101:25 102:21
102:22 103:15
103:17 105:12
107:20 110:15
111:6,19,25
112:21 115:20
115:21,22
120:13,24
121:3,19,24
**exhibits** 3:4 7:7
17:6,14 33:11
76:19 77:9
79:5 82:17
120:13,20
121:12 136:9
**expect** 44:13
94:20
**expectation**
44:15 94:14
**expected** 44:5,9
**expecting** 43:24
95:9
**expenditures**
4:6 22:8 25:22
26:7,19 85:12
85:15 86:9,16
90:3 92:15
93:1,25 97:18
97:22,25
102:15
**expenses** 22:8
24:13,16,19
25:1,15 26:10
26:18 92:11
**experience**
18:19

**experienced**
48:24
**expert** 114:19
**Expires** 137:9
**explain** 49:14
55:5 97:10
**extent** 10:8
21:24 31:23
39:21 88:24
93:9 99:3,11
113:15,18

**F**

**F1** 85:10 91:3,4
**Facebook** 8:25
34:24 36:7,8
36:11,12,13
128:17,17,20
**fact** 41:25 48:23
61:13 68:9
99:4
**facts** 31:13 46:4
**factually** 92:5,6
**fair** 53:16 65:19
70:5 107:16
119:1 137:4
**fairly** 58:22
**familiar** 20:11
57:23 59:16
**far** 31:16 57:13
88:25 93:10
101:4 102:9
118:5 123:19
130:11
**faster** 112:11
**favor** 52:23
123:10,16
**favoritism** 106:3
106:4,5,8
**February** 8:19
11:3 91:11
**Federal** 1:22
39:16
**feeds** 120:1,6
**feel** 22:2 66:24
75:1 114:17,17
114:18 132:6
**fees** 91:13

116:22
**fellow** 63:17
**field** 107:17
**fighting** 108:9
**figure** 30:5
110:3,4
**figured** 73:13
**figurehead** 47:3
118:12
**file** 15:11,18,22
18:22 19:1
29:4,14,25
30:3,15,19
78:2 91:25
109:24 121:11
**filed** 5:9,11,13
5:17,19,21,23
27:8 28:22,25
29:18,18 30:15
30:16 40:3
41:3 46:2
64:11 71:4,25
85:4,19 91:23
95:17,20 111:1
111:8 112:3,21
115:14 117:16
121:13
**filing** 17:22
29:19,23 30:7
30:9 77:20
110:18 127:18
127:24,25
**filings** 6:16
15:22 125:18
**fill** 59:2,5
**final** 69:12
**finance** 3:19
5:13,18,20,22
21:24 70:24
71:25 85:4
95:16,19
**financial** 19:3
19:17
**financially**
19:22,25 67:14
67:24 136:23
**find** 7:9 32:23

46:9 53:18,22
54:19 60:20
73:6 80:19
83:11 84:20
90:6,14 91:5
92:13 96:9,11
100:3,22,25
112:10 120:18
121:8 125:19
**fine** 61:16
115:13
**finish** 7:1 74:5
**finished** 61:10
**fired** 46:23
**firm** 2:4 90:7,9
90:10 91:12
**first** 3:16 4:16
4:18,18,22 5:7
6:2 18:2 20:16
24:9 31:9
33:12,15,20
40:25 45:25
46:16 64:8
70:22 72:15
79:5 103:25
104:1 107:24
111:5,18 112:2
115:23 117:9
118:2 120:14
124:10,10,11
126:25 127:13
**first-time** 17:25
46:20
**Fisher** 58:12,13
58:14 60:19
100:25 103:1
**fits** 67:4
**five** 16:12 62:5
**flip** 55:13
**floor** 1:21
**focused** 13:13
**follow** 29:16
37:5,6,8,9
63:12 118:22
127:4,7
**follow-up** 117:9
127:15

**follow-ups**
127:11
**followers** 36:19
**following** 12:17
12:24 76:10
135:15 136:16
**follows** 6:2
136:11
**forbidden** 99:13
**foregoing** 134:4
**Forever** 11:18
11:19
**forgotten** 31:6
**form** 27:5 93:18
134:7
**formal** 15:10
**forms** 93:12
95:3
**forth** 114:16
**forum** 34:25
35:3 38:11
**found** 73:6
79:13 101:3
102:24
**founds** 46:14
**fourth** 87:7
**frankly** 89:11
**FRCP** 135:25
**free** 41:18 65:15
**FREED-rich**
81:2
**FREED-rik**
81:2,3
**Friedrich** 58:11
60:15 81:2,18
81:19
**front** 17:5 20:5
24:2 28:16
31:2 33:21
57:17 62:18
71:19 85:3
103:16
**full** 102:12
**fully** 79:2
**function** 93:7
**fundraise** 18:24
49:7 124:22

**fundraising** 4:4
21:25 22:16
41:12,19,21
53:2 65:22
67:1,18 68:25
69:3,25 70:10
85:19 86:12
88:8 89:10
94:12 97:1,7
99:13,19
100:10,24
101:11,14,19
103:9 107:21
107:25 109:6
109:18,20
117:15,17,22
117:23,24
124:5 125:2,3
125:15 126:1,7
130:18,19,21
131:4
**fundraising-w...**
44:1 57:6
**funds** 17:15 22:7
24:15,20 25:22
26:11 38:22,23
41:7 42:19
45:14,19 46:9
51:9 65:14
92:11 93:1,25
**further** 3:7
77:14,18
115:11 118:11
130:2 132:15
132:17 135:25
136:20,23
**future** 66:1,23
66:25 67:11
87:16,23

———————
**G**
**gauge** 119:5
**Gean** 58:10
60:11,13 103:2
103:11
**general** 3:21,23
4:12 19:16
21:22 23:10,11

28:20 73:16,20
83:17 98:6
**generally** 19:8
20:13
**generate** 120:6
**generating**
125:13
**gentleman** 62:22
**getting** 17:23
21:20 44:23
56:4 57:19
63:8 74:24
106:7 114:19
119:20
**give** 7:20 13:22
47:3,7 53:22
58:18 71:20
101:12,21
103:12 115:7
117:4 120:18
127:1,13
131:17,22
**given** 51:14
57:13 101:14
103:13 108:5
108:24,24
131:25 132:7
134:5 135:18
136:14
**Givens** 1:19
135:13 137:3,8
**gives** 52:10
126:15 127:3
**go** 19:19 21:9
22:4 25:7
34:17 35:15
47:3,19 49:10
50:4,9 53:23
54:19 58:4
63:9 64:17
73:2 75:19
76:2 86:1 87:6
89:25 92:8
94:7 100:15
112:5,11 116:9
120:8,10,12
122:11 123:4,5

123:10 125:11
125:13,14
127:22 129:16
130:13
**go-to** 68:15,21
69:1
**goal** 42:25 43:7
43:10,13,18,20
44:18
**goes** 50:10
102:22 109:22
118:5
**going** 7:7,19 9:2
9:23 10:7,22
10:24 14:5
17:24 28:3
29:6,7,24 30:3
30:10,22,23
31:22 32:1
33:11,16,23,23
33:24 36:9
40:16 42:15,25
50:5,14,16,19
64:7 66:13
68:1,2,3 69:4,8
71:20 73:23
74:8,21,25
75:1 78:18
79:4 82:6
87:22 88:14,24
90:14,16 98:9
105:21 110:4,7
114:7,16 117:8
118:15 120:10
120:12,13
122:17 124:15
124:19 131:11
131:17
**goings-on** 40:13
**good** 50:17
61:14 64:1
67:21 73:17
105:10 107:8
115:13 116:8
125:10
**gosh** 121:6
**governance** 55:3

**graduated** 13:9
**great** 15:17 19:9
115:21 129:25
**group** 35:12
48:2 125:10
**guess** 8:20 26:14
40:8 73:13
92:2 96:21
97:4 106:25
118:3 125:19
**guesswork** 62:7

_____
**H**
**H** 3:11
**half** 75:5,7
112:23
**Hall** 1:21
**hand** 14:5 28:3
33:11
**handed** 33:16
**handful** 62:1
**hang** 35:6
**happen** 15:6
67:3 75:3
114:14
**happened** 111:1
132:11
**happening** 47:9
**happens** 47:24
50:12 109:1
124:8
**hard** 76:10 78:5
78:6 125:17
**harder** 125:1,5,6
**harm** 49:25,25
50:3
**hat** 29:6,24
**hate** 92:8
**head** 31:7 64:25
105:15 122:23
**headed** 40:25
104:7
**hear** 7:8 126:10
**heard** 119:1
**hearing** 62:20
**Held** 3:21
**help** 76:18 80:5
**helping** 89:23

**helps** 80:22
90:24 117:2
**Hendrix** 62:23
62:24 63:10,13
84:14
**HendrixK1224**
5:5
**HendrixK1234**
62:24
**Hertel** 59:16
60:13
**hey** 50:5 51:14
62:12
**Hicks** 2:9,9 3:6
3:7 6:4,12 7:4
7:18,22 8:1
9:11 10:13
13:20 14:2
15:23 17:1,5,9
19:18 20:3
22:12 23:14,19
23:21,24 24:2
26:25 28:1,14
30:25 31:6
32:1,6,18,21
33:9 39:24
45:6 51:4
53:19,21 61:9
61:13,17 62:15
63:21 64:2,7
68:19 69:17
70:14 72:14
75:10,17 80:9
82:2,5,10,13
82:19,22,25
83:5 84:24
89:5 90:17
91:1 93:13
95:13 99:4
110:11,15
113:20,25
114:4,25 115:3
115:7,12 116:8
116:12,24
117:1,4 122:11
123:21 128:16
130:3 132:15

136:12,18
**high** 6:7 11:7
55:12
**hire** 98:9,17
**hired** 98:5,6,12
**historically**
42:16
**hold** 14:9 71:19
72:5 115:20
121:14
**homeless** 128:6
**hop** 6:13
**hopefully** 35:14
**hot** 101:20 128:4
**hours** 136:12
**Houston** 2:5
**hundred** 48:19
49:2 69:13
**hundreds** 48:16
124:16,18
**hurt** 69:2
**hyped** 124:23
**hyphenated**
81:17

_____
**I**
**idea** 106:23
109:23
**ideas** 41:17
**identify** 16:13
17:7
**II** 53:24
**imagine** 127:10
**immediate**
39:15 127:16
127:17
**immediately**
49:4 130:20,21
**important** 49:12
67:22
**in-unison** 48:15
**inaudible** 82:4
**include** 99:6,9
102:18
**included** 98:25
**includes** 113:10
121:15 136:16
**incumbent**

46:19 47:24
**incumbents**
16:14 47:23
**indication** 8:20
**indications** 8:22
**indistinct** 15:5
**individual** 14:18
15:5 126:24
127:13
**individuals**
57:22 80:10,19
81:23
**influence** 123:9
123:17,19
**influenced**
123:3
**inform** 40:5
**informal** 90:12
**information**
126:16,19
136:14
**initial** 4:14 31:4
127:12
**injunction** 58:4
62:20
**injured** 46:10,13
**instance** 1:16
106:10 108:23
**intend** 73:15,17
73:19
**intent** 25:23
**interest** 11:22
120:6 122:21
128:1
**interested** 12:14
12:16 55:23
136:24
**internal** 8:21
**interrogatories**
4:16,18,20
33:15,20
112:10 115:23
**interrogatory**
34:2 114:10
115:10,15,24
**interrupted**
100:8

intervening
  122:6
invite 37:8
involved 89:16
  109:19 123:4
iron 101:20
irreparably
  46:10,13 49:25
  50:1,2
issue 12:4 25:2
  32:5,17 40:11
  50:16 55:17
  100:12 106:14
  120:10 128:4
issues 41:18
  42:2 43:15
  54:1,21 55:4
  56:3 104:4,5,5
  104:6 107:13
  122:21 125:25
  126:4,8 128:1
item 39:2,8
itemized 92:10
items 106:20

**J**
January 76:3,24
  77:5,11 78:8
  95:17
Jennifer 1:3,11
  1:15 3:5,14 4:7
  4:22,24 5:24
  6:1,7 10:9
  31:22 39:22
  41:1 55:16
  113:14 126:5
  133:2 134:3,13
  135:3,10,16,21
Jennifer4Austin
  5:6 63:8
Jerad 2:4 6:16
  6:20 63:18
  84:22 116:4
  136:12,18
Jerad's 90:7,9
jerad@najvar...
  2:6
John 58:11,14

60:18 100:24
  103:1
joke 67:21
judge 119:10
July 15:12,13
  85:5 88:2
  95:24,25 102:1
  120:15,21
jump 124:10
jumping 17:25
June 8:9 71:25
  77:20 103:3
  112:1
justification
  51:14,19

**K**
keep 30:6 48:10
  54:12,16 60:11
  60:12,17,19
  114:16 130:13
  130:14
keeping 23:24
  52:19
kept 41:22 44:23
  54:14
Kevin 58:10
  60:12 83:18
  102:25
killed 49:13,18
  49:20
kills 47:12
kind 20:20
  62:11 67:3
  68:15 99:16
  108:6,17
  127:11 128:2
  129:12
Kirk 48:8 50:5
  51:9 69:4,7,20
  124:14 130:13
  130:25 131:24
  132:11
knew 10:21 18:2
  18:14,15 42:16
  42:17 43:5
  50:7 59:12
  74:16,21,25

84:2 98:8
  100:4
know 10:11
  18:10,11,12
  19:10 24:16,20
  29:12 30:10,17
  31:3,10 32:8
  32:15 35:19
  36:22,25 37:1
  37:2 39:22
  42:20,22 48:8
  49:21 50:6,6
  50:15 52:9,16
  53:4,15 56:16
  58:6,20 59:15
  60:1,2 61:22
  62:13,14,21
  63:2,13,13,15
  63:21,23,25
  66:9,12,15,17
  66:19,21 67:7
  67:16,20,22
  68:1 69:7,11
  70:19 74:8,22
  75:6,7 76:11
  78:13,19 83:21
  83:23,25,25
  84:2,5,16,20
  84:21 89:1,14
  89:17 90:13
  91:24 92:3,5,6
  92:6 93:10,13
  93:19 96:20,21
  98:17 99:22,23
  99:25 101:8,17
  101:18 102:9
  103:9,13,23
  108:11,13
  112:4 113:9,11
  113:15,16,23
  114:4,10,14
  116:23 117:14
  119:20,21
  122:21 123:3
  124:19,19
  125:3 127:5,14
  127:23 128:2

129:8,11,11,24
  130:9,25 131:7
  131:16 132:1,5
  132:5,10,11,12
  132:13
knowing 59:9
  73:23
knowledge
  31:13,19 46:5
  110:25
known 29:24
  117:25 130:22
  131:24
knows 113:21
  115:1

**L**
late 17:18,24
  18:20
latest 78:8
Laura 2:12 7:8
  7:20 23:24
  68:9
law 2:4,9 4:4
  10:16 22:15
  90:7,9,9 91:12
lawsuit 40:3,9
  41:3 91:22,23
lawyer 31:12
  51:15,17 91:19
  92:4 100:2
  114:13
lawyer's 89:18
Leadership
  104:8
learn 109:24
left 59:4 124:24
  130:7
leftover 24:19
  38:23 45:13
  85:15 86:17
legal 2:13 9:24
  10:8 31:23
  32:8 39:21
  88:24 89:16
  91:12,18 93:9
  93:16 94:23
  99:3 100:1

113:18,21
  114:24,25
  117:25
legality 100:11
legally 32:15
  99:17
legitimate
  105:24 107:9
  107:11,12
let's 6:13 9:3,11
  13:9,20 17:1
  20:3 22:10,12
  23:14 26:25
  45:6 57:1,1
  59:23 63:7
  64:2,17 70:14
  72:14 75:10
  76:2 79:7,22
  83:5 89:25
  92:8 100:15
  110:7 118:2
  120:8 123:2,3
  127:12 130:22
level 21:12,24
  108:2
leveled 21:20
Liberty 13:5,7
lifted 117:17
lifting 12:8
limit 4:4 14:22
  21:25 22:16
limitation
  106:10
limited 49:7
limits 3:19 4:5
  14:12,16,18
Linda 58:11
  60:14
LINE 133:5
link 55:6 56:13
  57:3,8
list 16:14 31:14
  32:25 34:10,21
  35:13 36:8
  59:8 100:21
  102:25 104:4
  105:16 125:2,2

125:12,14
126:20,21
**listed** 34:18
79:14
**listing** 129:1
**lists** 35:11
**little** 49:10
61:10 71:7
82:11 91:7
111:8 118:22
123:13
**live** 6:6 34:25
35:3
**lived** 27:21
**lnorton@austi...**
2:14
**loan** 25:2 71:13
73:7,15,18,19
74:1,4,7,17,22
76:6,8,22 77:6
78:22 86:21,24
93:7,17,17,20
94:24 95:9
96:4,14,17,24
97:6 98:23
99:8,9,11,17
99:21 102:4,19
117:10,12,21
118:16,18
119:4,5,7,13
120:10 121:8
122:6 130:7
**loaned** 24:14
**loans** 72:25 73:4
92:19
**lobbying** 106:2
**Local** 12:18,20
**lockstep** 47:10
**long** 8:17 9:18
11:12,17 34:10
37:25 38:17
49:11 60:13
75:4 93:3
114:5 127:12
127:13
**longer** 49:10
52:21

**longer-term**
119:11
**look** 8:6,23 9:11
9:16,19 11:5
13:20 17:1
20:3 21:1 22:5
22:6,10,12,21
22:25 23:14
26:25 31:9,10
33:3 34:2,3,17
35:2 39:2 41:5
45:6 53:18
55:16 64:14
70:14,23 71:6
71:11,22 72:3
75:10,13,24
76:9,11 77:1
79:4,5,10
80:17,17 81:18
83:6 85:8 86:6
86:23 87:25
90:20 96:8
97:14 103:11
110:7,17 111:5
111:9,14,19,25
111:25 112:5,9
112:13,20
113:2 120:20
121:4,17,19
125:17,18,19
**looked** 64:15
80:18 84:10,19
**looking** 12:10
16:3 18:18
19:8,15 26:21
72:12,16,18
76:19 81:7
91:2 98:14
102:21 110:15
**looks** 63:19
69:21
**Loop** 2:5
**lost** 46:20
**lot** 18:7 48:11
109:24 115:6
124:21 125:16
127:21 128:23

**love** 131:19
**lunch** 50:9,10

**M**
**machine** 1:20
**mail** 125:20
129:12
**mailer** 129:17
129:19,21
**mailers** 129:13
129:22
**main** 20:19,19
20:20
**maintaining**
36:15 37:12
**majority** 50:20
**making** 18:4
28:8 49:5 65:8
120:3
**manipulation**
52:18
**manner** 54:1,21
**March** 31:9
91:23 94:1,5
**Marie** 6:7
**mark** 7:24 8:3
**marked** 8:5 9:13
14:4,6 16:2
17:3 20:4
22:13 23:16
27:2 28:2,15
31:1 33:13,18
40:17,18,24
45:7,23 57:16
62:17 64:6
70:15 71:21
75:12 82:8
83:9 85:1
95:14 101:23
103:15
**Marshall** 63:10
63:11,15
**matters** 13:14
78:19
**matures** 73:12
**maturity** 73:10
73:11,12 96:17
**max** 2:9 48:4,13

48:20 49:4
126:25
**maxed** 79:22
103:6 127:8,15
**maximum** 14:11
**mayor** 8:16,18
8:24 10:25
11:3 13:17
15:12 16:9,16
27:17 28:10,12
28:23 29:11
30:13 42:15,17
43:6 55:2 61:6
69:5 123:18
130:22 131:8,9
**mayor's** 9:5
**mayoral** 43:14
43:25 46:13
48:9 85:5
86:13 95:16
130:6
**mean** 18:12
24:22 25:14
30:16 40:13
41:16 42:13
44:22 55:10,19
59:3,25 60:1,1
60:2 62:11
64:16 67:11,16
68:5 72:5
83:11 93:15
95:20 98:18
100:14 104:22
106:4,25 107:1
114:2 115:6,13
117:15 118:25
124:21 126:12
**means** 18:9
106:23
**meant** 18:12
49:21
**measure** 105:25
106:13,25
107:1,7,10
**measures**
105:13
**media** 60:11,12

60:15,16,18
**mediums** 34:21
**meet** 6:18
127:23
**member** 47:25
106:20
**members** 16:15
55:9,15,22
98:7
**Memorandum**
3:18
**mention** 106:2,3
**mentioned** 38:3
**message** 47:8
118:11
**messed** 77:25
**method** 1:20
**million** 43:1,8
43:13,18,25
44:9
**million-plus**
42:16
**mind** 19:18 23:8
42:14 43:20
44:18 66:17
89:21 108:25
110:9 119:22
128:6
**mine** 69:7
**minute** 30:11
116:9
**minutes** 38:18
61:8 130:17
136:12,12
**mislead** 32:12
**misleading**
32:11
**missed** 38:5
**Mm-hm** 14:14
15:19 20:8
21:6 23:4
24:25 26:16
40:1 51:24
54:6,23 60:22
60:25 76:20
77:8,10,13,17
77:21 81:5

83:15 84:12,15
86:5 97:2
101:2 103:4
104:3 120:17
120:23
**moment** 8:13
55:16 89:22
120:18
**momentarily**
116:11
**momentum**
46:17,20 49:23
54:22
**monetary**
115:25 116:2
116:15,17
**money** 24:14
41:25 42:18
44:25 47:3,7
47:15 54:20
62:8 67:12
68:1,22 69:23
74:7,19,23
75:2 87:4
97:22 98:3,8
98:10 101:15
101:21 118:6,7
118:9,10,13,18
119:14,17,24
124:21 128:21
129:6 130:6,25
131:9,17,22
132:7
**month** 50:9,10
111:8,15 112:1
**months** 41:11
47:14,21 48:10
50:4,6 60:10
75:5,8 91:24
91:25 103:8
112:2,23
124:13,14
**Motion** 5:1
**motivator** 128:3
**move** 30:4,6,8
30:24 119:15
119:17

**movement** 47:2
47:4 118:12

_____

**N**

**N** 2:1 3:1
**Najvar** 2:4 3:6
7:14,21,24
10:7,11 14:1
17:7 19:14
23:17,23 24:1
31:21 32:4,9
32:20 33:7
39:20 51:2
61:7,12,16
63:18,20 72:12
80:7 82:11,15
82:20,24 83:2
88:23 90:23
91:12 93:8
99:2 110:9
113:14,23
114:2,23 115:2
115:5,9 116:7
116:13,20,25
117:7 122:9,13
122:16 130:1
132:17 136:12
136:18
**Najvar's** 90:9
**name** 6:6 29:6
58:13 59:16
61:22 62:23,23
81:18 84:20,21
90:24
**names** 15:24
60:5
**narrative** 9:18
**narrow** 77:14,18
**NAVJAR** 2:4
**nearly** 29:3
46:19 55:13
86:9 91:23
102:15
**necessarily**
65:25 98:20
**need** 7:11 8:22
14:8 22:5 33:5
51:18 53:17

67:23 74:25
75:1 86:1 98:9
100:13 108:12
110:22 114:4
114:10 115:11
117:3,4 118:16
**needed** 18:23
42:6,22 74:18
74:19
**needs** 70:5
114:13,20
**neither** 136:20
**never** 88:14
89:11,13,13,21
92:21 114:15
**new** 21:5,14,14
64:23 69:1
82:6 132:9
**news** 12:18
**newspaper**
12:20
**nice** 101:19
**nine** 103:8
**no-bid** 106:6
**Nodding** 105:15
122:23
**nominal** 111:22
113:24 114:1
116:1,3,16,19
**nonresponsive**
69:18
**normally** 127:10
**North** 2:5
**Norton** 2:12
14:3 31:8
53:20 68:9
80:12 82:1,3,7
84:25 90:19
100:19
**note** 73:12
**noted** 134:8
**notes** 122:17
**notice** 6:9
**notwithstandi...**
116:5
**Nov** 3:23
**November** 3:21

13:18 14:19
17:12 27:17
28:10 38:21
41:8 42:1,21
42:24 43:2,3,8
43:14 44:1,7,9
45:3 46:15
47:18 62:8
66:6 83:13,18
99:18 100:5,9
100:23 117:16
**number** 7:9,11
7:12 9:16
10:14,24 11:6
27:24 34:8,16
49:7 80:21
90:17 97:4
100:19 125:9
**numbered** 1:17
71:7 81:13
92:9
**numbers** 97:17
112:9
**numeral** 53:24

_____

**O**

**Oak** 6:7 11:7
**object** 10:7
31:22 32:7
88:24 113:18
**objection** 32:19
33:7 39:20
69:17 93:8
99:2
**obtain** 35:14
**obtained** 43:18
**obvious** 9:3
30:18
**Obviously** 50:13
**occasion** 11:25
**October** 11:8
22:19,20,22,23
71:2,16 77:16
121:1,20,22
**offered** 62:19
**offering** 7:16
**office** 2:9 10:1
10:16,22 15:11

16:21 20:21,23
22:7 27:13
41:8 65:16
122:20
**Officeholder** 5:9
5:11,17
**officer** 135:17
136:15
**officer's** 136:7
**official** 26:14
**oh** 7:1,18 8:1,1
25:6 26:8 35:5
35:24 50:5
79:22 82:3,3
85:21 89:7
102:1 117:4
121:6 126:17
128:15
**okay** 6:12,18 7:3
7:13,14,21 8:3
8:6,14,17 9:2
9:17,22,23
10:12 11:4,14
11:17,21 12:13
12:23 13:16,20
14:11 15:3,8
15:15,16 16:8
20:2,2,13 21:9
21:19 22:10,25
23:13,23 24:1
24:2,18 25:9
25:12,18 26:8
26:13 27:7,18
27:23 28:13
32:4,9,18,20
33:3,9 34:9,9
34:19,21 35:5
35:6 36:2,7
37:10,18 38:3
38:11 39:7
40:16,22 41:5
41:5 43:13,23
49:13,22,24
51:13 52:5
53:12,17 54:12
55:1 57:1,12
57:15 59:18

Page 149

60:20 61:12,15
62:2,6,18
63:12,17 64:2
64:7,23 65:3
66:4,6,19
67:10,16 68:13
70:3,3,7,12,16
70:21 71:6,10
71:11,19 72:5
72:11,18,19,20
73:5 74:15,21
75:9 76:11,14
76:17 77:2
78:7,14 79:4,6
79:12,17 80:1
80:16,24 81:4
81:9,15,21,24
82:7 83:2,21
84:22,25 85:18
85:19,23,25
86:3,8,18,20
87:6,6,17,25
89:23,25 90:5
90:8,11,22
91:2,9,10 92:8
92:12 94:5,7
94:22 95:6,12
96:2,3,10,13
96:24 99:11,15
100:2,15,15
101:8,22,22
102:21 103:16
103:21 104:16
104:25 105:11
105:24 106:9
106:16,24
107:5,19,24
108:19 109:8
109:25 110:6
110:15,22,24
111:5,7,13,17
111:21,25
112:8,8,9,12
112:16,20
113:1,3,12
114:4,23
115:12,21

116:8,25 117:1
117:8 118:20
119:19 120:8
120:19,20
121:7 122:4
123:21 126:17
126:21,24
127:10,20
128:5,12 129:2
129:23 131:3
131:14 132:14
**old** 50:17 125:10
125:17
**Oliphint** 58:10
60:11 103:2
**Oliphint's**
103:11
**once** 16:21 50:9
50:10 94:15
**one's** 20:20
**one-year** 4:4
21:25 22:16
**ones** 48:18 58:9
59:22 84:2
**open** 65:23 69:4
88:8 89:11
101:19 107:16
109:2 117:16
123:23 124:8
131:10,12
**opened** 41:12
85:20 87:17
94:12 97:1,8
99:14,18,20
100:10,24
101:12,14
103:9 130:12
130:19
**opening** 15:10
67:2 103:25,25
104:1 124:4
**operates** 51:8
**operation**
125:15
**opinion** 48:24
53:15 89:3
**opponents** 30:2

30:21 119:15
**opposed** 5:1
115:14
**oral** 1:10,15
6:10 135:10,17
**order** 3:20 5:2
15:24 32:14
43:8,15 46:1
90:24,25
117:17 118:16
120:9,19
**ordinance** 4:3
22:15 23:1,22
**ordinary** 25:19
**organization**
13:12
**organized** 7:5
**original** 65:7
135:20 136:8
**outcome** 136:24
**outside** 14:25
15:3 66:20
67:13,15,18
**outstanding**
71:16 72:24
76:6 77:16
102:5,10
**outward** 8:20,22
**oxygen** 47:11
49:19

———————
**P**
**P** 2:1,1
**P-E-R-O-R-A...**
68:19
**p.m** 1:18,19 64:4
64:5 110:13,14
122:14,15
132:19
**P.O** 2:10
**pace** 44:21
119:10
**PACs** 125:19,20
**page** 3:13 15:1
21:1,2,9,10,11
27:8 34:5,5,6
36:12,13,15
39:4,5,6 46:3,9

53:18,23 64:18
71:6,8,8,9 72:3
72:6,13,19
73:3 74:2
75:24 76:5
80:21,22 81:1
81:9,19 83:17
83:18 85:8,9,9
85:10 86:6
87:7,7 89:25
91:3,4,11 96:3
96:13 97:14
99:5 100:23,25
101:25 102:25
103:1,2,25,25
104:1,2,4,5,6
104:16 105:12
111:10,19
113:2 133:5
134:8 136:5
**pages** 34:13 39:2
45:25 46:2
92:10 134:4
**paid** 24:15,19,21
26:11 45:13
60:24 61:1,3
74:22 75:2
76:8,23 77:3
78:7,8 79:2,21
87:2 91:12
94:10
**panel** 38:12
**paperwork** 92:1
**paragraph** 21:1
21:2 31:11
33:3,4,5 41:5
41:15 53:25
64:14,15,18,20
64:23 65:4
110:17 111:19
113:2
**paragraphs**
21:11
**parlay** 46:17
**part** 22:25 26:22
26:22 35:22
40:9 47:2,6

50:7 51:22
88:18 91:19
98:7 107:6
**participating**
13:1
**particular** 12:4
12:7 13:12
88:18 104:20
107:19 123:2
**parties** 135:23
136:16,21
**party** 136:10
**pass** 68:4 117:5
130:1
**pasted** 24:4
**pay** 7:11 22:7
25:10 26:18
38:22 41:7
73:23 74:23
128:17
**payee** 90:24
91:11
**paying** 12:2
55:14,18,21,22
109:8,18
**payment** 94:17
**payments** 92:18
92:18
**PDF** 80:22
**Penna** 59:12
60:9
**people** 16:8,13
31:12,12 35:6
35:12,15 36:17
37:18 38:15
40:2 48:12,20
49:3,6,8 51:9
55:14,18 58:7
59:8,19,20
61:17,18 62:3
62:4,7,10,12
68:21,24 69:1
69:5 79:11
83:12,21,22,23
88:19 89:9,19
92:16 98:14
100:17 101:10

102:22 104:20
106:11 120:2
124:10,18
125:10 126:9
126:10 127:6
127:22 131:7
131:16 132:6
**percent** 69:13
**period** 20:23
21:5,15 23:10
29:4,19 42:23
42:24 46:10
52:21 69:24
70:1 79:15,21
80:14 84:5
101:5 119:11
120:15 121:5
121:20
**periods** 83:23
**permitted** 70:10
**peroration**
68:16
**perplexed** 94:19
**person** 38:12
48:20 63:2
109:21
**person-** 26:10
**personal** 19:3
25:22 26:11
36:11 92:11,18
93:1,17,25
94:23 112:18
115:25 116:16
**personally** 58:6
59:9
**persons** 36:4
**perspective**
94:23,23
**phone** 60:18
62:10,11 125:9
**phrase** 57:2
106:4
**phraseology**
62:22
**pick** 69:12
**picture** 21:22
63:17

**pieces** 129:12
**pile** 117:3
**place** 3:20,22
4:12 17:11
28:19 44:3
**plaintiff** 1:4 2:3
31:4 135:4
136:18
**Plaintiff's** 4:2,14
5:1,7
**Plaintiffs** 113:4
**Plaintiffs'** 20:6
**plan** 8:2 42:10
42:10
**platform** 46:23
55:8 124:24
126:9 128:14
**played** 18:4
**playing** 77:22
107:16
**plays** 52:22
**pleading** 45:25
46:8
**pleadings** 58:1
**please** 10:12
21:16 27:4
39:23 51:6
58:18 73:18
81:8 91:6
105:5 127:9
**pledge** 87:13,13
89:20
**pledged** 87:8
88:9,10,13,15
88:17,22 89:12
89:19,22
**pledges** 87:11
**plenty** 98:3
**PLLC** 2:4
**plural** 20:6
**plus** 124:14
**point** 8:24 24:20
61:15 81:14
98:4,13,21
103:6 105:11
123:2 130:24
131:3

**pointed** 114:14
123:23
**pointing** 123:22
**points** 119:2
**police** 12:9
128:6,8,10
**policies** 123:20
**policy** 13:14
34:25 35:3
123:1
**political** 4:13
13:1 18:20,22
25:23 26:17
28:21 34:18
39:18,19,24
40:3,9,13
45:12 47:1,25
48:18 49:2,8
50:11,14,18,20
51:8 52:23
55:7 85:12,13
91:20 92:11,25
93:24 97:18,19
98:21,24
118:12 125:7
128:25
**politically** 12:1
40:4,7,14
69:16 108:16
120:2
**politician** 105:1
105:2,8
**politicians**
104:17
**politics** 11:23
13:13 54:4,8
109:22 122:22
122:24 125:11
**position** 8:15
41:21 42:1
104:13 108:19
116:5
**positions** 41:17
55:10,11
**positive** 123:7
123:19
**possible** 42:12

42:18,19 44:19
122:5,8
**possibly** 55:17
59:11 61:21
131:6
**potential** 30:2
119:6 120:2
**potentially** 30:7
31:13,20
**Prayer** 21:12
111:19
**pre-November**
46:10 50:23
51:11
**pre-window**
70:1
**precincts** 129:17
**predictable**
50:17
**prefaced** 53:6
**preferred** 54:15
**preliminary**
58:4 62:20
**preparation**
6:14,19,22
**preparing** 136:8
**presenting**
38:13
**pretty** 87:2
**prevent** 48:23
51:20 53:3
**preventing** 49:1
109:16
**prevents** 52:6
**previously** 10:20
**Primarily** 58:3
**principal** 35:17
35:18
**prior** 6:23 58:1
67:1
**probably** 7:7
8:25 11:24
40:5 57:22
58:22 64:14
72:21 106:17
124:17
**problem** 50:13

72:8 115:14
**Procedure** 1:23
**proceeding**
136:22
**proceedings**
64:4 110:13
116:10 122:14
132:19
**process** 17:19
**produced** 1:15
**profile** 55:12
**prohibitions**
106:2
**promise** 88:13
**promised** 87:15
87:18,21 88:5
88:6
**prop** 129:4
**property** 128:7
128:11
**propounded**
134:6
**provide** 41:17
110:21 111:2
**provision** 21:20
21:23 23:5
24:5 108:3
**provisional**
20:20
**provisionally**
24:5,6
**proviso** 116:21
**public** 16:21
42:2 104:24
128:2
**pull** 7:20 87:24
**purposes** 14:15
**pursuant** 1:22
135:25 136:14
**pursuit** 6:9
**put** 13:16 22:15
33:10 73:14
100:11 117:3
118:7 120:19
**Puts** 4:3

--------
**Q**
--------
**question** 9:19

10:12 18:11
19:16 31:23,24
32:15,16,19,22
39:23 43:11
49:24 51:1,5,6
51:17 52:24
53:6,8 56:8,18
56:21 57:11
58:6 66:16
69:15,19 73:17
85:24 86:1
91:18 93:16
99:3,4 105:5
106:23 107:9
108:12 114:24
115:1 118:3,21
122:18 123:21
126:13 131:13
**questions** 9:2
36:9 78:17
89:16 110:1,7
114:6 117:9
130:4,17
132:16,18
134:6
**quick** 61:13
**quickly** 42:19
129:18
**quite** 89:11
**quote** 105:13
**quoted** 10:15

———————
**R**
**R** 2:1
**race** 9:5,6,9
16:23 17:15
18:20 19:24
24:13 26:23
45:14 48:9
55:12 70:24
76:23 85:6,16
86:13 95:17,20
108:23 124:12
124:20 130:6
130:21
**races** 66:4,6
**radar** 63:4
**radio** 12:20

34:24 38:3,6
129:3,4,10,25
**raise** 17:15 22:7
41:7 42:23
43:7,13,24
44:14,18,24
45:19 46:9,14
51:9 65:14
69:23 130:5
**raised** 44:9,20
**raising** 42:18
54:20 94:15
130:20 131:8
**ran** 19:23 45:13
**reach** 59:9
**reaching** 37:23
**read** 14:8,10
17:10 21:16
23:8 46:11
64:20 110:22
134:4
**reading** 12:17
**ready** 62:7
**ready-made**
70:8
**reality** 50:22,23
51:7,10
**realization** 75:3
**really** 20:2
29:25 30:3
31:24 32:16
36:9 40:19
73:22 76:11
93:2 106:24
114:24 118:10
119:12,13
126:9 129:18
131:12,16
**reason** 7:22
37:21 48:22
53:2 56:7,8
65:10 79:18
80:2 95:2 98:7
131:15 133:5
**reasonable**
43:24
**reasons** 136:5

**recall** 12:6 13:15
21:25 25:12,25
26:1 27:19
38:5,10,15
54:24 60:10,14
62:5 64:24
65:2 93:2
**receipt** 27:4
136:3
**receive** 42:8
46:22
**received** 130:10
**receiving** 47:15
48:11
**recessed** 64:5
110:14
**recontact** 47:19
**reconvene** 114:7
**record** 6:5 7:5
7:15 9:4 17:8
23:9 31:22
32:10 65:7
79:24 80:10
86:3 91:22
96:25 101:4
116:9,11
122:12,15,20
128:14 129:3
135:18 136:17
**records** 60:23
**refer** 7:15,17
21:3 53:18
**reference** 53:23
113:9
**referred** 51:19
124:1
**referring** 27:19
37:14 39:12
66:1 104:20
**refers** 21:4
113:6
**reflect** 17:14
60:23 91:22
**reflected** 78:15
122:6
**reflects** 101:4
**regard** 27:12

**regarding** 40:6
40:7 41:17
**regardless** 37:16
41:19
**registered** 9:8
**regular** 25:15
**reimburse** 26:10
**reimbursed**
92:21 94:16
**reimbursement**
25:23
**relate** 126:1,7
**related** 40:4,7
40:14 136:21
**relates** 91:17
**relatively**
124:25
**Release** 39:15
**relevant** 31:13
31:19 65:18
110:21 111:2
**relief** 21:12,14
110:5 111:20
**reluctantly**
119:3
**rely** 115:9
**remaining** 24:15
25:1
**remapping**
10:24 27:22
**remember** 15:14
25:16 26:5,11
33:4 35:3 36:6
38:1 59:15,17
93:1 111:14
121:18
**remove** 110:19
**Renea** 2:9,9 6:12
17:7 31:22
61:7 136:12,18
**repaid** 86:24
93:4 94:21
119:18 121:9
**repay** 118:16
119:6 130:7
**repayment**
78:23 86:21

95:10 122:6
**repeat** 85:24
99:15 106:16
**rephrase** 49:22
**replying** 63:7,10
**report** 5:13,19
5:21,23 26:5,6
70:24 71:25
79:16 80:7,19
85:4 88:2,5
95:9,16,19
101:15 118:23
120:25 121:11
121:13,18,24
122:3,7,10
127:24
**reported** 1:20
**reporter** 7:13
17:4 22:14
26:2,4 68:17
70:18 71:23
75:15,18,22
82:9 85:2
128:8 135:13
**reporter's** 3:9
14:5 135:9
**REPORTING**
137:3
**reports** 26:12
92:25 95:4
109:23 117:11
120:9,12
127:19
**represent** 15:15
24:3 65:6 79:9
83:10 84:19
103:18 104:12
104:13 110:17
110:25
**representing**
66:24
**request** 3:16
11:6
**requested** 136:2
**required** 96:22
**requirement**
106:19

**Reread** 6:16
**reserve** 110:1
  132:18
**reside** 11:14
**resided** 11:12
**residence** 10:25
  11:7
**resident** 68:8,10
**Residents** 5:4
**respect** 88:19
  109:6 114:9
  115:17
**response** 9:16
  10:13 11:5
  34:2,4,7,10
  39:17 40:20
  63:6 115:24
  130:17
**responses** 3:16
  4:16,18,20
  33:14,19,20
  112:9,14,24
  114:10 115:10
  115:16,22
**restart** 47:19
**restarted** 13:6
**restate** 10:12
  51:6 105:5
**restraining** 5:2
  46:1
**restriction** 44:2
  44:23 51:20
  106:13,21
  107:21 109:13
**restroom** 110:10
**results** 24:24
  26:13
**retain** 126:16
**returned** 136:2
  136:4
**review** 6:23 8:11
  122:17
**reviewed** 8:12
**revised** 3:20
  16:4
**rhicks@renea...**
  2:11

**Richard** 59:15
  60:3,10
**right** 8:14,15 9:6
  9:9,15,20
  12:10 14:19
  15:6 16:18,24
  18:6 20:24
  21:15 22:8
  24:11 27:9
  28:23 30:14,20
  34:11 39:17
  41:19 44:22
  45:10 47:11
  50:24 55:3
  56:3,7,10,24
  57:15 62:3,21
  63:13 65:4
  66:2 67:7,8,18
  68:10,21,22
  69:21,25 70:7
  70:10 71:4,14
  72:7,15,19
  73:2 74:5,9,19
  75:10,22 76:25
  78:1,25 79:2
  80:17 81:21,25
  83:19 86:13
  87:3,4 91:2
  92:19,22 94:1
  94:11 95:21,24
  96:1,18 97:3
  97:12,19 98:15
  99:19 100:15
  101:3,6 104:13
  104:14 105:1
  105:25 108:22
  109:10,13,25
  110:1 111:9,18
  112:3,18,25
  113:7 116:7
  117:12,13,18
  120:9,22 121:3
  121:4,16,23
  122:1,22 124:2
  127:18 128:18
  131:1,22,25
  132:7,9,12

**rights** 20:16
  113:5
**ring** 29:25
**Robert** 29:17
  58:10 59:11,23
  60:9
**Roman** 53:24
**roughly** 36:3,23
  36:24 38:17
  62:3 102:14
**round** 97:17
**rule** 20:21 49:18
  57:6 68:4
  135:25
**rules** 1:22 20:14
  21:23 22:11
  41:12
**rules-based**
  32:16
**run** 15:11 16:21
  18:2,5 28:23
  29:10,14,18,18
  29:24 30:3,9
  30:22,23 34:13
  38:8,9,24 41:7
  42:17 43:6
  55:8 69:4,6,8
  110:10 124:15
  124:22,23
**running** 8:14,16
  10:22 16:8
  18:25 19:2
  23:25 30:12
  39:5 42:15
  55:4 56:10,13
  62:10 118:5
  122:19 125:3
  130:22,25
  131:5,8,9,18
  131:25 132:12
**runoff** 11:1 15:5
  24:10,23 25:10
  25:25 26:13
  46:18 66:7
  73:13,14,16,20
  74:8,16 83:14
  83:19 87:3

  121:11,16
―――――――
**S**
**S** 1:19 2:1 3:11
  135:13 137:8
**Sandra** 1:19
  135:13 137:8
**Sandy** 75:20
**saw** 60:13
**saying** 23:5
  30:22 32:12
  40:9 44:3,8,22
  45:16 46:4
  52:1,3 58:5
  80:3,8 88:7,19
  89:3,10 104:17
  119:3 130:16
  130:24 131:7
  132:4
**says** 10:14 33:4
  103:12 112:20
  113:4,6 116:1
  131:10
**schedule** 73:3
  85:10 96:8,8
**School** 4:12
  28:20
**screen** 63:4
  104:5
**screenshots** 5:24
  103:18
**search** 79:10
**seat** 55:13
**second** 4:2,20,24
  14:25 20:6
  22:20 27:8
  33:17 34:4
  45:9 53:22,25
  64:16 71:9
  72:3,6 75:24
  76:2,5 81:8
  85:9 96:3
  97:14 99:5
  101:25 104:4
  115:15 116:6
  118:23 122:12
  122:16
**second-time**

  109:17
**seconds** 38:7
  110:2
**section** 4:5
  61:11
**secure** 19:22,25
**see** 8:23 9:23,24
  11:8 13:9 14:7
  20:9 21:2,7
  23:2 24:7 29:5
  29:6 31:14
  32:2,3 34:9,22
  39:8,9,11 41:1
  41:8 45:19
  46:6 54:2
  55:16,23 59:23
  60:14,15 62:20
  62:24 63:1,7
  64:8,12,15
  65:19 72:9
  73:25 79:7,23
  81:11,22 87:8
  88:10 89:23,25
  90:13 91:3,10
  94:3,22 97:15
  100:20,22
  102:24 103:5
  103:22 104:10
  104:18 105:14
  106:9 108:25
  110:2 112:6,14
  115:19 118:2
  119:15 120:3,8
  122:17
**seek** 25:23
  115:25 116:2
  116:15,17
**seeking** 110:5,5
  112:17 113:13
  114:18,20
  115:16 116:21
**seen** 6:10 109:3
**Self-serving**
  105:9
**send** 35:11
  129:19
**sending** 27:3

36:1,2
**sense** 45:2 55:3
**sent** 27:7 119:24
**sentence** 112:13
116:1
**separate** 15:4
**September** 1:12
1:18 73:8 74:1
74:6 76:24
77:4,7 81:4,20
103:19 112:21
120:16,21,25
133:3 135:11
135:23 137:1
**sequentially**
120:14
**series** 34:7 114:5
**serve** 128:2
**served** 112:6
135:22
**service** 35:8,9
104:7,24 112:7
**set** 4:16,18,20
33:15,20 34:4
35:20 57:21
69:1 108:4
109:25 115:23
**sets** 21:25 22:10
**seven** 41:11
**sg-1967** 137:9
**Shaking** 64:25
**short** 114:5
**shorten** 108:16
**shorthand** 1:20
21:5 22:3,4
135:13
**show** 40:16 64:7
65:7 77:6,11
78:11 82:6
90:6 91:10
96:4,17 97:17
102:14 117:11
**showed** 87:11
**shown** 40:23
135:23
**shows** 14:19
15:4 16:8 27:8

71:13 72:4,11
72:24 73:7,10
74:2,5 76:5
77:15,19 80:22
81:1 85:12
86:9 94:10
96:13,25 102:1
102:4 129:3
**shrink** 52:21
**sic** 62:24
**sign** 58:18,24
61:18 62:3
**signature** 3:8
133:1 134:8
136:1,2,5
**signed** 88:1
**significantly**
19:5
**silly** 66:15
**similar** 61:19
**single** 50:9
**sit** 32:25 33:5
66:9 130:4
**site** 36:10
**sitting** 16:15,15
102:9
**situation** 19:3
19:17 37:5
**six** 16:10 103:6
**skipping** 64:19
**slate** 52:12
69:12
**slide** 13:24
**Slowed** 49:22
**small** 69:9 97:21
97:24
**smaller** 52:19
127:1,2,3
**smaller-dollar**
48:17
**snail** 125:20
**social** 60:11,12
60:15,16,18
**solicit** 20:22
26:17 88:9
**solicited** 88:11
88:15

**somebody** 16:6
67:4,12 87:22
89:3 120:3
125:1 126:14
126:15,17
127:3 131:16
**something's**
77:25
**son** 13:5
**soon** 42:18
70:10 109:1
**sooner** 18:23
19:1,2 100:13
119:8 123:23
124:9
**sorry** 7:1 8:2
21:10 25:6
34:6 35:22
36:8 39:4,11
53:22 68:18
72:19 75:19
81:7 85:9,21
85:24 90:10
94:4 96:1
100:8 112:4
128:9
**sort** 67:8 88:18
107:18 119:2,3
**sought** 27:13
116:23
**sound** 81:6
83:19 101:6
**sounds** 52:1
66:15 117:13
**source** 38:21,25
78:22 86:15
106:7
**speak** 54:1,7
63:5
**speaker** 47:4
**speaking** 20:13
54:12,14,16,21
60:10 99:18
126:8,11
**speaks** 53:25
**special** 36:10
**specially** 37:15

**specific** 18:11
19:15
**specifically**
25:14
**spend** 41:25
42:6,6 68:3,3
75:1 118:11
119:14,16,17
**spending** 42:10
118:13
**spent** 45:18
**spoke** 6:16
58:18
**spoken** 60:3,8,9
**spot** 54:19
**spread** 47:8
**springing**
114:24
**Springs** 68:9
**staff** 98:6,9,12
98:17
**staffing** 128:7
128:10
**staking** 41:25
**stand** 57:12
**stands** 12:23
**start** 11:21 19:1
42:18 47:15
57:1 104:16
130:20
**started** 12:1
36:4 49:24
56:8 109:8
132:9
**starting** 10:5
108:22,22
**starts** 34:4,10
121:4
**state** 1:20 6:5
19:10 45:13
105:12 135:14
**stated** 46:4
**statement** 56:24
56:25
**statements**
104:12
**STATES** 1:1

135:1
**stay** 60:2
**stick** 45:21
125:10
**stipulated**
116:13,23
**stop** 118:19
**stopped** 89:18
**straight** 82:16
**strategic** 30:4,6
30:8 50:7
119:15,17
**strategy** 18:7,13
30:5,24
**stream** 63:24
**Street** 1:21
**struck** 101:20
**stuff** 15:9
**stupid** 36:9
**styled** 1:17
**Subdivision**
4:13 28:21
**Subject** 39:15
**submit** 58:15
**submitted** 57:25
101:15 111:9
135:21
**subscribe** 35:15
**subsection** 23:1
23:1
**substance** 134:7
**subtract** 31:15
31:17
**success** 126:1
**successfully**
108:9
**sucks** 47:11
49:19
**sued** 20:14
**sufficient** 130:5
**suggest** 109:15
123:5
**suggested** 53:6
**suggesting** 32:11
**suit** 91:25
**Suite** 2:5
**summary** 65:19

**super** 131:23
**supplemental**
  4:18,22,24
  33:19 34:3
  40:25 45:9
  115:22
**support** 5:3 67:5
  67:12,14,25
  106:13 119:6
  123:16 131:17
**supporters** 40:5
  46:21 47:1,16
  66:25 69:6
  70:8 118:8
  123:16
**supporting** 47:5
**suppose** 12:21
**supposed** 19:12
**sure** 9:3 10:13
  10:15 17:9
  18:4,9,16,16
  18:23 29:16
  60:6 61:9,12
  72:14,18 76:12
  82:16 83:8
  87:2 98:10
  101:18 110:23
  113:11 122:13
  126:12 128:13
  129:22
**surprise** 79:19
**Susan** 58:11
  60:15 81:1,19
**suspect** 103:23
**swamp** 69:25
**swearing** 112:17
**sworn** 1:17 6:2
  135:16

————————
        **T**
**T** 3:11
**tab** 7:8,9,15,19
  8:3 9:11 13:21
  15:23 20:3
  22:12 23:14,25
  26:25 28:1,14
  30:25 31:10
  45:6 53:19

62:16 70:14
75:11,21 82:1
82:2,3 84:24
95:13
**tabbed** 7:6
**Tabs** 17:1
**take** 8:6 11:21
  22:19,20 35:2
  55:15 64:2
  75:4 76:13
  82:13 107:20
  110:12 119:10
**taken** 1:17 32:25
  103:19 136:16
  136:23
**takes** 22:22
  39:16 42:16
  123:9
**talk** 84:22 117:9
  122:25
**talked** 38:12
  110:16 112:24
  117:11 129:3
**talking** 7:17
  65:4,9 76:21
  80:20 120:11
  122:21 125:25
  126:5
**talks** 87:7
**tap** 70:8
**target** 129:16
**targeted** 129:21
**taxes** 128:7,11
**technically** 27:8
**tell** 12:11 34:6
  36:17,19 37:18
  37:22 45:4
  50:4 52:11,14
  57:18,19 62:23
  77:4,5 80:21
  104:1 110:4
  119:8
**telling** 40:2
**temporal** 48:22
  51:19 106:13
  106:21 107:21
  108:11 109:12

**temporary** 5:1
  46:1 58:3
**tends** 120:5
  127:18
**tens** 124:16,17
**term** 24:6 32:11
  52:25 53:1
  115:6 119:22
**terms** 12:24
  15:10 17:23
  18:20 106:18
  109:16
**testified** 6:2
  109:9 123:22
**testify** 114:19
**testifying** 65:10
  119:19
**testimony**
  131:14 135:18
  136:15
**Texas** 1:1,20,22
  2:5,10 6:8
  10:16 135:1,14
  137:4
**text** 46:8 60:18
**Thank** 26:4
  87:24 89:24
  115:21
**Thanks** 63:8
**therefor** 136:6
**they'd** 59:5
**thing** 27:11
  30:16,17 62:11
  67:10 75:5
  78:20 81:7
  98:5 118:18,25
  119:11 131:11
**things** 6:22
  18:23 34:17
  40:12 53:10
  55:14,24 56:15
  57:4 61:14
  92:9 115:6
  122:20 125:19
  126:6 127:8
  128:20 129:12
  130:23

**think** 7:7 8:13
  10:10 11:2,2,3
  11:13 13:11,24
  19:16 25:16
  29:13,13,18,22
  29:23 31:24
  32:10,24 34:3
  34:4 35:24
  36:4 38:1 39:3
  40:4,11 47:17
  48:7 52:4,22
  53:7,16 55:21
  55:22 57:22
  58:24 61:14
  62:1 68:12
  70:5,7,12
  72:23 77:3
  78:12,17,18
  80:2 83:5,16
  86:1 87:1 88:6
  88:7 89:2,3,9
  90:23 91:7
  93:11,11 100:1
  105:24 106:6
  110:1,1 116:9
  117:11,13
  119:1,18,20
  122:24 123:5
  123:11,15
  124:4,8 126:8
  128:15,25
**thinking** 18:1
  30:9 67:10
  85:21
**third** 71:6,8,8
  72:19 85:8,9,9
  86:6 104:6,16
  105:12
**Thomas** 29:17
**thought** 29:23
  42:6 49:11
  56:14 68:24
  96:23 108:25
  113:17 131:15
  132:4
**thousand** 38:1
  48:19

**thousands** 48:17
  124:16,17,17
  124:18
**Thread** 63:25
  64:1
**three** 29:18 59:8
  75:5,7 76:19
  79:5 102:24
  110:2
**three-page**
  103:17
**throw** 29:6,24
  49:4
**tie** 125:25
**tied** 125:1
**till** 7:1 29:3
**time** 10:19,21
  13:2 15:11
  18:14,16 19:4
  19:5 24:9
  27:20 30:1
  35:2 47:22
  48:16 52:21
  54:8 55:7 58:3
  65:22 73:21
  76:10,13 84:6
  92:7 94:14,17
  96:22 101:15
  116:10 122:14
  123:2,2 124:5
  129:5,7 136:10
  136:15
**timely** 9:8 54:1
  54:21
**times** 38:8
  114:15
**timing** 18:1
  98:11 109:6
**today** 33:1,6
  45:21 102:9
  116:14 130:5
**today's** 6:15
**told** 69:10
**ton** 129:25
**top** 31:7 90:2
  128:6
**total** 85:12

97:18,18 99:6
102:18
**touch** 59:18 60:2
60:11,12,17,19
**town** 42:17
**Trail** 137:4
**transcript** 3:14
6:23 8:8
135:17,20
136:4,9
**transcription**
134:5
**transparency**
107:2,3,13
**treasurer** 3:25
4:8,10 17:13
27:6,12 28:5
**treat** 88:4
**treating** 99:12
**trial** 132:18
**trick** 32:22
74:11 77:24
**tricked** 75:20
**tricks** 77:22
**true** 11:10 46:5
52:16 58:24
104:24 135:18
**trust** 50:19
**truthfully** 51:5
**try** 30:6 57:2
78:20 117:17
127:6
**trying** 19:19,21
21:21 30:5
32:11,21,22
40:8 45:1 57:7
74:13 77:2
80:5 82:25
98:9 105:6
106:24 110:3,4
117:15 119:2
121:8 127:23
**turn** 14:25 71:9
101:25
**TV** 12:20 129:24
**tweet** 5:5 62:21
63:6,6,22,24

84:11
**tweets** 37:19
**Twitter** 8:25 9:1
34:24 37:11,12
37:14,17 84:13
128:24,25
**two** 17:6,14
20:14 22:10
29:18 33:11
46:2 56:15
57:8 61:13
80:19 83:11,12
91:24,24 101:3
112:14,23
130:23
**two-sided** 70:20
70:22 71:24
72:8
**type** 69:21
**types** 129:8,10
**typically** 37:22
42:17 127:2

—————
**U**
**Uh** 90:5
**Uh-huh** 21:17
59:13 107:15
**ultimately** 29:14
**unclear** 32:12
**unconstitutio...**
23:6
**understand** 14:7
32:6,19 40:8
48:22 57:10
67:23 74:13
77:23 80:3,6
82:22,23 89:1
89:12,16 92:15
105:4,4,6
106:24 107:10
107:20 109:20
109:22 114:12
114:21 116:4
116:24 131:13
**understanding**
10:18 42:4,5
43:23 46:12
53:2,4 87:14

87:15,20 88:17
89:15,17 95:8
95:11 104:25
105:7 108:8
109:3
**understood**
56:22 130:16
130:23 131:14
**unfair** 68:25
69:14 73:2
108:15
**unison** 47:10
**UNITED** 1:1
135:1
**unitemized** 87:8
87:13
**unpaid** 24:13,16
24:21,21,22
25:1
**unreimbursed**
22:8 25:21
26:18
**unsuccessful**
22:6 24:7,9
**updated** 32:2
**upload** 35:11
**upshot** 113:12
**upside** 17:10
**use** 7:7 32:10
35:25 36:11
38:22 51:9
65:17 74:18
93:18 104:23
118:11,17
125:14 130:15
**uses** 24:6
**USPS** 129:13,22
**usual** 7:6
**usually** 7:10
**UT** 13:7

—————
**V**
**v** 1:5 135:5
**Valley** 137:4
**vary** 37:24
127:2
**verification** 4:22
4:24 40:25

45:10 46:3
**verifications**
89:7
**Verifications/...**
5:3
**verified** 112:16
**verifying** 53:25
**version** 16:4
22:3,4
**versus** 118:7
124:6
**viability** 120:4
**view** 36:17
**violations** 20:16
**Virden** 1:3,11
1:15 3:5,14 4:7
4:22,24 6:1,5,7
8:6 10:15
17:11 39:15
41:1 55:16
115:17,24
116:2,14,15,17
117:8 133:2
134:3,13 135:3
135:10,16,21
**Virden's** 3:16
4:16,18,20
5:24 126:5
**voice** 47:10
48:15
**volunteer** 61:2
**vote** 9:9 50:16
105:21 106:12
**voters** 9:8
**votes** 106:20

—————
**W**
**W** 1:21
**wait** 7:1 29:3,5
43:11 47:13,14
51:1,1
**waited** 91:24
**waiting** 70:9
**want** 13:17,22
18:10,12 22:21
23:25 30:9
32:2,8,10
33:10,24 34:17

37:3,6 41:7,17
41:23 46:11
49:21 51:3
52:13 54:20
55:5 56:23
58:20 61:19
65:14 66:2,16
66:16,19,22
67:11 69:10,11
78:20 79:10
80:25 81:12,12
81:14 84:7
89:17 92:3
98:20 100:4,12
105:8 117:9
118:10 119:12
119:13 123:1
130:13 131:17
**wanted** 18:5,17
20:2 29:5,12
29:25 30:2
40:5 41:23
42:6,8,18,25
43:9,16,17
44:24,25 45:3
53:23 56:8
57:5 59:4,14
59:24 65:12
81:18 84:22
101:20 119:16
123:23 131:21
131:22
**wanting** 41:16
**wants** 115:1
**war** 47:22 67:25
**wasn't** 18:10
44:19 74:25
**watching** 30:15
109:22
**Watson** 48:8
51:10 69:4,20
124:15 130:14
131:24 132:12
**Watson's** 50:5
130:25
**way** 12:7 19:4,8
22:2 35:17,18

36:21 43:9,15 44:24 45:3 50:5 51:3,7 52:12 56:23 69:24 73:22 78:15 93:21 95:3 114:16 118:15 123:4 126:20 128:24
**ways** 46:16 104:17
**we'll** 13:24 31:11 48:8 127:8 132:17
**we're** 7:7 11:4 18:25 47:18 65:4 76:21 78:18 79:4 84:22 86:3 103:8 114:7
**we've** 7:6 80:19 110:16
**website** 5:24 35:15,21,22 103:19 125:16
**welcome** 79:9
**well-connected** 69:16
**well-funded** 46:19 48:2
**Wempe** 59:15 60:10
**went** 51:25 109:13 116:10 122:15
**weren't** 24:21 44:3 92:19 131:4
**West** 2:5
**WESTERN** 1:1 135:1
**Westminster** 35:4 38:11
**widely** 37:24
**wife** 81:17
**William** 58:11 59:16 60:13,17
**willing** 59:3,5
**win** 57:7
**window** 15:18 17:22 18:15 41:12,22 48:23 53:3 65:23 66:20 67:1,13 67:15,18 69:3 69:8 76:16,25 85:19 86:12 87:17 88:8 89:11 94:12 97:1,8 99:14 99:18,20 100:10,24 101:11,14,19 103:9 108:17 108:17,18,20 109:1 117:15 117:17,22,24 123:23 124:4,9 130:12,18,19 131:4,12
**window's** 131:10
**wings** 70:9
**winning** 56:5,10
**wish** 66:25
**wishes** 66:24
**Withdrawn** 5:15
**witness** 1:16 19:12 23:18,20 26:3 75:16,20 117:5 128:10 128:13 130:1 135:16,19,23
**wonder** 30:2
**wondering** 30:22 78:2
**word** 29:13 43:9 43:15 44:23 45:3 63:8 64:1 79:10 104:18 104:22
**work** 35:10 80:5 89:12 91:18
**worked** 58:22
**worker** 61:3
**working** 109:16
**works** 37:9 48:25 60:2 109:18,20
**world** 18:24 78:20
**wouldn't** 67:14 99:20,21,22,23 117:23,25 118:1 130:25 131:5,16,25
**write** 75:18
**writing** 25:17
**wrong** 34:5 45:17 57:19 66:1 72:13 75:19 104:1
**wrote** 42:14

**X**

**X** 3:1,11

**Y**

**y'all** 7:20 62:19 114:15
**y'all's** 14:3
**yeah** 7:18 8:1,1 18:25 21:3,10 25:15 31:20 34:4,7 39:12 49:16 52:15 60:6 61:12,16 63:20 65:5,5 66:15 68:11 71:9 72:5 73:5 74:15 75:20 80:18 82:19,22 82:25 83:2,5 84:21 87:5 88:12 92:2 94:9 95:7 99:7 100:7 111:12 111:14 117:1 120:19 123:7 129:13,21 129:21 131:20
**year** 30:13 52:10 52:22 65:18 69:9,11 85:22
**years** 11:13,20 11:20 107:24 108:7 109:12
**Young** 13:5,6

**Z**

**zero** 77:12 78:11 87:11
**Zimmerman** 108:1
**zip** 68:12

**0**

**1**

**1** 3:14 8:4,5,7 11:6 21:11 22:12 41:6 103:3,24
**1,400** 37:3
**1/15/2021** 77:2
**1/15/21** 5:13
**1/31/24** 137:9
**1/4/22** 5:21
**1:21-CV-271-...** 1:6 135:6
**1:32** 64:4
**1:40** 64:5
**10** 3:23 4:7 10:23 16:23 18:5 19:23 24:11 27:1,2 27:16,20,21 34:3,8 45:14 46:18 47:14 55:11,20,21 57:21 61:17 62:7 69:6,7 70:24 76:23 79:11 80:10,19 83:12,23 85:16 87:25 100:17 100:21 102:22 109:12 124:12 124:22 130:21
**10,000** 91:12
**10/27/20** 5:9
**100** 38:7
**101** 5:22
**103** 5:24
**10th** 27:9 89:25 91:3,4
**11** 4:9 9:11 28:2 28:4 34:16 47:14,21 48:10 50:4 124:13
**117** 3:6
**12** 4:11 28:15,17
**12/8/20** 5:17
**12:15** 1:18
**1224** 62:24
**12th** 100:23 103:1 112:21
**13** 4:14 11:13 31:1,3 45:6 102:1 110:15
**130** 3:7
**133** 3:8
**134** 3:9
**14** 3:17 4:15 33:13,14
**14th** 80:22 81:9
**15** 4:17 8:3 10:17 31:9 33:16,18 34:4 34:14 39:3 62:2 103:2 111:25 115:21 115:22
**150** 103:1
**155,000** 130:12
**15th** 10:1,6 38:21 73:11 76:3,24 77:5 77:11 78:8 85:5 88:2 95:24,25 103:19
**16** 3:20 4:19 34:13 40:17,18
**16th** 22:20,22
**17** 3:22,24 4:21

17:16 40:22,24
62:16 94:1
111:19
**17th** 8:9 17:15
18:15 94:5
100:25
**18** 4:23 21:9,10
45:7,9
**18,887.39** 85:13
**180** 107:25
**18th** 72:1 77:20
81:4,20
**19** 5:1 20:3
45:23,24 53:17
53:20 57:5
113:2 136:12
**19,000** 86:9
**1997** 50:15
107:22
**19th** 28:25
**1A** 23:15
**1st** 41:3 120:15
120:21

―――――
**2**
―――――
**2** 3:3,15 9:12,13
9:16,16 10:14
10:14 11:5
17:1 21:1,2
22:25 91:11
136:12
**2-2-7** 23:2
**2-2-7(B)** 26:22
**2,000** 79:21
**2,205** 45:13
**2,500** 36:4 38:1
**2:41** 110:13
**2:51** 110:14
**20** 4:1 5:3 37:24
57:16,18 61:4
70:14 79:11
80:12,13 82:1
87:24,25 88:20
89:8,9,19
96:14 100:19
100:20 101:13
102:23,24
107:24

**20,000** 98:16,18
**200** 80:23 103:3
103:13
**2008** 11:24 12:3
12:6 109:9
**2012** 12:3,6 13:9
**2015** 13:9
**2016** 12:3,6
**2017** 11:8 22:19
22:20,22 23:22
**20171005-029**
4:3
**2019** 12:9
**2020** 3:23 10:3,6
10:17 12:9
16:24 17:12,16
24:10 26:23
29:17 36:24
38:21,23 60:24
70:24 71:2,17
73:8,11 74:6
76:15,24 77:2
77:5,7,16
80:23 81:4
82:18 83:13,18
86:19 120:15
120:16,21,22
120:25 121:1,4
121:20,25
**2021** 8:9,19 27:9
36:25 38:21
41:3,6 42:1
43:4,5,8,15
44:1,7,10 45:4
46:4,10,15
50:15,24 51:11
62:9 72:1 76:3
76:24 77:5,11
77:20 78:9
81:20 85:5,21
91:12,23 94:1
96:14 99:18
100:23 117:12
117:16 129:4
135:24
**2022** 1:12,18
3:18,21 13:18

15:20 27:17
28:10,25 31:9
37:2 41:8
42:21 65:22
66:7 95:17
102:2 103:1,2
103:3,20 112:1
112:23 133:3
135:11 137:2
**2024** 108:23
**20th** 83:18
**21** 1:12 5:5
62:17,18 75:11
75:15,21,21
84:10 133:3
135:11
**21,000** 97:18
**2180** 2:5
**21st** 1:18
**22** 4:3 5:7 64:6,8
111:6,19 112:1
**22nd** 15:12,20
81:1,19 92:9
**23** 4:5 5:8 64:14
64:18 65:4,5
70:15,18,19
73:8 76:22
77:15 79:5,7
80:10 82:2,3,7
82:17 120:13
120:20,24
121:12,19
**23rd** 74:6 76:24
77:5,7
**24** 5:10 71:17,21
71:23,24 72:17
72:18 74:2
76:22 77:19
80:17,18 82:17
84:24 120:13
120:13,20,21
**24th** 77:16
120:16,21
121:1,20,22
**25** 5:12 75:12,13
75:16,17 76:22
91:23 95:13

108:7 120:13
120:21 121:3
121:12,24
**250** 100:25
**255** 2:5
**25th** 83:17
120:25
**26** 5:14 46:3
65:22 82:8,9
82:10 135:24
**26th** 137:1
**27** 4:7 5:16 71:2
83:7,8,9
**27th** 92:10
**28** 4:9,11 5:18
17:2 85:1,2,2,4
86:4 88:5,18
90:1,19,20,20
93:23,24
**281** 2:6
**29** 5:20 95:14,15
99:6 100:16
136:12
**29th** 102:25
**2nd** 1:21 91:11

―――――
**3**
―――――
**3** 3:4,17,23 14:4
14:6 17:12
21:1,3,11 27:1
39:2,8 41:5
53:23
**3,500** 36:6
**3/15** 31:8
**3:10** 122:14
**3:13** 122:15
**3:27** 1:19 132:19
**30** 5:22 38:7,16
101:23,24,25
136:3
**30-day** 15:17
29:4
**30(f)(1)** 136:1
**300,000** 96:4
97:7 98:19,21
98:23,25 99:8
99:9,11,17
102:1,4,19

117:10,21
118:19 119:13
119:16 130:7
**301** 1:21
**301-7088** 137:5
**303187** 2:10
**31** 4:14 5:24
80:23 103:15
103:17 105:12
**31st** 83:17
121:15
**32,000** 129:17
**326,000** 98:19
**326,847.69** 99:5
**327,000** 97:19
**32nd** 103:1
**33** 4:15,17
**350,000** 102:15
102:18
**365** 108:4
**365-day** 20:23
**365th** 23:11

―――――
**4**
―――――
**4** 3:6,20 16:2,4
16:14 28:1
34:5,5,6,13
39:2,5 97:15
102:14
**4/1/22** 3:18
**40** 4:19,21 38:16
38:16
**400** 14:19 83:13
83:18 100:23
102:25 103:12
**404-4696** 2:6
**41,000** 14:24
68:11
**42** 97:1
**45** 4:23 5:1
38:18
**450** 48:20
**480-8231** 2:11
**4th** 1:21 95:17

―――――
**5**
―――――
**5** 3:22 13:21
17:3,4,6,11

39:2,6 85:8,9
85:10 86:7
97:15 99:6
102:14 111:19
113:2
**5,000** 36:5
**5/6/21** 4:7
**50** 81:1,4,19
**50,000** 71:13
72:24 76:22
77:20 86:21
93:20 120:10
121:9
**5000** 137:8
**512** 2:11,13
137:5
**55** 11:20,20
**57** 5:3
**58th** 96:13
**5th** 22:19,23
83:13

---
**6**

**6** 3:24 17:4,6,13
27:7 28:14
55:13 64:18
71:11 72:3,9
72:24 75:25
96:4 101:25
121:25
**6/17/21** 3:14
**6/18/21** 5:11
**6/23/21** 4:10
**60** 38:18
**62** 5:5
**62,000** 102:14
**64** 5:7
**6549** 137:4
**6th** 121:4

---
**7**

**7** 4:1 15:23 20:4
20:6 112:21
**7.03** 94:10
**7/13/22** 5:23
**7/15/21** 5:19
**70** 5:8
**71** 5:10

**74th** 103:2
**75** 5:12
**75th** 73:3 74:2
**77018** 2:5
**78701** 1:22
**78731** 2:10
**78749** 137:4
**78759** 6:8

---
**8**

**8** 3:14,21 4:3,5
22:13,14 23:17
23:21 26:21
30:25 42:1
46:10,15 50:24
51:11 99:18
100:23 112:9
112:10 115:24
**82** 5:14
**83** 5:16
**8307** 6:7 11:7
**85** 5:18
**8th** 13:18 14:19
38:21 42:21,24
43:2,3,8,14
44:1,7,10 45:3
47:18 66:7
100:7

---
**9**

**9** 3:15 4:5 23:16
23:18,19 24:3
112:10,10
116:1 121:5
**900** 48:5
**917-6115** 2:13
**95** 5:20