**EXHIBIT 5**

# Transcript of the Testimony of
# **William H. Clark**

November 28, 2022

Jennifer Virden v. City of Austin

Givens Court Reporting
sgivens@austin.rr.com
(512) 301-7088

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

JENNIFER VIRDEN,  §
                 §
      Plaintiff,  §
                 §  CIVIL ACTION NO.
v.               §
                 §  1:21-CV-271-RP
THE CITY OF AUSTIN,  §
                 §
      Defendant.  §

* * * * * * * * * * * * * * * * * *

THE ORAL DEPOSITION OF

WILLIAM H. CLARK

NOVEMBER 28, 2022

* * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF WILLIAM H. CLARK, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above styled and numbered cause on the 28th day of November 2022, from 11:33 a.m. to 1:07 p.m., before Sandra S. Givens, CSR, in and for the State of Texas, reported by machine shorthand method, at Austin City Hall, 301 W. 2nd Street, 4th floor, Austin, Texas 78701, pursuant to the Federal Rules of Civil Procedure.

## Page 3

1                    I N D E X
2
3  Appearances - - - - - - - - - - - - - - - - - - - 2
4  Exhibits - - - - - - - - - - - - - - - - - - - 3
5  WILLIAM H. CLARK
6      Examination by Mr. Hicks - - - - - - - - - - - 5
       Examination by Mr. Najvar - - - - - - - - - - 65
7  Further Examination by Mr. Hicks - - - - - - - - 69
8  Changes and Signature - - - - - - - - - - - - - - 77
9  Reporter's Certification - - - - - - - - - - - - 79
10
11                  E X H I B I T S
12
   NO.  DESCRIPTION                              PAGE
13
   Exhibit 1 - - - - - - - - - - - - - - - - - - - 5
14     Notice of Deposition
15 Exhibit 2 - - - - - - - - - - - - - - - - - - - 6
       Clark Responses to City's First Set of
16     Interrogatories
17 Exhibit 3 - - - - - - - - - - - - - - - - - - - 21
       Austin Ordinance No. 20171005-029
18
   Exhibit 4 - - - - - - - - - - - - - - - - - - - 24
19     Second Amended Complaint
20 Exhibit 5 - - - - - - - - - - - - - - - - - - - 30
       Plaintiffs' First Amended Initial Disclosures
21
   Exhibit 6 - - - - - - - - - - - - - - - - - - - 31
22     William Clark Declaration, 3/30/21
23 Exhibit 7 - - - - - - - - - - - - - - - - - - - 54
       Jennifer Virden CFR 10/7/20, Excerpt
24
   Exhibit 8 - - - - - - - - - - - - - - - - - - - 55
25     Jennifer Virden CFR 12/8/20, Excerpt

## Page 2

1                 A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4      Mr. Jerad Najvar
       NAVJAR LAW FIRM, PLLC
5      2180 North Loop West, Suite 255
       Houston, Texas 77018
6      (281) 404-4696
       jerad@najvarlaw.com
7
8  FOR THE DEFENDANT:
9      Mr. Renea Hicks
       LAW OFFICE OF MAX RENEA HICKS
10     P.O. Box 303187
       Austin, Texas 78731
11     (512) 480-8231
       rhicks@renea-hicks.com
12
       Ms. Laura Norton
13     Contract Legal Assistant
       (512) 917-6115
14     lnorton@austin.rr.com
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1
2  Exhibit 9 - - - - - - - - - - - - - - - - - - - 56
3  Exhibit 10 - - - - - - - - - - - - - - - - - - - 57
       Jennifer Virden CFR 1/4/21, Excerpt
4
5  Exhibit 11 - - - - - - - - - - - - - - - - - - - 73
       Jennifer Virden First Supplemental Responses
       to City's First Set of Interrogatories
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

GIVENS COURT REPORTING

6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1          WILLIAM H. CLARK,
2 having been first duly sworn, testified as follows:
3          EXAMINATION`
4 BY MR. HICKS:
5      Q   Mr. Clark, what did you do in preparation for
6 today's deposition?
7      A   Not much.  Spoke briefly with Jerad
8 downstairs, and we had a little phone conversation, I
9 don't know how long, maybe 15, 20 minutes or so on the
10 phone on the drive here.  And email, sent me an email a
11 few weeks ago where you had some interrogatories you
12 wanted answers to.  So I answered those, and I
13 re-reviewed the documents.  I believe it was this
14 document.  Whatever, whatever this --
15     Q   Right.
16     A   My statements, previous statements.  That's
17 it, so not much.
18     Q   Okay.  What does the H stand for?
19     A   Hudson.
20     Q   Okay.
21     A   William Hudson Clark.
22     Q   Let's look at Deposition Exhibit 1.
23     A   Mm-hm.
24     Q   Ask you to take a look at that.  Does that
25 appear to be the Notice of Deposition that you're

Page 5

1 appearing here for?
2      A   I've never seen this document before, but --
3 I mean, I've never seen this before, but it would
4 appear to be correct.
5      Q   Okay.  As I understand it, you now reside in
6 Spring, Texas at 28122 East Benders Landing; is that
7 correct?
8      A   That is correct.
9              (Exhibit No. 2 marked.)
10     Q   I'd ask you to take -- go ahead if you need
11 to look at that.
12     A   Look at this now?
13     Q   Take a look at Exhibit 2 that's in front of
14 you.  I'll represent to you that these are -- you
15 probably recognize them -- your responses to the city's
16 first set of interrogatories.  Do you recognize them?
17     A   I've never seen, never seen this before,
18 but so this whole document or just the first page?
19     Q   The whole document.  These are your answers.
20     A   Okay.  Yeah.  All right.  We'll see.  Yes.
21 This just gives my current and former residences on
22 number 1.  Yeah.  So this is just me describing what my
23 duties as a volunteer coordinator back on the city
24 council campaign in 2020.  Identifying campaign
25 contributions to Jennifer Virden's campaigns.  This

Page 6

1 looks right.  Yeah.  Okay.  Sure.
2      Q   Okay.  Do you, do you have anything that
3 you've seen in this Exhibit 2 in your responses that
4 you want to correct or change?
5      A   No.  Not that I'm aware of.
6      Q   Do you have anything to supplement other
7 than -- well, do you have anything to supplement?
8      A   I can reread it again to make sure if you
9 want.
10     Q   We'll go through it in greater detail if you
11 want, but you're welcome to read through it as much as
12 you want to right now.
13     A   Yeah.  I mean, this is fine.
14     Q   Okay.  Where is Spring, Texas?
15     A   It is east of The Woodlands.  So The
16 Woodlands is actually a community inside of Spring.
17 It's Montgomery County, Texas, so it's north of Houston
18 in Montgomery County, which is adjacent to Harris
19 County.  And Spring actually encompasses parts of
20 Harris County and, and Montgomery County.
21     Q   And about how far is it where you live from
22 Austin roughly?
23     A   It's about two, two and a half hours, a
24 little over two and a half hours.
25     Q   Okay.  In the period between November 1, 1997

Page 7

1 and October of 2014 where did you live?
2      A   From '97?
3      Q   Yeah.
4      A   It's a long -- okay.  All right.  So 1997 I
5 lived in Houston, Texas.  I went into the Navy in 2002,
6 something like that.  I lived in Connecticut for a year
7 or so, lived in -- well, first boot camp in Great
8 Lakes, Illinois and then Connecticut for a year or so,
9 Groton, Connecticut, submarine base.  Then off to
10 Seattle -- well, Bremerton, Washington from 2004 to
11 2006 and then Hawaii, then spending some time in Hawaii
12 on another submarine.  Then, then Pearl Harbor, Hawaii
13 from two thousand -- I think August of 2006 until,
14 until I got out of the Navy in November of 2008.  And
15 then I stayed in Hawaii from 2008 until October of 2014
16 when I moved to Austin.  So I moved to Austin in
17 October of 2014, so now we're in 2014 and I lived in
18 Austin until --
19     Q   I only asked you up until --
20     A   Yeah.  Okay.  I didn't, I didn't know the
21 (indiscernible) was relevant, but yeah.  Okay.
22          THE REPORTER:  You didn't know the
23 what?
24          THE WITNESS:  The '90s.
25     A   You said '97.  That was -- okay.  Yeah.  I

Page 8

2 (Pages 5 to 8)

**Page 9**

```
 1   didn't know that -- was that, was that in here?
 2       Q   No.
 3       A   Okay.  Yeah.
 4       Q   And then starting in October 2014 you lived
 5   in Austin until --
 6       A   Until --
 7       Q   Wait.
 8       A   -- January of 2021.
 9       Q   Okay.
10       A   But I actually owned a house here still until
11   it closed in March of 2021.
12       Q   Okay.  Do you -- and that was on the Ranch
13   Creek Drive property?
14       A   Correct.
15       Q   And did you -- do you recall which city
16   council district you were in?
17       A   Yes.  District 10.
18       Q   The whole time?
19       A   Yes.
20       Q   Okay.  Do you know Jennifer Virden
21   personally?
22       A   Yes.
23       Q   And how did you, how did you come to know
24   her?
25       A   Back in I want to say August of 2020 I was
```

**Page 10**

```
 1   looking at the state of affairs in Austin, and I was
 2   looking, looking for candidates who were running to
 3   represent me, my -- where I lived, our home in District
 4   10, and she, and she announced she was running for
 5   office.  So I reached out to volunteer for the
 6   campaign, and, and I looked at some of the other
 7   options.  There was another person running; they didn't
 8   respond.
 9           So, but she did, and shortly thereafter
10   I had communications with her campaign manager at the
11   time -- not sure his official title, but his name is
12   Brad Parsons -- and met with him and met with Jennifer.
13   They came over to my house, we met, and they, they
14   wanted me to be a volunteer coordinator.  And so then I
15   took on -- I want to say in August of that year I
16   became a volunteer coordinator for her city council
17   campaign.  And yeah, from there that's where our
18   relationship began.
19       Q   Okay.  And you said there was another person
20   running at that time.  Who was that other person?
21       A   Well, so the incumbent was Alison Alter.
22       Q   Yes.
23       A   And there was another candidate running
24   against her, name of Robert Thomas.
25       Q   Okay.  Who --
```

**Page 11**

```
 1       A   And he didn't respond so didn't -- I didn't
 2   get anything out of him.  I mean, I just, I just wanted
 3   to support somebody that was in opposition to the
 4   incumbent, and so Jennifer was the first one that
 5   responded.
 6       Q   So did it matter to you whether it was
 7   Jennifer Virden or Robert Thomas?
 8       A   No.  At that time I didn't really know either
 9   one of them.
10       Q   And this makes it sound like you were doing
11   political work.  What kind, what --
12       A   No.  I just was as a citizen wanting to --
13   seeing, seeing what was happening around me with
14   homeless everywhere and defunding the police, and I
15   wasn't happy with that.
16       Q   Okay.  What do you --
17       A   And I had some time.  Yeah.  What do I do?
18   Yeah.  So --
19       Q   Go ahead and finish your, finish your answer.
20       A   No.  Yeah, so I had, I had some spare time,
21   work was kind of slow, so I figured, well, why not, you
22   know?  I wasn't initially planning to spend so much
23   time on it, but, you know, somebody needed to do it, so
24   I did it.
25       Q   Have you ever run for public elective office
```

**Page 12**

```
 1   yourself?
 2       A   Negative.
 3       Q   What do you -- what were you doing for a
 4   living then?
 5       A   Yeah.  Same thing I'm doing now.  So I worked
 6   for a company called the Tech -- it's actually a local
 7   government corporation called the Texas Conference of
 8   Urban Counties.
 9       Q   It's a local what?  I didn't hear you.
10       A   Local government corporation.  So essentially
11   it's called the Texas Conference of Urban Counties --
12   their offices are down the street -- and they have a
13   subsidiary called Techshare, which is basically an
14   entity that develop- develops, writes, and maintains
15   software for counties in the state of Texas, and the
16   software is criminal justice software.  Travis County,
17   for example, is one of the, one of the customers.
18       Q   And what do you do in there?
19       A   Oh, I'm the IT, the IT -- well, I guess the
20   chief architect for, for, for IT.  So essentially I
21   manage the hosting, the security, the firewalls, all,
22   you know, the hacking stuff you were talking about
23   earlier.  I do all the, I do all, all the -- I don't
24   hack anyone, but I prevent us from being hacked.
25       Q   Okay.
```

3  (Pages 9 to 12)

1      A    So it's IT security managing our, our hosting
2  and all of that.
3      Q    Before your work on the Virden campaign for
4  District 10 had you done political work before of any
5  sort?
6      A    No.  Only contributions.
7      Q    Okay.  Back in the 2014 to 2021 period, other
8  than contributions with respect to Jennifer Virden's
9  campaign did you make any political contributions then?
10     A    2014 to 2021?
11     Q    Yes.
12     A    Oh, I'm sure I did.
13     Q    And what about Austin City Council or mayor
14  races, did you?
15     A    No.  I didn't really, I didn't really focus
16  on that until 2020.
17     Q    And were your contributions, without going
18  into the details yet, primarily in, like, partisan
19  races?
20     A    Primarily.
21     Q    And primarily I take it from your description
22  to Republican candidates?
23     A    Almost exclusively.
24     Q    What, what Democratic candidates did you give
25  to?

Page 13

1  Republican presidential nominee was, that kind of
2  thing.
3      Q    Well, I mean, would you give in the primaries
4  too?
5      A    No.  Not -- I, I didn't start giving that
6  much until recently.
7      Q    In primaries you mean?
8      A    Well, I didn't -- I mean, money, money
9  doesn't grow on trees, so --
10     Q    No, no.  I'm trying to distinguish between
11  contributing to these Republican candidates --
12     A    Yeah.  So --
13     Q    Wait, wait.  Let me finish my question,
14  because it's hard for her.
15     A    My giving is --
16     Q    Wait, wait, just --
17     A    No, I'm, I'm still talking.  So my giving
18  increased more recently, so...
19     Q    Okay.  That's not my question.
20     A    Okay.
21     Q    My question is -- or maybe I didn't ever get
22  to my question.  My question is this -- let's start in
23  2016.  Okay?  I'm trying to distinguish between
24  contributions you made to Republican candidates in the
25  general election from contributions you made to

Page 15

1      A    None.
2      Q    Okay.  Did you give some to Libertarian or
3  other party?
4      A    No.
5      Q    Why do say "almost exclusively" then?
6      A    Well, I don't want to leave -- I don't want
7  to paint them -- I'm not sure, there may be some, but I
8  can't think of any, any -- I can't think of anyone
9  other than Republican candidate I would, I would ever
10  have given to.
11     Q    Okay.  And did you make contributions both at
12  the -- to partisan races both at the local, state, and
13  federal levels?
14     A    No.  Only at the federal level.
15     Q    Tell me starting in 2014 some candidates at
16  the federal level that you did contribute money to.
17     A    I'm not sure.  Let's see, 2014.
18     Q    Let's start in 2016.  That at least cuts out
19  two years of it.
20     A    Probably any, any federal Republican
21  candidates at that time.
22     Q    You mean you just gave to everybody?
23     A    No.  I mean, in my, my congressional district
24  perhaps senate, you know, there's two senators in
25  Texas, both of them perhaps, maybe whoever the

Page 14

1  candidates in the Republican primaries.  Okay?  That's
2  what I'm trying to distinguish.  Did you give money to
3  candidates for federal office in the Republican
4  primaries?
5      A    I don't know.  I don't remember.  Maybe.  I
6  don't know.
7      Q    Okay.
8      A    I know that I gave to John McCain when he
9  ran, when he ran in the primaries, but that was before
10  2014.  Other than that I can't think of anyone else.
11     Q    So you -- let's, let's just pick the 2016
12  Republican primary campaign for president of the U.S.
13  Did you give any money to him?
14     A    I didn't give any -- I don't think -- you
15  know what, actually I don't think I gave to any
16  candidate in 2016, because, because I -- because, you
17  know, Trump got the nomination.  I figured he's got
18  plenty of money, so I didn't want to bother giving him
19  any money, so -- plus I didn't really like him.  Did
20  not like him, don't like him, never did.  So yeah, so I
21  don't think -- I may not have given to anyone in 2016.
22  Who knows.  You'd have to go back and -- but you can
23  look at the records, right, the FEC records --
24     Q    Right.
25     A    -- and find out.

Page 16

4  (Pages 13 to 16)

1      Q    Right.
2                THE REPORTER:  Could I ask you to
3   slow down a bit?  You're kind of slurring your words
4   together, and it's making it a little hard for me to --
5                THE WITNESS:  Okay.  Sorry.
6                THE REPORTER:  Thank you.
7                THE WITNESS:  I'm a fast talker.
8                THE REPORTER:  Yeah.
9      Q    In which sense did you use that term?  Just
10  kidding.  So in 2020 --
11     A    Yes the.
12     Q    -- in the Republican primary campaign for
13  president -- I don't guess there was much of a fight,
14  as I think about it, was there?  Did you give to Trump?
15     A    Yeah, I did.
16     Q    In the primary?
17     A    Yes.
18     Q    Do you plan --
19     A    I'm not sure in the primary, but I know -- I
20  think I gave to him after that.  I can't remember, but
21  probably -- I may have.
22     Q    So --
23     A    My wife probably did.  I'm sure my wife did.
24     Q    So you may not have seen, but I'm guessing
25  you did, that Mr. Trump has announced he's running for

Page 17

1      Q    Are you thinking you'll also contribute to
2   him possibly for the 2024 race?
3      A    Yeah.  If it, if it becomes clear that he's
4   the frontrunner, perhaps.  Yes.
5      Q    What if it's not clear between him and Nikki
6   Haley?
7      A    Well, it's going to be, it's going to be
8   anyone other than Trump that's a Republican for me.
9      Q    Right.  But I'm saying what if, what if it's
10  Haley and DeSantis vying for this, which one will you
11  give to?
12     A    Probably Nikki Haley.  Until she's out I'll
13  give it to her.
14     Q    Are you a registered voter now?
15     A    Yes.
16     Q    In Montgomery County?
17     A    Yes.
18     Q    When did you switch from -- well, were you a
19  registered voter in Travis County when you lived in
20  Austin?
21     A    Yes.
22     Q    When did you switch from Travis County to --
23     A    Well, I moved --
24     Q    -- to Montgomery -- make sure for her and for
25  clarity you let me finish the question.  I know you

Page 19

1   president in '24.
2      A    Yeah.
3      Q    And do you anticipate making a contribution
4   to him in connection with that campaign?
5      A    Definitely not.
6      Q    Why not?
7      A    I don't like him.
8      Q    Okay.
9      A    But I will be making a contribution to
10  whoever the competition is.
11     Q    In the primary you mean?
12     A    Yes.  I have contributed to Nikki Haley
13  already, and I may even contribute to Ron DeSantis.
14     Q    Nikki Haley already in connection with 2024?
15     A    Well, she has an ongoing --
16     Q    Well, I --
17     A    She's raising money ongoing.
18     Q    That's just a question.
19     A    I don't know.  I just know I contributed to
20  her recently.  Yes, for 2024 if that's what it is.
21     Q    But for what office?
22     A    President.
23     Q    Okay.  But you also mentioned Mr. DeSantis,
24  Governor DeSantis.
25     A    Mm-hm.

Page 18

1   anticipate what it's going to be.
2                When did you switch from Travis County
3   to Montgomery County as a registered voter?
4      A    I moved to Montgomery County in January of
5   2021.  The first election I voted in in Montgomery
6   County was November of 2021.  So that -- I would think
7   that that's when I registered.  I'm sure -- somewhere
8   between when I moved and when I voted.
9      Q    Okay.
10     A    I don't know exactly when.
11     Q    Okay.  And since you weren't registered here
12  I think it's fair to assume, and correct me if I'm
13  wrong, that you did not vote in the mayoral, Austin
14  mayoral race that --
15     A    Sure.
16     Q    Let me finish, because it's hard for her.
17     A    Okay.
18     Q    In the mayoral race that just concluded on
19  November 8th, right?
20     A    Right.
21     Q    Are you aware of the outcome of that race?
22     A    Yes.
23     Q    And you are aware that Ms. Virden finished
24  third, didn't get into the runoff, and got about 18
25  percent of the vote?

Page 20

5  (Pages 17 to 20)

Page 21

```
 1      A   Yes.
 2      Q   Do you intend to make any campaign
 3   contributions to either of the two mayoral candidates
 4   in the runoff?
 5      A   No.
 6                (Exhibit No. 3 marked.)
 7      Q   Now I'm going to ask that you take a look at
 8   what's been marked as Deposition Exhibit 3.
 9      A   Okay.
10      Q   Let me represent to you that that's the
11   ordinance that the Austin City Council passed back in
12   October of 2017 --
13      A   Mm-hm.
14      Q   -- that set out the campaign finance rules
15   that you and Ms. Virden are challenging.  Okay?
16      A   Right.  It essentially bars a candidate from
17   campaigning until the arbitrary deadline in November,
18   which is what I -- why I'm here.
19      Q   I don't think it says arbitrary, does it?
20      A   Well, I'm saying it's an arbitrary deadline.
21      Q   Okay.  And why do you care about this
22   ordinance?
23      A   Because, because the citizens of Austin are
24   basically not allowed to voice, unless they're a
25   Democrat, and they're, they're not allowed to voice
```

Page 21

```
 1   their opinion.  The candidate -- I'm not running for
 2   office, but this candidate -- Jennifer Virden as a
 3   candidate was, and she couldn't campaign, because if
 4   you can't raise money, you can't campaign.
 5      Q   Well, you can campaign with your own funds,
 6   correct?
 7      A   Well, that's -- yeah.  If you have them,
 8   but not everyone has a lot of money, right?  And if
 9   you -- how much, how much of your own funds do you want
10   to get into?
11      Q   Well, let's assume that you have $300,000
12   that you can loan to your campaign and you can spend
13   that before what you call the arbitrary deadline.
14   Doesn't that allow you to campaign?
15      A   Perhaps.  I'm not going to, I'm not going to
16   go down -- that's, that's -- you're -- that's a --
17   you're making a --
18      Q   Well, I get to ask the questions.
19      A   Well, you're asking a hypothetical.
20      Q   Yes.  That's what I'm asking you.
21      A   You're asking a hypothetical question, right?
22      Q   Yes.
23      A   Possibly.  I don't know the answer.  But if
24   you have those, if you have those funds and you want to
25   use your own money, then sure.
```

Page 22

```
 1      Q   Then you --
 2      A   But generally candidates don't do that, do
 3   they?
 4      Q   You understand that Ms. Virden loaned her
 5   mayoral campaign --
 6      A   No.  I understand.
 7      Q   May I finish the question, please?  Remember
 8   that.  Okay?
 9          You understand that Ms. Virden loaned
10   her campaign $300,000 in the mayoral race.
11      A   Yes.
12      Q   Okay.  And what kept her from spending that
13   before this deadline that you're concerned about?
14      A   I don't know, but perhaps she wasn't sure if
15   she was going to be a viable candidate back then.
16   She -- you have to first see if you can raise money to
17   see if you're a viable candidate.  So if you can't even
18   go out there and test the waters by trying to raise
19   money, why would you, why would you sink $300,000 of
20   your own money into a campaign when you don't even know
21   if you have support.
22          So the way you determine if you have
23   support is by seeing if you can raise money, by seeing
24   if the people are interested.  I was interested, and a
25   lot of people were, and we couldn't contribute.
```

Page 23

```
 1      Q   But you could tell her you were interested.
 2      A   Oh, well, she knew that.  She knew that, of
 3   course.
 4      Q   Well, why doesn't that tell you whether
 5   you're a viable candidate?
 6      A   Well, just me, you know, I could tell her,
 7   but I mean, but actually pledging money and giving
 8   money is, is a, is a much bigger commitment.  You can
 9   say you'll do something, but until you've actually done
10   it, that's a, that's a whole different level of
11   commitment.
12          THE WITNESS:  Did you get all that?
13          THE REPORTER:  I did.  Thank you.
14   Renea, I hate to ask this, but I need a real quick
15   break.
16          MR. HICKS:  No.  Absolutely not
17   (laughing).
18          (At 11:54 a.m. the proceedings
19   recessed, continuing at 12:00 p.m., after which Exhibit
20   No. 4 was marked.)
21      Q   (By Mr. Hicks)  Mr. Clark, I want you to take
22   a look what you've got in front of you, Exhibit 4.
23      A   Mm-hm.
24      Q   Do you recognize that document?
25      A   Yes, I do.
```

Page 24

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

**Page 25**

1    Q   It's your -- it's, it's basically yours and
2  Ms. Virden's lawsuit against the city, correct?
3    A   Right.
4    Q   So do you understand that Ms. Virden filed
5  the initial lawsuit in this matter back in March in
6  2021?
7    A   Yes.  I understand that.
8    Q   Okay.  And then you joined in the lawsuit in
9  September of this year, correct?  This shows it was
10  filed at the top there 9/21/22.  I'll represent to you
11  this is your first formal appearance in the lawsuit
12  here as a plaintiff.
13          THE WITNESS:  Is that right?  What
14  are the -- are those dates right?
15          MR. NAJVAR:  Well, I do want to
16  clarify.  This date is when the Court put it on the
17  docket, but this -- you know, I filed the motion for
18  leave to amend months before this.  It was, like, six
19  months or four months earlier.
20          THE WITNESS:  That's what I
21  understand.
22          MR. HICKS:  And the record will
23  reflect that.  I'm --
24          MR. NAJVAR:  Okay.  Yeah.
25          MR. HICKS:  -- not arguing with

**Page 26**

1  that.  I'll accept that.
2    Q   But let's assume it's four months before for
3  purposes of this discussion, that it was in May of
4  2022.  Okay?  Let's assume that's when you made the
5  first effort to join through your lawyer.  Can you tell
6  me why you waited?
7    A   I didn't wait.  I don't think I waited.  I
8  think I was on board with this lawsuit all along.  I
9  think it was just a matter of the filings.
10    Q   Well, I'm not asking what your position was
11  on the lawsuit.  I'm asking why you weren't a plaintiff
12  in the lawsuit.
13    A   I wasn't asked, or maybe I wasn't aware of
14  it.  When I became aware of it I immediately jumped on.
15    Q   So you didn't know about the lawsuit back
16  in -- when it first filed?
17    A   I think I did.  I think I knew about it
18  before it was filed.
19    Q   Okay.  So you knew about the lawsuit but you
20  didn't join.
21    A   Well, I mean, I mean, I don't -- I think, I
22  think the -- I think Jennifer's attorney, the attorney
23  was handling that, so I don't know.
24    Q   Well, why didn't you say, I want to be a
25  plaintiff, back then?

**Page 27**

1    A   I think I did, and I don't know -- for
2  whatever reason.  Your dates may be -- maybe your dates
3  are wrong.  I don't know.
4    Q   Let's assume my --
5    A   I was on board with this lawsuit all along.
6    Q   I'm not asking whether you were on board.
7  I'm asking about being a plaintiff.  Okay?
8    A   Essentially that's the same thing.  I wanted
9  to be a plaintiff all along.
10    Q   Well, they aren't the same thing.  They may
11  be to you, but --
12    A   Well, I -- they mean -- I was -- the intent
13  is the same.  My intent was the same.  My intent was
14  to support this lawsuit all along.  That's what
15  I'm --
16    Q   I'm not asking that question.  My question,
17  as I've said, is not whether you're on board with it,
18  support it.  My question is why didn't you become a
19  plaintiff when it was filed?
20    A   Maybe -- I guess because I wasn't asked or I
21  wasn't aware that that was something I, I could do.
22    Q   Did you ask to become a plaintiff?
23    A   No.  I don't think I ever asked, but it was
24  mentioned, it was discussed, and then I became, then I,
25  then I became a plaintiff apparently.  So I mean --

**Page 28**

1    Q   What do you mean "apparently"?
2    A   I mean I never had discussions with anyone
3  about being a, you know, quote/unquote, plaintiff.
4  Okay?  I know that I supported the lawsuit.  I
5  supported -- I was against the fact that Jennifer
6  couldn't raise funds during the, the blackout period,
7  because, you know, she's not an incumbent and she needs
8  to get her message out.  She has, she has constituents,
9  she has, she has, she has an agenda which matches my
10  agenda, which is, you know, a voice for, for the
11  rest -- for the few people that maybe don't agree with
12  everyone else, and we, we -- and that's just what we
13  wanted.  We wanted to be represented.  So, you know, as
14  far as the technical of when the lawsuit was filed or
15  when it -- what, what date I became a plaintiff, that's
16  up to the, up to the lawyers.  I don't know.
17    Q   Well, did you know you'd been made plaintiff?
18    A   No.  Like I said, I don't even -- the word
19  "plaintiff" never came up.  I don't know.  I just know
20  that I supported the lawsuit all along.
21    Q   How did you learn that you were a plaintiff
22  in the lawsuit?
23    A   I guess either, I guess -- I think that I was
24  asked to join, I guess at some point.  Do, do -- I
25  think the question I received was, "Do you want to give

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1  a" -- "would you be willing to support the lawsuit?"  I
2  think the answer was yes from me.  So Jennifer asked,
3  you know, "Would you be willing to jump on this,
4  support this lawsuit?"  I said yes, you know, because
5  obviously I wanted her -- you know, to give money and I
6  couldn't.  I think I had -- we had -- like you said, I
7  was, I was on board all along.  So --
8      Q   Let me interrupt a second.  I'm not
9  criticizing anything you're saying, it's just you're
10 talking really fast.
11     A   Well, what specifically do you want to know?
12 I'm trying to get -- what, what --
13     Q   Well, I know.  Can you just -- first point is
14 can you just slow down?  Because she's having a hard
15 time keeping up.
16              THE WITNESS:  Sorry.  Why can't
17 they let you record my voice?  It's easier.
18     Q   So I will -- you were giving a nonresponsive
19 answer, but that's okay.  Let's just terminate the --
20     A   Well, no.  I'm trying, I'm trying to -- what
21 is your -- can you rephrase the question?  Maybe I can
22 answer succinctly.
23     Q   When were you told you were going to be a
24 plaintiff?
25     A   I don't remember exactly.

Page 29

1      Q   have any knowledge of facts that have to do with this
2  case separate from what it's in your verification?
3      A   I know that as soon as Jennifer announced she
4  was running for mayor I immediately wanted to
5  contribute that day and I was unable to do so.
6      Q   That wasn't my question.  I said do you have
7  any --
8      A   I want that on the record.
9      Q   Do you have any -- I know, but you're
10 supposed to answer my questions.  Your attorney can ask
11 you questions.  Okay?
12     A   Okay.
13     Q   So do you have any knowledge of facts other
14 than the facts based in the verification itself that
15 you consider pertinent to this case?
16     A   No.
17     Q   Okay.
18              (Exhibit No. 6 marked.)
19     Q   Mr. Clark, you have in front of you an
20 exhibit marked Exhibit 6 to this deposition.
21     A   Yes.
22     Q   Do you recognize that?
23     A   Yes, I do.
24     Q   What is it, just briefly?  We'll go into
25 details.

Page 31

1              (Exhibit No. 5 marked.)
2      Q   You have in front of you what's been marked
3  as Exhibit 5 for your deposition.  Do you see the
4  heading there is Plaintiffs' First Amended Initial
5  Disclosures?
6      A   Yes.
7      Q   And it shows at the back that it was served
8  on me on October 3rd, 2022 after you became a
9  plaintiff.  Okay.  Read on the first page there that
10 bolded Paragraph A.  You can just read it to yourself
11 if it's easier.  And then scroll down further down the
12 page.  Right on that same page you'll see your name, I
13 believe.  Do you --
14     A   Yes.  I see that.
15     Q   -- see that?
16     A   Yes.
17     Q   Okay.  You see at the end there your block or
18 your name and address?
19     A   Mm-hm.
20     Q   It says, "Submitted verification of intent to
21 contribute dated March 30, 2021."  Do you see that?
22     A   Yes.  I mean, that makes sense.
23     Q   Okay.  And we'll go into the details of that
24 verification in just a second, but other than what's
25 stated in the verification, to your knowledge do you

Page 30

1      A   Well, this is what I signed when I joined the
2  lawsuit, I believe.  Yeah.  So this March, I wanted to
3  contribute in March or even earlier than that, as soon
4  as she announced -- whenever she announced her
5  candidacy I wanted to contribute.  I wasn't able to do
6  so, so I was asked -- so I joined the lawsuit, and, and
7  this is me basically saying that I wanted to contribute
8  and I was unable to do so.
9      Q   When you say you joined the lawsuit what you
10 mean is you submitted this verification, right?
11     A   Correct.
12     Q   And this verification was your way of showing
13 support for the lawsuit, correct?
14     A   Yes.
15     Q   How did you get the, the verification draft
16 that you then filled in?
17     A   From this gentleman here, the attorney.
18     Q   Mr. Najvar?
19     A   Yes.  I think.  I don't know how else I would
20 have gotten it, but...
21              THE WITNESS:  Do you know?
22              MR. NAJVAR:  I can't, I can't chime
23 in yet, but --
24              THE WITNESS:  Okay.
25              MR. NAJVAR:  -- I can ask if I need

Page 32

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1 to follow up -- just for sort of procedural so you
2 understand, when he's not asking questions if I need to
3 clarify something or follow up, I can, I can ask my own
4 questions.
5     A     So presumably I would have gotten it from
6 either the attorney in this case, which is Mr. Najvar
7 here, or from the, the campaign maybe -- I mean
8 from the candidate.  I don't recall exactly who gave me
9 the document.
10     Q     (By Mr. Hicks)  Do you recall discussing this
11 with Ms. Virden?
12     A     Not much.  I don't think I ever really maybe
13 discussed it with her really at all, but I did discuss
14 it with her, her campaign sort of manager/field
15 coordinator in the previous campaign.
16     Q     Who was that?
17     A     Brad Parsons.  I did discuss it with him.
18     Q     And what was -- tell me what y'all discussed.
19     A     The, the issue we couldn't raise money
20 because of this law, this blackout law.  We thought it
21 was unconstitutional.  In other words, she was, yeah,
22 she was prevented from contributing during this, I
23 think it's called, blackout period.  I believe that's
24 written down somewhere.  Anyway, so unable to
25 contribute during this period of time from all the way

<div align="right">Page 33</div>

1 from March all the way until November.
2     Q     Okay.  This --
3     A     And so I wanted to, I wanted to get involved.
4     Q     That wasn't, that wasn't my question.  My
5 question was, what did you discuss with Mr. Parsons?
6     A     What I just said, that I was unable to
7 contribute all the way from March until November and
8 then that that was unfair.
9     Q     I asked what you discussed about this
10 document.
11     A     That exact -- I just told you what I
12 discussed.
13     Q     That's it?
14     A     Yeah.  That's it.
15     Q     Okay.  And did he tell you what this document
16 was in effect saying?
17     A     No.  He didn't need to do that.  I can read
18 it myself.
19     Q     Did you read it yourself?
20     A     Yes.
21     Q     Okay.  As you sit here today, do you have
22 anything in this document -- "this document" being
23 Exhibit 6 -- that you want to change or correct?
24     A     No.
25     Q     Okay.  Let's look at Paragraph 2 of

<div align="right">Page 34</div>

1 Exhibit --
2     A     Okay.
3     Q     That front page there, short sentence.
4     A     Right.
5     Q     At the time you signed this did you know
6 whether Jennifer Virden was running for city council or
7 mayor?
8     A     Right.  So we --
9     Q     Wait, wait.  Answer the question.
10     A     No.  I did not.
11     Q     Okay.  Did it matter to you?
12     A     No.  It did not.
13     Q     Now look at Paragraph 3 and look at the first
14 sentence there.  Just read that to yourself.
15     A     Right.  So yeah.  I --
16     Q     Wait, wait.  Wait till I ask the question.
17     A     Okay.
18     Q     Okay.  So in there you mention that you
19 support Virden's vision.  What was it about -- what was
20 Virden's vision that you supported?
21     A     Fiscal responsibility, low taxes, and a
22 government accountable to the citizens and not to a
23 single political party.  In other words, representing
24 all the taxpayers, advocating for fiscal restraint,
25 responsible city government.

<div align="right">Page 35</div>

1     Q     I didn't hear the last part.  Sorry.
2     A     Responsible city government.
3     Q     And you say later in that same sentence that
4 you thought it was imperative that she begin
5 fundraising as soon as possible --
6     A     Yes, I did.
7     Q     -- instead of waiting.  So what do you mean
8 by "imperative"?
9     A     Imperative, just what it, just what it
10 means:  Urgent, critical.  In other words, the
11 incumbent can -- the incumbent has their message out,
12 right?  They're, they're in office, they can, they can
13 essentially campaign all they want to.  And Jennifer as
14 a candidate for either city council or mayor to
15 represent my -- representing me as someone who wants
16 responsible city government wasn't able to campaign.
17 So that's why I use "imperative."
18     Q     Okay.  And let's assume -- let's set aside
19 the city council, the district race for a second.  You
20 understand she ended up running for mayor, right?
21     A     Yes.  I understand.
22     Q     And you understand that when she ran she did
23 not run against an incumbent, don't you?
24     A     I understand.
25     Q     Okay.  So what does your point about the

<div align="right">Page 36</div>

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

**Page 37**

1 incumbent have to do with it then since she wasn't
2 running against an incumbent?
3     A    Well, we didn't know at the time.  We didn't
4 know at the time whether or not she'd be running
5 against an incumbent or a -- or, or not.
6     Q    Well, with regard to the mayor's race what
7 does that --
8     A    Well, if you're setting, you're setting aside
9 the city council race and if she was running again the
10 same race, same seat, which was City Council District
11 10 against -- that would have been the incumbent Alison
12 Alter yet again.  Depending on the redistricting.
13 There was redistricting in Austin, and so that was all
14 up in the air.
15           But we -- it was intentionally running
16 against an incumbent, and obviously democ- Austin is
17 completely controlled by the Democratic Party, wholly
18 controlled.  So you're obviously running against the
19 party in reality.  So they control Austin, so...
20     Q    What does that have to do with the incumbent
21 though?
22     A    Well, you're running, you're running -- the
23 entire city government is controlled be a single party.
24 So we're running against not just a single person,
25 we're running against the entire infrastructure.

**Page 38**

1     Q    So you knew ahead of time that everybody that
2 was going to be running for any office she ran for was
3 going to be the supported by the Democratic Party?
4     A    Anyone of any -- that would -- yeah, for the
5 most part.  Anyone that had any traction or significant
6 support would have been a candidate for the Democratic
7 Party.  Of course I knew that.
8     Q    Because those are the only people that can
9 win in Austin?
10     A    Correct.
11     Q    Then why would you support somebody that's
12 bound to lose?
13     A    Because, because she needed to have a voice.
14 All the people need to be represented.
15     Q    Okay.  Well, you understand from what you're
16 saying she had no chance of being represented.
17     A    No.  She had a chance, but you've got to
18 start some- she had a -- you always have a chance, but,
19 you know, the odds are stacked against her.  They're,
20 they're stacked even further by being unable to raise
21 money because of this, this law, this unconstitutional
22 law that prevented her raising money till November.
23     Q    And how does that stack it against her?
24 She's on the same footing, you understand, as everybody
25 else running.  None of them can raise funds then --

**Page 39**

1     A    Not --
2     Q    -- either.  Wait, let me finish the question.
3 None of them can raise funds either, right?
4     A    Because they are members of the Democratic
5 Party, which controls Austin.  And if there's an
6 incumbent, which in this case there wasn't, but if
7 there was, they would have had that advantage.
8     Q    So what you're saying is, my -- tell me if
9 I've got it wrong.  It's my understanding that your
10 problem with this rule about when you can fundraise --
11     A    Mm-hm.
12     Q    -- is that it benefits, in Austin it benefits
13 the Democratic Party?
14     A    It benefits one single party over all -- over
15 everyone else.  So nobody else matters.  Nobody else's
16 point of view matters.
17     Q    Nobody, nobody else from the Democratic Party
18 you mean?
19     A    Right.  Well, in my statement I pointed out
20 how it's dangerous that one party controls city
21 government, has sole control.  It's in one of my
22 statements here.  Maybe not this one, maybe the other
23 one.  Or maybe it's in Amendment 2.  Maybe you should
24 look in Amendment 2.
25     Q    Maybe what?

**Page 40**

1     A    The other, the other statement.
2     Q    Are you looking at Exhibit -- what exhibit
3 number are looking at there?
4     A    So now I'm looking at the --
5     Q    The complaint.  Okay.
6     A    Yeah.
7     Q    Okay.
8     A    So unlike, unlike the Texas Legislature, the
9 city council meets year-around.  The incumbent mayor
10 and council members are free year-around to promote
11 their agenda and propagate their messages.
12     Q    Yeah.  But the question had to do with the
13 Democratic Party.  That's what you said one-party
14 control, and that's what you didn't like about this
15 rule, that it benefited that one party's control.
16     A    Whoever the party.  If it was -- no matter
17 who the party is, it's wrong, right?  There should
18 always be representation from multiple parties.
19     Q    What do you -- by "party" what do you mean?
20     A    Political party.
21     Q    Okay.
22     A    Different points of view.
23     Q    Okay.
24     A    We need to have consensus government.
25     Q    Okay.

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749    (512) 301-7088    sgivens@austin.rr.com

1     A    Not a majoritarian.  We're not tyranny of
2  majority.
3     Q    And how, how does, how does the fundraising
4  rule keep their -- that you're challenging keep there
5  from being diversity of political views?
6     A    Because essentially you're only -- the only,
7  the only candidate that can challenge for office, for
8  office in Austin is the candidate that has a lot of
9  money, because they can't raise money -- based on this
10  law they, they can't -- they're prevented from raising
11  money.  So the only way they can do it is having a lot
12  of their own money that they're willing to throw in
13  that's going to be, you know, flushed down the -- so
14  essentially it's, it's, it's -- unless you're wealthy,
15  you have no voice.
16     Q    Is 300 --
17     A    If you don't agree with the Democrats and you
18  don't have any money, you don't exist.
19     Q    Well, I'm getting confused about your
20  constant reference to the Democrats in this situation,
21  so I'm not sure.  Let me tell you what I'm taking from
22  this --
23     A    Mm-hm.
24     Q    -- and you tell me what I'm getting wrong
25  about it.

1  happens to be Democrats.  It doesn't matter if -- it
2  could be Republicans.  Whoever, whoever the -- it
3  doesn't matter who the party is.  The point is, is that
4  one party is in control and everyone else is unable to
5  raise money unless they have -- unless they're a
6  millionaire or billionaire.  Unless they're wealthy,
7  they can't do anything.
8        So essentially there's no way for my
9  voice to be heard, because no candidate can, can
10  campaign because unless they're, unless they're
11  wealthy.  That's, that's not, that's not -- that's
12  unconstitutional, it's not American, it's bad.  I'm
13  sure everyone would agree on that.
14     Q    Just so you know, the Supreme Court doesn't
15  agree.
16        But, so do you consider having $300,000
17  to throw at your campaign to be having money?
18     A    If the -- if she -- now, again you're saying
19  this candidate.  I'm not -- this isn't just about this
20  candidate.  This is about all candidates running for
21  office.
22     Q    That wasn't my question though.
23     A    I didn't join the lawsuit just for --
24     Q    Wait, wait.  Answer my question.
25     A    Well, what is your question again?

1     A    Right.
2     Q    It sounds like you're saying Democrats
3  control city government, elective city government
4  positions.
5     A    Right.  That's correct.
6     Q    Okay.
7     A    Yeah.
8     Q    And the problem that you have with the
9  fundraising rule is that it benefits Democrats.
10     A    It benefits one party over, over all others.
11     Q    That party being Democrats, right?
12     A    Yeah.  If it was Republicans, it'd be the
13  same thing.  If it was solely controlled by
14  Republicans, that would be bad.  I'm, I'm against one
15  party solely controlling any government.
16     Q    And but I, I -- the next step for me, and my
17  question is, how does the one-year fundraising-window
18  rule benefit Democrats in --
19     A    It benefits --
20     Q    -- city council -- wait, let me -- in city
21  council races?
22     A    It benefits the controlling party.
23     Q    Wait.  How does it benefit Democrats?  That's
24  my question.
25     A    It benefits the controlling party, which

1        MR. HICKS:  Can you read it back?
2     Q    Do you consider $300,000 -- I'll just say it.
3  Do you consider $300,000 to have available for the
4  Virden -- Ms. Virden has for her campaign, do you
5  consider that to be the kind of money you're concerned
6  about people being able to spend outside the
7  fundraising window?
8     A    That -- it's a start.  That's a start, but
9  it's not -- that's not nearly enough.
10     Q    Okay.  I'm going to come back to this.  It's
11  a little unclear to me, but I'll come back to it.
12  Okay.  Let's look at the third sentence in paragraph 3
13  of Exhibit 6.
14     A    Okay.  Third sentence.
15     Q    It's the one that begins, "I want Virden to
16  be able to."
17     A    Yeah.  "I want Virden to be able to raise
18  funds for her campaign immediately" --
19     Q    Yeah.
20     A    -- "without waiting for arbitrary date set by
21  the city council" -- "by the city."
22     Q    Right.
23     A    Do you want me to keep reading?
24     Q    No.  I didn't even want you to read at all.
25     A    Okay.

Q   So you use there the term "arbitrary date."

A   Yes.

Q   What do you mean by arbitrary?

A   Arbitrary is a date without meaning, that has no meaning.

Q   Okay.  And how do you consider that date of one year before to have no meaning?  It has legal meaning.  It says you can't do it, right?

A   Right.  Arbitrary in a sense that you set a date without a reason for setting that specific date. Okay?  In other words, if, if you were getting married, okay, and we, we chose September because you -- and we're going to get married in Hawaii, you love the weather in Hawaii in September, that would have a meaning.  There's a reason why you chose that date.
         There's no -- as far as I'm aware, there's no reason why there's a one-year blackout in raising funds.  That's an arbitrary date.  There's no reason for setting that date.

Q   Can you think of any date that wouldn't be arbitrary in terms of a blackout period?

A   It would just -- you have to give me a reason.  I mean --

Q   No.  Can you think of a date?

A   I possibly could, but I'm not advocating for

Page 45

any blackout period, so why would I do that?

Q   So what would you take into account if you were picking a date and not making it arbitrary?

A   Well, I'm not arguing for anybody.

Q   No.  That's not my question.

A   Well, I'm not going to, I'm not going to --

Q   You need to answer my question.

A   Well, I'm not going to pick a date.  I would, I would --

Q   What would you take into account in picking a date is what I said.

A   I haven't -- I'd have to give it some thought.  I haven't --

Q   Well, give it some thought now and then answer the question.

A   Well, I'm not advocating for --

Q   I'm not asking what you're advocating for. I'm asking --

A   Well, it would require, it would require more thought.  It would require careful thought and study, and we -- I don't have time to do that right now. That's my answer.

Q   So you don't know.

A   I don't agree with any arbitrary date.

Q   That's -- do you agree with any date?

Page 46

A   Possibly.

Q   Okay.

A   It depends on --

Q   So I'm trying to -- you're opposed to an arbitrary date, but you're possibly okay with a date for the cut-off period but you don't know what that date would be and you don't know what factors to take into account.  Is that fair?

A   Well, what I'm saying is, is --

Q   Wait.  Is that fair?  If it's not fair, then you can go ahead and --

A   Well, let me rephrase my --

Q   No.  Don't rephrase.  Answer my question.

A   Well, you're rephrasing my answer.  That's not my answer.

Q   No.  I'm just saying -- if I got it wrong, that's fine.

A   You got it wrong.

Q   Okay.

A   Okay.  So what I'm saying is, is I don't believe there should be any date limiting any candidate from running for, for office.

Q   For fundraising.

A   Correct.

Q   Okay.  That gets there.  You understand,

Page 47

don't you, that the Texas Legislature has rules that prevent fundraising within certain periods of the regular session?

A   I understand the Texas Legislature meets in session every other year.

Q   Wait.  Answer my question first and then give me what you want to talk about.

A   I understand the -- you're, you're making me aware of that.  Yeah.  I understand that, and then again, the Texas Legislature only meets in session every other year.  So it's a, it's a difference -- that body of government is different than this body of government.

Q   Okay.  And what makes it different?

A   That they are in session only on, what is it, odd years?  Even years?  Do you remember?  Odd years, even years, whatever it is, and the Austin City Council is always in session.

Q   Okay.

A   The mayor and city council are always in session, always making decisions that affect the lives of people in Austin, whereas the legislature -- those rules are for the legislature.  They're not, they are not applicable to the City of Austin where the city council and the mayor are, are making decisions year

Page 48

12 (Pages 45 to 48)

1   around.
2        Q   Okay.  And so is it your sense of things that
3   it would -- if, if there is an Austin City Council
4   that's sitting and let's say half the city council
5   seats and the mayoral seat are up in the next election
6   that those -- and those people are running as
7   incumbents --
8        A   Mm-hm.
9        Q   -- that they should just be able to raise
10  funds whenever they want to, campaign funds whenever
11  they want to?
12       A   Okay.  Say it again?  Say it one more time?
13  I'm sorry.
14       Q   I may say it a little differently, but is it,
15  is it your view --
16       A   Okay.
17       Q   -- that if you have a situation where you
18  have half the city council seats up for election in two
19  years --
20       A   Mm-hm.
21       Q   -- and the mayoral seat up for election in
22  two years --
23       A   Okay.
24       Q   -- and all of the sitting council members are
25  running in those elections as an incumbent for

Page 49

1   reelection, okay?
2        A   Okay.
3        Q   Is it your view that those incumbents should
4   be able to raise funds year around without any
5   fundraising window?
6        A   So even the ones that are not up for election
7   can raise funds?
8        Q   No.  I said the ones --
9        A   Yeah.
10       Q   -- up for election.
11       A   Yes.  Anyone up for election should -- anyone
12  who's vying for an office should be able to raise
13  funds.
14       Q   Including incumbents?
15       A   Including incumbents.
16       Q   At any time?
17       A   Yes.  Now, that's the City of Austin.  I'm
18  not saying -- I'm saying the City of Austin.  I'm not
19  saying this is the case for the state legislature.  I
20  understand the law for the state legislature.  That's
21  for them.  I think the idea of the law maybe it's to
22  prevent some sort of corruption in the legislature,
23  right?  That's probably the idea of the law, but that
24  does not apply here.  The intent of the law does not
25  really apply to the City of Austin.

Page 50

1        Q   Why?
2        A   Because like I said earlier and as is stated
3   in the complaint, the legislature meets every other
4   year, whereas the City of Austin is always, always
5   meeting.
6        Q   Right.  But why is corruption, the threat of
7   corruption different?
8        A   Well, so you -- so essentially, I mean,
9   there's, there's always a threat from it, but you're
10  limiting -- you're, you're, you're -- basically in the
11  city of Austin you're saying the opposition can't
12  campaign, and the, and the incumbents can.  Just by
13  virtue of having that office they can campaign.  If you
14  can't raise money, you can't campaign.
15       Q   But as I understand it, you're saying, and
16  tell me if I'm wrong, as I understand it, you're saying
17  you understand the rationale for the legislative, state
18  legislative rule about not raising funds before a
19  session to be addressing the issue of corruption in
20  connection with contributions, correct?
21       A   Possibly.  I don't want to, I probably
22  don't -- I don't want to get into that.
23       Q   You did get into it, so I just wanted to find
24  out --
25       A   Yeah.  I shouldn't have even got into it, but

Page 51

1   anyway, the point is, is in Austin --
2        Q   Wait, wait.  So are you backing off what you
3   said about the corruption thing in the state
4   legislature?
5        A   Yeah.  I'm not sure about that.  I'd have to
6   do more research in the law, but -- and I'm not a
7   lawyer.  So, and I'm not really that interest- to me
8   I'm just saying that in Austin I think it's unfair that
9   the city council candidate or mayoral candidate cannot
10  raise funds during the period.  That's what I'm saying.
11  That's my concern.
12       Q   Okay.  Now, still in that Exhibit 6, the
13  fourth sentence, it's the one that's at the bottom of
14  the page there --
15       A   Okay.
16       Q   -- that runs over, "I also want Virden to be
17  able to."  Do you see -- well, it starts on the
18  previous page.
19       A   Yes.
20       Q   And I've asked this of everybody, because I
21  have a hard time understanding.  Tell me what your
22  point is there.
23       A   I want, that I want Jennifer Virden -- I
24  wanted Jennifer Virden to be able to establish her
25  campaign, and you have to have money to establish a

Page 52

13 (Pages 49 to 52)

1  campaign.

2      Q   Okay.

3      A   That's the point.

4      Q   All right.  So you start off saying, "I want

5  her to be able to begin building her campaign account

6  immediately," which I take to mean raising campaign

7  contribution funds, right?

8      A   Yes.

9      Q   "So that she can use funds collected closer

10  to election day when she determines necessary."  What

11  do you mean by closer to election day?

12      A   It says "now and closer to election day."  I

13  mean, maybe it's missing an "and."

14      Q   It says "use funds collected now."

15      A   "Now closer to" -- I think it's missing -- is

16  it?  This says "collected now," and it says "closer" --

17  it doesn't make any sense.  So I think, I think it's --

18      Q   Thank you.  That's what I've been trying --

19      A   I think it's missing an "and."

20      Q   So there is a correction you would make?

21      A   Yeah.  I think, I think it should be "and."

22      Q   "And" closer to election.

23      A   Yes.

24      Q   Okay.

25      A   But -- yeah.

Page 53

---

1      Q   Now look at paragraph 4 of that exhibit.

2  That's the one where you said, If I could, I'd give her

3  $400 now, correct?

4      A   Yes.

5      Q   And "now" being back in March --

6      A   Yes.

7      Q   -- of 2021.

8      A   Yes.

9      Q   Were you ready, willing, and able to do that?

10      A   Yes.

11      Q   How did you pick the amount?

12      A   I think it's the maximum amount.  I think it

13  actually turned out to be $450, but yeah, whatever the

14  maximum amount.  The previous -- the maximum amount in

15  the, in the previous campaign was $400 per person, and

16  so that's why I -- that's how I picked that amount.

17      Q   Okay.

18              (Exhibit No. 7 marked.)

19      Q   I'd ask you to take a look at the exhibit in

20  front of you, which is Exhibit 7.

21      A   Yes.

22      Q   And to make certain, from Jennifer Virden's

23  Campaign Finance Report dated October 7, 2020 in

24  connection with her general election race for Council

25  District 10?

Page 54

---

1      A   Okay.  Yeah.

2      Q   Right?

3      A   Yeah.

4      Q   Look at the last page in the second box.

5      A   Okay.

6      Q   It shows that on August 31st of 2020 you

7  contributed $200 to her campaign; is that correct?

8      A   Yeah.  I guess it does.  Okay.  Yeah.  That

9  was the only contribution.  That is correct.

10      Q   And I'm sorry that this may be repetitive of

11  some of your answers --

12      A   Mm-hm.

13      Q   -- to the interrogatories, but I didn't get

14  those in time to fully integrate them, wherever they

15  were.  Hold on a second.  Okay.  Let's look at...

16              (Exhibit No. 8 marked.)

17      Q   I'd ask you to take a look at Exhibit 8.

18      A   Okay.

19      Q   It's an excerpt from Jennifer Virden's

20  Campaign Finance Report dated December 8th, 2020.  This

21  is in connection with the runoff election for Council

22  District 10.  Do you see that?

23      A   Yeah.  Another contribution.

24      Q   Third page -- I mean the last page, third box

25  shows you contributed $400 November 5th, 2020 to that

Page 55

---

1  campaign, right?

2      A   Yes.  That's what it says.

3      Q   And that's correct, right?

4      A   I assume it is.

5              (Exhibit No. 9 marked.)

6      Q   I'd ask you to look at Exhibit 9, excerpt

7  from the Campaign Finance Report for Virden dated

8  January 4, 2021 [sic] submitted in connection with her

9  mayoral race in 2022.  Do you see that?

10      A   Yes.

11      Q   Turn to the last page, second box.

12      A   Yes.

13      Q   It shows that on November 8, 2021 you

14  contributed $400 to that campaign, is that correct, as

15  far as you recall?

16      A   I believe that's right.

17      Q   And you understand that you could have

18  contributed $50 more to that campaign somewhere between

19  the time you first contributed and the end of the

20  campaign, right?

21      A   Yeah.  I think I -- did I do that?  I don't

22  remember if I did or not.

23      Q   You don't recall doing it, do you?

24      A   It's only $50, so I didn't think, I didn't

25  think it was going to help, but yeah, I mean, yeah, I

Page 56

14 (Pages 53 to 56)

**Page 57**

```
1  guess that's it.  Yeah.
2            (Exhibit No. 10 marked.)
3     Q    I'd ask you to take a look at Exhibit 10.
4     A    Mm-hm.
5     Q    It's another Campaign Finance Report excerpt
6  dated January 15, 2021 in connection with the runoff
7  race for District 10 for Virden.
8     A    Uh-huh.
9     Q    You see that?  Turn to the last page, which
10 is the second page I think.  Shows that on December 23,
11 2020 the campaign paid you $2,000.  Do you see that?
12    A    Yeah.  Okay.
13    Q    Is there any reason to question that?
14    A    I think that -- yeah.  That sounds right.  I
15 mean, I didn't ask for it, but basically it was a
16 compensation for all of my work I guess.
17    Q    What did you do as volunteer coordinator?
18    A    Everything.  Basically -- I mean, I put that,
19 I put it into my statement earlier.
20    Q    I just haven't had a chance to digest that
21 yet, so --
22    A    Essentially --
23    Q    The way you described it in your
24 interrogatories, which is Exhibit -- interrogatory
25 responses, which is Exhibit 2, right?  Whatever you
```

**Page 58**

```
1  said in those interrogatories?
2     A    Yes.  Whatever I said in the interrogatories.
3  Yeah.
4     Q    Okay.  All right.  Let's go back to
5  Exhibit 4.
6     A    Yes.
7     Q    Turn to paragraph 27.  Read that to yourself,
8  and then I have a question.
9     A    Go ahead.
10    Q    So how are you involved in Austin politics
11 today?
12    A    Today I -- we just had, we just had an
13 election where, where my candidate Jennifer Virden lost
14 in the election.  So right now we don't have -- we have
15 no -- there's no candidates, there's no other
16 candidates right now.  I mean, there's no election
17 pending, but if there was, I would be supporting her
18 again.
19    Q    And I asked how you're involved in Austin
20 politics now.
21    A    As a, as a donor and then a participant in
22 any campaign I believe in.
23    Q    And why are you still interested in Austin
24 politics since you don't live here anymore?
25    A    Well, I knocked on, like, 4,000 doors back in
```

**Page 59**

```
1  2020, so I guess I kind of got a -- you know, I guess I
2  can't let it go.  I just, you know, I, I want what's
3  right, and, you know, so maybe my -- maybe over time my
4  interest will wane, but, you know, there's work,
5  there's work to be done and there's -- I want to, like
6  I say, I want all people, all parties to be
7  represented.  I want, you know -- what's good for
8  Austin is good for Texas, and what's good for Texas is
9  good for me.
10    Q    How big is Spring, Texas roughly?
11    A    The population?
12    Q    Population.  Yeah.
13    A    I don't know.  I would have to estimate a
14 hundred thousand, maybe right -- maybe -- oh, that's
15 probably about 200,000.
16    Q    Are you active in any way, contributions,
17 volunteer work, whatever, just paying attention, in
18 Spring County?
19    A    No.
20    Q    Spring, I'm sorry, Spring, Texas --
21    A    Montgomery County?
22    Q    -- politics?
23    A    No.  Not really.
24    Q    What about Montgomery County?
25    A    No.  Not really.  I donate money though.
```

**Page 60**

```
1     Q    You don't have money what?
2     A    I donated money to -- I can tell you who I
3  donated to this last election.
4     Q    Why don't you do that.
5     A    Dan Crenshaw for the second congressional
6  district in Texas.  Who else.  Oh, I also -- this is
7  interesting.  So this -- all right.  I donated to a
8  county judge for Harris County.  Even though I don't
9  live in Harris County, I donated to Alex, Alex Mealer
10 for county -- for Harris County judge.
11    Q    He was a Republican nominee?
12    A    She.
13    Q    She.
14    A    She, she -- I always, I always -- I've only
15 donated money to women candidates, I don't know why,
16 but anyway, yeah.  They're probably more reasonable
17 than men, right?
18    Q    Yeah.
19    A    So anyway --
20    Q    I didn't know Mr. Crenshaw was a female,
21 but --
22    A    No.  Well, yeah, other than him.  Yeah.
23    Q    Okay.
24    A    Nothing wrong with that, but anyway --
25    Q    Oh?
```

15 (Pages 57 to 60)

**Page 61**

1    A    No.  I mean, well, I mean her, Alex Mealer,
2  yeah.
3    Q    Okay.
4    A    Might get him more votes, who knows.  But
5  anyway, yeah.  So that's -- those are the two that I
6  can think of where I gave them some money.  Who else.
7  Oh, Governor Greg Abbott, gave him money.  So, yeah,
8  all the Republican candidates that I found relevant.
9    Q    Well, then who else did you --
10    A    Greg Abbott for governor, Dan Crenshaw from
11  the 2nd congressional district, Chris (indiscernible),
12  and Alex Mealer for Harris County judge.  And then the
13  only other -- those, those are the only -- there may be
14  some other congressional candidates even outside of
15  Texas, but I don't -- I can't think of who they are
16  right now.  I know, I know that in 2020 I gave to at
17  least 10, 8 or 10 candidates.
18    Q    So when did you give your money to Dan
19  Crenshaw, how far before the election?
20    A    Way -- I think, I mean, as soon as I knew
21  about it.  So probably way back in the primary period,
22  early, or early on, because I was worried about the
23  far, far-right candidate.  He had some opposition from
24  the far right, and so I was worried about that.
25    Q    Okay.

**Page 62**

1    A    So early on.
2    Q    And what about the Republican candidate for
3  county judge in Harris County, what's the timing on
4  that contribution?
5    A    Early on as well, very early on.  As soon as,
6  as soon as I became aware of it.
7    Q    In the primary then?
8    A    I think -- yes.  In the primary, definitely
9  in the primary.  The big concern is, there's -- both
10  parties are controlled by extremists, okay?  And the
11  far-right and the far-left people, they control
12  the -- essentially they control the primary.  They're
13  the ones that turn out.  People that are extreme turn
14  out, and that's what I'm worried about.  So we have to
15  get the centrist candidates, people that are
16  reasonable.  We need -- they need support.  That's why
17  I was contributing in the primary process.
18    Q    Do you -- have you been in touch with
19  Ms. Virden since the election?
20    A    Yeah.  Just via a text message or so here and
21  there.  He's got all that, or should.
22    Q    Okay.  And --
23    A    She's out of town -- yeah.  I was going to
24  see her this week, today, but she's out of town.
25    Q    Has she confided in you whether she plans to

**Page 63**

1  run again for Austin city office?
2    A    No, she hasn't.  We haven't discussed it yet.
3    Q    If she does, do you plan to make a campaign
4  contribution to her?
5    A    Probably.
6    Q    Why do you say probably?
7    A    I mean, I would say -- yeah.  I would just
8  say yes.  Let's just say yes.
9    Q    Well, no.  I mean, say what the truth is.
10    A    Well, unless her views, unless her views
11  change fundamentally and she, and she becomes a
12  communist or she becomes, you know, either far -- you
13  know, if her views dev- deviate in what they are now,
14  either too far right or too far left, I won't support
15  her.  But if her views are the same as they are now, I
16  will continue to support her, you know?  This will
17  probably be her last chance, you know, her third time.
18  Three strikes, you're out, so...
19    Q    Are you willing to give any campaign
20  contributions in case she has campaign debt she needs
21  to pay off?
22    A    Yeah.  Probably.  I mean, I don't know.  I'd
23  have to think about that, but possibly.
24    Q    Do you, do you intend to make any
25  contribution to -- contributions, rather, to any

**Page 64**

1  candidates in Austin future elections, setting aside
2  Virden?
3    A    Yeah.
4    Q    Who?
5    A    I don't know yet.  We don't have any -- it
6  depends if we have -- if there's a candidate that I
7  agree with and that, and that -- you know, just
8  depends.  I wouldn't rule it out, no, by any means.
9    Q    So I --
10    A    I give to candidates all over the place.  I
11  give to candidates in New York, all over the country.
12    Q    Okay.  I, I may not have been paying enough
13  attention and may have missed what you said, but so I
14  want to clarify this.  You said at one point that you
15  knocked on over 4,000 doors in Austin in 2020, right?
16    A    Right.
17    Q    That was in the Virden campaign, right?
18    A    Correct.
19    Q    Is that the only political volunteer work,
20  setting aside contributions, that you've ever done?
21    A    Yes.
22    Q    And for you what's the difference in terms of
23  for you as a contributor if you give money to a
24  campaign, what's the difference between doing that and
25  putting up a yard sign, knocking on doors in support of

16 (Pages 61 to 64)

**Page 65**

1 the candidate and such?
2   A   It's a lot more work, a lot bigger
3 commitment.
4   **Q   Giving money?**
5   A   No.  Actually doing work, knocking on doors,
6 making phone calls, whatever, volunteering.  Either
7 volun- you know, working for the campaign is a lot more
8 work than giving money.
9   **Q   It's just easier.**
10   A   Sorry?
11   **Q   Giving money is easier and faster.**
12   A   It's easier if you have the money.  Yeah.
13        MR. HICKS:  Okay.  I pass the
14 witness.
15             EXAMINATION
16 BY MR. NAJVAR:
17   **Q   Mr. Clark, let me just maybe follow up on a**
18 **few, a few quick things that were discussed earlier.**
19   A   Uh-huh.  Do you want to leave (inaudible) --
20 oh.
21   **Q   So you mentioned earlier that -- well, let me**
22 **just ask you.  When you found out Jennifer Virden was**
23 **running for office again in 2022 your declaration says**
24 **you would have given her $400 but for the blackout**
25 **period back in March of 2021, right?**

**Page 66**

1   A   That's correct.
2   **Q   Why, why is it important to you to -- or why**
3 **did you desire to give the money that early before the**
4 **election day?**
5   A   So that, so that the campaign could get off
6 the ground.  It's, it's viable to raise money early.
7   **Q   And what do you mean by getting off the**
8 **ground?**
9   A   Well, you have to have supporters, you have
10 to have people out there to support -- people out there
11 that support you, and, and you have to get an early
12 start.  Just like running a race, if you get, if you
13 get a head start --
14        THE REPORTER:  Excuse me.  I'm
15 sorry.  If you could answer a little bit more central
16 so I can hear you.
17        THE WITNESS:  Okay.  Yeah.
18   A   So it's important to get a head start, and
19 you don't want to fall behind if some other candidate
20 is raising money -- if other candidates are raising
21 money and you don't have any, then you're, you're,
22 you're -- you fall behind, and you don't want to fall
23 behind.
24   **Q   And I know you said a moment ago that you're**
25 **not aware of any candidates to future Austin elections**

**Page 67**

1 that have announced already that you're aware of,
2 right?
3   A   Right.  We just had an election, so I'm not
4 aware of any yet.
5   **Q   Right.  But do you, do you continue to pay**
6 **attention to Austin politics?**
7   A   Yeah.  I continue to pay attention to Austin
8 politics and politics across the country, yeah, and,
9 yeah, so it's conceivable that I would donate to
10 another Austin candidate or candidates anywhere,
11 wherever I see the need.
12   **Q   Well, and but I just want to, you know, make**
13 **sure I'm clear that that intent continues to apply with**
14 **respect to Austin politics.**
15   A   Yeah.  It continues to apply.  I still, I
16 still have intent to contribute to Austin candidates if
17 I believe in what they believe in, and I believe we'll
18 see.  I'll leave it at that.
19   **Q   That may be all I have.  Just let me take a**
20 **quick look at my notes here.**
21        And maybe just one last question on
22 this, this statement where you added an "and" into the
23 declaration form earlier where you say you thought that
24 maybe it was a (crosstalk) --
25   A   I think it -- I, I could be wrong.

**Page 68**

1   **Q   Yeah.  Looks like --**
2   A   Looks like it to me.  It looks to me like it
3 was a grammat- an error in the, in the way the document
4 was written, that it was a typo and they left out the
5 "and."  I think that's what it is.
6   **Q   Well, let me just ask you.  So you made clear**
7 **that you believe the campaign should, should be allowed**
8 **to start raising funds as early as they want.  Is that**
9 **fair to say?**
10   A   That is correct.  I believe the campaign
11 should be able to raise funds immediately.
12   **Q   And do you think, having worked in a**
13 **campaign, do you have any thoughts on -- well, what are**
14 **the -- can you identify or explain some of the purposes**
15 **that early, money raised early can be used for, whether**
16 **it's spent or whether it's just kept in a campaign?**
17   A   Right.  So it's important, it's important for
18 a campaign to raise funds early and often, early
19 specifically so that we can, we can have a -- host
20 events, host events like, Let's meet at some restaurant
21 and have our supporters, you know, get together.
22 You've got, you've got to go to host events and host,
23 you know, and, and need to gain access to venues.  And
24 you've got to spend money, you know, to do these
25 things, and that's how you get supporters.  You have to

17 (Pages 65 to 68)

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

1   spend money for your supporters to meet and talk and
2   collaborate.  Does that answer your question?
3       Q   It does.  Thank you.
4               MR. NAJVAR:  And we'll reserve our
5   questions for trial.
6           FURTHER EXAMINATION
7   BY MR. HICKS:
8       Q   I have a couple of follow-up questions.  The
9   Exhibit 6 that's your verification, you can, you can
10  find it.  You're welcome to dig it out.  I have a
11  broader question.
12      A   Okay.  Go ahead.
13      Q   In that you don't consider this to be a
14  pledge to make that contribution to her, did you?
15      A   No.  I didn't consider it a pledge, but --
16      Q   That's all.
17      A   No.
18      Q   Okay.  Then when did you first learn of the
19  fundraising window that's reflected in Exhibit 3?
20      A   I first learned of the fundraising window
21  limitations when I, when I was discussing with Brad and
22  Jennifer her running for mayor.
23      Q   When was that?
24      A   Shortly -- I would say early in 2021, early
25  in 2021, maybe a few months after we lost the city

Page 69

1   council runoff.  Sometime in 2021.  I don't know
2   exactly when, but when I found out about it I'm, like,
3   "What?  That isn't right."  So, "So what do we do?"
4   "Well, we can file this lawsuit."  So that's what we
5   did.
6       Q   But you didn't know about the fundraising
7   rule when Ms. Virden was running for the District 10
8   seat in 2020, correct?
9       A   Well, because in that case --
10      Q   Wait, wait, that's not my question.
11      A   I wasn't aware -- it didn't -- it wasn't
12  applicable there, because she didn't start running
13  until August.
14      Q   And she did a good job fundraising, right, in
15  that race?
16      A   Yeah.  She out- she outraised her opponent.
17              MR. HICKS:  I have no further
18  question.
19              MR. NAJVAR:  And before you --
20  maybe we caveat that, because I sent you a link to the
21  photos.  I don't think -- you might want to look at
22  those.
23              MR. HICKS:  Let's go off the record
24  for just a second to see.
25              (At 12:55 the proceedings went off

Page 70

1   the record, continuing at 1:00.)
2       Q   (By Mr. Hicks)  Mr. Clark, I've looked
3   through the text -- quickly through the texted -- I
4   mean the email texts that you had provided in this
5   document production.
6       A   Yes, sir.
7       Q   Is Janet your wife?
8       A   Correct.  Janet is my wife.
9       Q   Okay.  And I note June 20th, 2022 -- well,
10  June 20th Ms. Virden asked if you would hit your wife
11  up for $400, do you recall doing that, for a
12  contribution?
13      A   Yeah.  My wife wasn't in a good mood, so I
14  didn't ask her.
15      Q   Okay.  Do you -- was that in 2022?
16      A   Yeah.  It was recently.  Yeah.
17      Q   And then somewhere in here there's, there's a
18  couple of texts about asking whether there'd be a brief
19  endorsement video or statement done for her.  Was that
20  directed at asking you to do it?
21      A   Yeah, yeah.  I offered to do that, and
22  then -- but then they told -- Brad told me I didn't
23  need to do it because they already had so many videos
24  they didn't need any more.
25      Q   Do you recall when that happened?

Page 71

1       A   Well, I'd say probably within a week or two
2   after the, after the request that I was going to do it,
3   and then they told me, "No, don't bother.  We already
4   have plenty of videos."  So they didn't need it
5   anymore.
6               MR. HICKS:  Okay.  I have no
7   further questions.
8               MR. NAJVAR:  And we looked -- just
9   for the record, we discussed this.  You know, your
10  request for production of course pertains to all
11  communications, but in his email I understand that he's
12  got, like, the blast emails that Jennifer sent out in
13  her campaign, but in terms of -- so if you want those,
14  he can produce those --
15              THE WITNESS:  Yeah.
16              MR. NAJVAR:  -- but, like, if you
17  wanted to --
18              MR. HICKS:  What you've already
19  provided?
20              THE REPORTER:  We're still on?
21              MR. NAJVAR:  Yeah.  I'm just asking
22  if you -- in the interest of complete transparency
23  or -- you know, if you already have those lists of the
24  blast emails.  I'm just saying your RFP technically
25  asked for his communications with Jennifer Virden, and

Page 72

18 (Pages 69 to 72)

1  if those are responsive to your request, then he has
2  those in his email also.
3      Q   (By Mr. Hicks)  Let's do it this way --
4      A   I have those.  I think there was one -- I
5  think one of those blast emails I responded to, and I
6  got back, like, a responsive thank you.  So I mean, you
7  can look at it, I can show you right now, but I mean,
8  you can see what's there.  But I'm just saying we want
9  to be fully transparent.
10     Q   No.  I think I know how we can handle this.
11  Let's look at Deposition Exhibit -- it's good we did
12  this.
13     A   You missed one.
14     Q   Yeah.
15              (Exhibit No. 11 marked.)
16     Q   I'll ask you it's to look at Deposition
17  Exhibit 11.  Let me tell you what it is.  Basically
18  it's Jennifer Virden's responses to first set of
19  interrogatories to her.  This is supplemental, excuse
20  me, supplemental responses.  Go back to --
21     A   So these are Jennifer Virden --
22     Q   Hold on a second.  Go back to page 10.
23     A   Okay.
24     Q   I'm sorry.  Page 4.
25     A   I don't think I ever saw this before, so --

Page 73

1  to show support for the campaign, but that's it.  I
2  mean, and then some of the Facebook posts, but I don't
3  read everything, you know.
4      Q   You read some of them.
5      A   Yeah.  I'm sure I did some of them.
6      Q   Okay.  And so as I understand it, this set of
7  documents that Mr. Najvar was talking about a few
8  minutes ago that you have that I could look at in a
9  sense of completeness are the same set of documents as
10  this; is that correct?
11     A   That is correct.
12     Q   Okay.  No more questions, and I don't need
13  them.
14     A   Well, I was trying to explain there's one,
15  there was one email, one of those, those communications
16  where I responded saying something, but I don't
17  remember what I said, and then she responded to say
18  thank you, or somebody did.  That's all.  But you're
19  happy to look through my email to verify.  I just want
20  to make sure.
21          MR. NAJVAR:  I doubt he wants to do
22  that.


Page 75

1  to show support for the campaign, but that's it.  I
2  mean, and then some of the Facebook posts, but I don't
3  read everything, you know.
4      Q   You read some of them.
5      A   Yeah.  I'm sure I did some of them.
6      Q   Okay.  Any of -- and what about the Constant
7  Contact emails?
8      A   Yeah.  I read some of those.
9      Q   Okay.  And so as I understand it, this set of
10  documents that Mr. Najvar was talking about a few
11  minutes ago that you have that I could look at in a
12  sense of completeness are the same set of documents as
13  this; is that correct?
14     A   That is correct.
15     Q   Okay.  No more questions, and I don't need
16  them.
17     A   Well, I was trying to explain there's one,
18  there was one email, one of those, those communications
19  where I responded saying something, but I don't
20  remember what I said, and then she responded to say
21  thank you, or somebody did.  That's all.  But you're
22  happy to look through my email to verify.  I just want
23  to make sure.
24          MR. NAJVAR:  I doubt he wants to do
25  that.

Page 75

1      Q   This is to take care of this problem we have
2  here.  So look on page 4, see number 10 there that's in
3  bold?  This is directed to her, right here.
4      A   Yeah.  Okay.
5      Q   Read that to yourself, and then I'll tell you
6  my question.
7      A   "Identify" --
8      Q   Wait, you don't have to read it out.  Okay.
9      A   Okay.
10     Q   Okay.  So if you look at pages 4 through
11  16 --
12     A   Mm-hm.
13     Q   -- you'll see, and you're welcome to look
14  through it as closely as you want, you'll see that
15  what's included there are Constant Contact emails that
16  were sent out in connection with the campaign, Facebook
17  postings in connection with the campaign, and tweets in
18  connection with the campaign.
19     A   Mm-hm.
20     Q   Are the documents -- did you review those?
21     A   No.  I've never seen this before.
22     Q   No.  I don't mean that set of documents.  I
23  mean the communications that are her, basically her
24  social media --
25     A   Well, I re-tweeted a lot of her tweets trying

Page 74

1          THE WITNESS:  I know.
2      Q   (By Mr. Hicks)  I would be unhappy to look
3  through those.
4      A   I'm just trying to, I'm just trying to be as,
5  you know, as honest as I can, you know.  That's the way
6  I operate.
7          MR. HICKS:  No further questions.
8          MR. NAJVAR:  And we'll reserve our
9  questions for trial.
10          (At 1:07 p.m. the proceedings
11  adjourned.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 76

GIVENS COURT REPORTING
6549 Fair Valley Trail, Austin, Texas 78749   (512) 301-7088   sgivens@austin.rr.com

CHANGES AND SIGNATURE

WILLIAM CLARK

November 28, 2022

PAGE   LINE   CHANGE                    REASON
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
23     _____
24     _____
25     _____

Page 77

---

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JENNIFER VIRDEN,                §
                                §
        Plaintiff,              §
                                §  CIVIL ACTION NO.
v.                              §
                                §  1:21-CV-271-RP
THE CITY OF AUSTIN,             §
                                §
        Defendant.              §

REPORTER'S CERTIFICATION OF THE
ORAL DEPOSITION OF WILLIAM CLARK
November 28, 2022

    I, Sandra S. Givens, Certified Shorthand Reporter
in and for the State of Texas, hereby certify to the
following:
    That the witness, WILLIAM CLARK, was duly sworn by
the officer and that the transcript of the oral
deposition is a true record of the testimony given by
the witness;
    That the original deposition transcript was
submitted to WILLIAM CLARK;
    That a copy of this certificate was served on all
parties and/or the witness shown herein on December 5,
2022.
    I further certify that pursuant to FRCP Rule

Page 79

---

ACKNOWLEDGMENT OF DEPONENT

    I, WILLIAM CLARK, do hereby certify that I have
read the foregoing pages and that the same is a correct
transcription of the answers given by me to the
questions therein propounded, except for the
corrections or changes in form or substance, if any,
noted in the attached Changes and Signature Page
(Errata).




                    WILLIAM CLARK


                    DATE

Page 78

---

30(f)(1) that the signature of the deponent was
requested and that the signature is to be returned
within 30 days from the date of receipt of the
transcript.  If returned, the attached Changes and
Signature Page contains any changes and the reasons
therefor:
    That $432.30 is the deposition officer's charges
to the City of Austin for preparing the original
deposition transcript and any copies of exhibits;
    That the amount of time used by each party at the
deposition is as follows:
        Renea Hicks - 1 hour, 13 minutes
        Jerad Najvar - 6 minutes

    That pursuant to information given to the
deposition officer at the time said testimony was
taken, the following includes counsel for all parties
of record:
        Renea Hicks - Attorney for Defendant
        Jerad Najvar - Attorney for Plaintiff

    I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further, that I am not financially or
otherwise interested in the outcome of the action.

Page 80

---

20  (Pages 77 to 80)

```
1        Certified to by me this  5th  day of December
2    2022.
3
                       GIVENS COURT REPORTING
4                      6549 Fair Valley Trail
                       Austin, Texas 78749
5                      (512) 301-7088
6
7
8                      SANDRA S. GIVENS, CSR
                       Certification No. 5000
9    # sg-1984         Certificate Expires 1/31/24
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 81

**A**

**a.m** 1:18 24:18
**Abbott** 61:7,10
**able** 32:5 36:16
  44:6,16,17
  49:9 50:4,12
  52:17,24 53:5
  54:9 68:11
**Absolutely**
  24:16
**accept** 26:1
**access** 68:23
**account** 46:2,10
  47:8 53:5
**accountable**
  35:22
**ACKNOWLE...**
  78:1
**action** 1:5 79:5
  80:22,24
**active** 59:16
**added** 67:22
**address** 30:18
**addressing**
  51:19
**adjacent** 7:18
**adjourned** 76:11
**advantage** 39:7
**advocating**
  35:24 45:25
  46:16,17
**affairs** 10:1
**affect** 48:21
**agenda** 28:9,10
  40:11
**ago** 5:11 66:24
  75:11
**agree** 28:11
  41:17 43:13,15
  46:24,25 64:7
**ahead** 6:10
  11:19 38:1
  47:11 58:9
  69:12
**air** 37:14
**Alex** 60:9,9 61:1
  61:12

**Alison** 10:21
  37:11
**allow** 22:14
**allowed** 21:24
  21:25 68:7
**Alter** 10:21
  37:12
**amend** 25:18
**Amended** 3:19
  3:20 30:4
**Amendment**
  39:23,24
**American** 43:12
**amount** 54:11
  54:12,14,14,16
  80:10
**and/or** 79:23
**announced** 10:4
  17:25 31:3
  32:4,4 67:1
**answer** 11:19
  22:23 29:2,19
  29:22 31:10
  35:9 43:24
  46:7,15,22
  47:13,14,15
  48:6 66:15
  69:2
**answered** 5:12
**answers** 5:12
  6:19 55:11
  78:5
**anticipate** 18:3
  20:1
**anybody** 46:4
**anymore** 58:24
  72:5
**anyway** 33:24
  52:1 60:16,19
  60:24 61:5
**apparently**
  27:25 28:1
**appear** 5:25 6:4
**appearance**
  25:11
**Appearances**
  3:3

**appearing** 6:1
**applicable** 48:24
  70:12
**apply** 50:24,25
  67:13,15
**arbitrary** 21:17
  21:19,20 22:13
  44:20 45:1,3,4
  45:9,18,21
  46:3,24 47:5
**architect** 12:20
**arguing** 25:25
  46:4
**aside** 36:18 37:8
  64:1,20
**asked** 8:19
  26:13 27:20,23
  28:24 29:2
  32:6 34:9
  52:20 58:19
  71:10 72:25
**asking** 22:19,20
  22:21 26:10,11
  27:6,7,16 33:2
  46:17,18 71:18
  71:20 72:21
**Assistant** 2:13
**assume** 20:12
  22:11 26:2,4
  27:4 36:18
  56:4
**attached** 78:8
  80:4
**attention** 59:17
  64:13 67:6,7
**attorney** 26:22
  26:22 31:10
  32:17 33:6
  80:18,18
**attorneys** 80:22
**August** 8:13
  9:25 10:15
  55:6 70:13
**Austin** 1:2,6,21
  1:22 2:10 3:17
  7:22 8:16,16
  8:18 9:5 10:1

13:13 19:20
  20:13 21:11,23
  37:13,16,19
  38:9 39:5,12
  41:8 48:17,22
  48:24 49:3
  50:17,18,25
  51:4,11 52:1,8
  58:10,19,23
  59:8 63:1 64:1
  64:15 66:25
  67:6,7,10,14
  67:16 79:2,6
  80:8 81:4
**available** 44:3
**aware** 7:5 20:21
  20:23 26:13,14
  27:21 45:16
  48:9 62:6
  66:25 67:1,4
  70:11

**B**

**B** 3:11
**back** 6:23 9:25
  13:7 16:22
  21:11 23:15
  25:5 26:15,25
  30:7 44:1,10
  44:11 54:5
  58:4,25 61:21
  65:25 73:6,20
  73:22
**backing** 52:2
**bad** 42:14 43:12
**bars** 21:16
**base** 8:9
**based** 31:14
  41:9
**basically** 12:13
  21:24 25:1
  32:7 51:10
  57:15,18 73:17
  74:23
**began** 10:18
**begins** 44:15
**believe** 5:13
  30:13 32:2

33:23 47:21
  56:16 58:22
  67:17,17,17
  68:7,10
**Benders** 6:6
**benefit** 42:18,23
**benefited** 40:15
**benefits** 39:12
  39:12,14 42:9
  42:10,19,22,25
**big** 59:10 62:9
**bigger** 24:8 65:2
**billionaire** 43:6
**bit** 17:3 66:15
**blackout** 28:6
  33:20,23 45:17
  45:21 46:1
  65:24
**blast** 72:12,24
  73:5
**block** 30:17
**board** 26:8 27:5
  27:6,17 29:7
**body** 48:12,12
**bold** 74:3
**bolded** 30:10
**boot** 8:7
**bother** 16:18
  72:3
**bottom** 52:13
**bound** 38:12
**box** 2:10 55:4,24
  56:11
**Brad** 10:12
  33:17 69:21
  71:22
**break** 24:15
**Bremerton** 8:10
**brief** 71:18
**briefly** 5:7 31:24
**broader** 69:11
**building** 53:5

**C**

**C** 2:1
**call** 22:13
**called** 12:6,7,11
  12:13 33:23

calls 65:6
camp 8:7
campaign 6:24
    6:24 10:6,10
    10:17 13:3,9
    16:12 17:12
    18:4 21:2,14
    22:3,4,5,12,14
    23:5,10,20
    33:7,14,15
    36:13,16 43:10
    43:17 44:4,18
    49:10 51:12,13
    51:14 52:25
    53:1,5,6 54:15
    54:23 55:7,20
    56:1,7,14,18
    56:20 57:5,11
    58:22 63:3,19
    63:20 64:17,24
    65:7 66:5 68:7
    68:10,13,16,18
    72:13 74:16,17
    74:18 75:1
campaigning
    21:17
campaigns 6:25
candidacy 32:5
candidate 10:23
    14:9 16:16
    21:16 22:1,2,3
    23:15,17 24:5
    33:8 36:14
    38:6 41:7,8
    43:9,19,20
    47:21 52:9,9
    58:13 61:23
    62:2 64:6 65:1
    66:19 67:10
candidates 10:2
    13:22,24 14:15
    14:21 15:11,24
    16:1,3 21:3
    23:2 43:20
    58:15,16 60:15
    61:8,14,17
    62:15 64:1,10

64:11 66:20,25
    67:10,16
care 21:21 74:1
careful 46:20
case 31:2,15
    33:6 39:6
    50:19 63:20
    70:9
cause 1:17
caveat 70:20
central 66:15
centrist 62:15
certain 48:2
    54:22
certificate 79:22
    81:9
Certification 3:9
    79:9 81:8
Certified 79:13
    81:1
certify 78:3
    79:14,25 80:20
CFR 3:23,25 4:2
    4:3
challenge 41:7
challenging
    21:15 41:4
chance 38:16,17
    38:18 57:20
    63:17
change 7:4
    34:23 63:11
    77:5
changes 3:8 77:1
    78:7,8 80:4,5
charges 80:7
chief 12:20
chime 32:22
chose 45:12,15
Chris 61:11
citizen 11:12
citizens 21:23
    35:22
city 1:6,21 6:23
    9:15 10:16
    13:13 21:11
    25:2 35:6,25

36:2,14,16,19
    37:9,10,23
    39:20 40:9
    42:3,3,20,20
    44:21,21 48:17
    48:20,24,24
    49:3,4,18
    50:17,18,25
    51:4,11 52:9
    63:1 69:25
    79:6 80:8
city's 3:15 4:5
    6:15
Civil 1:5,23 79:5
clarify 25:16
    33:3 64:14
clarity 19:25
Clark 1:11,15
    3:5,15,22 5:1,5
    5:21 24:21
    31:19 65:17
    71:2 77:2 78:3
    78:13 79:10,16
    79:21
clear 19:3,5
    67:13 68:6
closed 9:11
closely 74:14
closer 53:9,11
    53:12,15,16,22
collaborate 69:2
collected 53:9
    53:14,16
come 9:23 44:10
    44:11
commitment
    24:8,11 65:3
communicatio...
    10:10 72:11,25
    74:23 75:18
communist
    63:12
community 7:16
company 12:6
compensation
    57:16
competition

18:10
complaint 3:19
    40:5 51:3
complete 72:22
completely
    37:17
completeness
    75:12
conceivable 67:9
concern 52:11
    62:9
concerned 23:13
    44:5
concluded 20:18
Conference 12:7
    12:11
confided 62:25
confused 41:19
congressional
    14:23 60:5
    61:11,14
Connecticut 8:6
    8:8,9
connection 18:4
    18:14 51:20
    54:24 55:21
    56:8 57:6
    74:16,17,18
consensus 40:24
consider 31:15
    43:16 44:2,3,5
    45:6 69:13,15
constant 41:20
    74:15 75:6
constituents
    28:8
Contact 74:15
    75:7
contains 80:5
continue 63:16
    67:5,7
continues 67:13
    67:15
continuing
    24:19 71:1
Contract 2:13
contribute 14:16

18:13 19:1
    23:25 30:21
    31:5 32:3,5,7
    33:25 34:7
    67:16
contributed
    18:12,19 55:7
    55:25 56:14,18
    56:19
contributing
    15:11 33:22
    62:17
contribution
    18:3,9 53:7
    55:9,23 62:4
    63:4,25 69:14
    71:12
contributions
    6:25 13:6,8,9
    13:17 14:11
    15:24,25 21:3
    51:20 59:16
    63:20,25 64:20
contributor
    64:23
control 37:19
    39:21 40:14,15
    42:3 43:4
    62:11,12
controlled 37:17
    37:18,23 42:13
    62:10
controlling
    42:15,22,25
controls 39:5,20
conversation 5:8
coordinator
    6:23 10:14,16
    33:15 57:17
copies 80:9
copy 79:22
corporation
    12:7,10
correct 6:4,7,8
    7:4 9:14 20:12
    22:6 25:2,9
    32:11,13 34:23

38:10 42:5
47:24 51:20
54:3 55:7,9
56:3,14 64:18
66:1 68:10
70:8 71:8
75:13,14 78:4
**correction** 53:20
**corrections** 78:7
**corruption**
50:22 51:6,7
51:19 52:3
**council** 6:24
9:16 10:16
13:13 21:11
35:6 36:14,19
37:9,10 40:9
40:10 42:20,21
44:21 48:17,20
48:25 49:3,4
49:18,24 52:9
54:24 55:21
70:1
**counsel** 80:16,20
**counties** 12:8,11
12:15
**country** 64:11
67:8
**county** 7:17,18
7:19,20,20
12:16 19:16,19
19:22 20:2,3,4
20:6 59:18,21
59:24 60:8,8,9
60:10,10 61:12
62:3,3
**couple** 69:8
71:18
**course** 24:3 38:7
72:10
**Court** 1:1 25:16
43:14 79:1
81:3
**Creek** 9:13
**Crenshaw** 60:5
60:20 61:10,19
**criminal** 12:16

**critical** 36:10
**criticizing** 29:9
**crosstalk** 67:24
**CSR** 1:19 81:8
**current** 6:21
**customers** 12:17
**cut-off** 47:6
**cuts** 14:18

---
### D

**D** 3:1
**Dan** 60:5 61:10
61:18
**dangerous** 39:20
**date** 25:16 28:15
44:20 45:1,4,6
45:10,10,15,18
45:19,20,24
46:3,8,11,24
46:25 47:5,5,7
47:21 78:15
80:3
**dated** 30:21
54:23 55:20
56:7 57:6
**dates** 25:14 27:2
27:2
**day** 1:18 31:5
53:10,11,12
66:4 81:1
**days** 80:3
**deadline** 21:17
21:20 22:13
23:13
**debt** 63:20
**December** 55:20
57:10 79:23
81:1
**decisions** 48:21
48:25
**declaration** 3:22
65:23 67:23
**Defendant** 1:7
1:16 2:8 79:7
80:18
**definitely** 18:5
62:8
**defunding** 11:14

**democ-** 37:16
**Democrat** 21:25
**Democratic**
13:24 37:17
38:3,6 39:4,13
39:17 40:13
**Democrats**
41:17,20 42:2
42:9,11,18,23
43:1
**Depending**
37:12
**depends** 47:3
64:6,8
**deponent** 78:1
80:1
**deposition** 1:10
1:15 3:14 5:6
5:22,25 21:8
30:3 31:20
73:11,16 79:10
79:18,20 80:7
80:9,11,15
**DeSantis** 18:13
18:23,24 19:10
**described** 57:23
**describing** 6:22
**description** 3:12
13:21
**desire** 66:3
**detail** 7:10
**details** 13:18
30:23 31:25
**determine** 23:22
**determines**
53:10
**dev-** 63:13
**develop-** 12:14
**develops** 12:14
**deviate** 63:13
**difference** 48:11
64:22,24
**different** 24:10
40:22 48:12,14
51:7
**differently**
49:14

**dig** 69:10
**digest** 57:20
**directed** 71:20
74:3
**Disclosures** 3:20
30:5
**discuss** 33:13,17
34:5
**discussed** 27:24
33:13,18 34:9
34:12 63:2
65:18 72:9
**discussing** 33:10
69:21
**discussion** 26:3
**discussions** 28:2
**distinguish**
15:10,23 16:2
**district** 1:1,1
9:16,17 10:3
13:4 14:23
36:19 37:10
54:25 55:22
57:7 60:6
61:11 70:7
79:1,1
**diversity** 41:5
**DIVISION** 1:2
79:2
**docket** 25:17
**document** 5:14
6:2,18,19
24:24 33:9
34:10,15,22,22
68:3 71:5
**documents** 5:13
74:20,22 75:10
75:12
**doing** 11:10 12:3
12:5 56:23
64:24 65:5
71:11
**donate** 59:25
67:9
**donated** 60:2,3,7
60:9,15
**donor** 58:21

**doors** 58:25
64:15,25 65:5
**doubt** 75:24
**downstairs** 5:8
**draft** 32:15
**drive** 5:10 9:13
**duly** 1:16 5:2
79:16
**duties** 6:23

---
### E

**E** 2:1,1 3:1,11
**earlier** 12:23
25:19 32:3
51:2 57:19
65:18,21 67:23
**early** 61:22,22
62:1,5,5 66:3,6
66:11 68:8,15
68:15,18,18
69:24,24
**easier** 29:17
30:11 65:9,11
65:12
**east** 6:6 7:15
**effect** 34:16
**effort** 26:5
**either** 11:8 21:3
28:23 33:6
36:14 39:2,3
63:12,14 65:6
**election** 15:25
20:5 49:5,18
49:21 50:6,10
50:11 53:10,11
53:12,22 54:24
55:21 58:13,14
58:16 60:3
61:19 62:19
66:4 67:3
**elections** 49:25
64:1 66:25
**elective** 11:25
42:3
**else's** 39:15
**email** 5:10,10
71:4 72:11
73:2 75:18,22

emails 72:12,24
  73:5 74:15
  75:7
employed 80:21
encompasses
  7:19
ended 36:20
endorsement
  71:19
entire 37:23,25
entity 12:14
Errata 78:9
error 68:3
essentially 12:10
  12:20 21:16
  27:8 36:13
  41:6,14 43:8
  51:8 57:22
  62:12
establish 52:24
  52:25
estimate 59:13
events 68:20,20
  68:22
everybody 14:22
  38:1,24 52:20
exact 34:11
exactly 20:10
  29:25 33:8
  70:2
Examination
  3:6,6,7 5:3
  65:15 69:6
example 12:17
excerpt 3:23,25
  4:2,3 55:19
  56:6 57:5
exclusively
  13:23 14:5
excuse 66:14
  73:19
exhibit 3:13,15
  3:17,18,20,21
  3:23,24 4:1,3,4
  5:22 6:9,13 7:3
  21:6,8 24:19
  24:22 30:1,3

31:18,20,20
  34:23 35:1
  40:2,2 44:13
  52:12 54:1,18
  54:19,20 55:16
  55:17 56:5,6
  57:2,3,24,25
  58:5 69:9,19
  73:11,15,17
exhibits 3:4 80:9
exist 41:18
Expires 81:9
explain 68:14
  75:17
extreme 62:13
extremists 62:10

        F
Facebook 74:16
  75:2
fact 28:5
factors 47:7
facts 31:1,13,14
fair 20:12 47:8
  47:10,10 68:9
  81:4
fall 66:19,22,22
far 7:21 28:14
  45:16 56:15
  61:19,23,24
  63:12,14,14
far-left 62:11
far-right 61:23
  62:11
fast 17:7 29:10
faster 65:11
FEC 16:23
federal 1:22
  14:13,14,16,20
  16:3
female 60:20
fight 17:13
figured 11:21
  16:17
file 70:4
filed 25:4,10,17
  26:16,18 27:19
  28:14

filings 26:9
filled 32:16
finance 21:14
  54:23 55:20
  56:7 57:5
financially
  80:23
find 16:25 51:23
  69:10
fine 7:13 47:17
finish 11:19,19
  15:13 19:25
  20:16 23:7
  39:2
finished 20:23
firewalls 12:21
FIRM 2:4
first 3:15,20 4:5
  4:5 5:2 6:16,18
  8:7 11:4 20:5
  23:16 25:11
  26:5,16 29:13
  30:4,9 35:13
  48:6 56:19
  69:18,20 73:18
fiscal 35:21,24
floor 1:21
flushed 41:13
focus 13:15
follow 33:1,3
  65:17
follow-up 69:8
following 79:15
  80:16
follows 5:2
  80:11
footing 38:24
foregoing 78:4
form 67:23 78:7
formal 25:11
former 6:21
found 61:8
  65:22 70:2
four 25:19 26:2
fourth 52:13
FRCP 79:25
free 40:10

front 6:13 24:22
  30:2 31:19
  35:3 54:20
frontrunner
  19:4
fully 55:14 73:9
fundamentally
  63:11
fundraise 39:10
fundraising
  36:5 41:3 42:9
  44:7 47:23
  48:2 50:5
  69:19,20 70:6
  70:14
fundraising-w...
  42:17
funds 22:5,9,24
  28:6 38:25
  39:3 44:18
  45:18 49:10,10
  50:4,7,13
  51:18 52:10
  53:7,9,14 68:8
  68:11,18
further 3:7
  30:11 38:20
  69:6 70:17
  72:7 76:7
  79:25 80:20,23
future 64:1
  66:25

        G
gain 68:23
general 15:25
  54:24
generally 23:2
gentleman 32:17
getting 41:19,24
  45:11 66:7
give 13:24 14:2
  15:3 16:2,13
  16:14 17:14
  19:11,13 28:25
  29:5 45:22
  46:12,14 48:6
  54:2 61:18

63:19 64:10,11
  64:23 66:3
given 14:10
  16:21 65:24
  78:5 79:18
  80:14
Givens 1:19
  79:13 81:3,8
gives 6:21
giving 15:5,15
  15:17 16:18
  24:7 29:18
  65:4,8,11
go 6:10 7:10
  11:19 16:22
  22:16 23:18
  30:23 31:24
  47:11 58:4,9
  59:2 68:22
  69:12 70:23
  73:20,22
going 13:17 19:7
  19:7 20:1 21:7
  22:15,15 23:15
  29:23 38:2,3
  41:13 44:10
  45:13 46:6,6,8
  56:25 62:23
  72:2
good 59:7,8,8,9
  70:14 71:13
  73:11
gotten 32:20
  33:5
government
  12:7,10 35:22
  35:25 36:2,16
  37:23 39:21
  40:24 42:3,3
  42:15 48:12,13
governor 18:24
  61:7,10
grammat- 68:3
Great 8:7
greater 7:10
Greg 61:7,10
Groton 8:9

**ground** 66:6,8
**grow** 15:9
**guess** 12:19
   17:13 27:20
   28:23,23,24
   55:8 57:1,16
   59:1,1
**guessing** 17:24

**H**

**H** 1:11,15 3:5,11
   5:1,18
**hack** 12:24
**hacked** 12:24
**hacking** 12:22
**Haley** 18:12,14
   19:6,10,12
**half** 7:23,24
   49:4,18
**Hall** 1:21
**handle** 73:10
**handling** 26:23
**happened** 71:25
**happening**
   11:13
**happens** 43:1
**happy** 11:15
   75:22
**Harbor** 8:12
**hard** 15:14 17:4
   20:16 29:14
   52:21
**Harris** 7:18,20
   60:8,9,10
   61:12 62:3
**hate** 24:14
**Hawaii** 8:11,11
   8:12,15 45:13
   45:14
**head** 66:13,18
**heading** 30:4
**hear** 12:9 36:1
   66:16
**heard** 43:9
**help** 56:25
**Hicks** 2:9,9 3:6
   3:7 5:4 24:16
   24:21 25:22,25

33:10 44:1
65:13 69:7
70:17,23 71:2
72:6,18 73:3
76:2,7 80:12
80:18
**hit** 71:10
**Hold** 55:15
   73:22
**home** 10:3
**homeless** 11:14
**honest** 76:5
**host** 68:19,20,22
   68:22
**hosting** 12:21
   13:1
**hour** 80:12
**hours** 7:23,24
**house** 9:10
   10:13
**Houston** 2:5
   7:17 8:5
**Hudson** 5:19,21
**hundred** 59:14
**hypothetical**
   22:19,21

**I**

**idea** 50:21,23
**identify** 68:14
   74:7
**Identifying** 6:24
**Illinois** 8:8
**immediately**
   26:14 31:4
   44:18 53:6
   68:11
**imperative** 36:4
   36:8,9,17
**important** 66:2
   66:18 68:17,17
**inaudible** 65:19
**included** 74:15
**includes** 80:16
**Including** 50:14
   50:15
**increased** 15:18
**incumbent**

10:21 11:4
28:7 36:11,11
36:23 37:1,2,5
37:11,16,20
39:6 40:9
49:25
**incumbents** 49:7
   50:3,14,15
   51:12
**indiscernible**
   8:21 61:11
**information**
   80:14
**infrastructure**
   37:25
**initial** 3:20 25:5
   30:4
**initially** 11:22
**inside** 7:16
**instance** 1:16
**integrate** 55:14
**intend** 21:2
   63:24
**intent** 27:12,13
   27:13 30:20
   50:24 67:13,16
**intentionally**
   37:15
**interest** 59:4
   72:22
**interest-** 52:7
**interested** 23:24
   23:24 24:1
   58:23 80:24
**interesting** 60:7
**interrogatories**
   3:16 4:5 5:11
   6:16 55:13
   57:24 58:1,2
   73:19
**interrogatory**
   57:24
**interrupt** 29:8
**involved** 34:3
   58:10,19
**issue** 33:19
   51:19

**it'd** 42:12

**J**

**Janet** 71:7,8
**January** 9:8
   20:4 56:8 57:6
**Jennifer** 1:3
   3:23,25 4:2,3,5
   6:25 9:20
   10:12 11:4,7
   13:8 22:2 28:5
   29:2 31:3 35:6
   36:13 52:23,24
   54:22 55:19
   58:13 65:22
   69:22 72:12,25
   73:18,21 79:3
**Jennifer's** 26:22
**Jerad** 2:4 5:7
   80:12,18
**jerad@najvar...**
   2:6
**job** 70:14
**John** 16:8
**join** 26:5,20
   28:24 43:23
**joined** 25:8 32:1
   32:6,9
**judge** 60:8,10
   61:12 62:3
**jump** 29:3
**jumped** 26:14
**June** 71:9,10
**justice** 12:16

**K**

**keep** 41:4,4
   44:23
**keeping** 29:15
**kept** 23:12 68:16
**kidding** 17:10
**kind** 11:11,21
   15:1 17:3 44:5
   59:1
**knew** 24:2,2
   26:17,19 38:1
   38:7 61:20
**knocked** 58:25

64:15
**knocking** 64:25
   65:5
**know** 5:9 8:20
   8:22 9:1,20,23
   11:8,22,23
   12:22 14:24
   16:5,6,8,15,17
   17:19 18:19,19
   19:25 20:10
   22:23 23:14,20
   24:6 25:17
   26:15,23 27:1
   27:3 28:3,4,7
   28:10,13,16,17
   28:19,19 29:3
   29:4,5,11,13
   31:3,9 32:19
   32:21 35:5
   37:3,4 38:19
   41:13 43:14
   46:23 47:6,7
   59:1,2,3,4,7,13
   60:15,20 61:16
   61:16 63:12,13
   63:16,17,22
   64:5,7 65:7
   66:24 67:12
   68:21,23,24
   70:1,6 72:9,23
   73:10 75:3
   76:1,5,5
**knowledge**
   30:25 31:1,13
**knows** 16:22
   61:4

**L**

**Lakes** 8:8
**Landing** 6:6
**laughing** 24:17
**Laura** 2:12
**law** 2:4,9 33:20
   33:20 38:21,22
   41:10 50:20,21
   50:23,24 52:6
**lawsuit** 25:2,5,8
   25:11 26:8,11

26:12,15,19
27:5,14 28:4
28:14,20,22
29:1,4 32:2,6,9
32:13 43:23
70:4
**lawyer** 26:5 52:7
**lawyers** 28:16
**learn** 28:21
69:18
**learned** 69:20
**leave** 14:6 25:18
65:19 67:18
**left** 63:14 68:4
**legal** 2:13 45:7
**legislative** 51:17
51:18
**legislature** 40:8
48:1,4,10,22
48:23 50:19,20
50:22 51:3
52:4
**let's** 5:22 14:17
14:18 15:22
16:11,11 22:11
26:2,4 27:4
29:19 34:25
36:18,18 44:12
49:4 55:15
58:4 63:8
68:20 70:23
73:3,11
**level** 14:14,16
24:10
**levels** 14:13
**Libertarian**
14:2
**limitations**
69:21
**limiting** 47:21
51:10
**LINE** 77:5
**link** 70:20
**lists** 72:23
**little** 5:8 7:24
17:4 44:11
49:14 66:15

**live** 7:21 8:1
58:24 60:9
**lived** 8:5,6,7,17
9:4 10:3 19:19
**lives** 48:21
**living** 12:4
**lnorton@austin...**
2:14
**loan** 22:12
**loaned** 23:4,9
**local** 12:6,9,10
14:12
**long** 5:9 8:4
**look** 5:22,24
6:11,12,13
16:23 21:7
24:22 34:25
35:13,13 39:24
44:12 54:1,19
55:4,15,17
56:6 57:3
67:20 70:21
73:7,11,16
74:2,10,13
75:11,22 76:2
**looked** 10:6 71:2
72:8
**looking** 10:1,2,2
40:2,3,4
**looks** 7:1 68:1,2
68:2
**Loop** 2:5
**lose** 38:12
**lost** 58:13 69:25
**lot** 22:8 23:25
41:8,11 65:2,2
65:7 74:25
**love** 45:13
**low** 35:21

**M**
**machine** 1:20
**maintains** 12:14
**majoritarian**
41:1
**majority** 41:2
**making** 17:4
18:3,9 22:17

46:3 48:8,21
48:25 65:6
**manage** 12:21
**manager** 10:10
**manager/field**
33:14
**managing** 13:1
**March** 9:11 25:5
30:21 32:2,3
34:1,7 54:5
65:25
**marked** 6:9 21:6
21:8 24:20
30:1,2 31:18
31:20 54:18
55:16 56:5
57:2 73:15
**married** 45:11
45:13
**matches** 28:9
**matter** 11:6 25:5
26:9 35:11
40:16 43:1,3
**matters** 39:15
39:16
**MAX** 2:9
**maximum** 54:12
54:14,14
**mayor** 13:13
31:4 35:7
36:14,20 40:9
48:20,25 69:22
**mayor's** 37:6
**mayoral** 20:13
20:14,18 21:3
23:5,10 49:5
49:21 52:9
56:9
**McCain** 16:8
**Mealer** 60:9
61:1,12
**mean** 6:3 7:13
11:2 14:22,23
15:3,7,8 18:11
24:7 26:21,21
27:12,25 28:1
28:2 30:22

32:10 33:7
36:7 39:18
40:19 45:3,23
51:8 53:6,11
53:13 55:24
56:25 57:15,18
58:16 61:1,1
61:20 63:7,9
63:22 66:7
71:4 73:6,7
74:22,23 75:2
**meaning** 45:4,5
45:7,8,15
**means** 36:10
64:8
**media** 74:24
**meet** 68:20 69:1
**meeting** 51:5
**meets** 40:9 48:4
48:10 51:3
**members** 39:4
40:10 49:24
**men** 60:17
**mention** 35:18
**mentioned**
18:23 27:24
65:21
**message** 28:8
36:11 62:20
**messages** 40:11
**met** 10:12,12,13
**method** 1:20
**millionaire** 43:6
**minutes** 5:9
75:11 80:12,12
**missed** 64:13
73:13
**missing** 53:13
53:15,19
**Mm-hm** 5:23
18:25 21:13
24:23 30:19
39:11 41:23
49:8,20 55:12
57:4 74:12,19
**moment** 66:24
**money** 14:16

15:8,8 16:2,13
16:18,19 18:17
22:4,8,25
23:16,19,20,23
24:7,8 29:5
33:19 38:21,22
41:9,9,11,12
41:18 43:5,17
44:5 51:14
52:25 59:25
60:1,2,15 61:6
61:7,18 64:23
65:4,8,11,12
66:3,6,20,21
68:15,24 69:1
**Montgomery**
7:17,18,20
19:16,24 20:3
20:4,5 59:21
59:24
**months** 25:18,19
25:19 26:2
69:25
**mood** 71:13
**motion** 25:17
**moved** 8:16,16
19:23 20:4,8
**multiple** 40:18

**N**
**N** 2:1 3:1
**Najvar** 2:4 3:6
25:15,24 32:18
32:22,25 33:6
65:16 69:4
70:19 72:8,16
72:21 75:10,24
76:8 80:12,18
**name** 10:11,24
30:12,18
**NAVJAR** 2:4
**Navy** 8:5,14
**nearly** 44:9
**necessary** 53:10
**need** 6:10 24:14
32:25 33:2
34:17 38:14
40:24 46:7

62:16,16 67:11
68:23 71:23,24
72:4 75:15
**needed** 11:23
38:13
**needs** 28:7 63:20
**Negative** 12:2
**neither** 80:20
**never** 6:2,3,17
6:17 16:20
28:2,19 74:21
**New** 64:11
**Nikki** 18:12,14
19:5,12
**nomination**
16:17
**nominee** 15:1
60:11
**nonresponsive**
29:18
**north** 2:5 7:17
**Norton** 2:12
**note** 71:9
**noted** 78:8
**notes** 67:20
**Notice** 3:14 5:25
**November** 1:12
1:18 7:25 8:14
20:6,19 21:17
34:1,7 38:22
55:25 56:13
77:3 79:11
**number** 6:22
40:3 74:2
**numbered** 1:17

———————
**O**
———————
**obviously** 29:5
37:16,18
**October** 8:1,15
8:17 9:4 21:12
30:8 54:23
**odd** 48:16,16
**odds** 38:19
**offered** 71:21
**office** 2:9 10:5
11:25 16:3
18:21 22:2

36:12 38:2
41:7,8 43:21
47:22 50:12
51:13 63:1
65:23
**officer** 79:17
80:15
**officer's** 80:7
**offices** 12:12
**official** 10:11
**oh** 12:19 13:12
24:2 59:14
60:6,25 61:7
65:20
**okay** 5:18,20 6:5
6:20 7:1,2,14
7:25 8:4,20,21
8:25 9:3,9,12
9:20 10:19,25
11:16 12:25
13:7 14:2,11
15:19,20,23
16:1,7 17:5
18:8,23 20:9
20:11,17 21:9
21:15,21 23:8
23:12 25:8,24
26:4,19 27:7
28:4 29:19
30:9,17,23
31:11,12,17
32:24 34:2,15
34:21,25 35:2
35:11,17,18
36:18,25 38:15
40:5,7,21,23
40:25 42:6
44:10,12,14,25
45:6,11,12
47:2,5,19,20
47:25 48:14,19
49:2,12,16,23
50:1,2 52:12
52:15 53:2,24
54:17 55:1,5,8
55:15,18 57:12
58:4 60:23

61:3,25 62:10
62:22 64:12
65:13 66:17
69:12,18 71:9
71:15 72:6
73:23 74:4,8,9
74:10 75:6,9
75:15
**one-party** 40:13
**one-year** 42:17
45:17
**ones** 50:6,8
62:13
**ongoing** 18:15
18:17
**operate** 76:6
**opinion** 22:1
**opponent** 70:16
**opposed** 47:4
**opposition** 11:3
51:11 61:23
**options** 10:7
**oral** 1:10,15
79:10,17
**ordinance** 3:17
21:11,22
**original** 79:20
80:8
**out-** 70:16
**outcome** 20:21
80:24
**outraised** 70:16
**outside** 44:6
61:14
**owned** 9:10

———————
**P**
———————
**P** 2:1,1
**p.m** 1:19 24:19
76:10
**P.O** 2:10
**page** 3:12 6:18
30:9,12,12
35:3 52:14,18
55:4,24,24
56:11 57:9,10
73:22,24 74:2
77:5 78:8 80:5

**pages** 74:10 78:4
**paid** 57:11
**paint** 14:7
**paragraph**
30:10 34:25
35:13 44:12
54:1 58:7
**Parsons** 10:12
33:17 34:5
**part** 36:1 38:5
**participant**
58:21
**parties** 40:18
59:6 62:10
79:23 80:16,21
**partisan** 13:18
14:12
**parts** 7:19
**party** 14:3 35:23
37:17,19,23
38:3,7 39:5,13
39:14,17,20
40:20 42:10,11
42:15,22,25
43:3,4 80:10
**party's** 40:15
**pass** 65:13
**passed** 21:11
**pay** 63:21 67:5,7
**paying** 59:17
64:12
**Pearl** 8:12
**pending** 58:17
**people** 23:24,25
28:11 38:8,14
44:6 48:22
49:6 59:6
62:11,13,15
66:10,10
**percent** 20:25
**period** 7:25 13:7
28:6 33:23,25
45:21 46:1
47:6 52:10
61:21 65:25
**periods** 48:2

**person** 10:7,19
10:20 37:24
54:15
**personally** 9:21
**pertains** 72:10
**pertinent** 31:15
**phone** 5:8,10
65:6
**photos** 70:21
**pick** 16:11 46:8
54:11
**picked** 54:16
**picking** 46:3,10
**place** 64:10
**plaintiff** 1:4 2:3
25:12 26:11,25
27:7,9,19,22
27:25 28:3,15
28:17,19,21
29:24 30:9
79:4 80:18
**Plaintiffs'** 3:20
30:4
**plan** 17:18 63:3
**planning** 11:22
**plans** 62:25
**please** 23:7
**pledge** 69:14,15
**pledging** 24:7
**plenty** 16:18
72:4
**PLLC** 2:4
**plus** 16:19
**point** 28:24
29:13 36:25
39:16 43:3
52:1,22 53:3
64:14
**pointed** 39:19
**points** 40:22
**police** 11:14
**political** 11:11
13:4,9 35:23
40:20 41:5
64:19
**politics** 58:10,20
58:24 59:22

67:6,8,8,14
**population**
59:11,12
**position** 26:10
**positions** 42:4
**possible** 36:5
**possibly** 19:2
22:23 45:25
47:1,5 51:21
63:23
**postings** 74:17
**posts** 75:2
**preparation** 5:5
**preparing** 80:8
**president** 16:12
17:13 18:1,22
**presidential**
15:1
**presumably**
33:5
**prevent** 12:24
48:2 50:22
**prevented** 33:22
38:22 41:10
**previous** 5:16
33:15 52:18
54:14,15
**primaries** 15:3,7
16:1,4,9
**primarily** 13:18
13:20,21
**primary** 16:12
17:12,16,19
18:11 61:21
62:7,8,9,12,17
**probably** 6:15
14:20 17:21,23
19:12 50:23
51:21 59:15
60:16 61:21
63:5,6,17,22
72:1
**problem** 39:10
42:8 74:1
**procedural** 33:1
**Procedure** 1:23
**proceeding**

80:22
**proceedings**
24:18 70:25
76:10
**process** 62:17
**produce** 72:14
**produced** 1:15
**production** 71:5
72:10
**promote** 40:10
**propagate** 40:11
**property** 9:13
**propounded**
78:6
**provided** 71:4
72:19
**public** 11:25
**purposes** 26:3
68:14
**pursuant** 1:22
79:25 80:14
**put** 25:16 57:18
57:19
**putting** 64:25

—————

**Q**

**question** 15:13
15:19,21,22,22
18:18 19:25
22:21 23:7
27:16,16,18
28:25 29:21
31:6 34:4,5
35:9,16 39:2
40:12 42:17,24
43:22,24,25
46:5,7,15
47:13 48:6
57:13 58:8
67:21 69:2,11
70:10,18 74:6
**questions** 22:18
31:10,11 33:2
33:4 69:5,8
72:7 75:15
76:7,9 78:6
**quick** 24:14
65:18 67:20

**quickly** 71:3
**quote/unquote**
28:3

—————

**R**

**R** 2:1
**race** 19:2 20:14
20:18,21 23:10
36:19 37:6,9
37:10 54:24
56:9 57:7
66:12 70:15
**races** 13:14,19
14:12 42:21
**raise** 22:4 23:16
23:18,23 28:6
33:19 38:20,25
39:3 41:9 43:5
44:17 49:9
50:4,7,12
51:14 52:10
66:6 68:11,18
**raised** 68:15
**raising** 18:17
38:22 41:10
45:18 51:18
53:6 66:20,20
68:8
**ran** 16:9,9 36:22
38:2
**Ranch** 9:12
**rationale** 51:17
**re-reviewed**
5:13
**re-tweeted**
74:25
**reached** 10:5
**read** 7:11 30:9
30:10 34:17,19
35:14 44:1,24
58:7 74:5,8
75:3,4,8 78:4
**reading** 44:23
**ready** 54:9
**real** 24:14
**reality** 37:19
**really** 11:8
13:15,15 16:19

29:10 33:12,13
50:25 52:7
59:23,25
**reason** 27:2
45:10,15,17,19
45:23 57:13
77:5
**reasonable**
60:16 62:16
**reasons** 80:5
**recall** 9:15 33:8
33:10 56:15,23
71:11,25
**receipt** 80:3
**received** 28:25
**recessed** 24:19
**recognize** 6:15
6:16 24:24
31:22
**record** 25:22
29:17 31:8
70:23 71:1
72:9 79:18
80:17
**records** 16:23
16:23
**redistricting**
37:12,13
**reelection** 50:1
**reference** 41:20
**reflect** 25:23
**reflected** 69:19
**regard** 37:6
**registered** 19:14
19:19 20:3,7
20:11
**regular** 48:3
**related** 80:21
**relationship**
10:18
**relevant** 8:21
61:8
**remember** 16:5
17:20 23:7
29:25 48:16
56:22 75:20
**Renea** 2:9,9

24:14 80:12,18
**repetitive** 55:10
**rephrase** 29:21
47:12,13
**rephrasing**
47:14
**Report** 54:23
55:20 56:7
57:5
**reported** 1:20
**Reporter** 8:22
17:2,6,8 24:13
66:14 72:20
79:13
**Reporter's** 3:9
79:9
**REPORTING**
81:3
**represent** 6:14
10:3 21:10
25:10 36:15
**representation**
40:18
**represented**
28:13 38:14,16
59:7
**representing**
35:23 36:15
**Republican**
13:22 14:9,20
15:1,11,24
16:1,3,12
17:12 19:8
60:11 61:8
62:2
**Republicans**
42:12,14 43:2
**request** 72:2,10
73:1
**requested** 80:2
**require** 46:19,19
46:20
**reread** 7:8
**research** 52:6
**reserve** 69:4
76:8
**reside** 6:5

residences 6:21
respect 13:8
  67:14
respond 10:8
  11:1
responded 11:5
  73:5 75:19,20
responses 3:15
  4:5 6:15 7:3
  57:25 73:18,20
responsibility
  35:21
responsible
  35:25 36:2,16
responsive 73:1
  73:6
rest 28:11
restaurant
  68:20
restraint 35:24
returned 80:2,4
review 74:20
RFP 72:24
rhicks@renea...
  2:11
right 5:15 6:20
  7:1,12 8:4
  16:23,24 17:1
  19:9 20:19,20
  21:16 22:8,21
  25:3,13,14
  30:12 32:10
  35:4,8,15
  36:12,20 39:3
  39:19 40:17
  42:1,5,11
  44:22 45:8,9
  46:21 50:23
  51:6 53:4,7
  55:2 56:1,3,16
  56:20 57:14,25
  58:4,14,16
  59:3,14 60:7
  60:17 61:16,24
  63:14 64:15,16
  64:17 65:25
  67:2,3,5 68:17

70:3,14 73:7
  74:3
Robert 10:24
  11:7
Ron 18:13
roughly 7:22
  59:10
rule 39:10 40:15
  41:4 42:9,18
  51:18 64:8
  70:7 79:25
rules 1:22 21:14
  48:1,23
run 11:25 36:23
  63:1
running 10:2,4
  10:7,20,23
  17:25 22:1
  31:4 35:6
  36:20 37:2,4,9
  37:15,18,22,22
  37:24,25 38:2
  38:25 43:20
  47:22 49:6,25
  65:23 66:12
  69:22 70:7,12
runoff 20:24
  21:4 55:21
  57:6 70:1
runs 52:16

_____

**S**

S 1:19 2:1 3:11
  79:13 81:8
Sandra 1:19
  79:13 81:8
saw 73:25
saying 19:9
  21:20 29:9
  32:7 34:16
  38:16 39:8
  42:2 43:18
  47:9,16,20
  50:18,18,19
  51:11,15,16
  52:8,10 53:4
  72:24 73:8
  75:19

says 21:19 30:20
  45:8 53:12,14
  53:16,16 56:2
  65:23
scroll 30:11
seat 37:10 49:5
  49:21 70:8
seats 49:5,18
Seattle 8:10
second 3:19 29:8
  30:24 36:19
  55:4,15 56:11
  57:10 60:5
  70:24 73:22
security 12:21
  13:1
see 6:20 14:17
  23:16,17 30:3
  30:12,14,15,17
  30:21 52:17
  55:22 56:9
  57:9,11 62:24
  67:11,18 70:24
  73:8 74:2,13
  74:14
seeing 11:13,13
  23:23,23
seen 6:2,3,17,17
  7:3 17:24
  74:21
senate 14:24
senators 14:24
sense 17:9 30:22
  45:9 49:2
  53:17 75:12
sent 5:10 70:20
  72:12 74:16
sentence 35:3,14
  36:3 44:12,14
  52:13
separate 31:2
September 25:9
  45:12,14
served 30:7
  79:22
session 48:3,5,10
  48:15,18,21

51:19
set 3:15 4:5 6:16
  21:14 36:18
  44:20 45:9
  73:18 74:22
  75:9,12
setting 37:8,8
  45:10,19 64:1
  64:20
sg-1984 81:9
she'd 37:4
short 35:3
shorthand 1:20
  79:13
shortly 10:9
  69:24
show 73:7 75:1
showing 32:12
shown 79:23
shows 25:9 30:7
  55:6,25 56:13
  57:10
sic 56:8
sign 64:25
signature 3:8
  77:1 78:8 80:1
  80:2,5
signed 32:1 35:5
significant 38:5
single 35:23
  37:23,24 39:14
sink 23:19
sir 71:6
sit 34:21
sitting 49:4,24
situation 41:20
  49:17
six 25:18
slow 11:21 17:3
  29:14
slurring 17:3
social 74:24
software 12:15
  12:16,16
sole 39:21
solely 42:13,15
some- 38:18

somebody 11:3
  11:23 38:11
  75:21
soon 31:3 32:3
  36:5 61:20
  62:5,6
sorry 17:5 29:16
  36:1 49:13
  55:10 59:20
  65:10 66:15
  73:24
sort 13:5 33:1,14
  50:22
sound 11:10
sounds 42:2
  57:14
spare 11:20
specific 45:10
specifically
  29:11 68:19
spend 11:22
  22:12 44:6
  68:24 69:1
spending 8:11
  23:12
spent 68:16
Spoke 5:7
Spring 6:6 7:14
  7:16,19 59:10
  59:18,20,20
stack 38:23
stacked 38:19
  38:20
stand 5:18
start 14:18 15:5
  15:22 38:18
  44:8,8 53:4
  66:12,13,18
  68:8 70:12
starting 9:4
  14:15
starts 52:17
state 1:20 10:1
  12:15 14:12
  50:19,20 51:17
  52:3 79:14
stated 30:25

Page 91

51:2
statement 39:19
  40:1 57:19
  67:22 71:19
statements 5:16
  5:16 39:22
STATES 1:1
  79:1
stayed 8:15
step 42:16
street 1:21 12:12
strikes 63:18
study 46:20
stuff 12:22
styled 1:17
submarine 8:9
  8:12
submitted 30:20
  32:10 56:8
  79:21
subsidiary
  12:13
substance 78:7
succinctly 29:22
Suite 2:5
supplement 7:6
  7:7
supplemental
  4:5 73:19,20
support 11:3
  23:21,23 27:14
  27:18 29:1,4
  32:13 35:19
  38:6,11 62:16
  63:14,16 64:25
  66:10,11 75:1
supported 28:4
  28:5,20 35:20
  38:3
supporters 66:9
  68:21,25 69:1
supporting
  58:17
supposed 31:10
Supreme 43:14
sure 7:1,8 10:11
  13:12 14:7,17

17:19,23 19:24
  20:7,15 22:25
  23:14 41:21
  43:13 52:5
  67:13 75:5,23
switch 19:18,22
  20:2
sworn 1:17 5:2
  79:16

—————
           T
—————
T 3:11
take 5:24 6:10
  6:13 13:21
  21:7 24:21
  46:2,10 47:7
  53:6 54:19
  55:17 57:3
  67:19 74:1
taken 1:17 80:16
  80:23
talk 48:7 69:1
talker 17:7
talking 12:22
  15:17 29:10
  75:10
taxes 35:21
taxpayers 35:24
Tech 12:6
technical 28:14
technically
  72:24
Techshare 12:13
tell 14:15 24:1,4
  24:6 26:5
  33:18 34:15
  39:8 41:21,24
  51:16 52:21
  60:2 73:17
  74:5
term 17:9 45:1
terminate 29:19
terms 45:21
  64:22 72:13
test 23:18
testified 5:2
testimony 79:18
  80:15

Texas 1:1,20,22
  2:5,10 6:6 7:14
  7:17 8:5 12:7
  12:11,15 14:25
  40:8 48:1,4,10
  59:8,8,10,20
  60:6 61:15
  79:1,14 81:4
text 62:20 71:3
texted 71:3
texts 71:4,18
thank 17:6
  24:13 53:18
  69:3 73:6
  75:21
therefor 80:6
thing 12:5 15:2
  27:8,10 42:13
  52:3
things 49:2
  65:18 68:25
think 8:13 14:8
  14:8 16:10,14
  16:15,21 17:14
  17:20 20:6,12
  21:19 26:7,8,9
  26:17,17,21,22
  26:22 27:1,23
  28:23,25 29:2
  29:6 32:19
  33:12,23 45:20
  45:24 50:21
  52:8 53:15,17
  53:17,19,21,21
  54:12,12 56:21
  56:24,25 57:10
  57:14 61:6,15
  61:20 62:8
  63:23 67:25
  68:5,12 70:21
  73:4,5,10,25
thinking 19:1
third 20:24
  44:12,14 55:24
  55:24 63:17
Thomas 10:24
  11:7

thought 33:20
  36:4 46:13,14
  46:20,20 67:23
thoughts 68:13
thousand 8:13
  59:14
threat 51:6,9
Three 63:18
throw 41:12
  43:17
till 35:16 38:22
time 8:11 9:18
  10:11,20 11:8
  11:17,20,23
  14:21 29:15
  33:25 35:5
  37:3,4 38:1
  46:21 49:12
  50:16 52:21
  55:14 56:19
  59:3 63:17
  80:10,15
timing 62:3
title 10:11
today 34:21
  58:11,12 62:24
today's 5:6
told 29:23 34:11
  71:22,22 72:3
top 25:10
touch 62:18
town 62:23,24
traction 38:5
Trail 81:4
transcript 79:17
  79:20 80:4,9
transcription
  78:5
transparency
  72:22
transparent
  73:9
Travis 12:16
  19:19,22 20:2
trees 15:9
trial 69:5 76:9
true 79:18

Trump 16:17
  17:14,25 19:8
truth 63:9
trying 15:10,23
  16:2 23:18
  29:12,20,20
  47:4 53:18
  74:25 75:17
  76:4,4
turn 56:11 57:9
  58:7 62:13,13
turned 54:13
tweets 74:17,25
two 7:23,23,24
  8:13 14:19,24
  21:3 49:18,22
  61:5 72:1
typo 68:4
tyranny 41:1

—————
           U
—————
U.S 16:12
Uh-huh 57:8
  65:19
unable 31:5 32:8
  33:24 34:6
  38:20 43:4
unclear 44:11
unconstitutio...
  33:21 38:21
  43:12
understand 6:5
  23:4,6,9 25:4,7
  25:21 33:2
  36:20,21,22,24
  38:15,24 47:25
  48:4,8,9 50:20
  51:15,16,17
  56:17 72:11
  75:9
understanding
  39:9 52:21
unfair 34:8 52:8
UNITED 1:1
  79:1
uphappy 76:2
Urban 12:8,11
Urgent 36:10

use 17:9 22:25
  36:17 45:1
  53:9,14

---

**V**

v 1:5 79:5
Valley 81:4
venues 68:23
verification
  30:20,24,25
  31:2,14 32:10
  32:12,15 69:9
verify 75:22
viable 23:15,17
  24:5 66:6
video 71:19
videos 71:23
  72:4
view 39:16
  40:22 49:15
  50:3
views 41:5 63:10
  63:10,13,15
Virden 1:3 3:23
  3:25 4:2,3,5
  9:20 11:7 13:3
  20:23 21:15
  22:2 23:4,9
  25:4 33:11
  35:6 44:4,4,15
  44:17 52:16,23
  52:24 56:7
  57:7 58:13
  62:19 64:2,17
  65:22 70:7
  71:10 72:25
  73:21 79:3
Virden's 6:25
  13:8 25:2
  35:19,20 54:22
  55:19 73:18
virtue 51:13
vision 35:19,20
voice 21:24,25
  28:10 29:17
  38:13 41:15
  43:9
volun- 65:7

volunteer 6:23
  10:5,14,16
  57:17 59:17
  64:19
volunteering
  65:6
vote 20:13,25
voted 20:5,8
voter 19:14,19
  20:3
votes 61:4
vying 19:10
  50:12

---

**W**

W 1:21
wait 9:7 15:13
  15:13,16,16
  26:7 35:9,9,16
  35:16,16 39:2
  42:20,23 43:24
  43:24 47:10
  48:6 52:2,2
  70:10,10 74:8
waited 26:6,7
waiting 36:7
  44:20
wane 59:4
want 7:4,9,11,12
  9:25 10:15
  14:6,6 16:18
  22:9,24 24:21
  25:15 26:24
  28:25 29:11
  31:8 34:23
  36:13 44:15,17
  44:23,24 48:7
  49:10,11 51:21
  51:22 52:16,23
  52:23 53:4
  59:2,5,6,7
  64:14 65:19
  66:19,22 67:12
  68:8 70:21
  72:13 73:8
  74:14 75:22
wanted 5:12
  10:14 11:2

27:8 28:13,13
  29:5 31:4 32:2
  32:5,7 34:3,3
  51:23 52:24
  72:17
wanting 11:12
wants 36:15
  75:24
Washington
  8:10
wasn't 11:15,22
  23:14 26:13,13
  27:20,21 31:6
  32:5 34:4,4
  36:16 37:1
  39:6 43:22
  70:11,11 71:13
waters 23:18
way 23:22 32:12
  33:25 34:1,7
  41:11 43:8
  57:23 59:16
  61:20,21 68:3
  73:3 76:5
we'll 6:20 7:10
  30:23 31:24
  67:17 69:4
  76:8
we're 8:17 37:24
  37:25 41:1
  45:13 72:20
wealthy 41:14
  43:6,11
weather 45:14
week 62:24 72:1
weeks 5:11
welcome 7:11
  69:10 74:13
went 8:5 70:25
weren't 20:11
  26:11
West 2:5
WESTERN 1:1
  79:1
wholly 37:17
wife 17:23,23
  71:7,8,10,13

William 1:11,15
  3:5,22 5:1,21
  77:2 78:3,13
  79:10,16,21
willing 29:1,3
  41:12 54:9
  63:19
win 38:9
window 44:7
  50:5 69:19,20
witness 1:16
  8:24 17:5,7
  24:12 25:13,20
  29:16 32:21,24
  65:14 66:17
  72:15 76:1
  79:16,19,23
women 60:15
Woodlands 7:15
  7:16
word 28:18
words 17:3
  33:21 35:23
  36:10 45:11
work 11:11,21
  13:3,4 57:16
  59:4,5,17
  64:19 65:2,5,8
worked 12:5
  68:12
working 65:7
worried 61:22
  61:24 62:14
wouldn't 45:20
  64:8
writes 12:14
written 33:24
  68:4
wrong 20:13
  27:3 39:9
  40:17 41:24
  47:16,18 51:16
  60:24 67:25

---

**X**

X 3:1,11

---

**Y**

y'all 33:18
yard 64:25
yeah 6:20,22 7:1
  7:13 8:3,20,21
  8:25 9:3 10:17
  11:17,18,20
  12:5 15:12
  16:20 17:8,15
  18:2 19:3 22:7
  25:24 32:2
  33:21 34:14
  35:15 38:4
  40:6,12 42:7
  42:12 44:17,19
  48:9 50:9
  51:25 52:5
  53:21,25 54:13
  55:1,3,8,8,23
  56:21,25,25
  57:1,12,14
  58:3 59:12
  60:16,18,22,22
  61:2,5,7 62:20
  62:23 63:7,22
  64:3 65:12
  66:17 67:7,8,9
  67:15 68:1
  70:16 71:13,16
  71:16,21,21
  72:15,21 73:14
  74:4 75:5,8
year 8:6,8 10:15
  25:9 45:7 48:5
  48:11,25 50:4
  51:4
year-around
  40:9,10
years 14:19
  48:16,16,16,17
  49:19,22
York 64:11

---

**Z**

---

**0**

---

**1**

1 3:13 5:22 6:22

| | | | |
|---|---|---|---|
| 7:25 80:12 | 3:17 | **303187** 2:10 | **78731** 2:10 |
| **1/15/21** 4:3 | **2020** 6:24 9:25 | **31** 3:21 | **78749** 81:4 |
| **1/31/24** 81:9 | 13:16 17:10 | **31st** 55:6 | **79** 3:9 |
| **1/4/21** 4:2 | 54:23 55:6,20 | **3rd** 30:8 | |
| **1:00** 71:1 | 55:25 57:11 | | **8** |
| **1:07** 1:19 76:10 | 59:1 61:16 | **4** | **8** 3:24 55:16,17 |
| **1:21-CV-271-...** | 64:15 70:8 | **4** 3:18 24:20,22 | 56:13 61:17 |
| 1:6 79:6 | **2021** 9:8,11 13:7 | 54:1 56:8 58:5 | **8th** 20:19 55:20 |
| **10** 4:3 9:17 10:4 | 13:10 20:5,6 | 73:24 74:2,10 | |
| 13:4 37:11 | 25:6 30:21 | **4,000** 58:25 | **9** |
| 54:25 55:22 | 54:7 56:8,13 | 64:15 | **9** 4:1 56:5,6 |
| 57:2,3,7 61:17 | 57:6 65:25 | **400** 54:3,15 | **9/21/22** 25:10 |
| 61:17 70:7 | 69:24,25 70:1 | 55:25 56:14 | **90s** 8:24 |
| 73:22 74:2 | **2022** 1:12,18 | 65:24 71:11 | **917-6115** 2:13 |
| **10/7/20** 3:23 | 26:4 30:8 56:9 | **404-4696** 2:6 | **97** 8:2,25 |
| **11** 4:4 73:15,17 | 65:23 71:9,15 | **432.30** 80:7 | |
| **11:33** 1:18 | 77:3 79:11,24 | **450** 54:13 | |
| **11:54** 24:18 | 81:2 | **480-8231** 2:11 | |
| **12/8/20** 3:25 | **2024** 18:14,20 | **4th** 1:21 | |
| **12:00** 24:19 | 19:2 | | |
| **12:55** 70:25 | **20th** 71:9,10 | **5** | |
| **13** 80:12 | **21** 3:17 | **5** 3:6,13,20 30:1 | |
| **15** 5:9 57:6 | **2180** 2:5 | 30:3 79:23 | |
| **16** 74:11 | **23** 57:10 | **50** 56:18,24 | |
| **18** 20:24 | **24** 3:18 18:1 | **5000** 81:8 | |
| **1997** 7:25 8:4 | **255** 2:5 | **512** 2:11,13 81:5 | |
| | **27** 58:7 | **54** 3:23 | |
| **2** | **28** 1:12 77:3 | **55** 3:24 | |
| **2** 3:3,15 6:9,13 | 79:11 | **56** 4:1 | |
| 7:3 34:25 | **281** 2:6 | **57** 4:3 | |
| 39:23,24 57:25 | **28122** 6:6 | **5th** 55:25 81:1 | |
| **2,000** 57:11 | **28th** 1:18 | | |
| **20** 5:9 | **2nd** 1:21 61:11 | **6** | |
| **200** 55:7 | | **6** 3:15,21 31:18 | |
| **200,000** 59:15 | **3** | 31:20 34:23 | |
| **2002** 8:5 | **3** 3:4,17 21:6,8 | 44:13 52:12 | |
| **2004** 8:10 | 35:13 44:12 | 69:9 80:12 | |
| **2006** 8:11,13 | 69:19 | **65** 3:6 | |
| **2008** 8:14,15 | **3/30/21** 3:22 | **6549** 81:4 | |
| **2014** 8:1,15,17 | **30** 3:20 30:21 | **69** 3:7 | |
| 8:17 9:4 13:7 | 80:3 | | |
| 13:10 14:15,17 | **30(f)(1)** 80:1 | **7** | |
| 16:10 | **300** 41:16 | **7** 3:23 54:18,20 | |
| **2016** 14:18 | **300,000** 22:11 | 54:23 | |
| 15:23 16:11,16 | 23:10,19 43:16 | **73** 4:4 | |
| 16:21 | 44:2,3 | **77** 3:8 | |
| **2017** 21:12 | **301** 1:21 | **77018** 2:5 | |
| **20171005-029** | **301-7088** 81:5 | **78701** 1:22 | |